John Doe V. US & Does 1- 20, Case No. TBD, Filed 2/18.22, Complaint,  Page 1 of  1660

**Name: John Doe (AKA , Name provided on internal court documents)**
**Address: 210 S. Ellsworth Ave, #1275**
**San Mateo, CA 94401**
**Phone Number: 510-868-2862**
**E-mail Address: justice@majestic111.com**
*Pro Se – A federal witness*

FILED

FEB 22 2022

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA





# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

CV22          1107

| | | |
|---|---|---|
| **JOHN DOE, a Pro Se non-lawyer citizen** | § | |
| **PLAINTIFF** | § | |
| | § | |
| **V.** | § | **Case No.** |
| | § | **MULTIPLE CAUSES OF ACTION** |
| **UNITED STATES OF AMERICA** | § | |
| **and DOES 1 through 20** | § | **JURY TRIAL DEMANDED** |
| **DEFENDANTS** | § | |
| | § | |
| **Filed:** | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |

---

### COMPLAINT
### JURY TRIAL DEMANDED
### EXHIBITS ATTACHED IN ELECTRONIC FILING

---

## STATEMENT OF FACTS

Plaintiff, AKA 'John Doe', a pro se, natural citizen whistle-blower brings this complaint on his own

against the UNITED STATES OF AMERICA **and DOES 1 through 20** requesting relief under the

United States Constitution, the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2672 and

related jurisdictions and applicable rights.


Plaintiff has pleaded with the Court for: (A) A "JOHN DOE' filing status; (B) A judge or magistrate

who holds no stock ownership, or personal relationships, in Valic/AIG or the Silicon Valley Cartel

companies; (C ) The appointment of Counsel by the Court; (D) Fee Waivers; (E) the right to EFILE. (F)

a Court-ordered demand to the FBI to provide the 'FBI 302' reports on each of the named attackers,

listed below and (G) damages as specified.


As hundreds of investigations, (from Durham, to FBI, To SEC, To Congress, To Propublica, et al) have

now revealed: Standard operating procedure for government officials involves the hiring of spy

agency operatives to attack competing, or whistle-blowing, citizens with spy agency tools and 'dirty

tricks' tactics. These United States Government politicians exchange payola, bribery and other

compensation in these schemes via stock market securities and rigged insider trading. Investment

banker husbands often stage their spouses to be 'Senators' or other political high-end functionaries and

then get them to make laws that benefit their investment bank ownerships.

While Plaintiffs damages amount may seem to be a large amount to the naive and unaware, the Defendants make that amount every day EACH FEW HOURS, from corruption-based gains.

Much of that profit was made off the work of Plaintiff by copying his patents, trade secrets, business models, start-up companies and innovations, which Plaintiff deployed years before any of the Defendants, and by engaging in Racketeering, RICO violations, bribery, monopolies and ant-competitive and reprisal attacks to prevent Plaintiff from competing and from whistle-blowing.

Many billions of dollars of illicit 'unjust gains' have been transacted this way by Defendants. Plaintiff is suing the United States Government because that body: financed, operated, provided the tools for, staffed, manipulated policy for, created unique exclusions for the Defendants of, ignored police reports about, and otherwise, operated command and control of the attacks, anti-competitive actions, IP violations and harms to Plaintiff which Plaintiff shall prove in this trial with first-hand knowledge and internal eye-witness testimony already filed with federal law enforcement, Congress and regulatory agencies. Plaintiff reported information to Federal law enforcement and Congressional committees which, if properly acted upon by authorities, would have removed a seated President and Vice President from office. The President and the Vice President steer trillions of dollars to political campaign financiers, particularly those in Silicon Valley. This was the reason Defendants used such extreme spy tactics, opposition research attacks and Fusion GPS/Black Cube-type 'hit-jobs' on Plaintiff, using government resources.

Plaintiff has been a multi-decade resident of San Francisco since he moved there to continue his education in criminology and media documentation via local universities. Plaintiff's superlative law

enforcement and state licensing credentials go back to this period. His residences at 20th Street, Vallejo Street, Green Street and Chenery Street were visited by, and cohabited, with "famous" political figures. Plaintiff is featured is 'hug' photos and videos with the most senior White House insiders. The daughter of a Mayor of San Francisco and a Bay Area Senator stayed overnight at the residence, often, and partied and enjoyed the backyard hot-tub. The senior staff member of Nancy Pelosi dated Plaintiff. Plaintiff lived in the home of Dianne Feinstein's office coordinator.

Major City Hall figures kept dating Plaintiff and revealing all of the inside dirt to Plaintiff because they wanted Plaintiff to run for office. Regional Congressional officials, Judges and Magistrates, agency officials and other public officials have attempted to stall, delay or obfuscate this filing because they hold stock market securities ( through which bribes are paid ) and other financial, political and personal interests in the Defendants companies. This fact is easily confirmed, by any party, via a simple forensic database cross-comparison analysis between the FINCEN, DOJ, XKEYSCORE, FBI, INTERPOL, ICIJ, SEC and GAO financial crimes databases. Federal law enforcement criminal referrals have been, and will be, filed for each person confirmed to be so doing.

High-level City Hall family members helped Plaintiff, with support from the regional Universities, produce a 10 segment documentary film series called: "*City Circus – The Insiders*", which featured everyone from Melvin Belli, to James Bronkema to George Moscone revealing, on camera, how payola corruption works from SFO to DC. Plaintiff has received multiple Mayoral, White House and State proclamations and written commendations and has been awarded, by the United States federal government, many seminal patents as First *Inventor-Of-Record* of the core technologies and business

models which support over 50% of Silicon Valley 'Big Tech' . It is well proven that Plaintiff had

'superior knowledge' of political corruption in San Francisco and has so testified regarding ongoing,

active, investigation matters to the FBI, DOJ, FinCen, Interpol, EU, GAO, IG, AG, SEC, FTC,

Congressional Ethics teams, the Durham investigations and other high-level law enforcement and

regulatory officials.

## *Causes of action herein appear to include:*

**- Conduct, Conspiracy And Participation In An Organized RICO Tech Cartel '*Enterprise*'**

**Through A Pattern of Racketeering Activity: 18 U.S.C. §§ 1961(5), 1962(c),  18 U.S.C. §§ 1961(5),**

**1962(d) 773.**

**- Breach Of Contract**

**- Abuse Of Process**

**- FTCA Violations**

**- Account Stated**

**- Breach Of Contract**

**- Conversion**

**- Defamation**

**- Fraudulent Misrepresentation**

**- Fraudulent Concealment**

**- Injurious Falsehood**

**- Product Disparagement And Trade Libel**

**- Civil Rights Violations And Violations Of The U.S. Constitution**

**- Misappropriation Of Trade Secrets**

**- Prima Facie Tort**

**- Quantum Meruit**

**-  Tortious Interference Including A.) Tortious Interference With An Existing Contract, B.)**
**Tortious Interference With Prospective, C.) Tortious Interference With Business Relations**
**Contractual Relations**

**- Patent Infringement**

**- Personal Injury**

**- Unjust Enrichment**

**- Conspiracy To Monopolize**

**- Anti-Trust Law Violations**

**- Labor Law Violations And Other Causes.**

**- Failure To Timely Pay Witness Fees, Informant Fees and Whistle-Blower Awards**

Also related are: SFPD Case # **150528148**  ( **-** Company E (Northern District) Per Officer Liu – Badge
# 4742 ) is relevant. Police incident report # **25119268** is relevant. OSC Case File No. **MA-19-002006**
is relevant. OSC Case File **DI-15-4541** is relevant. California Victim Compensation & Government
Claims Board Claim # **G628261** is relevant. Also relevant are: Case No. **1:20-cv-03010** ( Google

monopoly and competitor attacks case); Case No. **11-CV-2509** (

https://www.cand.uscourts.gov/judges/koh-lucy-h-lhk/in-re-high-tech-employee-antitrust-litigation/ );

Task force Case No. **20-xyz2020a** ( http://www.case-xyz2020a.com/ ); Case No. **20-03664** (

https://www.insurancejournal.com/app/uploads/2020/06/brown-v-google.pdf ); Case No. 1:12-CV-

00774-mms and related cases. ( https://thehill.com/blogs/congress-blog/the-administration/250109-a-

case-study-in-pay-to-play-cronyism. Criminal referrals against the attackers have been filed with the

FBI, DOJ, SEC, FEC, FTC ); Case No. **18-cv-8865** (S.D.N.Y.)(SEC v. Elon Musk for lies and scams );

Case No. **18-cv-8947** (S.D.N.Y.)( SEC v. Tesla, Inc. for lies and scams ); Case No. **1:14-cv-270143**

( Google racketeering charges - https://artistrightswatch.com/2017/10/08/googles-racketeering-

challenge/ ); Case No. **1:19-cr-00490** ( United States v. Epstein - Big tech sex cult crimes case ); Case

No. **129 So.3d 119**6 (Fla. 2d DCA 2014); 170 So.3d 125 (Fla. 2d DCA 2015) ( Gawker Media, LLC v.

Bollea in which Gawker, Deadspin, Gizmodo, Jalopnik, Jezebel, Kotaku and Lifehacker were exposed

as character assassination and money-laundering fronts working for notorious third parties); Case No.

**19-cv-343672** James Martin (on behalf of ALPHABET INC) v Larry Page et al (Sex Cults In Silicon

Valley ); Case No. **CGC-11-508414**, California Superior Court, San Francisco (Plaintiff v Google );

Case No. **3:16-cv-03061** U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, San

Francisco Division ( Plaintiff V. Google/Alphabet/YouTube); Case No. **18-CIV05380** Rubin Vs. Rubin

(Google sex cult and sex slave charges ); Case No. : **1:17 - cv - 06404**  Vs. Rubin (Organized crime sex

trafficking stock market manipulators ); Case No. D.C. No. **3:17-cv-05369 -**  VC (Big tech harassment

of outsiders);Case No. **3:21-cv-00077**  (Another of many lawsuits proving that the Silicon Valley Cartel

conspires to manipulate media and markets) and the SFPD Roger Boas case records.

Plaintiff provided tips which resulted in the FBI raid of Solyndra and is a major promoter of the U.S.

JOBS ACT and the Congressional STOCK ACT. Plaintiff was encouraged to run for Mayor of San

Francisco as part of a multi-agency anti-corruption taskforce effort to beak up an organized corruption

"*Enterprise*" which had permeated City government and was based around an ongoing and massive

sex-trafficking operation for San Francisco "elites". The successful effort indicted one City Hall

executive, who ran a City Hall brothel for public officials, detailed in police reports and arrest records,

and indicted another for abuse of his daughter and corruption. FBI staff have referred to San Francisco

as "*one of the most corrupt cities in America*", San Francisco's local anti-corruption lawyer: Harmeet

Dhillon is constantly on national TV disclosing epic corruption in San Francisco. Renown anti-

corruption reporters: Tim Redmond, Phil Matier and Andy Ross have found that they have so many

corruption and bribery stories to report on that they can barely catch their breath. Senior San Francisco

FBI agent Peter D. Cair, known as "*The Elliot Ness of San Francisco*" has been plowing through

corruption at Netflix, and other bay area political financiers and business partners of White House

senior executives and Congress members, with arrest after arrest. The Daily Mail global news outlet,

with one of the largest news readerships in the world, reports on San Francisco corruption almost daily.

The endless, ongoing, tsunami of corruption arrests of San Francisco political figures validates the

assertion of endemic organized corruption and quid pro quo being the soul of government operations

between SFO and Washington, DC. Plaintiff finds it sad that, these days, the name of his friend:

*George Moscone* is not as well known nationally as "*Shrimp Boy*".

Some major public officials, and their family members, invited Plaintiff to join the corrupt enterprise

wherein, to this day, Defendants employ a layered and tentacular stock market covert bribery scheme to

funnel payola through securities transactions. Plaintiff did not comply with Defendants enterprise

participation request but did provide information to federal law enforcement. Major regional law firms and former regional and Washington, DC law enforcement officials held these corrupt stocks and participated in 'unjust gains based on criminal corruption' according to the U.S. Treasury. Law firms Latham Watkins, Perkins Coie and Wilson Sonsini are now under federal and international investigation for corruption, spying and other manipulations via Durham, FBI, FinCEn, FTC and other entities. This clearly shows that nearly every law firm related to this effort has been compromised with conflicts of interest, making it impossible for Plaintiff to acquire qualified legal representation.

Plaintiff is, **BOTH**, a litigant against the United States and a provider of law enforcement specialty services TO The United States and Congress, at the same time.

*To be clear: Public officials including Mayors, Members of Congress, White House Executives and agency bosses own and operate Plaintiff's competitors, de-funded Plaintiff in political and anti-competitive reprisal and hired political dirty tricks operatives (as exposed in the Durham and ICIJ reports) to run 'hit-jobs' against plaintiff as detailed in the evidence attached! Government officials decided to help themselves instead of helping the citizens that hired them!*

Other major public officials, and their family members, revealed the operations of the enterprise and told Plaintiff: *"My Mom can have her people get into any HUD, SSA, DOE, or other government database and cut off all the funding and benefits for any person that she does not like and nobody can trace those moves…"*. ***In fact the government officials did just that*** in reprisal for Plaintiff's assistance to law enforcement. Government officials used tricks and manipulations as described in Ronan

Farrow's popular book: ***Catch And Kill***, to open, hack, manipulate, change, alter, delay and affect Plaintiff's SSA, HUD and DOE funding in an effort to *"...totally 'kill him'. Cut off every possible source of funding he can get. Wipe him off the planet by destroying all of his cash options…"* , per one party who is a family member of a famous politician. This was done in reprisal because of Plaintiff's whistle-blowing and law enforcement efforts and because the U.S. Patent office had stated that Plaintiff had invented, and was first to operate in commerce as the technology operating Facebook, YouTube, Google/Alphabet, Tesla: The very companies covertly, anti-trust violation, owned by the public figures in question and the very companies that pay for those public figures political campaigns are also the very companies charged with corruption by FTC, SEC, FEC, DOJ, etc. That would seem to be a vast violation of the RICO Laws. The Inspector General and the Courts have documented thousands of such cases where public officials used government resources, and spy agencies, for reprisal attacks on citizens who told the truth about crime.

Plaintiff, and his peers, filed lawsuits against the ex-spy agency hired attack services (some of whom were charged when DEA found 4+ tons of cocaine on their airplanes), The U.S. Government and The Department of Energy. Plaintiff won his remand case, proving that his funding was cut off by crony government officials infected by corruption, he got the AG and the Secretary of Energy fired for corruption and cronyism and created new anti-corruption legal precedents.

Whereas White House executives, U.S. Senators, and Government agency executives colluded with Silicon Valley oligarchs, operating, together, as an "*Enterprise*", to coordinate insider stock market '*Stimulus Scams*' that involved funding blockades, blacklists, contracted tabloid media assassinations and RICO Racketeering law violations, Anti-trust law violations, IP law violations, lobbying law violations and various civil and criminal acts that harmed domestic citizens and Democracy. This case

matter is well known to Courts, media, federal law enforcement and in nearly a million news articles. It is not possible for this Judge, who knows many of the participants in this case, to not have seen the conflict of interest herein, at first blush.

A simple cross-comparison of the ICIJ, FINCEN, Interpol, SEC, GAO forensic accounting and XKEYSCORE, et al, databases proves the illicit financial interactions between Defendants. Such a check can be technically accomplished within 60 minutes, or less, according to federal IT experts. For example: Almost every single investor of Elon Musk is also the primary financier and beneficiary of the politicians, and their Congressional shenanigans, that used taxpayer money and resources to give Musk's companies all that free money. For example, Dianne Feinstein's family run the HR service (Herb Newman), the construction company, the railroads, the building leases (CBRE), the China funds (Mart Bailey, Steve Westly, Steve Spinner, et al) and swap staff members for Tesla and Solyndra. Feinstein and Pelosi blocked funding for all Tesla competitors for the same State and Federal cash and tax waivers and for the NUMMI factory. The government politicians, personally, made billions off insider trading, pump-and-dumps and payola. Have you ever wondered how Congress could have FIVE YEARS of a huge number of hearings about Facebook's, Google's, Tesla's and Alphabet's crimes against society, tax evasions, money-laundering and other evils… and YET..NEVER BE ABLE TO ENACT ANY REGULATIONS ON THOSE COMPANIES!!??

It is because half of Congress owns, and gets paid by Facebook's, Google's, Tesla's and Alphabet's crimes against society… See how that works? Parents are still sickened by the horrific things that Big Tech does to our kids We can thank our Senators that own those tech companies and do their bidding like obedient little dogs!

Felonies? You Bet!

Plaintiff lived with, worked with and was invited into their crimes by these official representatives of the United States Government. Defendants used the United States Government, The White House and various government agencies to engage in their crimes and to harm Plaintiff in reprisal for whistle-blowing and for competing with them. The United States Patent Office has issued thousands of pages of validated research proving that Plaintiff was the first to invent, found and operate the very business technologies and business models that were copied and now owned by United States Government officials including those senior members of Congress, The White House and various agencies. Plaintiff is a key promoter of THE STOCK ACT, in Congress, which is a law seeking to cut off all politicians and government employees, and their families, from owning any stock, because that is how all modern bribes have been paid, and were paid, in this case.

### BACKGROUND

- This is an action by the above-captioned Plaintiff, John Doe, against Defendant UNITED STATES ("GOVN" or Defendant") and though its Attorney General (the "District") for tortious acts which violated the Federal Torts Claim Act ("FTCA"), 28 USC § 2679.

- In short, and as described more fully below, GOVN, violated the Federal Tort Claim Act. (FTCA).

- The Federal Tort Claims Act is the federal legislation that allows parties claiming to have been injured by negligent actions of employees of the United States to file claims against the federal government. The Act also provides authority for the federal government to defend against such claims. In 1988 and again in 1990, Congress extended the Federal Tort Claims Act to negligent acts of Tribal contractors conducting contracts, grants, or

cooperative agreements pursuant to Public Law 93–638, the Indian Self-Determination and Education Assistance Act [25 U.S.C. 450f (d) and 25 U.S.C. 458aaa–15].

- Accordingly, the PLAINTIFF seeks to recover civil remedies, interest, costs, fees, and all other relief provided by law for the DEFENDANT'S past and ongoing violations.


**JURISDICTION AND VENUE**

- Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as Plaintiff's claims arise under the Constitution and laws of the United States. This Court has jurisdiction to grant relief in this action pursuant to 28 U.S.C. § 1346(b), as Plaintiff brings claims under the Federal Tort Claims Act

- This case presents a federal matter within this Court's jurisdiction under Article III of the United States Constitution, 28 U.S.C. § 1331, and the Administrative Procedure Act, 5 U.S.C. § 702, and under other related law acts and precedents.

- This Court has authority to grant declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., and to award damages, costs, and attorneys' fees under 28 U.S.C. § 2412, and under other related acts and precedents. Plaintiff has worked in Washington, DC. He has had his past multiple government lawsuits venue found to be in Washington, DC and all of the Plaintiff's are located in Washington, DC or have major offices and Congressional interaction in Washington, DC.

- Venue is proper in this district under 28 U.S.C. § 1391(e), and under other related acts and precedents. The venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because a substantial part of the acts or omissions that give rise to the Plaintiffs' claim occurred or

will occur in the District of Columbia. Federal courts are courts of limited jurisdiction (limited power). Under 28 U.S.C. § 1332.

- Plaintiff timely filed administrative complaint with multiple complaints, on a weekly basis, for the last six months, updated weekly as federal and news investigators supply new evidence of harms and crimes to Plaintiff. Plaintiff has filed multiple federal STANDARD FORM 95 Complaints on a regular basis and has filed regularly updated 1000+ page complaints as attached to this complaint. Plaintiff has had a 24 hour, around the clock online data service operated FOR the FBI, The DOJ, The FTC, The SEC and Congressional Investigators so that each of those parties can receive evidence updates on an immediate basis and those agency IP Addresses, IMEI Codes and Domains have regularly visited the site, proving that had complaint knowledge. Additionally, every day, including today, informants, whistle-blowers, investigators and others provide new and confirming data. Additionally, at least 60% of the reprisal attacks listed in the attached evidence are ongoing, as recently as the day of this filing, a fact proving that there has been no exclusion by any statute of limitations. Additionally, Plaintiff has had daily and/or weekly communication, so stating the reasons for his complaint to over 200 senior government officials including:

- Sarah Winslow – Organized Crime, US-DOJ
  Stephanie Hinds - Organized Crime, US-DOJ
  Merrick Garland – US DOJ AG
  ADRWeb@usdoj.gov - Antitrust Foia Web Mailbox (ATR)
- Antitrust Foia Web Mailbox (ATR) - Antitrust.Foia@usdoj.gov
- Antitrust.complaints - antitrust.complaints@usdoj.gov
- Askcrs - askcrs@usdoj.gov
- AskDOJ - AskDOJ@usdoj.gov
- ATR-Antitrust - Internet (ATR) - antitrust.atr@usdoj.gov
- Display Name: ATR-NCRPAnotifications (ATR) - ATR.NCRPAnotifications@usdoj.gov

- Colthurst, Tom (USACAN) -Tom.Colthurst@usdoj.gov
- Devin.omalley - devin.omalley@usdoj.gov
- Dintzer, Kenneth (CIV) - Kenneth.Dintzer@usdoj.gov
- Elder.justice -  elder.justice@usdoj.gov
- Foster, Wayne (ATR) - PMWayne.Foster@USDOJ.gov
- Hoffman, Hallie (USACAN) - Hallie.Hoffman@usdoj.gov
- ITVERP -  ITVERP@usdoj.gov
- kathy.hsu - kathy.hsu@usdoj.gov
- Lo, Michelle (USACAN) - michelle.lo@usdoj.gov
- MRUFOIA Requests - MRUFOIA.Requests@usdoj.gov
- Pamela.Johann - Pamela.Johann@usdoj.gov
- Ravi.narayan  - ravi.narayan@usdoj.gov
- Santiago, Olga (OJP) - Olga.Santiago@usdoj.gov
- Schoenberger, Carina (USANYN) - Carina.Schoenberger@usdoj.gov
- Sharanya.Mohan - Sharanya.Mohan@usdoj.gov
- USAEO-VictimOmbudsman - USAEO-VictimOmbudsman
- USAFLN.Corruption - USAFLN.Corruption@usdoj.gov
- USAWVS.Corruption - USAWVS.Corruption@usdoj.gov
- USTWeb - ustrustee.program@usdoj.gov
- Wawrzyniak, Katherine (USACAN) - Katherine.Wawrzyniak@usdoj.gov
- Wendy.garbers - wendy.garbers@usdoj.gov
- Winslow, Sara (USACAN) - Sara.Winslow@usdoj.gov
- 
- Plaintiff has met with the FBI on numerous occasions but was told: "..we take years to investigate anything involving big shots in Washington, DC.." to "We can't comment on an active investigation (which means that there IS an active investigation)..."related to

- By letters and emails dated across the course of the last year, the DEFENDANT denied Plaintiff's administrative claim. In the denial notification, GOVT. advised Plaintiff that if Plaintiff disagreed with the denial, Plaintiff had the right to file suit in federal district court "no later than six months after the date

- This instant suit is timely filed under the FTCA, 28 U.S.C. § 2401(b), as it is being filed within six months of the date of the mailing of the denial of the administrative claim. Federal courts are courts of limited jurisdiction (limited power). Under 28 U.S.C. § 1332, federal courts may hear cases in which a citizen of one State sues a citizen of another State

or nation and the amount at stake is more than $75,000. In that kind of case, called

diversity of citizenship case, no defendant may be a citizen of the same State as any

Plaintiff,

- **JUDICIAL CONFLICT OF INTEREST NOTICE**

- Be it hereby known that any Judge, Magistrate or Court officer who owns, or has family

  who owns, stock market securities in VALIC/AIG, Tesla Motors, Facebook, SpaceX,

  Google, Alphabet, YouTube, Netflix, Linkedin or NASDAQ 'FANG' stocks shall be

  disqualified from this case per FINCEN, FTC, DOJ and case investigations and the

  financial and political conflicts of interest in those pending Defendants and their RICO law

  and Anti-Trust law violating schemes.


**JURY DEMAND**

- Plaintiff demands a jury trial.

**PARTIES**

- The Plaintiff is 'John Doe'. John Doe is a natural person and has a right to bright this suit.

  Plaintiff is a resident of California. Plaintiff is located at the address in his PACER account.

- Defendant is the U.S. Government ("GOVT"), a government body. PLAINTIFF has

  reported to, and interacted with, said entity via its agencies: DOE, DOJ, FBI, SEC, FTC,

  OPM, GAO, FEC, FERC, HUD, SSA, The White House, and related agencies, and DOES

  1 through 20 and those parties participated in cover-ups, attacks, reprisals, and other

  activities that caused harm to the PLAINTIFF.

**I. STATEMENT OF FACTS**

- PLAINTIFF is a Congressionally awarded, White House commended, USPTO patent awarded, federally financed government employee/contractor innovative energy technology producer and program director and a criminal case whistle-blower.

- PLAINTIFF was attacked, in reprisal for his whistle-blowing and his assistance to law enforcement, with spy-agency type 'dirty tricks' attacks, sponsored by public officials who were employees and contractors of DEFENDANT. DEFENDANT spent over $30 million dollars in fees and services contracting and executing attacks on Plaintiff, as proven by bank records, hacker leaks, other Court records and investigation documents. Plaintiff has been attacked multiple times, manners listed in the attached exhibits, and threatened with death. Over 40 related parties in this case died in suspicious manners (**See Exhibits)**.

- PLAINTIFF has been associated with a global auto production group and a global power plant development group.

- PLAINTIFF has obtained a GOVERNMENT ("GOVT") award grant from the United States Congress, under the Iraq War Bill, has received commendations from the Congress and from the federal government's various premier high technology research organizations.

- PLAINTIFF has been associated with the White House and government agency projects, in technology development and law enforcement investigation, since 1978.

- PLAINTIFF is a disabled, senior who is on a fix income from social security which validates the reason for him to receive all fee waivers and expediting in this case matter.

- PLAINTIFF has been a victim of disabling attacks, media hit-jobs, and defunding reprisals were launched against PLAINTIFF by DEFENDANT, who were both government

employees and contractors AND owners of PLAINTIFF's competitors AND, stock market
profiteering beneficiaries.

- The PLAINTIFF has been subjected to the malicious attacks of the operator, black-lists,
and reprisal defunding attacks on PLAINTIFF.

- The PLAINTIFF has been victimized based on a vendetta for reporting crimes that resulted
in indictments, arrests, and terminations of DEFENDANT and their associates.

- This can be considered as an action of an "Enterprise," a RICO law violating, anti-trust law
which is done in the violating scheme to steal stimulus funds that continue to this day.

- DEFENDANT is the U.S. Government ("GOVT"), a government body. PLAINTIFF has
reported to, and interacted with, said entity through various agencies such as the DOE,
DOJ, FBI, SEC, FTC, OPM, GAO, FEC, FERC, HUD, SSA. The White House and related
agencies, all have and participated in cover-ups, attacks, reprisals, defunding, defamation,
RICO violations, and related crimes and abuses.

- Pursuant to §136 of the Energy Independence and Security Act of 2007, 42 U.S.C. § 17013,
the U.S. Department of Energy ("GOVT") administers the Advanced Technology Vehicle
Manufacturing (ATVM) loan program to support the manufacture of advanced technology
vehicles and components in the United States. In 2008, Congress authorized the GOVT to
make $25 billion in ATVM loans. GOVT currently has over $16 billion of unused lending
authority. Congress-people, GOVT agency executives and their Silicon Valley financiers
invested in stock ownerships of the upside collateral profits from the manipulation of the
Department of Energy and foreign mining benefits from Iraq, Afghanistan, and other
foreign mining regions.

- The public officials operated a profiteering swindle based on the exploitation of stocks from government policy financed energy and mining deals and they operated this scheme in violation of RICO, anti-trust, civil rights, and other law violations. The perpetrators 'before' and 'after' stock market account records and leaked private emails and phone calls prove this. DOJ, FTC, and SEC are strongly encouraged to expand their criminal investigation into short selling by hedge funds and research firms benefiting politicians as bribery payola. Federal law enforcement must more deeply scrutinize the symbiotic covert relationships between Senators and tech companies and hunt for signs that improperly coordinated trades broke laws to create profiteering schemes for corrupt U.S. Senators.ie: https://www.businessinsider.com/conflicted-congress-key-findings-stock-act-financesinvesting-2021-12

- The federal probes have revealed significant and pertinent information. Currently, the federal probe ran by the DOJ fraud section with federal prosecutors in Los Angeles. They are digging into how hedge funds tap into research and set up their bets, especially in the run-up to the publication of reports that move stocks. For example, in the "Fake McKinsey White Papers" created by Kleiner Perkins, Draper Fisher, Greylock, et al is a classic example. These publications were used to manipulate energy markets for Tesla, batteries, solar and etc.

- McKinsey produced and released hundreds of biased reports for the Obama financiers to push "Cleantech" and lithium-ion batteries which Obama's financiers exclusively owned.

McKinney's founder is quoted as promoting "monopolies" and "competitor destruction via lies."

- "While one is prying into financial relationships between hedge funds and researchers, and hunting for signs that money managers sought to engineer startling stock drops or engaged in other abuses, such as insider trading, the California politicians must not be ignored, protected, or given a pass because they are friends with some DOJ officials or because it is "politically embarrassing" for certain elitists social lives…"

- PLAINTIFF has sworn, warranted, and certified that these West Coast politicians are engaging in felony organized crime using the stock market to receive bribes from companies that they favor, and, or own.

- Tellingly, in this inquiry's sweep means federal investigators are examining trading in at least several dozen stocks, including well-known short targets such as Luckin Coffee Inc., Banc of California Inc., Mallinckrodt Plc and GSX Techedu Inc.

- All reporters are watching to see if they hear that any federal investigators are ignoring the SpaceX, Tesla, Netflix, Google, Instagram, Facebook, etc. stock market payola to politicians because there will be hell to pay.

- Peter D. Cair is referred to as the FBI's "Elliot Ness" in San Francisco. He busted one of the early NETFLIX stock swindles. More recently, Other Netflix engineers were caught in stock frauds. Plaintiff has asked why did the investigations not, though, go all the way up to Obama and Susan Rice and their Netflix "trades"?

- The federal investigators must scrutinize over one hundred tech firms WITH the help of unbiased SEC and FTC investigators and those investigations are underway.

- Toronto-based Anson Funds and anonymous researcher Marcus Aurelius Value are among the firms involved in the inquiry.

- Other prominent firms that circulated research on stocks under scrutiny include Carson Block's Muddy Waters Capital and Andrew Left's Citron Research. The investigations, though, **MUST** look at the deeply compromised McKinsey Consulting, which the Silicon Valley oligarchs lobby the feds to avoid looking.

- The U.S. probe finally opens yet another front in an already treacherous era for those who try to profit on stock drops. Some bearish funds gave up as government stimulus buoyed prices during the pandemic. That pressure intensified as retail investors organized counterattacks on popular short targets, bidding up shares to inflict losses on hedge funds, this year. By late January, Citron vowed to give up short-selling research and focus on long bets.

- Meanwhile, companies criticized by short-sellers have become increasingly bold in firing back, sometimes launching legal battles even as they face government probes that support short-sellers such as theses. Several corporate executives have been hoping U.S. authorities might help to further shift the focus to investors' tactics. Some examples of companies in which there are government probes are Eric Schmidt, Larry Page, Elon Musk, Mark Zuckerberg, Steve Jurvetson, Goguen, et al.

- Government attorneys are trying to determine whether short-sellers engaged in some form of deception -- say, by misleading the public about their financing of independent research, violating confidentiality agreements with authors, or orchestrating stock plunges to panic

shareholders and exacerbate selling. The reality is that THEY DID and West Coast politicians' profit from those crimes as payola.

- DOJ has a database to look at every cent that moved in and out of various accounts of members of Congress. Nancy Pelosi's has over twenty-two and more family trusts, bank accounts, and investment bank funds for the last 20 years. The evidence is overt and tracks straight back to the "Enterprise," but it is DEEPLY covered up by those who are friends with Pelosi at DOJ and other agencies. These crimes have been covered up. These blatant acts are in themselves a felony. If it were the average person, criminal charges would have been filed. Not in this case, instead, these criminal acts are swept under the rug. There is no harm or damage to these parties only that the parties are getting richer without the public knowing what really is going on behind the silent curtain.

- Hedge funds are known to strike a wide variety of deals with researchers, sometimes paying handsome subscription fees for fresh insights into possible corporate trouble, or even becoming an author's primary source of funding. In one example, prominent financial investigator Harry Markopolos, who normally makes money from whistle-blower awards, said he partnered with a hedge fund to share profits when he released a report on General Electric Co. Politicians get the profits from such deals in exchange for keeping competitors to Tesla and SpaceX from getting funded.

- Some hedge funds have been known to suggest targets to researchers, who then deliver scathing reports that harm companies that Senators own the stocks in.

- One cautionary tale emerged in court after Dallas-based Sabrepoint Capital agreed to pay a short-selling researcher a monthly retainer of $9,500 in 2018. Sabrepoint encouraged him

to dig into real estate company Farmland Partners Inc. The researcher, who also wrote publicly under a pseudonym, later published an article on Seeking Alpha, setting off a 39 percent drop in Farmland's share price. The company sued and used a judge's order to force him to reveal his identity: Quinton Mathews

- The entire stock market just is a well-oiled fraud that only profits a few oligarchs and most West Coast Senators.

- Mathews later said in a statement that he subsequently "learned" his article "contained inaccuracies and false allegations" and retracted it. He and Farmland reached a settlement. Sabrepoint has said it did not know about the Seeking Alpha article.

- Farmland also is on the list of stocks that the Justice Department is examining. Lawyers for Sabrepoint and Mathews declined to comment.

- The Justice Department unit managing the inquiry already has a formidable reputation on Wall Street. It recently brought several cases against global banks and traders for illegal spoofing of precious metals and Treasury futures. As part of that probe, JPMorgan Chase & Co. paid more than US$900 million in penalties after its traders placed and canceled orders for commodities to benefit positions held by the bank or prized hedge fund clients. Those cases were brought by analyzing trading data for suspicious patterns and then attributing it to individual traders. The DOJ must GO TO THE TOP of these mobsters and take out Goldman Sachs bosses and U.S. Senators that run this MAFIA and the Elon Musk's and Eric Schmidt's that are their operatives.

- While prosecutors in the short-selling investigation issued subpoenas as recently as October, the effort has been underway much longer. It is time for perp walks of Senators and not just the low-level flunkies. The DOJ will find out the truth and end fracas.

- These inquiries gained momentum after U.S. lawmakers called for more scrutiny of short-sellers following the so-called meme-stock trading frenzy that erupted in January. In a single week that month, retail investors sent the price of GameStop Corp. soaring more than 700 percent before brokerages began limiting bets. Some organizers of the buying spree claimed hedge funds had been unfairly using their market influence to drive down stocks.

- The compromised Senators have held multiple hearings on the fracas, at times discussing whether to force short sellers to boost disclosures but their hand-wringing is all for show. There is no real intent to expose or show what is really going on. These Senators fear that if the truth comes out. It will have a devastating impact on not only them personally but all those associates as well.

- Academics have been encouraging U.S. authorities to address the possibility that short sellers are laying out their cases against stocks, then using the impact of that news to quickly reap gains and quietly move on.

- Early last year, Mitts and about a dozen other prominent securities-law professors urged the SEC to write rules requiring that short sellers who voluntarily reveal bets against a stock be required to disclose when they have exited the position. The professors also asked the regulator to write a new rule that would make closing a short position immediately after

disseminating a negative report -- with an intent to do so upon publication -- constitute market manipulation.

- One of the most powerful lawmakers in the U.S. defended the right of congresspeople to trade stocks. Pelosi, Feinstein, Reid, Harris, and other California politicians own Silicon Valley companies Google, Facebook, Netflix, Apple, Facebook, Tesla, SpaceX, and YouTube which provides them funds and cash. They defund their competitors and put hit-jobs on those competitors, who are their own constituents. These politicians block government actions that would regulate these companies and laws designed to control the corruption and public safety hazards of these companies.

- When asked about the issue during a press conference, House Speaker Nancy Pelosi (D-Calif.) said that "We're a free market economy" and lawmakers "should be able to participate in that." That reply was an insincere, pandering, smokescreen of a lie

- When asked about the issue during a press conference, House Speaker Nancy Pelosi (D-Calif.) said that "We're a free market economy" and lawmakers "should be able to participate in that." That reply was an insincere, pandering, smokescreen of a lie!

- For example, Pelosi's own stock portfolio, which gained over $65 million in value between 2019 and 2021, has often been the subject of scrutiny. The Stop Trading on Congressional Knowledge (STOCK) Act, which was passed in 2012, is designed to combat insider trading by lawmakers, who many across the spectrum argue have too much access to inside information to be able to trade stocks ethically. In October, the Federal Reserve banned its officials from owning individual stocks. In March 2020, four senators were accused of

insider trading and investigated by the Justice Department when they sold off stocks ahead of the COVID-19-induced economic downturn.

- Voices across the spectrum, especially on the right but also on the left, criticized Pelosi's comments and questioned her position. Many argue that lawmakers since have access to information that the public does not, and because they also can write and pass policy, they should not be allowed to buy and sell individual stocks and other assets. Some on the right highlighted silence from other progressives in response to Pelosi's statement despite their previous opposition to the practice.

- Nancy Pelosi owns more than $500,000 in Apple stock, according to her financial disclosure reports. Pelosi is also the speaker of the House. Congressional Democrats and Republicans alike have introduced multiple antitrust bills that would affect Big Tech companies.

- The CEO of Apple, Tim Cook, called Pelosi personally in June and told her not to move ahead on these bills. The House Judiciary Committee passed six of these bills in June. Not one of them has seen movement on the House floor in six months, with some reports pinning the inaction on the speaker.

- In January of 2021, Pelosi's husband, Paul, bought at least a quarter million in "call" options for Apple, which is a more sophisticated way of betting on a stock going up in value. Paul Pelosi also bought at least half a million in call options for Tesla, which stood to get subsidized by the Build Back Better bill his wife shepherded through the House.

- Pelosi and her family are already extraordinarily rich, and nobody but the Pelosi's. themselves knows the motivations of Nancy Pelosi or the calculations of Paul Pelosi. But

still, it ought to raise eyebrows that the speaker of the House keeps taking actions that benefit her stock portfolio and not the public. The leader of the House such as Pelosi should not take advantage of the public trust.

- Yet. Pelosi has stated that there should be no restrictions on her ability to buy and sell stocks in the companies Plaintiff is regulating, subsidizing, protecting, and taxing. Pelosi, says lawmakers/Capitol staff should not be prohibited from trading stock: "This is a free market, we are a free-market economy, they should be able to participate in that."

- Pelosi has a long history of entangling her policymaking with her families profit-making. Peter Schweizer, in his book, *Throw Them All Out*, documented how Pelosi and her husband have gained insider status and made millions betting on companies that were directly involved in pending legislation.

- PLAINTIFF has attempted hundreds of "proper procedure" efforts to resolve this matter in writing but government officials either: 1.) Stonewall any response, or 2.) Get fired or transferred if they investigate the matter, or 3.) Send a generic non-responsive form letter, or 4.) Finger point to another agency in an endless runaround.

- PLAINTIFF was attacked by government-financed, directed, and resourced hired attack services that had command-and-control operated by government officials.

- The GOVT has spent over ten times more money on delaying the payment of funds to the PLAINTIFF than if they had just settled with PLAINTIFF in the first place. The GOVT has exacerbated the case to the point that it has gained thousands of times more media coverage than if it had just settled with PLAINTIFF in the first place. The GOVT has wasted vast amounts of taxpayer money and created an international media incident when those losses

could have been entirely avoided if they had just settled with PLAINTIFF and been responsive to the PLAINTIFF, in the first place.

- Many government officials, up to and including the U.S. Attorney General, The Secretary of Energy, The Director of the FBI, etc., have been fired over this case and related matters, due to their attempts to manipulate government funds and resources to inure to a cartel of insiders who backed those officials' appointments to those positions. (i.e.: The Covington & Burling files) LDLinsiders who backed those officials' appointments to those positions. (i.e.: The Covington & Burling files) LDLinsiders who backed those officials' appointments to those positions. (i.e.: The Covington & Burling files)

- PLAINTIFF became a government witness and reported on crimes by government officials. In reprisal, revenge, vendetta, retaliation, and retribution, PLAINTIFF has been severely harmed. The angry government officials took away the PLAINTIFF's QUALITY OF LIFE. Plaintiff has lost everything which includes his house, income, job, life savings, brand, and every source of income using sophisticated spy craft-type attacks. They attacked him as reprisal/vendetta because he reported an organized crime activity involving famous U.S. Senators and their billionaire sex-addict financiers. (i.e.: for context, look up the court cases of Jeffrey Epstein, Andy Rubin, Howard Rubin, Ed Buck, and the hundreds of other related sex cult cases in the federal courts on (http://www.pacer.gov).

- The PLAINTIFF served the public, only to have the criminals they investigated get hundreds of billions of dollars, at the expense of the PLAINTIFF and public tax dollars, while PLAINTIFF got nothing and lost everything.

- It is now well documented in court records and in federal investigations that over 120 companies (listed by name, below, in the Exhibits) sell attack services ("hit-jobs") to well-known politicians.

- The PLAINTIFF'S investigators have proven that kill services (like Gawker-Gizmodo, Black Cube, Fusion GPS, etc.) were hired by public officials and aimed at one the victims because of their effective law enforcement cases. Police records prove that the arrested and/or charged financiers of these public officials (i.e.: Howard Rubin, Ed Buck, Roger Boas, Jeffrey Epstein, Joe Lonsdale, Eric Schmidt, Andy Rubin, Sergy Brin, Steve Bing, Michael Goguen, Forrest Hayes, Tom Perkins, etc.) ran a national executives-only sex cult in which some victims were murdered, and many were underage. The depth of their sick depravity proves that the perpetrators will stoop to any crime, using the highest levels of government resources, to cover-up their crimes. PLAINTIFF helped investigate some of these perverted perpetrators and has had government agencies deployed to attack him in reprisal, retribution, retaliation efforts as payback. The FBI has the full capacity and resources to easily confirm this via an interview and investigation of the Defendants hired attackers, specifically Nicholas Guido Denton, John Herrman, Gabrial Darbyshire, Patrick George, Jay Carney, Robert Gibbs, Adrian Covert, John Cook, Elon Musk, and those other parties listed herein, and, in fact, may have already done so. The FBI will be subpoenaed in this matter.

- PLAINTIFF's investigators have proven that kill services (like Gawker-Gizmodo, Black Cube, Fusion GPS, etc.) were hired by public officials and aimed at one the victims because of their effective law enforcement cases. Police records prove that the arrested

and/or charged financiers of these public officials (i.e.: Howard Rubin, Ed Buck, Roger Boas, Jeffrey Epstein, Joe Lonsdale, Eric Schmidt, Andy Rubin, Sergy Brin, Steve Bing, Michael Goguen, Forrest Hayes, Tom Perkins, etc. were responsible for running a national executives-only sex cult in which some victims were murdered, and many were underage. The depth of their sick depravity proves that the perpetrators will stoop to any crime, using the highest levels of government resources, to cover up their crimes. PLAINTIFF helped investigate some of these perverted perpetrators and has had government agencies deployed to attack him in reprisal, retribution, retaliation efforts as payback. The FBI has the full capacity and resources to easily confirm this via an interview and investigation of the Defendants hired attackers, specifically Nicholas Guido Denton, John Herman, Gabrial Darbyshire, Patrick George, Jay Carney, Robert Gibbs, Adrian Covert, John Cook, Elon Musk, and those other parties listed herein, and, in fact, may have already done so. The FBI will be subpoenaed in this matter.

- The Silicon Valley tech oligarchs from Tesla, Google, Facebook, Kleiner Perkins, etc., manage a large part of these crimes. For example, one applicant's Senators have made many tens of millions of dollars in profits and bribes off (hidden in real estate (i.e.: https://www.wsj.com/articles/big-tech-companies-amass-property-holdings-during-covid19-pandemic-11632821401..

- PLAINTIFF was specifically and illegally excluded from participation in funding, benefits, jobs, and income by major political figures, including U.S. Senators and White House executives who he knew personally, and their Silicon Valley oligarch financiers. They attacked him as reprisal because he would not cooperate with their sex trafficking, tax

evasion, off-shore money laundering, political bribery quid-pro-quo, revolving door payola frauds, foreign nation-sponsored domestic manipulations, stock market rigging, internet censorship, and search engine manipulation, and other crimes.

- The perpetrators attacked the PLAINTIFF in retaliation because they reported their crimes to federal police. They attacked him as revenge because his products obsoleted their products. They attacked him using taxpayer-funded state resources. That is a felony violation of the law. The ongoing cover-up of these crimes and attacks is also a felony violation of the law. PLAINTIFF is owed damages compensation, witness fees, and back-pay.

- In 1988 The Federal Office of Personnel Management ranked this victim, known herein as PLAINTIFF", with a top eighty-five percentile ranking as a Criminal Investigator in the 1811-C nationals when he was being solicited by the government for cross-border casework as a Federal Criminal Investigator (See OPM documents, attached). In other words, he placed top-in-the-nation when the government assessed his criminal investigation skills. His father, an electronics signals intelligence analyst specialist with the U.S. Army and grandfather, a U.S. Air Force Colonel had both been federal intelligence specialists in a portion of their careers. By 1988, PLAINTIFF had already been working on organized crime and corruption matters since 1978. His white-collar and corruption cases were under-cover and sting operations and were side projects keyed off his public work as a private sector management and technology specialist for corporations and community programs.

- The PLAINTIFF attended many social affairs with some of the politicians. Many of the events were in public but some were in Plaintiff's private home. Some of those figures

informed PLAINTIFF of their organized crime scheme, the participants, and the operators. They invited PLAINTIFF to become part of their scheme

- As a White House and City Hall commended Federal patent-awarded inventor/CEO, PLAINTIFF has been government, and network newscast, documented as the first to invent, launch, operate, and deliver the companies and technology that Google, Facebook

- PLAINTIFF has been covertly reporting to GAO, FBI, FTC, SEC, FEC, IG OSC, California Fair Political Practices officials and Senators and others for decades

- PLAINTIFF'S cases included notorious subjects that most people have seen in the news headlines. Lately, by partnering with the messaging, media outreach, investigations and demands of https://socialsecurityworks.org, https://seniorsleague.org

- AARP, ICIJ, and other related organizations, and using Streisand Effect amplifiers, torrents and mass social media processing, the PLAINTIFF, and his peers were able to get the heads of the Social Security Administration, the heads of The U.S. Government and the Attorney General fired from their jobs for corruption and abuse of public funds.

- Due to the effectiveness of the PLAINTIFF'S associate's anti-corruption efforts, public officials have engaged in reprisal/retaliation attacks on the PLAINTIFF and those officials engaged in felonies by doing that.

- In the Solyndra/Silicon Valley Cartel matter, PLAINTIFF did "too good a job" and broke up one of the largest corruption matters in America with roots that ran all the way to the Oval Office. The FBI raid on Solyndra was only the beginning. Energy and Media Industry crimes like these have a SIX TRILLION DOLLAR upside if the crooks can pull them off.

- The United States Congress had awarded PLAINTIFF, and his team, a commendation, and a multi-million-dollar federal contract to build America's energy "back-up" plan should the Middle East oil interests 'go sideways,' as they, indeed, have.

- PLAINTIFF and his engineering team, as early as 2005, had informed the Department of Energy, in writing that, as Lithium-ion batteries age, the 'dendrite defects' in their internal chemistry cause the batteries to constantly increase their tendency to blow up. This was proven via x-ray analysis of lithium-ion batteries, particularly those from Panasonic that are used by Tesla Motors. This data was intentionally covered up by White House and Department of Energy executives because they wanted those "trillions" of dollars of profits in their pockets from the fabled Afghanistan mining fields

- External forces, moisture, ambient energy waves and other factors, increase their tendency to self-ignite. Department of Energy Secretaries of Energy, their staff, White House, and CIA executives have been proven, via their public stock brokerage records, to own lithium-ion battery companies and child labor rare earth mining interests.

- That is why they cover up the dangers of toxic lithium ion (the burning smoke of which causes cancer, brain, and fetus damage) and sabotage domestic efforts to market competing energy storage like fuel cells, ultra-capacitors, alkali metal-chlorine batteries, in-car batteries, beta-voltaic batteries, tritium batteries and competing alternative energy storage: in violation of anti-trust laws

- The Secretary of Energy Jennifer Granholm's Proterra Buses is now blowing up, Tesla is known for blowing up, Bolt and Volt cars are now blowing up and under massive recall.

Ener1 batteries destroyed millions of dollars of Fisker's when they got wet... The U.S. Government has hundreds of reports proving this to be a fact

- The victim has, for years, filed all the proper forms, gone "through proper channels" and inquired as to next steps from officials at the highest levels. For his efforts he has been rewarded with cover-ups, lies, obfuscation, stonewalling and avoidance. The victim now has one of America's largest collections of "Finger-Pointing" letters from government agencies and officials, each correspondence, essentially, saying: "Oh, it's not us go try DOJ or... (FBI, SEC, GAO. ...." No government body will step up to resolve the issue or allow their IG to investigate or let "302 reports" be written for interviews that never happen. It is the RUN-AROUND on an epic scale

- Today, on the other hand, PLAINTIFF, has had every source of income (See reprisal attack details, below) blockaded by the government as reprisal for whistleblowing.

- Ninety percent of the public officials with authority own stock market assets in, or are financed by, PLAINTIFF's competitors. Workers at government agencies serving PLAINTIFF have been exposed as extreme ANTIFA-type biased activists in their leaked emails, social media postings, web photos, and recorded conversations.

- PLAINTIFF is a claimant making claims for witness fees, informant fees, rewards, whistle-blower fees, legal fees, and damages caused by this matter.

- PLAINTIFF demands legal counsel be provided by your office, for the claimant, because his rights to fair legal representation, his civil rights, and Constitutional rights have been blockaded by these reprisal attacks, in violation of the law.

- PLAINTIFF has asked for a grant. After being previously awarded a multi-million dollar valued, fully executed contract in 2005; On or about November 10, 2008, PLAINTIFF at the request of U.S. Senators and Department of Energy officials applied for a $40 million ATVM loan to build a scalable, innovative, and efficient electric car for government agencies including the Pentagon. The GOVT's own Sandia National Laboratory ("Sandia") was identified as a project subcontractor.

- This application was in response to a GOVT solicitation. GOVT was supposed to evaluate loan applications on a "first-in, first-out" basis and to make ATVM loan funds available in January 2009 for successful applicants.

- PLAINTIFF'S car design used advanced "hot-swap cartridges" to provide a nearly unlimited range, cost less than $20,000 in the base configuration, required no gasoline or extension cords to charge, required no garage, could be used by apartment dwellers, was easy to repair and build, and used "damp down" crash effect reduction materials.

- PLAINTIFF had operations in Detroit, the Midwest, and the San Francisco Bay area. A critical PLAINTIFF'S innovation, based on a decade of research, was the use of next-generation polymer plastics in the automotive body. By replacing metal doors, body panels, hoods, and roofs with lightweight polymer plastics on a carbon fiber frame and lightweight alloy chassis, PLAINTIFF build a four-seat, SUV-format vehicle with a curb weight of less than 1,400 pounds, or approximately one-third the weight of a Toyota Prius. This, in turn, enhanced vehicle efficiency and performance.

- PLAINTFF's pressure membrane technology was well proven and widely used in a variety of applications, including zodiac (inflatable) boats used in leisure, commercial and military

applications, airbags, Mars landing equipment, and even buildings and arenas with polymer membrane coverings.

- PLAINTIFF'S car's key parts were built and evaluated, or already existed in off-the-shelf components proven in the industry for over a decade. Autodesk and other engineering software allowed for full virtual prototyping and operational testing of the design

- PLAINTIFF'S products were the top of the line for their precision and design. For consideration of PLAINTIFF'S  ATVM loan application, Defendants promised to protect PLAINTIFF'S technical and business. The DEFENDANT used the products and information of the PLAINTIFF without his permission or consent

- PLAINTIFF'S financial and technical partners included Ranson Green Community Development Foundation (a 501(c)(3) nonprofit), ZAP and Detroit Electric, major automobile manufacturers and national laboratories.

- PLAINTIFF offered GOVT asset collateral of over $100 million to secure the ATVM loan.

- PLAINTIFF'S loan application revealed sensitive and confidential technical and business information as defined by 10 CFR §§ 1004.10(b)(4), 11 and 5 U.S.C. § 552(b)(4) to GOVT. This information included fuel cell and hydrogen storage technologies, fuel cassettes, and pressure membrane body parts.

- PLAINTIFF also disclosed his issued patents for a solid-state energy storage system and an electric and hybrid vehicle system with an estimated 3rd party appraised value of $17,291,568.64; another U.S. Patent with an estimated 3rd party appraised value of $10,524,792.26; another U.S. Patent with an estimated 3rd party appraised value of $5,607,695.94; another U.S. Patent with an estimated 3rd party appraised value of

$104,072,538.36; and other trade secrets, trademark, and intellectual property assets. These IP assets were offered as collateral to GOVT.

- In consideration of PLAINTIFF'S ATVM loan application, Defendants promised to protect PLAINTIFF'S technical and business secrets and not to infringe its patents. and requesting certain additional information. **See Exhibits where** PLAINTIFF provided this information and http://www.uspto.gov

- On December 31, 2008, Seward informed PLAINTIFF that its application was complete and that GOVT would advise PLAINTIFF if it needed additional information during the application review process. **See Exhibits**. Upon information and belief, PLAINTIFF'S ATVM loan application was the first to be deemed complete.

107. Always relevant, PLAINTIFF qualified for the ATVM loan under GOVT's published underwriting criteria. For example:

PLAINTIFF was an "automobile manufacturer" that demonstrated "improved fuel economy" as defined at 10 C.F.R. § 611.100(a)(1).

o PLAINTIFF was "financially viable" as defined at 10 C.F.R. § 611.100(a)(2).

o PLAINTIFF'S application satisfied all GOVT's requirements under 10 C.F.R. § 611.101 et seq.

o PLAINTIFF's product satisfied all GOVT's evaluation criteria under 10 C.F.R. §611.103(b). Among other things, PLAINTIFF'S car used no gasoline and traveled over 125 miles on a single charge.

o PLAINTIFF met all GOVT's environmental requirements under 10 C.F.R. § 611.106 et seq.

o PLAINTIFF was a "covered firm" as defined by GOVT at 10 C.F.R. § 611.207(a), and eligible for the set aside specified at 10 C.F.R. § 611.207(b).

o GOVT internal staff Excel comparison matrices placed PLAINTIFF in the top 5% in overall comparison metrics of all applicants.

108.  GOVT began processing PLAINTIFF'S ATVM loan application in or about January 2009. This process should have taken no more than several weeks.

109. However, GOVT did not promptly underwrite PLAINTIFF'S application.

110. PLAINTIFF was unaware that Defendants had "fixed" the ATVM loan process to benefit political donors. PLAINTIFF also was unaware that Defendants had no intention of approving PLAINTIFF'S ATVM loan application under any circumstances as a matter of reprisal for whistle-blowing and unfair business practices to avoid competition against Tesla and other Congressional stock holdings.

111.  Therefore, PLAINTIFF repeatedly contacted GOVT to provide engineering, financial and other information in support of its application.

112. On April 23, 2009, Jason Gerbsman, the Chief of Staff and Senior Investment Officer, at the Loan Programs Office, Automotive Division, of GOVT, notified PLAINTIFF that: PLAINTIFFS has submitted a complete application and has been assigned to both a technical eligibility and merit review team, as well as a financial viability analysis team. The technical team is close to finishing their evaluations on both eligibility and project merit, and the financial team will be launching a more detailed and interactive due diligence phase of the PLAINTIFF'S application review very soon. Following the technical and financial evaluation under the second stage of the process, we will move into the underwriting phase where our goal is to negotiate a conditional commitment, including a detailed term sheet. This will be followed by the fourth phase of the loan process where the final details will be negotiated, and the loan will be close

113.  On May 26, 2009, Gerbsman offered an in-person meeting to discuss "PLAINTIFF'S next steps."

114. On May 28, 2009, PLAINTIFF flew a delegation from California to meet with Gerbsman, who said that GOVT had determined "everything was in order" with PLAINTIFF'S ATVM loan application, that "everything looked good" and that PLAINTIFF "appeared to be fully compliant and passed technical review."

115. Shortly thereafter, PLAINTIFF discovered that Tesla Motors, Inc. ("Tesla") and Fisker Motors, Inc. ("Fisker") had received and were receiving special assistance from GOVT staff with the ATVM loan application process. Fisker even had a business office in GOVT's headquarters.

116. On or about June 22, 2009, GOVT advised PLAINTIFF that a Northern California solar energy company had requested a copy of PLAINTIFF'S ATVM loan application from GOVT through the Freedom of Information Act ("FOIA"). PLAINTIFF contacted this company to see why it was interested in PLAINTIFF'S ATVM loan.

117. PLAINTIFF spoke with the company's principal, who said that he had been "screwed over" by GOVT and wanted to know if others had a similar experience. He said that the company had suffered "bad dealings" with Matt Rogers, a "stimulus advisor" to the Chu from McKinsey & Company, and Steven Spinner, a key player in GOVT's loan program office. Spinner, an Obama campaign bundler who raised millions for the President and who had been appointed to his government position in exchange for his fundraising, also had worked at McKinsey & Company and, according to his biography posted by the Center for American Progress, had served as an active advisor and investor to Tesla.

118. PLAINTIFF was told that Rogers and Spinner were "rigging the game." It was given Spinner's phone number and told to call Spinner and ask him why PLAINTIFF'S ATVM loan application was not moving forward.

119.  PLAINTIFF texted Spinner and then called him. Spinner answered the phone and told

PLAINTIFF words to the effect of "Do not ever call me again. The awards have already been decided."

120.  On June 24, 2009, GOVT announced $8 billion in ATVM loans to Ford Motor Company

("Ford"), Nissan North America, Inc. ("Nissan") and Tesla. Tesla   was the PLAINTIFF'S competitor --

received an ATVM loan of $465 million at a rate of 1.6% from GOVT to manufacture an expensive

electric car.

121. On June 29, 2009, PLAINTIFF wrote to Gerbsman again asking for action on its ATVM loan

application, pointing out that other lenders were hanging back until after GOVT issued its term sheets,

the offering document issued by GOVT that specifies the detailed terms and conditions under which

GOVT may enter a Conditional Commitment with the Applicant.

122. In the following weeks, authorized GOVT representatives repeatedly assured PLAINTIFF that

"everything was fine", "everything is on-track", and "you [WITNESS] appear to meet every criterion"

with respect to an ATVM loan. PLAINTIFF was even told that "we [GOVT] should be able to

announce [an approved ATVM loan] any day now…"

123.  However, on August 21, 2009, Seward denied PLAINTIFF's ATVM loan application**. See**

**Exhibit**

124. In an email to GOVT's Chris Foster, PLAINTIFF requested GOVT's merit review documents and

asked how GOVT technical evaluators could conduct a ten-month comparative merit review of

PLAINTIFF'S ATVM loan application without speaking to any single company engineer or senior

project staff member for more than 1% of the time that GOVT staff addressed Tesla, Nissan Ford, and

Fisker during the same review period.

125.  On or about August 26, 2009, PLAINTIFF called Foster. Foster said GOVT had denied the application because Foster said PLAINTIFF "electric car did not use E85 gasoline, PLAINTIFF was not planning on building "enough" cars, PLAINTIFF was not planning on selling cars to the government, PLAINTIFF's electric motors t and batteries were too futuristic and not developed for commercial use, PLAINTIFF'S car was a "hydrogen car," and PLAINTIFF had underestimated the cost of metal body fabrication."

126.  The reason given for the denial of the loan was based on false pretense.

127.  These "reasons" were baseless pretexts to protect Tesla, and other insider stock holdings, that U.S. Senators and DOE executives held.

o None of the PLAINTIFF'S competitors that were given ATVM loans to build electric cars used E85 gasoline in their vehicles.

o PLAINTIFF's car was designed to be easily scalable, using "off the shelf" parts from existing commercial sources with multiple points of supply.

o PLAINTIFF's business plan specifically provided for large government and fleet sales. PLAINTIFF's "futuristic" electric motor and battery configuration had been in commercial and government use for decades.

o PLAINTIFF's car was an electric car, not a hydrogen car.

o PLAINTIFF's scar body contained minimal amounts of metal, using safer and easier to source and fabricate polymers and plastics.

128.  Foster never provided PLAINTIFF with GOVT's merit review documents or described the applicable evaluation criteria. On September 21, 2009, PLAINTIFF wrote to the Chu requesting reconsideration of GOVT's ATVM loan denial. See Exhibit s.

41    Federal Complaint And Exhibits

129. PLAINTIFF demonstrated that the stated reasons for GOVT's denial were false. It asked Chu to explain why GOVT staff repeatedly assured PLAINTIFF that approval would be forthcoming and that no additional information was necessary (leading PLAINTIFF and its principals to expend huge sums of money in reliance thereon), and why government-crony companies that applied after PLAINTIFF were reviewed earlier, given the benefit of extensive access to and interaction with GOVT staff (a benefit denied to PLAINTIFF), and then awarded funds.

130.  On October 23, 2009, Seward replied to PLAINTIFF. **See Exhibit 5**. He did not answer PLAINTIFF's questions. Instead, he backfilled with new but equally baseless reasons for PLAINTIFF's rejection.

131. The reason given for the denial was unreasonable. To begin with, Seward said that PLAINTIFF's application was "deemed Substantially Complete on November 10, 2009." In fact, PLAINTIFF's application had been deemed complete on December 31, 2008.

132. Seward said that the "proposed technology appeared to be at a development stage and not yet ready for commercialization" and that the "assumption that the vehicle concept would be ready for production in three years" was a "significant weakness" due to the "high level of risk associated with the design." In fact, the PLAINTIFF's vehicle's technology had been in use commercially for years by the U.S. Department of Defense, NASA, and the automobile industry; the politically connected companies that were awarded ATVM loan funds were no further ahead in production than PLAINTIFF, and elements of PLAINTIFF's "elevated risk design" were already in use by Toyota and Nissan.

133.  The second reason given by Steward was baseless. Seward said, "the proposed project's impact on fuel economy…was determined to be weak." In fact, non-gasoline-powered automobiles are uniformly recognized to offer the most significant impact on fuel economy performance. The

PLAINTIFF's vehicle promised even better fuel economy than any of the ATVM loan "winners" (Tesla, Nissan, Ford or Fisker) proposed or offers to this day.

134. The third reason given by Steward was groundless. Seward said, "A review of the advanced fuels in your project and the feasibility of that energy source…was [sic] questionable." In fact, the fuels, products, and subparts of the "questionable" energy source are readily available to consumers at REI Sporting Goods, Amazon.com and Safeway supermarkets.

135. The fourth justification given by Steward for the denial was it was unrealistic. Seward said, "A review of the calculations and assumptions supporting your claims for reductions in petroleum use were deemed to be unrealistic." In fact, over two hundred institutional research and white papers from respected government and university agencies from around the world supported PLAINTIFF's claimed reductions.

136. Seward's letter was the first time any of these issues had been raised by GOVT with the PLAINTIFF, notwithstanding ten months of "underwriting," and multiple meetings, phone calls, and emails. Incomprehensibly, GOVT had refused to consult with any of PLAINTIFF's engineers and denied PLAINTIFF the "interactive" review that had been promised in April and had in fact been provided to Tesla, Fisker, Nissan, and Ford.

137. DEFENDANTS did not review PLAINTIFF's ATVM loan application in good faith and in accordance with its regulations, policies, and promises. Instead, it stonewalled PLAINTIFF.

138. Each application that the PLAINTIFF presented was denied.

139. Or about February 1, 2009, PLAINTIFF (through Limnia) applied for a $15 million ATVM loan to help fund work with GOVT's own Sandia National Laboratories ("Sandia") to produce a "best of

breed and state of the art" automobile energy storage system using PLAINTIFF'S patented fuel cell technology.

140. On April 10, 2009, Seward denied this application on the grounds that it "[did] not appear to be designed for installation in an advanced technology vehicle…" **See Exhibit 6.** At all times relevant, DEFENDANT knew Seward's claim was false and a mere pretext to preserve ATVM loan funds for government-favored companies.

141. On April 11, 2009, PLAINTIFF requested reconsideration, reminding Seward that the relevant patents provided the technology was for use in advanced technology vehicles, that Sandia's vehicle technologies group was the prime subcontractor for the project, and that GOVT had funded the technology specifically for use in advanced technology vehicles. **See Exhibit** s.

135. GOVT had funded the technology specifically for use in advanced technology vehicles. **See Exhibits**.

142. On May 13, 2009, Seward again denied the application because the technology was "not installed in the advanced technology vehicle." This time, though, he asked for more information. **See Exhibits.**

143. On June 3, 2009, PLAINTIFF again requested reconsideration, pointing out that the device "must be installed prior to use in an advanced technology vehicle and are, accordingly, designed for such installation, and therefore… 'qualifying components'" and answering Seward's other questions. **See Exhibits.**

144. On or about February 1, 2009, PLAINTIFF participated in a conference call with John Podesta, Chu, and Interior Secretary Kenneth Salazar during which Chu promised to waive the application fee.

145. On or about February 10, 2009, PLAINTIFF (through Limnia) filed a LGP application with a cover letter stating that it was PLAINTIFF'S understanding that GOVT had waived the application fee.

146.  On February 26, 2009, GOVT's Myrtle Gross called and said that the application fee of $18,000 had to be paid and that funds needed to be wired by midnight for the LGP application to be considered. This was PLAINTIFF'S  first notice from GOVT that the agency had reneged on its promise to waive the LGP application fee.

147. PLAINTIFF had access to the funds to make payment but could not complete the transaction by the midnight deadline.

148.  On February 27, 2009, Daniel Tobin, GOVT's Loan Programs Office Senior Investment Officer, called and said that there were "a few days of flexibility" to send in the application fee and promised to provide wire instructions.

149.  Tobin also promised to "pre-review" the application and to call back with feedback. The PLAINTIFF never heard back from Tobin or anyone else at GOVT. WITNESS repeatedly contacted Tobin by email, phone call and messenger, but neither he nor anyone else at GOVT would respond or provide wire instructions.

150. Instead, on April 9, 2009, Tobin dismissed PLAINTIFF from the LGP without recourse, writing PLAINTIFF that "due to non-remittance of the required application fee, your application will not be reviewed." **See Exhibit**

151.  GOVT ignored PLAINTIFF'S request for reconsideration.

## **DEFENDANT'S CORRUPT CRONY LOAN PROGRAM ABUSE**

152.  The Defendants did not use the loan program for the intended use.  Instead, the loan program was done by a selection process that intentionally eliminate all those viable candidates for a loan such as a Plaintiff.

153.  GOVT's ATVM loan program and LGP were not transparent, and GOVT's underwriting criteria were easily skewed and manipulated by political officials, these programs became cash cows for government cronies.

154. PLAINTIFF discovered in or about the end of Dec. 2008 that Seward angered at PLAINTIFF's public complaints about GOVT's ATVM loan and LGP administration told his staff in 2009 that it would be "a cold day in hell before I let [PLAINTIFF] get any money." Seward used his power to exclude ATVM loan PLAINTIF's arbitrarily, intentionally, and wrongly and LGP applications.

155.  In February 2011, GAO issued an investigative report on GOVT's ATVM program. See Exhibit s "Advanced Technology Vehicle Loan Program Implementation Is Under Way, but Enhanced Technical Oversight and Performance Measures Are Needed," GAO-11-145 (Feb 28, 2011) (the "GAO ATVM Loan Report"). It found that GOVT had made billions in loans without engaging "engineering expertise needed for technical oversight…. As a result, GOVT cannot be assured that the projects will be delivered as agreed. [Furthermore], GOVT has not developed sufficient performance measures that would enable it to fully assess the extent to which it has achieved its…program goals."

156.  In truth, GOVT's ATVM loan program was nothing more than a veil for political officials to steer hundreds of millions of taxpayer dollars to government cronies, including Tesla and Fisker.

157.  For example, Tesla's loan of $465 million was announced on June 24, 2009. This loan was obtained in material part through the efforts and influence of Steven Westly who had "bundled" hundreds of thousands of dollars in political contributions. Westly sat on Tesla's board from March 2007 to December 2009, the time in which GOVT made the ATVM loan.

158. In consideration for his financial contributions, Westly was given unusual Executive Branch access privileges and an appointment on a key advisory board counseling Chu. This allowed Westly to help shape GOVT policy to advance his personal business interests.

159. GOVT's Spinner, who played a key role in the ATVM loan program, was also a political "bundler," and a former Tesla investor and advisor. Additionally, Tesla's founder and CEO also made large political contributions to Democrats, including President Obama, in or about 2008.

160. On November 12, 2012, Tesla notified the Securities and Exchange Commission that: On January 20, 2010, we entered a loan facility with the Federal Financing Bank (FFB), and The U.S. Government (GOVT), pursuant to the Advanced Technology Vehicles Manufacturing (ATVM) Incentive Program. This loan facility was amended in June 2011 to expand our cash investment options, in February 2012 to modify the timing of certain future financial covenants and funding of the debt service reserve account, and in June 2012 to allow us to effect certain initiatives in our business plan. We entered another amendment with the GOVT in September 2012 to remove our obligation to comply with the current ratio financial covenant as of September 30, 2012 and amend the timing of pre-funding the principal payment due in June 2013. Under the GOVT Loan Facility, the FFB has made available to us two multi-draw term loan facilities in an aggregate principal amount of up to $465.0 million. Up to an aggregate principal amount of $101.2 million had been made available under the first term loan facility to finance up to 80% of the costs eligible for funding for the powertrain engineering and the build out of a facility to design and manufacture lithium-ion battery packs, electric motors, and electric components (the Powertrain Facility). Up to an aggregate principal amount of $363.9 million has been made available under the second term loan facility to finance up to 80% of the costs eligible for funding for the development of, and to build out the manufacturing facility for, our Model S sedan (the

Model S Facility). Under the GOVT Loan Facility, we are responsible for the remaining 20% of the costs eligible for funding under the ATVM Program for the projects as well as any cost overruns for each project. As of August 31, 2012, we have fully drawn down the facilities.

161. Also on November 12, 2012, with $465 million of taxpayer money spent, Tesla reported delivering a grand total of 256 vehicles for sale to customers.

162. Fisker's ATVM loan of $528.7 million was announced on September 22, 2009, a month after Seward rejected PLAINTIFF's application for a $40 million ATVM loan.

163. This loan was obtained in material part through the efforts and influence of John Doer, a major political contributor and government crony. At all times relevant, Doerr was a partner in the investment firm of Kleiner, Perkins, Caufield & Byers, along with former Vice President Al Gore, among others.

164. Kleiner, Perkins was a major Fisker investor. Doerr and his partners donated millions to the 2008 Obama campaign and related political causes, obtaining in exchange preferential access and treatment for their business interests. Among other things, Doerr's political contributions produced high-level Executive Branch access and a seat on the President's Council on Jobs and Competitiveness.

165. When GOVT announced Fisker's half-a-billion-dollar loan facility, it claimed that Fisker's ATVM loan would "create or save about 5,000 jobs for domestic parts suppliers" by funding "two lines of plug-in hybrids." Approximately $169.3 million of taxpayer funds were for "engineering integration" need for final assembly of a high-cost electric luxury car in Finland. Approximately $359 million of taxpayer funds was for manufacturing a low. cost plug-in hybrid sedan in the U.S. through "Project Kx." See Exhibit Conditional Commitment Letter by and between United States Department of Energy and Fisker Automotive, Inc. – Execution Copy (September 18, 2009).

166. When GOVT approved Fisker's loan, the Project Kx car did not exist, not even in prototype. Upon information and belief, GOVT lacked even detailed engineering and production specifications for the car. Nevertheless, Defendants parroted Fisker's claim that "up to 75,000-100,000 [Project Kx] vehicles will roll off assembly lines in the U.S. every year beginning in late 2012" to justify the Kx loan.

167. In 2011, Fisker promised that the Kx vehicle, which had yet to be publicly show, would be in mass production by the end of 2012.

168. On or about 2011, Fisker promised that the Kx vehicle, which had yet to be publicly show, would be in mass production by the end of 2012.

169. On or about February 2012, after Fisker had borrowed over $170 million, GOVT froze Fisker's ATVM loan credit facility because Fisker missed key production milestones.

170. On or about June 2012, Fisker finally revealed the Project Kx prototype, a "low cost" $55,000 auto called the "Atlantic."

171. On or about October 18, 2012, Fisker reported that Atlantic production would be delayed until 2014 or 2015.

172. Since 2008, Fisker has sold approximately 1,500 vehicles world-wide.

173. Upon information and belief, the over $170 million in taxpayer money GOVT has given to Fisker has "saved or created" fifty or fewer jobs.

## DEFENDANTS CORRUPT CRONY LGP ABUSE

174. In March 2012, and in response to complaints by PLAINTIFF and others, GAO issued an investigative report on GOVT's LGP performance. See Exhibit s "GOVT Loan Guarantees: Further Actions Needed to Improve Tracking and Review of Applications," GAO-12-157 (March 2012). GAO found that GOVT treated LGP applicants inconsistently, favoring some and disadvantaging others;

lacked systematic mechanisms for LGP applicants to administratively appeal its decisions; often ignored its own underwriting standards and skipping review steps; and re-reviewed rejected applications on an ad hoc basis. In fact, GOVT's "Omitting or poorly documenting reviews reduces LGP's assurance that it has treated applicants fairly and equitably."

175.  In October 2012, emails were released confirming that at least a number of LGP decisions were based on political factors not GOVT's stated evaluation criteria. See e.g., Exhibit s (Email from Jonathan Silver, former Executive Director, GOVT Loan Programs Office, to James C. McCrea, GOVT LPO credit adviser, dated June 25, 2010, stating "WH wants to move Abound [project] forward. Policy will have to wait…"); Exhibits (Email from James C. McCrea to B. Oakley stating "Pressure is on real heavy…due to interest from VP"); Exhibit s (Email from Monique Fridell to Kimberly Heimert, et al. dated May 25, 2010, stating "GOVT has made a political commitment to get Unistar through the approval

176. The process was by 6/15"; Exhibit 17 (Email from James C. McCrea to Monique Fridell dated June 1, 2010, stating "Secretary [of Energy] …is adamant that this transaction is going to OMB by the end of the day Fri if not sooner. Not a way to do things but a direct order")

177.  OVT bent the rules for political allies such as Sen. Harry Reid and Rep. Steny Hoyer, while government crony companies received special personal access to high-ranking GOVT officials. See e.g., Exhibit s (Email from James C. McCrea to "barbiar" dated December 5, 2009, stating "[Harry] Reid may be desperate. WH may want to help. Short term considerations may be more important than long term considerations and what is a billion anyhow?"); Exhibit s (Email from James C. McCrea to Julie Stewart dated May 25, 2010, stating "7th Floor has decided mid-June CRB…there has been a commitment from S1 [Secretary Chu] to Steny Hoyer on this. Nothing like over-committing and under-

delivering;" Exhibit s (Email from BrightSource Chairman John Woolard, an LGP applicant, to Jonathan Silver, GOVT Loan Office Director dated November 10, 2010, stating "Thanks for offering to meet at your house tomorrow morning." Silver replied "Came [sic] anytime. Guest bedroom is ready."). Defendants regularly slept with each other and at each other's homes.

## DEFENDANT'S OVERALL CORRUPT CRONY ABUSE OF AND HARM TO PLAINTIFF

178.  DEFENDANTS' actions have consistently abused and caused harm to the PLAINTIFF.

179.  When DEFENDANTS "fixed" the ATVM loan and LGP programs to benefit government cronies, they knowingly and intentionally rendered the ATVM loan and LGP applications by PLAINTIFF and other similarly situated companies futile and meaningless.

180.  DEFENDANT intentionally induced PLAINTIFF and others similarly situated through multiple written and verbal representations from GOVT officials with actual and apparent authority to bind GOVT, to spend hundreds of thousands of dollars, and invest thousands of hours of engineering and professional time on a meaningless snipe hunt.

181.  Defendants' administration of the ATVM loan program effectively dried up all alternative sources of capital and denied PLAINTIFF and others similarly situated access to private financing by delaying term sheets and/or wrongly denying ATVM loans, among other things. Defendants had actual or constructive knowledge that delaying or denying a small company's ATVM loan application would be as a business death sentence.

182.  DEFENDANTS" administration of the ATVM loan program effectively dried up all alternative sources of capital and denied PLAINTIFF and others similarly situated access to private financing by delaying term sheets and/or wrongly denying ATVM loans, among other things. Defendants had actual

or constructive knowledge that delaying or denying a small company's ATVM loan application would be as a business death sentence.

183. Chu and Seward skewed, manipulated, and fixed GOVT's ATVM loan review process against PLAINTIFF and other companies similarly situated to protect and advance the business and political interests of government cronies and caused PLAINTIFF's ATVM loan and LGP applications to be rejected on false bases and flimsy pretexts.

184. Some of the examples of the skewed and manipulated actions of the government officials are as follows:

a. Government cronies who applied for the ATVM loan after PLAINTIFF were reviewed earlier, walked through the "underwriting" process by GOVT staff and given the benefit of unique agency interaction, and then awarded funds.

b. GOVT staff first issued over twenty documents, public statements, policy notices, PowerPoints and other materials verifying that ATVM loans would be processed on a "first-come, first-served" basis. Because crony companies did not submit applications in a timely fashion, GOVT subsequently altered this policy.

c. GOVT paid outside, unqualified technical reviewers to conduct pre-textual diligence and application reviews. PLAINTIFF spoke with Carol Battershell, who stated she was the due diligence technical lead on PLAINTIFF'S application. She said she had gotten everything she needed "off [PLAINTIF'S] website." GOVT reviewers never talked to PLAINTIFF's founder, inventor, engineers, project leads or primary contractors, and refused to speak with PLAINTIFF'S engineers, even after PLAINTIFFs engineers called and visited them to offer data and other information.

d.  GOVT officials directed Argonne National Laboratory staff to manipulate data to favor certain applicants.

e.  GOVT employees were ordered by senior GOVT and Executive Branch political officials to ignore non-favored applicants until deadlines had passed to shrink the applicant pool.

f.  GOVT ignored standard commercial bank loan processes, including the use of competent engineers to conduct technical review and the consistent application of the same underwriting criteria to each loan application. Instead, the "loan review process" was intentionally manipulated, bypassed, or stalled, to ensure that funds were given to government favored "winners" but not to PLAINTIFF or other companies that lacked large political contributions and special Executive Branch access.

g.  The ATVM loan funds distribution DEFENDANTS repeatedly manipulated date to frustrate PLAINTIFF and other similarly situated companies' efforts to attract private investors, thereby starving PLAINTIFF of capital.

h.  Political officials made review and "underwriting" decisions.

i.  GOVT staff told PLAINTIFF and others that GOVT was out of money and thus ATVM loan applications could not advance. However, the ATVM loan fund was never out of money and, indeed, a "carve out" of appropriated funds was "held" for government cronies who made political contributions and hired political fixers to obtain "top-tier status" and "special relationships" with GOVT.

j.  GOVT eased expectations for projected car sales volume by Fisker, a favored crony company with close ties to senior political officials in the White House, after GOVT had conditionally approved an approximate $560 million loan, and then made allowances for scaling back projections in the final loan agreement, and then renegotiated loan terms to ameliorate Fisker's cash flow crisis in the weeks before the 2012 Presidential election.

k. GOVT applied different metrics to ATVM loan applicants based on political connections and contributions.

l. GOVT promised to waive the LGP application fee. Within hours of the due date, GOVT reneged. The next day, GOVT contacted WITNESS promising to accept overdue payment. Again, GOVT reneged.

m. GOVT hid the "merit review" data, reviewer identities, reviewer work histories, and other information from PLAINTIFF, all other ATVM loan applicants and the public. This information, if disclosed, would have allowed for an open and transparent loan process, and allowed PLAINTIFF and others to evaluate the efficacy of GOVT's merit review.

n. GOVT willfully, intentionally, and overestimated government crony company production capabilities and sales performance to justify its approval of ATVM loans. For example, GOVT promised that Fisker alone would have "75,000 – 100,000" ATVM loan-funded cars rolling off U.S. assembly lines. In 2012, Ford, Nissan, Fisker, and Tesla (the ATVM loan "winners") combined sold fewer than 25,000 ATVM loan-funded vehicles nationwide.

o. PLAINTIFF'S 2008 benefits application was hacked and manipulated by public officials to engage in reprisal, retribution, and revenge against Applicant for reporting about a federal crime involving public officials. The PLAINTIFF has been waiting for his proper benefits payments since 2008. Investigations have proven that government officials were ordered to not approve the Plaintiff as reprisal/vendetta punishment for his testimony against public officials with access to government records operations, records, and determinations.

p. Most of the PLAINTIFF'S injuries came from his contractor/employment work for the Government.

q.  Most of the PLAINTIFF'S injuries were never investigated by government officials in an unbiased or conclusive manner per word scans of government officials' records.

r. Government officials that met with, or interacted, with Applicant concurrently, or later, ended up working for his political/business enemies and bragged about that fact in their emails, voicemails, text messages, social media postings, photo postings and other media. They were biased to harm PLAINTIFF.

s.  Government officials that met with, or interacted, with PLAINTIFF concurrently, or later, ended up working for his political/business enemies and bragged about that fact in their emails, voicemails, text messages, social media postings, photo postings, and other media. They were biased toward the PLAINTIFF. The communications between Administration staff and PLAINTIFF and their representatives including minutes of those meetings, or any memorandum written about these meetings by Administration employees and contractors who were present has been demanded. The FBI, a third party with a fountain pen video camera and/or a cell phone, in addition to government recordings, are thought to exist for this CIVIL RIGHTS VIOLATION incident. While there have been a lot of concerns lately about efforts to misuse "wiretapping" laws that forbid any recordings of people without their knowledge, it appears at least a few courts are recognizing how silly that is. Yet another court has now said that secretly recording a conversation -- in this case with an iPhone -- is okay, assuming there was no crime committed with the recording, and the recording was for a legitimate purpose. As the court noted: "The defendant must have the intent to use the illicit recording to commit a tort of crime beyond the act of recording itself." That makes sense. The act of recording alone, should not be a criminal act, as it really depends on what is being done with the recording. And, in an age where not only is recording everything easier, but for some becoming standard, requiring permission to record all audio

seems like an outdated concept. Using an iPhone to secretly record a conversation is not a violation of the Wiretap Act if done for legitimate purposes, a federal appeals court has ruled. "The defendant must have the intent to use the illicit recording to commit a tort of crime beyond the act of recording itself," (.pdf) the 2nd U.S. Circuit Court of Appeals ruled. The decision by the 2nd U.S. Circuit Court of Appeals, which involves a civil lawsuit over a secret audio recording produced from the 99-cent Recorder app, mirrors decisions in at least three other federal appeals courts. The lawsuit concerns a family dispute over the making of a dying mother's will. Days before the Connecticut woman died, her son secretly recorded a kitchen conversation between the son, mother, stepfather, and others over how to manage her estate after her death. The son, in a probate dispute, turned over the audio file to the court in 2008 to bolster his position concerning the estate of his late mother, who died without a will. The stepfather sued him, alleging a privacy breach under the Wiretap Act. A federal judge dismissed the case, and the stepfather appealed. The appeals court ruled that, even if the son consented to his own taping, he could be sued for money damages for a breach of the Wiretap Act if and only if he did so with a nefarious intent. "We affirm, and, in so doing, hold that the exception to the one-party consent provision of 18 U.S.C. § 2511(2)(d) requires that a communication be intercepted for the purpose of a tortious or criminal act that is independent of the intentional act of recording," the New York-based federal appeals court said.

t. The Inspector-General has supplied certified federal records of numerous vendetta/reprisal attacks by government officials against other American citizens as reprisal/vendetta acts.

u. All the U.S. Inspector General offices for ALL agencies have documented thousands of vendetta/reprisal attacks by State and Federal public officials.

v. An ongoing practice of vendetta/reprisal attacks by State and Federal public officials exists and operates within government agencies.

w. The volume and scope of vendetta/reprisal attacks by State and Federal public officials uncovered against Applicant proves that he is a "targeted whistle-blower."

x. The hackers, by name**, (Per Exhibits and at http://www.majestic111.com**) have been identified by FBI, CIA, DIA, NSA and FinCEN as having hacked and having great ease to hack government servers and that some of them were employed by Applicant's enemies including working in the political offices of public officials (particularly U.S. Senators) who competed with or were adversarial to the PLAINTIFF in there, or their family business dealings.

y. PLAINTIFF worked over 60 hours per week for many decades based on assurances from the government that he would receive, at least, $1400.00 per month upon retirement but the government assurances, to HIM, were false.

z. The government only paid the PLAINTIFF $778.00 per month while Applicant's peers receive $3000.00 per month from the government while his ARRESTED adversaries and competitors receive over $10,000.00 per month from the government.

aa. All government agencies represent the "United States Government," and it is a false assertion for the agencies under the United States Government to have denied responsibility for their actions.

bb. The United States Government asked Applicant to invest his life savings in a government energy program and defrauded Applicant out of his lifesavings, years of his time and his pending profits while providing those same profits to his competitors and to his elected representatives who were financial partners and shareholders with those competitors.

cc. The IRS, GOVT, and other agencies were sued in Federal Court and LOST the court hearings as they WERE found to be engaging the abuse of government offices for vendetta/reprisal attacks. Those parties were compensated but PLAINTIFF has not received his compensation. There was an ongoing failure to respond to PLAINTIFF'S requests which is damaging PLAINTIFF via accruing monetary harms daily. PLAINTIFF and its advocates have provided over two million pages of FBI-quality evidence, proving all the assertions herein, via hard drives and online file repositories. At no time has the government ever provided written statements disputing any of the criminal charges in this matter. The website at http://www.majestic111.com is an example of thousands of evidence repositories posted online about this case.

dd. PLAINTIFF has filed federal RICO charge referrals in this matter with DOJ

ee. By withholding and blockading PLAINTIFF'S funds, SSA and other government agencies have prevented PLAINTIFF from having access to adequate legal representation. In previously provided documents PLAINTIFF'S advocates have provided extensive legal references and proof that such blocking of PLAINTIFF'S legal representation via the with-holding of government funds is illegal

ff. PLAINTIFF has never received a response to his multiple SSA Form 561-U2 or 7008 filings Applicant has filed multiple letters confirming that there should be no blank years in is earnings statement and has received no responsive action from SSA on those assertions and the hundreds of work proof reference letters, videos, and press clippings he provided proving the assertions. SSA and The U.S. Government owe PLAINTIFF monies for damages caused by government actions, harms, and inaction.

gg. The PLAINTIFF has provided the government with the medical records of other U.S. citizens that were sent to the PLAINTIFF by the government in violation of federal HIPPA laws. The government

said that the records were the PLAINTIFF's yet, they had other people's names, SS#s, and medical information. This is one of many evidence items that clearly prove that the Applicant's records were manipulated, confused, and mismanaged by government staff. To be clear, government officials sent the medical records of multiple other citizens to the PLAINTIFF in violation of HIPPA laws and those other parties privacy rights.

hh. Government officials told Applicant, in meetings at the San Francisco government offices, in 2007 and 2008, that he was fully qualified, with government credits. Applicant demands his funds for his damages and the back-owed monies.

ii. Defendants employed spy agency "dirty tricks" campaigns against Plaintiff.

185. The United States Government has awarded Plaintiff dozens of issued seminal patents as first-to-invent original technologies now commercially exploited by the U.S. government and the Silicon Valley Companies who finance the White House and California Senators.

186. White House senior staff and California politicians own the stock market shares of the infringing companies and are politically financed by those infringers.

187. The United States took actions to prevent Plaintiff from fair-market monetization of those patents. The United States blockaded Plaintiff's ability to profit from his inventions by its directives to the National Venture Capital Association, and related parties, and through communications with such NVCA bosses as Gilman Louie, James Breyer, Jeffrey Epstein, John Doer, and related persons.

188. PLAINTIFF was blockaded using the tactics described at http://www.usinventor.org and via the use of "The Enterprise" to protect the Silicon Valley political financiers and White House stock market holders of those Big Tech political campaign financiers.

59    Federal Complaint And Exhibits

189.  Plaintiff demands that the United States purchase Plaintiffs Patents at reasonable value based on third party appraisals and the published prices of recent similar patents that were purchased in the intellectual property market.

190. PLAINTIFF is seeking damages for the injuries that he has suffered because of the DEFENDANT"s ACTIONS.

## **CAUSES OF ACTION**

### **II. BREACH OF CONTRACT**

191.  The PLAINTIFF repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

192   Pursuant to §136 of the Energy Independence and Security Act of 2007, 42 U.S.C. § 17013, the U.S. Department of Energy ("GOVT") administers the Advanced Technology Vehicle Manufacturing (ATVM) loan program to support the manufacture of advanced technology vehicles and components in the United States. In 2008, Congress authorized the GOVT to make $25 billion in ATVM loans. GOVT currently has over $16 billion of unused lending authority. Congress-people, GOVT agency executives and their Silicon Valley financiers invested in stock ownerships of the upside collateral profits from the manipulation of Department of Energy and foreign mining benefits from Iraq, Afghanistan, and other foreign mining regions.

193.   The parties, for valuable consideration, entered a valid and enforceable contract  (with subsequent Work Orders as set forth above) for the performance of services by the Plaintiff for the Defendant in return for money payments by the Defendant.

194. PLAINTIFF has attempted hundreds of "proper procedure" efforts to resolve this matter in writing but government officials either: 1.) Stonewall any response, or 2.) Get fired or transferred if they investigate the matter, or 3.) Send a generic non-responsive form letter, or 4.) Finger point to another agency in an endless runaround.

195.        PLAINTIFF was attacked by government-financed, directed, and resourced hired attack services that had command-and-control operated by government officials.

196.        The GOVT has spent over ten times more money on delaying the payment of funds to the PLAINTIFF than if they had just settled with WITNESS in the first place. The GOVT has exacerbated the case to the point that it has gained thousands of times more media coverage than if they had just settled with WITNESS in the first place. The GOVT has wasted vast amounts of taxpayer money and created an international media incident when those losses could have been entirely avoided if they had just settled with WITNESS, and been responsive to the PLAINTIFF, in the first place.

197.        The Defendants failed to properly respond to the PLAINTIFF by all sorts of avoidance tactics.

198.        Pursuant to the contract, Project Materials, including all materials, processes, techniques, and data, including all intellectual property made or conceived or reduced to practice or learned by DEFENDANT, was owned a duty to the PLAINTIFF ONLY.

199.     DEFENDANT breached the material portion and express terms of the contract between Plaintiff and Defendant.

200.     Plaintiff has made various requests for Defendant to comply with the contractual terms, but Defendant has refused.

201.     Defendant's breach of contract has damaged the PLAINTIFF in an amount exceeding $75,000.

## III.  CONVERSION

202.     The PLAINTIFF repeats and re-alleges each of the foregoing allegations as thoughtfully set forth herein.

203.  PLAINTIFF'S car design used advanced "hot-swap cartridges" to provide a nearly unlimited range, cost less than $20,000 in the base configuration, required no gasoline or extension cords to charge, required no garage, could be used by apartment dwellers, was easy to repair and build, and used "damp down" crash effect reduction materials.

204. PLAINTIFF had operations in Detroit, the Midwest, and the San Francisco Bay area. A critical PLAINTIFF'S innovation, based on a decade of research, was the use of next-generation polymer plastics in the automotive body. By replacing metal doors, body panels, hoods, and roofs with lightweight polymer plastics on a carbon fiber frame and lightweight alloy chassis, PLAINTIFF build a

four-seat, SUV-format vehicle with a curb weight of less than 1,400 pounds, or approximately one-third the weight of a Toyota Prius. This, in turn, enhanced vehicle efficiency and performance.

205.  PLAINTIFF'S pressure membrane technology was well proven and widely used in a variety of applications, including zodiac (inflatable) boats used in leisure, commercial and military applications, airbags, Mars landing equipment, and even buildings and arenas with polymer membrane coverings.

206. All the PLAINTIFF'S car's key parts were built and evaluated, or already existed in off-the-shelf components proven in the industry for over a decade. Autodesk and other engineering software allowed for full virtual prototyping and operational testing of the design.

207.  All the PLAINTIFF'S products were the top of the line for their precision and design. For consideration of PLAINTIFF'S   ATVM loan application, Defendants promised to protect PLAINTIFF'S technical and business. The DEFENDANT used the products and information of the PLAINTIFF without his permission or consent. The DEFENDANT has committed conversion of the PLAINTIFF'S PROPERTY. The DEFENDANT has committed conversion which is based upon the DEFENDANT's unlawful exercise of ownership or control over the personal property of the PLAINTIFF. The exercise of ownership or the control by the DEFENDANT was intentional and have the effect of denying or repudiating the PLAINTIFF's rights to the property.

208. The PLAINTIFF's conversion b has damaged the PLAINTIFF in an amount exceeding $75,000.

### IV.  UNJUST ENRICHMENT

209. The PLAINTIFF repeats and re-alleges each of the foregoing allegations as thoughtfully set forth herein

210.  The Defendants promised Plaintiff a salary of an average of $200,000.00 per year as precedent-ed by similar employees and contractors in the same time period, in consideration for her exclusive work with working with the government. Yet, Plaintiff did the work but was not compensated properly.

211. PLAINTIFF has attempted hundreds of "proper procedure" efforts to resolve this matter in writing but government officials either: 1.) Stonewall any response, or 2.) Get fired or transferred if they investigate the matter, or 3.) Send a generic non-responsive form letter, or 4.) Finger point to another agency in an endless runaround.

212.  PLAINTIFF was attacked by government-financed, directed, and resourced hired attack services who had command-and-control operated by government officials.

213.  The GOVT has spent over ten times more money on delaying the payment of funds to the PLAINTIFF than if they had just settled with PLAINTIFF in the first place. The GOVT has exacerbated the case to the point that it has gained thousands of times more media coverage than if they had just settled with PLAINTIFF in the first place. The GOVT has wasted vast amounts of taxpayer money and created an international media incident when those losses could have been entirely avoided if they had just settled with PLAINTIFF and been responsive to the PLAINTIFF, in the first place.

214.  Many government officials, up to and including the U.S. Attorney General, The Secretary of Energy, The Director of the FBI, etc., have been fired over this case and related matters, due to their attempts to manipulate government funds and resources to inure to a cartel of insiders who backed those officials' appointments to those positions. (i.e.: The Covington & Burling files), LDLinsiders who backed those officials' appointments to those positions. (i.e.: The Covington & Burling files) LDLinsiders who backed those officials' appointments to those positions. (i.e.: The Covington & Burling files)

215.  PLAINTIFF became a government witness and reported on crimes by government officials. In reprisal, revenge, vendetta, retaliation, and retribution, PLAINTIFF has been severely harmed. The angry government officials took away the PLAINTIFF's QUALITY OF LIFE.

216.  Plaintiff has lost everything which includes his house, income, job, life savings, brand, and every source of income using sophisticated spy craft-type attacks. They attacked him as reprisal/vendetta because he reported an organized crime activity involving famous U.S. Senators and their billionaire sex-addict financiers. (i.e.: for context, look up the court cases of Jeffrey Epstein, Andy Rubin, Howard Rubin, Ed Buck, and the hundreds of other related sex cult cases in the federal courts on http://www.pacer.gov.)

217.  The PLAINTIFF served the public, only to have the criminals they investigated get hundreds of billions of dollars, at the expense of the PLAINTIFF and public tax dollars, while PLAINTIFF got nothing and lost everything

218.  The Defendants deliberately failed to live up to the terms of the agreement and have not paid the proper wages.

219.  The Defendants benefitted from Plaintiff's work on numerous occasions but failed to pay Plaintiff a just compensation for the work that he performed.

220.  Thus, the Defendants have been unjustly enriched.

221.  The PLAINTIFF is entitled to damages.

## V.  FRAUDULENT MISREPRESENTATION

222. The PLAINTIFF repeats and re-alleges each of the foregoing allegations as thoughtfully set forth herein.

223.  PLAINTIFF offered GOVT asset collateral of over $100 million to secure the ATVM loan.

224. PLAINTIFF's loan application revealed sensitive and confidential technical and business information as defined by 10 CFR §§ 1004.10(b)(4), 11 and 5 U.S.C. § 552(b)(4) to GOVT. This information included fuel cell and hydrogen storage technologies, fuel cassettes and pressure membrane body parts.

225. 103. PLAINTIFF was unaware that Defendants had "fixed" the ATVM loan process to benefit political donors. PLAINTIFF also was unaware that Defendants had no intention of approving PLAINTIFF'S ATVM loan application under any circumstances as a matter of reprisal for whistle-blowing and unfair business practices to avoid competition against Tesla and other Congressional stock holdings.

226. Therefore, PLAINTIFF repeatedly contacted GOVT to provide engineering, financial and other information in support of its application.

227. On April 23, 2009, Jason Gerbsman, the Chief of Staff and Senior Investment Officer, at the Loan Programs Office, Automotive Division, of GOVT, notified PLAINTIFF that: PLAINTIFFS has submitted a complete application and has been assigned to both a technical eligibility and merit review team, as well as a financial viability analysis team. The technical team is close to finishing their evaluations on both eligibility and project merit, and the financial team will be launching a more detailed and interactive due diligence phase of the PLAINTIFF'S application review very soon. Following the technical and financial evaluation under the second stage of the process, we will move into the underwriting phase where our goal is to negotiate a conditional commitment, including a detailed term sheet. This will be followed by the fourth phase of the loan process where the final details will be negotiated, and the loan will be close

228. On May 26, 2009, Gerbsman offered an in-person meeting to discuss "PLAINTIFF'S next steps."

229. On May 28, 2009, PLAINTIFF flew a delegation from California to meet with Gerbsman, who said that GOVT had determined "everything was in order" with PLAINTIFF'S ATVM loan application, that "everything looked good" and that PLAINTIFF "appeared to be fully compliant and passed technical review."

230. Shortly thereafter, PLAINTIFF discovered that Tesla Motors, Inc. ("Tesla") and Fisker Motors, Inc. ("Fisker") had received and were receiving special assistance from GOVT staff with the ATVM loan application process. Fisker even had a business office in GOVT's headquarters.

231. On or about June 22, 2009, GOVT advised PLAINTIFF that a Northern California solar energy company had requested a copy of PLAINTIFF'S ATVM loan application from GOVT through the Freedom of Information Act ("FOIA"). PLAINTIFF contacted this company to see why it was interested in PLAINTIFF'S ATVM loan.

232. PLAINTIFF spoke with the company's principal, who said that he had been "screwed over" by GOVT and wanted to know if others had a similar experience. He said that the company had suffered "bad dealings" with Matt Rogers, a "stimulus advisor" to the Chu from McKinsey & Company, and Steven Spinner, a key player in GOVT's loan program office. Spinner, an Obama campaign bundler who raised millions for the President and who had been appointed to his government position in exchange for his fundraising, also had worked at McKinsey & Company and, according to his biography posted by the Center for American Progress, had served as an active advisor and investor to Tesla.

233. PLAINTIFF was told that Rogers and Spinner were "rigging the game." It was given Spinner's phone number and told to call Spinner and ask him why PLAINTIFF'S ATVM loan application was not moving forward.

234.  PLAINTIFF texted Spinner and then called him. Spinner answered the phone and told PLAINTIFF words to the effect of "Do not ever call me again. The awards have already been decided."

235.  On June 24, 2009, GOVT announced $8 billion in ATVM loans to Ford Motor Company ("Ford"), Nissan North America, Inc. ("Nissan") and Tesla. Tesla   was the PLAINTIFF'S competitor -- received an ATVM loan of $465 million at a rate of 1.6% from GOVT to manufacture an expensive electric car.

236, On June 29, 2009, PLAINTIFF wrote to Gerbsman again asking for action on its ATVM loan application, pointing out that other lenders were hanging back until after GOVT issued its term sheets, the offering document issued by GOVT that specifies the detailed terms and conditions under which GOVT may enter a Conditional Commitment with the Applicant.

237. In the following weeks, authorized GOVT representatives repeatedly assured PLAINTIFF that "everything was fine", "everything is on-track", and "you [WITNESS] appear to meet every criterion" with respect to an ATVM loan. PLAINTIFF was even told that "we [GOVT] should be able to announce [an approved ATVM loan] any day now..."

238.  However, on August 21, 2009, Seward denied PLAINTIFF's ATVM loan application**. See Exhibits and evidence websites at** http://www.majestic111.com **and http://www.the-truth-about-the-dept-of-energy.com**

239.  In an email to GOVT's Chris Foster, PLAINTIFF requested GOVT's merit review documents and asked how GOVT technical evaluators could conduct a ten-month comparative merit review of PLAINTIFF's ATVM loan application without speaking to any single company engineer or senior project staff member for more than 1% of the time that GOVT staff attended to Tesla, Nissan Ford, and Fisker during the same review period.

240.  On or about August 26, 2009, PLAINTIFF called Foster. Foster said GOVT had denied the application because Foster said PLAINTIFF "electric car did not use E85 gasoline, PLAINTIFF was not planning on building "enough" cars, PLAINTIFF was not planning on selling cars to the government, PLAINTIFF's electric motors t and batteries were too futuristic and not developed for commercial use, PLAINTIFF's car was a "hydrogen car," and PLAINTIFF had underestimated the cost of metal body fabrication."

241.  The reason given for the denial of the loan was based on false pretense.

242.  Defendants made false and misleading statements to Plaintiff regarding his duties and application process for the grant application and approval.

243.  DEFENDANT made false allegations regarding the responsibilities and duties of the grants/loan and there was no causal connection.

244.  DEFENDANT made false promises to the PLAINTIFF.

245. DEFENDANT made false and misleading statements to PLAINTIFF regarding his duties and the responsibilities regarding the application process.

246.  DEFENDANT made false and misleading statements to PLAINTIFF and there was no causal connection.

247.  DEFENDANT fraudulently concealed information regarding the grants and the application process and the final assessment regarding the application process.

248. DEFENDANT made false promises regarding the conduct and what is necessary regarding the loan process.

249.  DEFENDANT has fraudulently concealed information relating to the issue of the LOAN.

250. There is a causal connection between the real reason the loan application was denied because the DEFENDANTS made false pretenses regarding the loan and applicant process.

251. DEFENDANTS have made false promises to conduct and failed to disclose objectives regarding the LOAN.

252. DEFENDANTS have made false and misleading statements and concealed material information concerning the LOAN.

253. In so doing, DEFENDANTS further violated their duties under the law regarding the application process and approval of the LOAN.

254. DEFENDANTS and their co-conspirators have made a material misrepresentation, have omitted material facts, and have concealed material information concerning the application and loan process.

255. The PLAINTIFF has been harmed and is entitled to damages.

## VI. **FRAUDULENT CONCEALMENT**

256. The PLAINTIFF repeats and re-alleges each of the foregoing allegations as thoughtfully set forth herein.

257. Foster never provided PLAINTIFF with GOVT's merit review documents or described the applicable evaluation criteria. On September 21, 2009, PLAINTIFF wrote to Chu requesting reconsideration of GOVT's ATVM loan denial. **See Exhibit**

258. PLAINTIFF demonstrated that the stated reasons for GOVT's denial were false. It asked Chu to explain why GOVT staff repeatedly assured PLAINTIFF that approval would be forthcoming and that no additional information was necessary (leading PLAINTIFF and its principals to expend huge sums of money in reliance thereon), and why government-crony companies that applied after PLAINTIFF

were reviewed earlier, given the benefit of extensive access to and interaction with GOVT staff (a benefit denied to PLAINTIFF), and then awarded funds.

259.  On October 23, 2009, Seward replied to PLAINTIFF. **See Exhibits**. He did not answer PLAINTIFF'S questions. Instead, he backfilled with new but equally baseless reasons for PLAINTIFF'S rejection.

260. The reason for the denial was unreasonable. To begin with, Seward said that PLAINTIFF'S application was "deemed Substantially Complete on November 10, 2009." In fact, APPLICATION'S application had been given deemed complete on December 31, 2008.

261. Seward said that the "proposed technology appeared to be at a development stage and not yet ready for commercialization" and that the "assumption that the vehicle concept would be ready for production in three years" was a "significant weakness" due to the "high level of risk associated with the design." In fact, the PLAINTIFFS vehicle's technology had been in use commercially for years by the U.S. Department of Defense, NASA, and the automobile industry; the politically connected companies that were awarded ATVM loan funds were no further ahead in production than PLAINTIFF, and elements of PLAINTIFF'S "elevated risk design" were already in use by Toyota and Nissan.

262.  The second reason given by Steward was baseless. Seward said, "the proposed project's impact on fuel economy…was determined to be weak." In fact, non-gasoline-powered automobiles are uniformly recognized to offer the most significant impact on fuel economy performance. PLAINTIFF vehicle promised even better fuel economy than any of the ATVM loan "winners" (Tesla, Nissan, Ford or Fisker) proposed or offers to this day.

263. The third reason given by Steward was groundless. Seward said, "A review of the advanced fuels in your project and the feasibility of that energy source…was [sic] questionable." In fact, the fuels,

products, and subparts of the "questionable" energy source are readily available to consumers at REI Sporting Goods, Amazon.com, and Safeway supermarkets.

264. The fourth justification given by Steward for the denial as it was unrealistic. Seward said, "A review of the calculations and assumptions supporting your claims for reductions in petroleum use were deemed to be unrealistic." In fact, over two hundred institutional research and white papers from respected government and university agencies from around the world supported PLAINTIFF'S claimed reductions.

265.. Seward's letter was the first time any of these issues had been raised by GOVT with the PLAINTIFF, notwithstanding ten months of "underwriting," and multiple meetings, phone calls, and emails. Incomprehensibly, GOVT had refused to consult with any of PLAINTIFF'S engineers and denied PLAINTIFF the "interactive" review that had been promised in April and had in fact been provided to Tesla, Fisker, Nissan, and Ford.

266. DEFENDANTS did not review the PLAINTIFF'S ATVM loan application in good faith and in accordance with its regulations, policies, and promises. Instead, it stonewalled WITNESS.

267. Each application that the PLAINTIFF presented was denied.

268.  ON or about February 1, 2009, PLAINTIFF (through Limnia) applied for a $15 million ATVM loan to help fund work with GOVT's own Sandia National Laboratories ("Sandia") to produce a "best of breed and state of the art" automobile energy storage system using PLAINTIFF'S patented fuel cell technology

269. DEFENDANTS and their co-conspirators have made material misrepresentations, have omitted material facts, and have concealed material information concerning the LOAN.

 270.  DEFENDANT concealed or suppressed a material fact

72    Federal Complaint And Exhibits

271. DEFENDANT had knowledge of the material fact

272. The PLAINTIFF f suffered damage because of the DEFENDANT's action.

273 The DEFENDANT suppressed or concealed this fact with the intention that the plaintiff be misled as to the true condition

274. The PLAINTIFF was so misled by the actions of the DEFENDANTS.

275. The PLAINTIFF suffered damage as a result

276. The PLAINTIFF repeats and re-alleges each of the foregoing allegations as thoughtfully set forth herein.

277. The acts and events set forth above constitute negligent and wrongful acts and omissions of agents and employees of the U.S. Government, inter alia, negligent investigation, abuse of process, conversion of personal property, denial of the right to legal counsel, infliction of emotional distress and interference with a prospective economic opportunity while acting within the scope of their offices and employment, under circumstances where the Defendant U.S., if a private person, would be liable to the Plaintiff in accordance with the laws of the Washington, D.C.

278. The PLAINTIFF is entitled to damages to determine by a jury.

### VII.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

279.         The PLAINTIFF repeats and re-alleges each of the foregoing allegations as thoughtfully set forth herein.

280. As set forth above, Defendants agreed to participate together in a common scheme to commit unlawful acts, or to commit lawful acts by unlawful means, including, but not limited to, unlawfully obstructing federal officials in the performance of their constitutional duties,

281.  Pursuant to, and in furtherance of that common scheme, Defendants exhibited extreme and outrageous conduct that went beyond all bounds of decency. This conduct intentionally or recklessly caused the PLAINTIFF to suffer from severe emotional distress, as described supra.

282. Based on the foregoing, all Defendants are liable to the PLAINTIFF for the resulting damage.

### VIII. VIOLATION OF 28 U.S.C. §2680 (h)

283. The PLAINTIFF repeats and re-alleges each of the foregoing allegations as though fully set forth here2in.

284.  The acts and events set forth above constitute negligent and wrongful acts and omissions of agents and employees of the U.S. Government, inter alia, negligent investigation, false imprisonment, abuse of process, conversion of personal property, infliction of emotional distress and interference with a prospective economic opportunity while acting within the scope of their offices and employment, under circumstances where the United States, if a private person, would be liable to the Plaintiff in accordance with the laws of the State of Oklahoma. Because these acts and events were undertaken and caused by investigative and law enforcement agents or persons holding themselves out as law enforcement agents of the Defendant U.S., the U.S. Government is liable for all damages caused by such acts, as provided by 28 U.S.C. §2680(h).

285.  The Plaintiff is entitled to damages

### IX.  VIOLATION OF FEDERAL TORTS CLAIMS ACT

286.. The PLAINTIFF repeats and re-alleges each of the foregoing allegations as thoughtfully set forth herein.

287.  The acts and events set forth above constitute negligent and wrongful acts and omissions of agents and employees of the U.S. Government, inter alia,  breach of contract, unjust enrichment,

fraudulent misrepresentation, fraudulent concealment,  conversion of personal property, , infliction of emotional distress, and interference with a prospective economic opportunity while acting within the scope of their offices and employment, under circumstances where the Defendant U.S., if a private person, would be liable to the Plaintiff in accordance with the laws of Washington, D, C. for the District of Columbia.t

288.  The Plaintiff is entitled to damages

## X.  INFRINGEMENT ON PATENT NUMBERS ASSIGNED TO PLAINTIFF

289.  The PLAINTIFF repeats and re-alleges each of the foregoing allegations as thoughtfully set forth herein.

290. The Plaintiff's issued PATENTS are valid and enforceable.

291. DEFENDANT has infringed and continues to infringe the claims of Plaintiff's issued patents under 35 U.S.C. § 271(a), either literally or under the Doctrine of Equivalents, by operating and using the patent process within the United States that is covered by the claims of the patents listed at http://www.uspto.gov.

292. DEFENDANT has had knowledge and notice of the Plaintiff patent,s as well as of its own infringement of the patents, since the first communications with Plaintiff and virtue of the present Complaint.

293. On information and belief, DEFENDANT has had knowledge and notice of the patents, including asking the U.S. Department of Energy to request valuation reports on the Plaintiff's patents as well as of its own infringement of the 'patent.

294. DEFENDANT has had the knowledge and notice of the patents, as well as of its own infringement of the patents, since the first communications with Plaintiff and virtue of the present Complaint.

295. PLAINTIFF has been and continues to be damaged by DEFENDANT's infringement of the Plaintiff's patent. On information and belief, a reasonable royalty for infringement of the patents would be at least $300,000.000.00 of loss revenue resulting from its infringing activities.

296. DEFENDANT's infringement of the Plaintiff's patents has been and continues to be willful.

297. DEFENDANT's infringement of the Plaintiffs patents renders this case exceptional within the meaning of 35 U.S.C. § 285.

298. PLAINTIFF is entitled to damages.

# CLAIMS FOR RELIEF

**BEFORE WITNESS** requests the following relief.

A. A declaration pursuant to 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706(2)(B) that the denial of 'PLAINTIFF'S applications was unlawful, and compensatory and injunctive relief directing GOVT to approve same.

B. Actual damages claimed for the acts alleged under the basis for these amounts per Exhibits, including any punitive or exemplary damages claimed, in the precedent amounts per past related cases, per the reasons claimed herein that PLAINTIFF is entitled to in actual and punitive money damages.

C. Such costs and fees as PLAINTIFF may be entitled to under the law.

D. PLAINTIFF is also making claims for witness fees, legal fees, and damages in relation to this matter, from his interaction with government agencies. Such other relief as this Court deems just.

Respectfully submitted,

John Doe                    2 -28 . 2 2
PLAINTIFF
Address provided to court under cover
Phone Number provided to court under
cover

# EXHIBITS

**(Attached In Electronic Filing)**

# EXHIBIT 1 – Exhibits Summation

Key Plaintiff personally knew famous politicians, and their Big Tech financiers, (Some even stayed at his house) who joined forces to manipulate government funds, and stock market rigged "market pumps" into their own pockets in the last two "stimulus" funds. Plaintiff was invited into the scheme but declined and became a federal witness.

There has never been so much taxpayer cash given to so few people, where each, and every, one of the recipients was a friend of the politicians. Those who got the cash immediately skimmed "unjust stock market profits" with it and paid kick-backs to the politicians. Plaintiffs found out that their political representatives own the stocks and assets of their competitors, have sex with and party with their competitors, get tens of millions of dollars of election manipulation services from their competitors and use government spy agencies and public services agencies to screw over competitors. Most of Plaintiff's political representatives work for corporations who abuse the public and they do it out of pure mercenary greed and lust for power.

'Big Tech' Cartel companies: Google, YouTube, Netflix, Tesla, Facebook, et al, coordinated to hire the same little organized group of lawyers, CPA's, lobbyists, opposition research attack services, paid-under-the-table "reporters" and CPAC managers. This created an FBI-prosecutable *"Enterprise"* as defined by the RICO Racketeering laws. This 'Enterprise' coordinated political campaign funding and internet manipulation to the exclusive benefit of this 'Enterprise' and paid payola, in stocks, to corrupted, and famous, political figures who assisted them. In FCC, DOE and EPA contracts, grants, tax waivers and insider regulation blockades, almost every person at those agencies held stock in, or was paid and/or hired, by this Cartel. That is a felony abuse of public resources!

Almost every competitor to the insiders, including Plaintiff, was attacked and sabotaged using state and federal resources to pay Fusion GPS, Black Cube, The Denton Tabloids, Media Matters, In-Q-Tel and other attack services. The victims demand justice and restitution for the government investment fraud, loss of years of their lives under a false federal pretext, harassment and interference they suffered. The victims seek to be compensated for the malicious, proven, retribution tactics, lies, toxic exposures, vendetta cut-offs of all earned government funds and benefits, tort-based interference, "missing hard drives" and interdiction efforts conducted, with applicants own tax dollars, against the applicants. White House senior executives and California's most powerful Senators hired a tabloid publisher to seed the internet with self-produced defamation articles and animated attack videos and paid Google to manually lock those attack media items on the first line of every Google and YouTube search, around the globe, for over a decade. Orders were given, BY the Defendants, TO certain federal agencies directing those agencies to with-hold beneficial actions, FOR Plaintiffs, as reprisal for reporting the crimes.

This is a felony-class slush-fund crime that has cost taxpayers trillions of dollars in losses and has cost Plaintiffs many tens of millions of dollars in damages and losses. The government has lost billions of dollars from Defendants tax evasions and money laundering and Google, for example, failed to report over a billion dollars of political campaign contributions.

Big investment banks like J.P. Morgan, Goldman Sachs, et al. coordinated these schemes with money laundering, tax evasion, offshore covert funds and other financial trickery. FinCEN, Interpol, FBI, GAO, and most other investigators, have proof of these assertions but they have been stalled from making arrests. The money-tracks go right back to the politicians families from the bank accounts of Google, Facebook, Tesla, Netflix, Sony Pictures, etc; forensic accounting records. Government agencies were in charge of making sure these crimes did not happen but they chose to 'steal instead of serve'! They chose to help these crooks 'cheat instead of compete'!

The politicians that the taxpayers EMPLOY do not get to make hundreds of millions of dollars in crooked profits off of government funds that are supposed to help citizens under duress. They won't let Plaintiffs have a jury trial, or a live Senate hearing, because they know they will lose and they will be shamed!

Defendants are government employees and contractors and their political financier corporations and individual high net worth oligarch owners.

---

http://www.majestic111.com

## EXHIBITS:

EXHIBIT 1 – Exhibits Summation........................................................................ 79
EXHIBIT 2 - State-Sponsored Reprisal Attacks And Harms Against The Whistle-Blowers:............... 83
EXHIBIT 3 - An Overview Of The Cover-Up......................................................... 98
EXHIBIT 4 - Public News Coverage Context Of These Crimes And Corruption Activities:.............. 105
EXHIBIT 5 - An Inconvenient Truth....................................................................... 109
EXHIBIT 6 – Testimony #231............................................................................. 138
EXHIBIT 7 – Crony Corruption Goes High Tech.................................................... 143
EXHIBIT 8 - Plaintiff Demands........................................................................... 160
EXHIBIT 9 - The Retaliation Attacks................................................................... 164
EXHIBIT 10 – Court Demand For FBI '302 Reports' On Each Attacker.......................... 170
EXHIBIT 11 - These Are The Hired Attackers........................................................ 172
EXHIBIT 12 - Senators Are Your Attackers And Your Business Competitors.................... 187
EXHIBIT 13 – Political Reprisal, Vendetta, Payback, Retribution, Retaliation, Revenge.................. 195
EXHIBIT 14 - Killing The Messenger................................................................... 199
EXHIBIT 15 – More Details On The Specific Attacks And Harms Against Plaintiff........................ 203
EXHIBIT 16 - Proof Of These Assertions............................................................... 219
EXHIBIT 17 – Analyzing The Attackers The White House Hired.................................. 220
EXHIBIT 18 - The Suspicious Deaths................................................................... 227
EXHIBIT 19 - The Tech Cartel........................................................................... 230
    EXHIBIT 20 – The Political Bosses.................................................................. 233
    EXHIBIT 21 - Felony Charges Against Elon Musk............................................... 242
    EXHIBIT 22 - Felony Charges Against Larry Page, Eric Schmidt, Sergey Brin And Jared Cohen. 303
    EXHIBIT 23 - Felony Charges Against Mark Zuckerberg And Cheryl Sandberg................ 352
EXHIBIT 24- Felony Charges Against U.S. Senators White House Executives And Other Public
Officials................................................................................................... 357
    EXHIBIT 25 - Related Cases And Dockets........................................................ 361
EXHIBIT 26 -Trillions Of Dollars Of Political Mining Manipulations............................ 363
EXHIBIT 27 - Energy Corruption Recap.............................................................. 513
    EXHIBIT 28 - The Political Money Laundering.................................................. 528
    EXHIBIT 29 – The Crony Insider Political Payola.............................................. 533
EXHIBIT 30 - Claim And Damages Elaboration..................................................... 550
EXHIBIT 31 - The Bay Area Culture Of Political Corruption..................................... 556
EXHIBIT 32 - Why Silicon Valley CEOs are such raging psychopaths............................ 566
EXHIBIT 33 – How They Ran The Scams............................................................. 669
EXHIBIT 34 - The Bribes Using The Stock Market.................................................. 675
    EXHIBIT 35 - The Hit Job Operators The White House Hired.................................. 694
    EXHIBIT 36 - The Sex Cult Club These Perpetrators Use...................................... 697
    EXHIBIT 37 - The Crimes And Corruption That Plaintiffs Experienced...................... 713
    EXHIBIT 38 - U.S. Senators, Agency Heads And Congress-People Were bribed With These
    Payments:............................................................................................. 725

EXHIBIT 39 - The Techtopus: How Silicon Valley's most celebrated CEOs conspired to drive down 100,000 tech engineers' wages.................................................................................................. 733
EXHIBIT 40 – General Overview Of The Corruption Scheme........................................................748
EXHIBIT 41- The Quid Pro Quo Process.......................................................................................755
EXHIBIT 42 - David Brock Can Kill You, And Destroy Your Democracy, With A Single Facebook Page............................................................................................................................................. 811
EXHIBIT 43 – How The Public Is Helping Fight Back Against This Corruption..............................818
    You Owe It To Yourself And The Nation To Take These Crooks Down!........................................827
EXHIBIT 44 - How Quid Pro Quo Works At The U.S. Dept Of Energy............................................839
EXHIBIT 45 - The Corrupt Crony-Capitalism Quid Pro Quo Payola...............................................847
EXHIBIT 46 - The Blockades Of The Victim's Legal Representation...............................................848
EXHIBIT 47 - The Indisputable Facts............................................................................................ 861
EXHIBIT 48 - KEY REPORTS......................................................................................................... 866
EXHIBIT 49 – Turning Government Employees And Contractors Into Mobsters.............................879
EXHIBIT 50 - The Details Of The RICO Racketeering Complaint And Reprisal Complaints............883
EXHIBIT 51 - We're Not Saying It's Mobsters But...It's Mobsters..................................................894
EXHIBIT 52 - Blockade Of Plaintiff Legal Representation And Rights.............................................903
EXHIBIT 53 - The Office Of The Special Counsel (OSC) Is Not Your Friend..................................907
EXHIBIT 54 - How Government Agencies Were Used As Reprisal Weapons Against Plaintiff..........909
EXHIBIT 55 - How Plaintiff And The Members Of The Public Were Harmed, Specifically..............915
EXHIBIT 56 – Further Details On The Demand By Victim/Plaintiff..................................................918
EXHIBIT 57 - How Much Have Others Been Paid For The Same Damages?.....................................920
EXHIBIT 58 - One Example Of The Corruption Experience..............................................................922
EXHIBIT 59 - The Scams At The Secretary Of Energy's Office........................................................955
EXHIBIT 60 -Witnesses Letter To The FBI.................................................................................... 960
EXHIBIT 61 - State-Sponsored Reprisal Attacks Suffered By Plaintiff's..........................................969
EXHIBIT 62 – Standard Government Operating Procedure = Kill The Witness.................................992
EXHIBIT 63 - State Sponsored Reprisal Programs Operated By Public Officials.............................1041
EXHIBIT 64 - THE RICO TECH CARTEL SYNDICATE....................................................................1056
EXHIBIT 65 - The Culture Of Crime In Silicon Valley And Washington, DC...................................1059
EXHIBIT 66 - The Tech Cartel And Their Khaki Pants Mobsters....................................................1068
EXHIBIT 67 – Details On The Factual Allegations.........................................................................1072
EXHIBIT 68 - The Rico Violations That Prove That These Guys Are Mobsters...............................1145
EXHIBIT 69 - What Sort Of Laws And Regulations Were Violated?................................................1173
EXHIBIT 70 - What A Jury Would Discover About This Case.........................................................1180
EXHIBIT 71 - Congress Took Massive Bribes from Big Tech..........................................................1193
EXHIBIT 72 – Case Diagrams And Web Links To Evidence...........................................................1196
EXHIBIT 73 - References, Proof And Bibliography........................................................................1237
EXHIBIT 74 - Acknowledgments & Additional Exhibits.................................................................1655
EXHIBITS 75 - Press Coverage Of The Case................................................................................ 1656