**Name: SD Redmond**
**Address: 210 S. Ellsworth Ave, #1275**
**San Mateo, CA 94401**
**Phone Number: 510-868-2862**
**E-mail Address: justice@majestic111.com**
**Case URLs With Additional Evidence Provided by Federal Agencies And Congress:**
**https://san-francisco-news.com**
**http://www.the-truth-about-the-dept-of-energy.com**
**https://san-francisco-news.com**
*PLAINTIFF, A Pro Se, disabled, non-lawyer, federal witness who has requested Court appointed counsel*

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

### SAN FRANCISCO, CALIFORNIA

### (UNLIMITED CIVIL JURISDICTION)

| | |
|---|---|
| **SD REDMOND, a Pro Se non-lawyer federal whistle-blower/witness** ) | **CASE NO.: 22-cv-1107-TSH** |
| ) | |
| ) | **JUDICIAL STATEMENT** |
| **PLAINTIFF,** ) | |
| ) | **INTENTIONAL FRAUD; CONCEALMENT** |
| ) | **FRAUD; NEGLIGENT** |
| **v.** ) | **MISREPRESENTATION; INTENTIONAL** |
| ) | **INFLICTION OF EMOTIONAL DISTRESS;** |
| ) | **RICO RACKETEERING;** |
| **UNITED STATES OF AMERICA** ) | **ANTI-TRUST/MONOPOLY;  COURT** |
| ) | **ORDER DEMANDED FOR FULL SSDI** |
| ) | **BACK PAYMENTS; AND SUCH OTHER** |
| ) | **CLAIMS LISTED HEREIN UNDER** |
| ) | **"CLAIMS" SECTION** |
| **DEFENDANTS.** | **DEMAND FOR JURY TRIAL** |

**Filed:**

**ADDITIONAL EXHIBITS TO BE FILED
ELECTRONICALLY AND NOW
AVAILABLE, ON THE WEB, TO THE
PUBLIC, GLOBALLY, AT LINKS ABOVE
AND MIRROR SITES**

**JUDICIAL STATEMENT**

**JUDICIAL JUDGE AND STAFF BIAS AND CONFLICT-OF-INTEREST MITIGATION IN THIS CASE**

To Whom It May Concern:

A famous local judge has spent many nights romping in Plaintiff's backyard hot-tub and Plaintiff has now testified to federal investigators about one of her family members. Another local judge has dated Plaintiff's ex girlfriend. A large number of Judges, and their senior staff, have been photographed attending parties and social events with the key Defendants. Three of the key Defendants insiders have stated that they "*control Bay Area politics and Court decisions*" and that they are "*bullet proof in Court*" due to their wealth and power. FINCEN, SEC, ICIJ, FTC and other investigative records prove that over 75% of the Judicial entities in the region share the same stock market profit paths with the key Defendants. For these, and many other reasons, known to the FBI and other agencies, the potential for Judicial bias, cover-ups, judicial obfuscation, intentional case delays, and other Court misdeed potential must be considered. This matter is rife for crony court manipulation. Plaintiff intends to fully pursue the arrest of any party who engages in such actions.

This document has been published to all law enforcement, regulatory, Judicial councils, Congressional and independent news outlets and presented to the public on multi-million-person platforms in order to mitigate cover-ups.

"Government staff and contractors have told us: "just sue us". This was their response to trying to resolve this issue.

# Table of Contents

The Blockade Of Counsel:.................................................................................................................2
Overview..............................................................................................................................................7
Supreme Court's Roberts Says Judges Must be Ethical After Over 100 Caught Violating Rule.............8
80% of U.S. Judges Can Be Taken Out Of Office By Exposing Their Sex Crimes...............................10
Robed in secrecy: How judges accused of misconduct and bribes dodge public scrutiny......................12
How Did America's Judges Become Such Corrupt Perverts?................................................................18
What's a judge's moral standard? Allegations of racism, sexism spotlight judicial misconduct.............21
Contra Costa Superior Court Judge Steven Austin Aided & Abetted Real Property Theft....................28
When The Judge Works For Your Political Adversary And Is Ordered To 'Take You Out' By The White House................................................................................................................................................35
Immigrant Who Became Hotshot Chicago DNC Judge Sentenced To Jail For $1.4m Mortgage Fraud.39
California Judges....................................................................................................................................41
Thousands of U.S. judges who broke laws or oaths remained on the bench..........................................53

A watchdog accused, a pattern of rulings delayed, a repeat offender.................................................70

# The Blockade Of Counsel:

The current tactics being used to prevent Plaintiffs from accessing their legal rights, and blockading them from fair legal representation, include:

**A.** Plaintiffs have been "black-listed". Even though the law in California (Cal. Lab. Code § § 1050 to 1053) says that an entity can't prevent or attempt to prevent former workers from getting work or representation through misrepresentation, knowingly permitting or failing to take reasonable steps to prevent blacklisting, or make a statement about why an employee was discharged or left employment, implying something other than what is explicitly said, or providing information that was not requested: It is done every day in Silicon Valley. The "Silicon Valley No Poaching Black-List" class-action lawsuit was about this issue. Federal FAR Section 9.104-1 (d), and related laws, apply. Blacklisting is a key part of the IC Vendetta Cycle attacks. The victims also suffered damage to their rights under the Age Discrimination in Employment Act (ADEA) (29 USC Sec. 621, et seq.); the Americans with Disabilities Act (42 USC Sec. 12181, et seq.); the Civil Rights Acts - (42 USC Sec. 2000, et seq.); the Davis-Bacon Act (40 USC Sec. 276a, et seq.); the Employee Retirement Income Security Act (ERISA) (29 USC Sec. 1001, et seq.); the Equal Pay Act (29 USC Sec. 206[d]) and other violations.

**B.** Each and every law firm capable of handling Plaintiffs case has been contracted, paid and/or influenced so that they are "conflicted out" from representing Plaintiffs. Law firm Mofo was threatened if they helped Plaintiffs. Lawyer Amy Anderson was threatened and lost her license for attempting to help Plaintiffs. Every lawyer or law firm who attempts to help Plaintiffs is hired by Defendants, or their agents and threatened or compromised in order to prevent them from helping Plaintiffs because this case affects trillions of dollars of energy industry profits, the White House, billionaire oligarchs and multi millionaire corrupt Senators. In fact, this issue lies at the root of this entire corruption case. Sociopath over-moneyed Silicon Valley oligarchs have hire Morrison Foerster, Wilson Sonsini, Perkins Coie, Covington Burling and every other major law firm and lobbyist and told them to "black list" Plaintiff or lose their multi-million dollar Big Tech contracts. These law firms (controlled by Mark Zuckerberg, Elon Musk, Larry Page, Eric Schmidt, Steve Westly, Vinod Khosla, Laurene Powell Jobs, Nancy Pelosi, etc. All of whom have nearly a trillion dollars of funds at their disposal) have carte blanche and unlimited payments to run coups, character assassination campaigns, money laundering and other crimes for the oligarchs. They have the staffing to do these things and zero incentive to not

do crimes. These law firms are the dirty deeds teams for the mobster-like suspects and there is no law enforcement body with the will nor resources to stop them. It is a violation of the U.S. Constitution to tell Plaintiffs to "go get a law firm" when EVERY possible, equitable, law firm works for, and is massively compensated by, the criminals that need to be sued. Both the politicians AND the tech oligarchs charged with these crimes have hired the very law firms that government agencies have told Plaintiffs to go out and hire.

**C.** There is a precedent that was set in the US Supreme Court case: Gideon v. Wainwright, (1963) that clarifies that you have a right to a lawyer even if you don't have money for one. The Sixth Amendment, as applied to the states through the Fourteenth Amendment Due Process Clause gives one their Due Process rights. One needs to kill someone, though, to most easily get your free lawyer, since the court-appointed lawyer is rarely ever appointed, on citizens behalf, in a case like this. Even if a defendant is represented by an attorney of his or her choosing, he or she may be entitled to relief on appeal if the attorney did not provide adequate representation. A defendant must demonstrate that the attorney's performance "fell below an objective standard of reasonableness" and that this was prejudicial to the case. See: Strickland v. Washington ( https://supreme.justia.com/cases/federal/us/466/668/case.html ) , 466 U.S. 668, 688-92 (1984). A few "free lawyers", that victims had tried, turned out to be working for the opposition side.

**D.** The federal organization: https://www.lsc.gov is required to help but has refused because it's administrators were friends with, and appointed by, the public officials charged with corruption in this case.

**E.** Plaintiffs have personally asked the Attorney General, The Director of the FBI and the U.S. Attorney's office for representation but they have been told not to respond because the case is politically embarrassing to major public officials and their corrupt Silicon Valley financiers.

**F.** The government agencies who have told Plaintiffs that Plaintiffs should "hire a law firm and sue them", in order to resolve this matter, are the same government agencies that have cut-off, or blockaded Plaintiffs income sources in order to prevent Plaintiffs from being able to afford to hire a law firm to sue them.

**G.** A federal agency provided Plaintiffs with a list of "free lawyers". Upon FBI-level investigation of every "free lawyer" on the list, (via their financial contributions, voting records, leaked emails, social media postings, event attendance, public records, social connections lists online and other surveillance data) they all worked for, or with the opposition interests and could not have possibly provided unbiased services. In fact, multiple lawyers have contacted Plaintiffs who turned out to be working for the opposition. They were sent in to delay, or redirect, Plaintiffs in order to keep the cases from being filed or properly prosecuted in order to protect the suspects. This is a common infiltration procedure

widely documented in CIA, British secret service, Russian FSB and Snowden leaks documents on IC dirty tricks tactics.

Agency staff were ordered to harm Applicants by manipulating their benefits in order to deny, delay, obfuscate and reduce their income as reprisal for their assistance to law enforcement in a political corruption and money laundering matter. Agency staff, ranging from the lowest level staff and up to the director headquarters offices, participated in this reprisal-vendetta-revenge action to harm Applicants.

Applicant's peers have filed DOJ and FBI criminal referrals, launched federal investigations and the assertions have been proven in numerous IG, FBI, Congressional and major news media investigations. Agency offices have failed to provide responsive FOIA requested data, hearing investigation data and fair responses because some of their staff are STILL operating a criminal cover-up which has now been update-reported to the FBI, Congress, the IG, the AG and investigative reporters.

Other federal agencies have complied, verified and provided the requested deliverables. SSA and GOVT have pointed the searchlight of suspicion on themselves, laser-like, by their overt failure to comply, unlike every other agency. Ironically, the political financing of their executives and their personal relationships "happens" to be with the exact same Silicon Valley oligarchs under felony criminal investigations. The stock market brokerage records, family trust accounts, PAC trace-routing, Interpol records and SEC investigation records proves it!

History has proven that non-corrupt portions of federal agencies and public service law and community action firms have executed on their willingness to expend millions of dollars of resources to fight this injustice. Every individual involved in this at SSA and GOVT are on a forensic database. No person at SSA or GOVT who uses our government as a garage sale for corruption favors or a 'kill mill' for political reprisals will avoid the 100% legally executed consequences. They will be targeted and prosecuted even more profoundly than the Applicants were targeted with IC-type hit jobs.

This felony criminal investigation case, is documented on thousands of websites and in dozens of federal court case records in which Applicant won the case or was vindicated in the case and in thousands of news websites.

Applicants researchers and investigators disagree with any decision by any agency which causes a delay in response which puts the applicants in jeopardy for their life and safety.

Testifying, and/or reporting about this crime has resulted in the death, potentially by murder, of the following individuals who reported to the authorities about this crime matter:

Rajeev Motwani; Gary D. Conley; Seth Rich; Philip Haney; David Bird; Doug Bourn; Misti Epstein;

Joshua Brown; Kenneth Bellando; Moritz Erhardt; Imran Aliev; Kate Matrosova; David Drye; Vincent Foster; Kathy Ferguson; Duane Garrett; Eric S. Fox; Judi Gibbs; Berta Caceres; Suzanne Coleman; L.J. Davis; John Hillyer; Stanley Huggins; Sandy Hume; Shawn Lucas; Gary Johnson; John Jones; John F. Kennedy, Jr.; Stephen Ivens; Mary 'Caity' Mahoney; Eric Butera; Danny Casolara; John Ashe; Tony Moser; Larry Nichols; Joseph Rago; Ron Brown; Bob Simon; Don Adams; Peter Smith; Victor Thorn; Lori Klausutis; Gareth Williams; Daphne Caruana Galizia; James D Johnston; Dave Goldberg; Loretta Fuddy; Paul Wilcher; Gary Webb; Beranton J. Whisenant Jr; Stanley Meyer; Jon Parnell Walker; Tyler Drumheller; Barnaby Jack; Dominic Di-Natale; Barbara Wise; Ilya Zhitomirskiy; Jeff Joe Black; Robin Copeland; John Wheeler; Ashley Turton; Michael Hastings; Antonin Scalia; David Koschman; David Werner; Alex Okrent; Kam Kuwata; Larry Frankel; And hundreds more connected to this case who suddenly, and strangely, turned up dead in this case and, ironically, their deaths all benefit the suspects in this case. Applicants are also whistle-blowers who have been previously attacked in reprisal and who have been threatened with continued harm and death.

Any delay, obfuscation, cover-up, FOIA refusal or other obscuring tactic by each and every member of an agency employee or contracting entity will be prosecuted on a person-by-person basis. Each employee or official who causes, by their action, further harm to the Applicants will be sued personally, have their assets garnished and will have a formal criminal referral authored and submitted to the FBI, DOJ, FTC, Congress and the news media. Applicants have sued the highest level personnel in the government for corruption, launched FBI and Congressional investigations against them and had them removed from their jobs and placed under permanent surveillance. The court and news records prove this fact. Do not imagine that any reprisal action by a public agency staffer will go unnoticed or unpunished by federal law enforcement, public forensics and major independent news media investigations.

The suggestion, by certain agency bosses, that one should "just file an IG report" is like telling someone to file a complaint against Hitler at the Nazi SS headquarters. You won't make it through the night! IG reports seem to accomplish nothing more than painting a target on your own back. Court records and news headlines prove that almost every citizen who reported similar political corruption through "official channels" was targeted with hit-jobs and economic blockades....ask Snowden!

What would you do if you found out that your politicians (ie: Dianne Feinstein, Nancy Pelosi, Harry Reid, Kamala Harris) had put over one hundred million dollars in their covert family bank accounts which they got from sabotaging your business, because it competed with them, and from blockading your money because their tech oligarch insiders told them to? Our forensic investigators can 'swear, warrant and certify' that the politicians did the asserted crimes and corruption.

Like a social *Terminex*(c) pest control service, we are eliminating every single tech asshole in Silicon Valley (like the roaches that they are) using 100% legal, law enforcement approved, resources.

# Overview

How can you know that a court will rule fairly on a case involving famous politicians and notorious millionaires that the judicial staff knows, parties with, co-invests with and gets political perks from?

In California, many Judges and Judicial staff own the stock in Silicon Valley companies that one may be suing or charging with RICO and Anti-Trust violations. This can create non-equity in the Court.

Here is what to watch out for.

# Supreme Court's Roberts Says Judges Must be Ethical After Over 100 Caught Violating Rule

https://www.theepochtimes.com/supreme-courts-roberts-says-judges-must-be-ethical-after-over-100-caught-violating-rule_4188383.html

The chief justice of the Supreme Court in his year-end report called on federal judges to work hard to adhere to ethics rules after over 100 were caught violating a rule that requires judges recuse in any matter in which they have a personal financial interest.

Chief Justice John Roberts cited (pdf) a Wall Street Journal investigation that uncovered violations by 131 federal judges across 685 cases between 2010 and 2018.

The George W. Bush nominee portrayed the number of violations as small, noting that they represented less than three-hundredths of one percent of the 2.5 million civil cases filed in the district courts in years studied.

"Let me be crystal clear: the Judiciary takes this matter seriously. We expect judges to adhere to the highest standards, and those judges violated an ethics rule. But I do want to put these lapses in context," he said.

The wording drew a response by James Grimaldi, one of the Journal investigators, who said his team investigated tens of thousands of cases, not 2.5 million.

"The Journal's initial tally was an undercount; it was impossible because of the peculiarities of the judiciary's financial-disclosure process and incomplete information available on case litigants," Grimaldi wrote on Twitter, adding that Roberts' comment "is technically accurate, the suggestion that we could review millions of cases is misleading."

The Journal said Friday that subsequent reporting raised the rally to at least 950 violations.

Roberts also pointed out that most of the judges involved only had one or two identified violations, painting those instances as likely "unintentional oversights" while singling out judges who had more violations or said they didn't know of the ethics rule. Each judge is schooled on ethical duties, Roberts noted.

"This context is not excuse. We are duty-bound to strive for 100% compliance because public trust is essential, not incidental, to our function. Individually, judges must be scrupulously attentive to both the letter and spirit of our rules, as most are. Collectively, our ethics training programs need to be more rigorous. That means more classtime, webinars, and consultations. But it also requires greater attention to promoting a culture of compliance, even when busy dockets keep judicial calendars full," he added.

Roberts proposed utilizing technology to check whether stocks held by judges and litigants would raise questions, floating the possibility of obtaining fresh funding from Congress for the purpose.

He also said that top federal legal experts are already working on addressing the problems, including enhancing the ethics training and refresher courses.

Roberts pens a year-end report annually. Last year, he praised how federal courts performed during the COVID-19 pandemic.

# 80% of U.S. Judges Can Be Taken Out Of Office By Exposing Their Sex Crimes

- NY Judge Bernstein Under Fire as All DNC Judges Re-Examine Their Pasts

- US judge steps down after accusations of sexual misconduct

SAN FRANCISCO (AP) — A prominent U.S. appeals court judge announced his retirement Monday days after women alleged he subjected them to inappropriate sexual conduct or comments.

Judge Alex Kozinski of the 9th U.S. Circuit Court of Appeals said in a statement that a battle over the accusations would not be good for the judiciary. He said he'll step down, effective immediately.

The Washington Post reported last week that at least 15 women made allegations against Kozinski that go back decades. The allegations include inappropriate touching and lewd comments.

Kozinski said while speaking in a "candid way" with male and female law clerks, "I may not have been mindful enough of the special challenges and pressures that women face in the workplace," the statement said. "It grieves me to learn that I caused any of my clerks to feel uncomfortable; this was never my intent. For this I sincerely apologize."

Leah Litman, a law professor at the University of California, Irvine, told the Post that the judge talked about having just had sex and pinched her side and leg at a restaurant the night before they appeared together on a panel at her school in July.

Christine Miller, a retired U.S. Court of Federal Claims judge, said Kozinski grabbed her breasts during a car ride in 1986 after a legal community function in the Baltimore area. She said it came after she declined his offer to go to a motel and have sex.

A lawyer who was not identified said Kozinski approached her when she was alone at a legal event in Los Angeles in 2008 and kissed her on the lips and gave her a bear hug with no warning.

The newspaper said the woman's husband confirmed the incident and said the couple didn't think they could do anything because of the judge's position.

The Post reported last week that six former clerks or more junior staff members accused Kozinski of inappropriate behavior, including showing them pornography.

Kozinski, 67, was chief judge of the 9th Circuit, the largest federal appeals court circuit in the country, from 2007 to 2014. He is known for his irreverent opinions, and his clerks often win prestigious clerkships at the U.S. Supreme Court.

The 9th Circuit has opened a misconduct inquiry that was transferred Friday to the Judicial Council of the 2nd U.S. Circuit Court of Appeals in New York.

Kozinski's retirement leaves five seats open on the 9th Circuit, with two more judges already having announced their intention to retire next year. That gives President Donald Trump potentially seven seats to fill on the largest and most liberal appeals court in the country.

Even if all those judgeships are filled, however, Democratic appointees still will maintain a healthy majority on the court with 17 of the 29 seats.

# Robed in secrecy: How judges accused of misconduct and bribes dodge public scrutiny

Thousands of complaints are filed against judges every year, but very few result in discipline. Ethics experts say the time for states to transform the judiciary is now. Judges in political cases are very often bribed by U.S. Senators who are involved in the case. Bribery includes stock ownership.

Some states investigating judges in judicial conduct complaints do not ever identify them publicly or the judges are later admonished privately.

By Erik Ortiz

When litigants angered Michael F. McGuire, the county judge in New York state's Catskills region, he might hit them with "judicial contempt" and order them handcuffed, or in extreme cases, jailed for 30 days.

McGuire, elected in Sullivan County in 2011, did it on several occasions over the years without warning: to a man who asked the judge to recuse himself because the man said McGuire knew his son; to a mother who had an outburst when she felt ridiculed by the judge; and to a grandmother who contested turning over her grandson to his allegedly abusive father.

That wasn't his only concerning behavior, according to an ethics complaint in 2018 filed by a state watchdog agency, which accused McGuire of berating court staff; making "undignified" comments, such as suggesting people in his court would date a "drug dealer" or a "slut"; presiding over cases in which his impartiality could be called into question; and representing family members and friends in personal cases. The watchdog, the New York State Commission on Judicial Conduct, said he "lacked candor" during its investigation.

Michael McGuire.Sullivan County

For his pattern of "serious" judicial lapses, a state appeals court agreed last year that McGuire — who earned a salary of $210,161 a year — be removed from the bench, the harshest sanction a judge can face. The public, however, had only learned about the ethics charges months before, in March 2020, more than a year and a half after McGuire was first served with the ethics complaint and when the appeals court said he had been notified of the commission's unanimous recommendation to have him punished.

McGuire ended up resigning in May 2020, but with another job already lined up — as Sullivan County's head attorney, a position that he currently holds.

McGuire did not respond to requests for comment. In his resignation letter last year, he wrote that "I am quite proud of our achievements" while on the bench and "deeply regret the issues that brought me before this Court."

Joseph LaPiana, who came before McGuire in a family court case last year and is unable to see his 1-year-old daughter as a result, said that "judges work for the public — we should know if they are being investigated for any misconduct."

But if McGuire's misconduct violations had happened in a neighboring state like New Jersey, Pennsylvania or Vermont, the public would have been alerted earlier — at the outset of the filing of ethics charges.

WATCH: Judge yells at prosecutor over Kyle Rittenhouse cross-examination

That difference in when the public is allowed to know about allegations against judges can differ broadly among states, with some allowing judges to go months or years before even credible complaints are in the open. With more than 100 million cases filed in local and state courts every year, and judges exerting near-absolute power in deciding who wins custody of children to who can get married to whether a person goes to jail, the public's ability to scrutinize judicial conduct is crucial for transparency's sake, and deserves as much attention as recent calls for policing and prosecutorial overhauls, judicial ethics experts argue.

Judicial misconduct "undermines confidence in our justice system," said Susan Saab Fortney, the director of the Program for the Advancement of Legal Ethics at Texas A&M University School of Law.

Secretive states

Misconduct findings are a rare outcome in the judicial complaint process. Legal ethics experts say the minuscule share of judges punished every year isn't necessarily indicative that all is well in the judiciary, but suggests a lack of accountability.

Each state has a form of a judicial conduct commission to which the public can file misconduct allegations against judges. Generally, it's up to that body, which can be made up of fellow judges, lawyers and laypeople, to determine if a complaint violates a state's code of judicial conduct — guidelines for judges to act with independence, integrity and impartiality. A judge's conduct inside of a courtroom as well as outside, including on social media, can be subject to discipline.

Judges misusing social media spark calls for reform

A review by NBC News of various states' judicial conduct commission data from 2016 to 2020 indicates thousands of complaints are filed across the United States annually, but about 1 percent of them result in judges being publicly disciplined or stepping down after an investigation is opened.

While these commissions maintain that most complaints are frivolous — for instance, a litigant is merely disgruntled over how a judge ruled — for a state to typically record zero public sanctions against judges sounds incredulous, said Robert Tembeckjian, the administrator and counsel of the New York State Commission on Judicial Conduct.

"It's highly unlikely that any state would have a judiciary that is so above reproach that year after year no one gets disciplined," Tembeckjian said. "Even in places like New York, where we have very sophisticated judicial education programs, there are numerous cases every year."

New York's commission, which oversees about 3,500 state and local judges, has received upward of 2,000 complaints annually in the past five years, and each year, the state has sanctioned a judge or had a resignation for misconduct in one to two dozen cases. Other large states, such as California and Texas, sanction multiple judges every year.

The level of transparency surrounding misconduct cases varies by state. Some that have reported no or few judges publicly sanctioned in recent years, such as Iowa, Mississippi, South Dakota and Wyoming, don't make cases public until the court or panel that decides discipline gets involved. And in three states — Delaware, Hawaii and North Carolina — misconduct cases are only made public in the final stage of an investigation when a judge is to be punished.

In about two-thirds of states, however, the public can learn much sooner, such as when a judicial conduct commission first charges a judge with misconduct or when the judge responds to the allegations.

States where information is kept under wraps argue that confidentiality is necessary for as long as possible to protect judges should they ultimately be cleared of wrongdoing. But it turns out that in some cases, depending on the type of transgression, judges can be privately admonished by other judges or sent warning letters, meant to jolt the offending judge into correcting their behavior.

NBC News found many states opt to reprimand judges privately more often than publicly. For instance, Pennsylvania filed formal charges against judges 17 times from 2016 to 2020, but issued private letters of warning or reprimand 172 times in that period.

A sweeping Reuters analysis in 2020 on judicial misconduct that examined thousands of discipline cases over a dozen years determined 9 out of 10 sanctioned judges were allowed to return to the bench.

"We have to recognize that oftentimes we have judges judging judges, and they're ultimately in control and judging their own," Charles Gardner Geyh, an Indiana University law professor who studies judicial conduct, said.

**Related: 'One disaster after another': How a family court judge failed families**

Tembeckjian believes that states, including New York, should be as transparent as possible once there's sufficient evidence to back up allegations against a judge, similar to how grand jury investigations are made public when an indictment is unsealed.

Tembeckjian said he'd like to see his judicial conduct commission have the authority to suspend a judge during an investigation, like other states' commissions can do, and continue investigating a case even after a judge resigns. Such changes, however, would require the approval of the New York Legislature.

Ultimately, ensuring that judges are being rightfully held accountable is essential since guidance from the U.S. Supreme Court allows them to be largely immune from lawsuits for acts done in their official capacity, Tembeckjian said.

"If there's no sense that you can get a fair shake by going into a court of law and have confidence that the judge is going to be neutral and fair and apply the law honestly and responsibly, it's ultimately going to lead to anarchy," he added. "Then, why not just settle our disputes in the streets rather than a court of law?"

[Making them pay](#)

Efforts are underway to enact meaningful judicial reforms at various levels. On Dec. 1, the U.S. House of Representatives overwhelmingly passed bipartisan legislation aimed at requiring federal judges to report their financial holdings in response to a [Wall Street Journal investigation](#) that found 131 federal judges had broken the law and violated judicial ethics by hearing cases in which they had a financial interest. A similar bipartisan Senate bill is pending.

On the state side, the Supreme Court of Louisiana last month [expanded its rules](#) against errant judges when it tacked financial burdens onto the disciplinary process. Not only can judges be made to pay for the cost of investigations if discipline is recommended, but they can be ordered to repay the cost of installing a replacement judge. And if a judge decides to retire or resign before a formal disciplinary process concludes, they can still be required to pay investigatory costs.

**[Related: What's a judge's moral standard? Allegations of racism, sexism spotlight judicial misconduct](#)**

The state's chief justice, John Weimer, said in a statement that the updated rules ensure that even retiring judges are "held accountable" and Louisiana taxpayers aren't on the hook for costs, which in recent investigations have been about $2,000 to $3,000.

About a dozen other states, including [Arizona](#), [Colorado, Florida, Kansas, Massachusetts, New Hampshire](#) and [South Dakota](#), have similar cost recovery rules or impose fines on judges, according to the Center for Judicial Ethics at the National Center for State Courts, a nonprofit organization that seeks to improve the judiciary.

Marni Bryson, a judge in Palm Beach County, Florida, faces a public reprimand, an unpaid suspension for 10 days and a fine of $37,500 after the state judicial conduct commission said she was excessively absent from her duties over a four-year period, [records show](#).

"I knew what I did was wrong … I have a whole year to reflect and contemplate my actions."

*said a suspended ohio judge*

In New Hampshire, former Circuit Court Judge Julie Introcaso was ordered to pay her investigation's cost, almost $75,000. Introcaso pleaded guilty last month to two counts of tampering with public records and submitting false statements in connection to a child custody case in which she was friends with a lawyer.

Janine Geske, a Wisconsin Supreme Court justice in the 1990s, said she'd like to see her state implement similar penalties, which might "encourage judges to take responsibility early on" if their behavioral violations are tethered to their finances.

Another option, Geyh said, is to make the payout of a judge's pension contractually contingent on good behavior.

Ethics experts say citizen judicial watchdog programs known as court watchers could be effective, but it's also incumbent upon other courtroom staff and officials who witness a judge's poor conduct, particularly lawyers, to speak up. They may be reticent to file complaints, however, because they're afraid of retaliation if a judge learns they were behind the allegations, Fortney, the legal ethics expert at Texas A&M, said.

"A large percentage of states require that the complaining party be identified," she added. "This clearly chills reporting."

**‘I don't trust any judge’**

But there have been cases where lawyers and court staff aren't afraid to stand up to a jurist.

Ohio's highest court last month suspended a 19-year municipal court judge, Mark Repp, for one year without pay after prosecutors in Seneca County relayed how he had ordered a 20-year-old woman who was sitting quietly in the back of his courtroom to watch her boyfriend's hearing get drug tested. When she refused, he sentenced her to 10 days in jail.

An investigation found that the woman was forced to take pregnancy tests and undergo full-body scans for contraband, although none was detected. And while Repp assumed the woman was under the influence of narcotics, there was no evidence indicating she was, and she had never been charged with drug-related offenses.

In a recent interview, Repp told NBC News that he has been concerned by the growing rate of overdose deaths in his community, and, in dealing with thousands of cases before him each year, he must "come up with some kind of decision that follows the law and also is appropriate under the circumstances."

"I knew what I did was wrong," Repp said. "I'll try to make amends on that, and I have a whole year to reflect and contemplate my actions."

But it wasn't the only time Repp, who is up for re-election in 2025, has faced criticism.

"Imagine someone sitting in court for the first time, and now they think it's what the judicial system is like," said John Kahler II, a lawyer who once accused the judge of being biased against a client and unsuccessfully tried to get him disqualified from the case.

One woman who appeared before Repp in August did file a complaint to say he labeled her a "known meth user" in open court, which she wrote made her feel "very embarrassed by Repp's conduct and false accusations." Repp said the complaint process in Ohio is a "good one" because the public does learn about judges accused of misconduct early on.

But Ana Petro, who was in Repp's court for a traffic violation this year, doesn't believe his suspension can remedy how he made her and others feel: worthless. A reckoning throughout the judiciary is needed, she said.

"I understand it's not a judge's job to be nice, but when he's abusing his power to be a judge, that's when I have a problem," Petro said. "And I don't trust any judge at all because of him."

# How Did America's Judges Become Such Corrupt Perverts?

EAST ISLIP, Long Island (WABC) --

A Long Island judge who police say repeatedly broke into his neighbor's home to steal her underwear has confessed to snatching panties on multiple occasions, even though he has pleaded not guilty.

Still, Suffolk County District Judge Robert Cicale has been removed from the bench and is facing up to 15 years in prison.

Cicale was arrested on burglary charges and appeared in court Friday morning.



The judge is a married father of three young children, and he is accused of sneaking into a home across the street and stealing the underwear of a 23-year-old woman who lives there with her parents. He reportedly knew the girl from when she worked as an intern at the Islip Town Attorney's Office, when he used to work there.

In his confession, he said he stole the underwear upon feeling "urges." He admitted that on several occasions, he entered the home, opened her hamper and took underwear.

Cicarle was taken into custody after an incident that happened around 9 a.m. Thursday, when the young

woman was alone. Prosecutors said she was sleeping but woke up when she heard the door open. She called out, "Hello?" and that's when she saw Cicale at the doorway.

Authorities say he turned around and ran away, and the victim closed and locked the door and called her mother, who called 911. Responding officers say they saw Cicale walking up to a different house and pretending to knock on the door.

They approached him because he matched the description of the person the victim described. They reportedly found several pairs of soiled women's underwear on him, which the victim identified as her own.

Cicale has written letter of apology to victim and also provided a written confession.

Cicale is accused of stealing his female neighbor's underwear.

"This is highly disturbing," Suffolk County District Attorney Tim Sini said. "This is an individual who swore to uphold the law. He violated it in a very serious way. The message here from both the Suffolk County Police Department and the Suffolk County District Attorney's office is that no one is above the law, and we'll prosecute this case to the fullest extent of the law."

A Nassau County district judge presided over Cicale's case to prevent a conflict of interest. Cicale is expected to receive mental health treatment.

"His reputation throughout the court is stellar," defense attorney William Wexler said. "Every judge, every lawyer respects him, and we just have to see how the process plays out."

Wexler went on to say that the judge's wife is standing by her husband through this process.

Cicale was ordered held on $50,000. Cicale was "temporarily relieved of his judicial duties" and the matter was referred to the state's Court of Appeals to determine whether to suspend the jurist, court system spokesman Lucian Chalfen said.

A judge also issued a restraining order that prevents Cicale from contacting the victim and, as a condition of his bail, Cicale will also be required to wear a GPS monitor, Sini said.

Neighbors were shocked when they learned of the judge's arrest.

"From what I heard, it's a little perverted maybe," neighbor William Bloom said. "And that never makes sense to me."

Cicale is a graduate of St. John's Law School, a former legal aide attorney and a former Islip Town Attorney elected to the District Criminal Court in 2016.

"He's a family man, he's always outside playing basketball with his kids," neighbor Jay Moceri said. "He's always jogging. He's always friendly to everybody in the neighborhood."

*(The Associated Press contributed to this report.)*

# What's a judge's moral standard? Allegations of racism, sexism spotlight judicial misconduct

Probate Judge Randy Jinks has mostly denied the allegations by employees. The case spotlights how Alabama handles ethics complaints against judges.



Probate Judge Randy Jinks faces more than 100 allegations in a scathing complaint.Chelsea Stahl / NBC News

By Erik Ortiz

Since he was sworn into office in January 2019, Probate Judge Randy Jinks of Alabama has had a central role in the most significant moments of people's lives in Talladega County, about 50 miles east of Birmingham. Jinks, the county's chief election official, has overseen adoptions and guardianships, mental health commitments and the issuing of marriage licenses.

Behind the scenes, employees accuse Jinks, 65, of cultivating a toxic and hostile workplace that undermined the integrity of his office.

More than 100 allegations were outlined in a scathing 78-page complaint issued in March by the Judicial Inquiry Commission, the state body that reviews complaints against judges, detailing racist and sexist conversations that employees claim Jinks initiated, including talking about pornography and a video of a woman doing a striptease. Some allege that he made disparaging remarks about George

Floyd, the Black Lives Matter movement, Black people who came into the office and the office's sole Black employee.

Some employees also allege that Jinks, who is white, used profane language and threw tantrums, once going on a tirade after his sandwich went missing from a refrigerator, and that he tried to use the power of his position to get or grant favors.

The complaint, which is based on interviews with current and former employees of the Talladega County Probate Office, accuses Jinks of exhibiting a pattern of behavior "that has created a difficult, unprofessional, and inappropriate atmosphere," which has "injured respect for the judiciary."

Jinks is accused of violating the state Canons of Judicial Ethics, the guidelines that say judges must uphold the honor of the judiciary, maintain decorum and avoid impropriety. He has denied the majority of the accusations, saying some of the incidents have been taken out of context, and he is fighting the allegations in the Alabama Court of the Judiciary.

Jinks was suspended in March and will remain suspended until the court decides whether the claims warrant punishment, including a longer suspension or removal from office. No trial date has been set.

"I am a decent person," Jinks said in an interview on local television station WOTM in March. "I am very respectful around women. I do not use racial slurs. I do not go on tirades in office. I do get mad if somebody steals my food." In a 44-page answer to the complaint filed in April, Jinks denies "any inappropriate demeanor regarding African Americans" and said the complaint "contains flagrant, false, vague and subjective accusations."

The case, which continues, has put a spotlight on how often complaints against judges in the state are reviewed and whether the mechanism to punish judges for misconduct or ethics violations is sufficient.

"In the past, there have been individuals on the Judicial Inquiry Commission that have had a less strict view of judges' adhering to the rules, and they simply were not really open to removing judges," said Sue Bell Cobb, who retired as chief justice of the Alabama Supreme Court in 2011 and has advocated for reforms. "Judges should be held to a higher standard. End of story."

'Grossly inappropriate demeanor'

Jinks won his probate judge race in November 2018, defeating his Democratic opponent by more than 5,000 votes and becoming the first Republican elected to the office in Talladega County.

Probate judges are elected to six-year terms in Alabama, and nearly every county, including Talladega, doesn't require them to have law degrees or to be lawyers, unlike probate judges in most other states. Jinks is a former program director for the Alabama State Parks, and he had worked on the campaign of Alabama Gov. Bob Riley, who left office in 2011.

"I felt the time was right," Jinks told The Daily Home newspaper of Talladega in 2018 about why he ran for the judgeship. "The man upstairs wanted me to do this."

According to the Judicial Inquiry Commission's complaint, which identifies employees only by their initials, Jinks' "grossly inappropriate demeanor" didn't begin immediately; instead, it ramped up about six months into his judgeship.

The employees say he would mouth a racial slur "on occasions" to his deputy chief clerk when he was referring to a Black person. One time, after a Black couple had been in the office to fill out a marriage certificate, he said, "What did their Black asses want?" an employee recalled, according to the complaint.

He is also accused of having spoken disparagingly about the Black Lives Matter movement and the protests that erupted across the country after Floyd was killed in police custody in Minneapolis a year ago.

Employees say he commented that "I don't see anything wrong with the police killing him" and that "he pretty much got what he deserved."

Jinks would also play uncensored videos of racial justice protests that included racial slurs and profane language loud enough that they could be "heard by others outside his office, including any customers at the front counter," according to the complaint.

Employees say that last June, when news reports surfaced that Bubba Wallace, the only Black driver in NASCAR's top series, had found a noose in his garage stall at Talladega Superspeedway, Jinks commented that Wallace was "just playing the Black card."

The only Black employee among the nine or so people who worked under Jinks at the probate office says in the complaint that Jinks would aim racist and unprofessional comments at him.

"He was a wolf in sheep's clothing," the man, Darrius Pearson, who joined the office as a clerk in 2018 under the previous probate judge, told NBC News. Pearson said that he had even voted for Jinks but that after months of humiliating and withering comments, he quit in November and wanted to come forward publicly.

Pearson said that in May 2019, Jinks saw his new car and said that he, as a judge, couldn't afford one. "What are you doing? Selling drugs?" Jinks said, according to Pearson.

Last September, Pearson returned to work after a trip to the post office about the same time that students from Talladega College, a private historically Black college, were marching in support of Black Lives Matter. He said Jinks asked him repeatedly whether he had joined the demonstration.

"I don't want nothing to have to happen to your job, you out there marching — marching 'Black Lives Matter' during county time," Jinks said before he walked off laughing, according to Pearson and the complaint.

The complaint says employees felt uncomfortable and embarrassed by Jinks' "inappropriate demeanor" toward Pearson and other Black people.

Jinks, who is married with a daughter, is also accused of using demeaning language about women and talking openly about sex. Pearson said that in July, around the time of a Republican runoff election in Alabama's U.S. Senate race, Jinks showed him a video of a woman doing a striptease while they were in an election room.

Pearson said he told Jinks he didn't want to look at the video.

Another time, Jinks told a female employee: "I like porn. Don't you?" according to the complaint. He is also accused of having commented about an employee's breasts and stared at her body, as well as having made other female employees uncomfortable. Employees said he also routinely commented about the physical appearance of female lawyers and spoke derisively about women with tattoos or about their body size.

"Don't ever marry a woman. She'll get fat," he said after he saw a photo of a female employee in her wedding dress, according to the complaint. Jinks' comments about the employee's weight were "so prevalent as to give her the impression that her weight matters more to him than her work performance," the complaint said.

Pearson, who had been the only male employee in the office, said Jinks gave him a birthday card in September featuring a cartoon cow and donkey and the message "Thought you'd like to see some teats and ass on your birthday!" The card, which was shared with NBC News, is signed, "Have a Great B'day. Randy."



A birthday card given to Darrius Pearson.Courtesy Darrius Pearson

Other employees refused to sign it, according to Pearson and the complaint. Jinks didn't deny having given the card but said in his response to the commission that "office humor has been overblown."

The complaint also says Jinks' county-owned cellphone was used to look at a website that sold sex products and to view provocative photos of women. It says he lent the phone to a felon whom he met when she was waitressing.

In addition, the complaint details allegations accusing Jinks of having abused the prestige of his judicial office by asking a prosecutor in a neighboring county to help the felon and release her early from her sentence on a narcotics-related charge.

The district attorney denied the request, saying it was inappropriate, according to the complaint, which said that Jinks tried to solicit the help of attorneys who appeared before his court to get the felon an early release and that he eventually succeeded.

Amanda Hardy, Jinks' attorney, said that the complaints were "concocted by a few disgruntled" employees and that the commission's complaint "fails to mention all exculpatory evidence and testimony." She said allegations that Jinks is racist were "fabricated to generate antagonism with the public, the Court of Judiciary, and the media."

'He thought he couldn't be touched'

In his response to the allegations, Jinks mostly denied what employees told the Judicial Inquiry Commission, according to the complaint.

He specifically denied the disparaging remarks about staring at women's bodies in the office and in court, as well as talking about body weight, among other accusations. He also said he couldn't remember certain actions he is accused of, such as telling an employee that he likes porn, according to the complaint.

He also denied having made remarks about Floyd.

"The Respondent believes ... that there exists no excuse for the killing of George Floyd, that watching the video is sickening, unconscionable, inhumane and horrifying," Jinks said in written answers to the complaint. In regard to Pearson's version of events about Black Lives Matter protests, Jinks "adamantly denies any communication, implied or expressed, that Mr. Pearson should not participate in any way with the Black Lives Matter march or the like."

Jinks also told the commission that if he did make certain comments, they were in a personal and private capacity, and that employees were eavesdropping or should have asked him to shut his door.

Colorado judge resigning after censure for racial slur

He said that comments people say they heard may have been taken out of context or were misunderstood jokes and that if he had been told that something was "racially or sexually insensitive and offensive," he would have "responded in a serious manner." Jinks didn't deny the interaction involving the striptease video that Pearson said he was shown, but he told the commission that it was played for three seconds or less.

In his written response, he said that "sharing the video amounted to a lapse in judgment, the significance of which has been exaggerated."

Jinks denied having asked for favors to help a felon, saying in his answer to the complaint that his helping her "was purely a ministry, in which no appearance of impropriety and/or expectation of judicial favor can reasonably be inferred."

Pearson said the complaints were a collaborative effort by employees who feared retaliation for speaking out but were fed up with Jinks.

"He is very arrogant, pompous, and he thought he couldn't be touched," Pearson said.

The complaint doesn't specify any grievances or allegations made by litigants, attorneys or members of the public, and it doesn't say any of Jinks' rulings were affected by his alleged misconduct.

Still, Jenny Carroll, a professor at the University of Alabama School of Law, said that it matters how judges behave outside the courtroom and in front of office staff and that comments that appear to be inappropriate can call into question how they came to rulings.

"What if people coming before you are women and Black? If they don't get the outcome they wanted, they'll be wondering was it because their claim wasn't strong enough or perhaps the judge carries explicit biases," Carroll said. "The bottom line is it's going to raise doubts in people's minds."

[Most complaints dismissed]

The nine-member state Judicial Inquiry Commission, which is made up of judges, lawyers and private citizens, gets scores of complaints about judges every fiscal year, many of which fail to rise to the level of formal charges to be filed with the Court of the Judiciary, which is also a mix of legal professionals and laypeople.

The commission said it reviewed 174 complaints against judges in fiscal year 2018 and dismissed 132 of them without investigation, citing reasons such as that there was no reasonable basis to charge, that no ethical violation was determined or that a case wasn't within its jurisdiction. Of 18 investigations that were completed, all of the related complaints were dismissed, the commission said.

Ultimately, the commission filed no charges against judges in the Court of the Judiciary during fiscal year 2018. Cases are often settled with judges before trials are held, and judges may decide to retire or resign to avoid public scrutiny, Carroll said.

In rarer cases, judges are removed from the bench. That happened to [Roy Moore, the former state chief justice], who was ousted twice for defying federal court orders. Moore's appeals were rejected.



[2014: Roy Moore said what?](#)

The commission didn't immediately respond to requests for further information. Chairman Billy Bedsole, a lawyer, also didn't immediately reply to requests for comment.

Cobb, the former state chief justice, said changes are needed in the complaint process so people are comfortable coming forward. Currently, she said, the commission's process is too lenient toward judges, who are notified and kept apprised of investigations and also get copies of subpoenas given to witnesses.

Cobb said that gives judges the opportunity to use their influence and potentially put pressure on people to dissuade them from filing complaints for fear of retaliation.

She said reforms should include doing away with notifying judges about who filed complaints and directing more state funding toward the Judicial Inquiry Commission so investigations don't have to languish and all complaints can be fully reviewed, not just the most egregious cases.

Carroll said that even after a judge who clearly violated ethical standards is removed, other issues deserve scrutiny, such as identifying cases in which people were the victims of unfair and impartial rulings and offering remediation.

"Getting problem judges off the bench is only a piece of the problem," she said.

# Contra Costa Superior Court Judge Steven Austin Aided & Abetted Real Property Theft

….Says Whistle Blower Architect



**Contra Costa County Superior Court Judge Steven Austin Aided & Abetted Real Property Theft with the help of Assessor Gus Kramer & Other Public Officials**

A local vetted source has provided a complaint filed with District Attorney Diane Becton on June 14, 2018, demanding a criminal investigation of several public officials including Gus Kramer and Martinez Superior Court Judge Steven K. Austin. This complaint alleges that Judge Austin colluded with County officials by rigging a trial in an effort to steal real property from an Orinda resident.

The verified complaint to the District Attorney describes how County and City of **Orinda** officials failed to enforce code violations on the property of an architect who committed horrific environmental crimes and zoning violations. This architect, with the help of City of Orinda and Contra Costa County officials, was able to double the square footage of his house and also change public records on the assessor's record to reflect the unpermitted additions. In early 2013, the County Assessor's office was

notified by the whistleblower about the tampering of public records, but Gus Kramer refused to investigate.

According to several forensic engineers and experts, this Orinda architect resorted to extreme tactics with reckless disregard for the environment in order to access the whistleblower's panoramic views and cheat on his property taxes. The architect's zoning violations also included exceeding setback and height limits, grading massive amount of dirt, destroying a ridge line, uprooting several landmark oak trees, and illegally building decking, structures, pouring concrete and piers next and on top of utility East Bay Municipal Utility District (EBMUD) drainage pipes. Further, this architect built nuisances on two neighboring properties and tampered with public records.

The subject experts who reviewed the case documents are in agreement that environmental and zoning violations have placed the surrounding houses and safety of residents in danger of flooding and created a fire hazard in the Sleepy Hollow, Orinda neighborhood.

New evidence indicates that recent press articles circulated by the Mercury News may be heavily influenced by the Contra Costa County Board of Supervisors. Such press alleges that **Gus Kramer** engaged in sexual misconduct, leading to his private censoring. However, in view of the complaint to the District Attorney, it is questionable as to whether the new sexual misconduct allegations are indeed the true crux of Kramer's wrongdoings, or whether these accusations are intended to detract from the very serious criminal acts that are described in the June 14, 2018 complaint to the DA Becton about the Orinda property theft.

This article states: "On June 18, **County Administrator David Twa** wrote to one of the accusers — associate appraiser Margaret Eychner — saying an independent investigator determined it was 'more likely than not' that on several occasions in 2014 and 2015, Kramer 'made comments that were not appropriate in a workplace environment and that made you feel uncomfortable.' "

08-05-2018 CCCounty Gus Kramer embroiled in another sex harassment probe (Click Here)

It is highly suspicious that within three days after the whistleblower's complaint having been filed, David Twa resurrects alleged sexual misconduct by Kramer dating back to 2015. It is reasonable to infer that the county officials are giving Gus Kramer a get out of jail free card instead of allowing DA Becton to do her job by conducting criminal investigation of Gus Kramer, Judge Austin and others. Strangely enough, the whistleblower's complaint names David Twa being involved in aiding and abetting the theft of her property as well.

Board of supervisors, not former DA Mark Petersen, axed the probe into Gus Kramer's criminal investigation. (Click here for evidence)

_

The complaint to DA Becton states that the whistleblower tried to facilitate the architect to remove the encroaching nuisance that interfered with her privacy. The architect continuously promised to do so,

but deliberately misled her for two (2) years. He then swiftly ambushed her by filing a lawsuit claiming several baseless legal assertions including outright ownership and punitive damages for accusing him of building without permit.

Before filing the lawsuit, the Orinda architect threatened **"either you agree to a lot line adjustment or I will drag you through the court for years to come and make you lose everything you have."**

Public records show the whistle blower in 2012 involved county deputy director, **Jason Crapo**, county engineer **Thoam Huggett**, and former Orinda planning director, **Emmanuel Ursu**. However, in a meeting both Ursu and Thoam Huggett, threatened that the county would retaliate and reverse everything by coming after the whistle blower instead, if she didn't stop complaining about the architect's violations.

 Communications between the whistleblower and the County public officials and the Assessor's office show a blatant refusal of public officials to investigate the architect's violations. The Orinda city officials, however, opened a code enforcement investigation against the architect for encroaching onto another neighbor's property. Incidentally, this other neighbor was an attorney with political aspirations.

The whistleblower's complaint to the District Attorney accuses the officials of selectively applying the rules and failing to prosecute white collar crime, as in this case clearly the violations didn't apply to the Orinda architect. Also, when it came to opening a code enforcement the rules only applied to an elite group of people, attorneys and others who are politically well-connected.

Obstructed by the tax collector, Gus Kramer, and the Building Department's refusal to investigate, the whistleblower sought help from the local police for unlawful trespass and property damage.  The police also refused to do their job, but assured her that she had every legal right to defend her property by removing the encroaching nuisance from her land. The police offered to protect the whistle blower and arrest the architect, if he interfered with the removal.

Documented communications prove the whistle blower went so far as to call self-proclaimed tree-hugger career-politician Steve Glazer when he was the mayor of City of Orinda. **Steve Glazer** ignored serious California environmental code violations, reckless destruction of protected Oak trees, perjury and falsifying a permit committed by the architect's surveyor, Rick Humann and county deputy director Jason Crapo.

The architect was emboldened knowing one of his many attorneys, **H. Clyde Long**, had inside connections with the Martinez judiciary, i.e. **Judge Steven K. Austin**. Attorney Long also serves as the chair of city of Lafayette's code enforcement appeal board and advertises on his website that he can help those with "city/county code enforcement."  The complaint alleges that the architect had inside political influence with the municipal officials, the Assessor's Office and the Building Department to be able to unlawfully change the public records twice by increasing the square footage of his house, without any evidence of any permits to increase his house's size.

Indisputable evidence is provided of open judicial extortion committed by Judge Austin in voluminous trial transcripts involving a lawsuit filed by the architect in violation of zoning laws who is also cheating on his taxes, demanding an outright ownership of the whistleblower's land and the court preventing her free speech regarding his violations. Judge Austin's abuse of power and judicial misconducts and collusion to steal the whistleblower's property is captured throughout the trial transcripts:

**"THE COURT:  So what they are saying is, as I understand from that side, the evidence that's been  developed would be that it's not relevant how big the house is even if it's more than what it's supposed to be on the records of the city because it has nothing to do with the property line dispute, and that it would be more prejudicial than probative to go into that because you'd make them look bad because they built a house bigger than it's supposed to be, right?"**

**"THE COURT:  It sounds like you're just trying to say that it looks like they must have cheated on their property taxes so they must be bad people" (RT.Vol.4P.168L-5-9)."  "It's a difficult case, in many respects and exactly how this property will be used, going forward, it's not going to matter that much as long as they don't move back, but if they do move back, it's going to make a big difference I think in terms of how the property will be used because of just the history. Okay (RT.Vol.062414P.3301L.9-P.3302L8)."**

**Dewey Wheeler (represented state farm insurance) openly made fun of Judge Austin's Kangaroo trial and jury instructions at the expense of CoCoCounty tax payers when he appropriately called the judicial council a dark hole.**

However, the law is clear in stating that:  The California Judicial Canon of Ethics prohibit a judge from ignoring indisputable evidence of the commission of fraud, he has an outright duty to report such fraud to law enforcement.  Not to mention that the rules of ethics prohibit a litigant from using the court system with "unclean hands".  On the record Judge Austin is allowing the architect and his three attorneys to play fast and loose with his court and helped them to correct deficiencies in their lawsuit by coaching them. The architect acted as though he owned Judge Austin's court.

Review of the trial transcripts by several legal experts show in no uncertain terms, this whistleblower's case is a posterchild example of thuggery run amok in a deeply-embedded incestuous web of municipal officials, the judiciary, attorneys and politicians. The whistle blower was retaliated against and thrusted into a rigged court because she exposed the systemic corruption in the offices of the county of Contra Costa and the tax collector, Gus Kramer.

Judge Austin on the record stated he found attorney misconduct entertaining when presented with evidence of witness intimidation, declaration tampering and obstruction of justice committed by three attorneys, **Clyde Long, Brandon Dooley and Dewey Wheeler** who represented State Farm Insurance. **David Miller of Moraga** was selected by Judge Austin as the discovery referee and paid by state Farm insurance. He too consistently ignored attorney misconduct and was actively engaged in legally abusing the whistle blower.

The lawsuit substantiates the architect's initial threats of his intent to use his political and judicial connections to steal her property and ruin her financially by dragging her through years of litigation. The court record shows that right from the inception the case was rigged.  Judge Steven K. Austin admitted that he personally hand-picked the case because he found it to be interesting.  Bolstering the existence of backroom dealing, Judge Austin just also happens to be a resident of Orinda and buddies with the architect's attorney Clyde Long. Additionally, the architect's homeowner's insurance is State Farm, Judge Austin's former employer.

The complaint alleges that **Judge Steven K. Austin** engaged in extortion by threatening that "if you do not give up your land for $10K I will make you fall flat on your face and make you pay him, instead. A lot of money." The complaint also states Judge Austin and public officials concocted a plan to extort the whistle blower in agreeing to a lot line adjustment, through abusive litigation and wasting taxpayer's money on allowing a white collar criminal to come to court with unclean hands. When she refused to relinquish her property rights, the officials with the help of Judge Austin retaliated. They schemed a plan to manipulate the trial to come up with a fake money judgement that the whistle blower could not pay. The judgment against the whistle blower ended up to become approximately about $300,000, including additional fees.

 The whistleblower demanded that local politicians and government agencies circumvent the retaliatory judgment, and involved the former DA Mark Petersen and other politicians such as **Mark DeSaulnier, Catharine Baker, John Garamandi, Dianne Feinstein, Kamala Harris**, and the Board of Supervisors of Contra Costa County, specifically Candace Andersen. None of the officials apparently did anything to stop the commission of the crimes by Contra Costa County officials.

Reviewing the emails with public officials show the whistleblower engaged legal counsel who agreed to confront the City of Orinda officials regarding these officials' failure to perform their jobs and ignoring perjury committed by **Rick Humann**, the architect's surveyor. In the meantime, the whistleblower involved the County chair of planning commissioner, Duane Steele, who referred her to the Deputy Director of County Building Department **Aruna Baht**. Aruna Baht, upon reviewing the

fraud documents, immediately assigned inspector **Joe Losado** to inspect the architect's house and tag it. Joe Losado admitted to the attorney that the architect did not have any permits on file.

Inexplicably, however, Joe Losado refused to inspect the architect's house and engaged in threatening the attorney to back off or the county attorney, Sharon Anderson, would revoke his license and file a restraining order against his client.

In 2017, Mark Petersen had assigned the case to Steve Moawad, former DA, for public corruption. However, DA Moawad was prohibited to investigate Gus Kramer, Judge Austin and others at the behest of board of supervisors.

DA Moawad stated in writing that he was going to continue investigating Orinda officials for failure to open a code enforcement against the architect. Conspicuously, Steve Moawad left the DA's Office to become California Bar Chief Trial Counsel without concluding the case. Several series of emails prove the public officials were complicit in committing crimes against the whistle blower.  (Click Here)

The court files demonstrate that the Board of Supervisors and Judge Steven Austin have committed egregious violations in order to silence the whistleblower and prevent the whistleblower from being able to seek appropriate remedy and redress. Judge Austin conducted an expensive jury trial in 2013 in which the jurors were provided with manipulated instructions that biased the jury improperly. In addition, according to several jurors and the transcripts, Judge Austin gave them a jury instruction that was not part of the record. Sample kangaroo trial transcripts

Further, the County appears to have enlisted State Farm Insurance to hire a private investigator to follow and harass the whistleblower's daughter in another state for over two years. The whistleblower accuses Contra Costa County Supervisor **Candace Andersen** for failing to mitigate and offer appropriate redress. Incidentally, her husband Philip Andersen works exclusively for State Farm Insurance as defense counsel.

As stated in a law review article by Orlando J. Villalba. "Slapping Criminal Speech; how Evolution of the Illegality Exception has Impacted California's Anti-Slapp Statute", this type of lawsuit is deliberately brought to financially decimate its opponent. The true desire of the trespasser is to cause delay and distraction. And to punish his/her opponent for standing up for him/herself. (Click here for Villalba's article)

CA Penal Section SCC. 518. State and Federal Statutes show the definition of the criminal offense of extortion as follows:

Extortion is the obtaining of property or other consideration from another, with his or her consent, or the obtaining of an official act of a public officer, induced by a wrongful use of force or fear, or under color of official right.

Years of articles published by the Mercury News show that a culture of "pay to play" is deeply embedded in Contra Costa County municipalities and its court system.  At the very core of this crisis is

Tax Collector and Assessor Gus Kramer and the Board of Supervisors.  As illustrated by Tom Lochner's article in May of 2008 "Building disputes near an end", falsifying and forging documents in the Contra Costa County Building Inspection Department is apparently standard operating procedure. (Click here for the article)

In 2011, the District Attorney's Office axed a probe investigating Assessor Gus Kramer for a financial scheme involving evading transfer taxes in shady land deals.  It was just outright nixed—as if it never existed.

All of this was obviously known to the Board of Supervisors. Thomas Peele, Pulitzer award winning Journalist, exposed Gus Kramer in his article titled "His Deal Deeds and Doubts." (Click here for the article)

Federal prosecutors have the authority and jurisdiction to hold judges accountable for their unlawful conduct by charging them with a federal crime.

Section 242 of Title 18 of the U.S. code — the so-called "color of law" statute — is the same federal civil rights legislation that Justice Department prosecutors use against Law enforcement officers who use excessive force and make false arrests. The law applies to prosecutors and judges too. However, the feds do not use it against judges.

Judges are responsible to apply the law and are held to the same standards as everyone else, and when judges flagrantly violate the law, there should be consequences for them as well. Unfortunately, when judges are caught committing a crime, they are allowed to collect tax payer funded retirement packages and obtain work as mediators collecting $500 hourly rates with corporate entities like ADR Services Inc.

Our News Group is a collaborative media organization with a focus on exposing public and judicial corruption, when main stream media fails. Please email us (californiaexposegroup@protonmail.com) if you have additional information about this case or your rights have been violated by Judge Austin or parties involved or any other judge in the Contra Costa Superior Court in California.

# When The Judge Works For Your Political Adversary And Is Ordered To 'Take You Out' By The White House



Chip Somodevilla/Getty Images

By KYLE CHENEY

Stone's lawyers say, in particular, that Judge Amy Berman Jackson's decision to assert that jurors in the case "served with integrity" strikes at the heart of Stone's motion for a new trial, which they indicated is largely based on whether at least one juror was inappropriately biased against him.

"Whether the subject juror (and perhaps others) served with 'integrity' is one of the paramount questions presented in the pending Motion," Stone's lawyers argued. "The Court's ardent conclusion of 'integrity' indicates an inability to reserve judgment on an issue which has yet been heard."

Jackson made her remark during an impassioned rebuke of the arguments Stone's legal team offered during his trial. She said that Stone and his lawyers minimized the significance of his effort to frustrate congressional investigators as they sought to understand Russia's interference in the 2016 election, a grave national security challenge.

"Sure, the defense is free to say: So what? Who cares?" Jackson said. "But, I'll say this: Congress cared. The United States Department of Justice and the United States Attorney's Office for the District of Columbia that prosecuted the case and is still prosecuting the case cared. The jurors who served with integrity under difficult circumstances cared. The American people cared. And I care."

Stone was convicted last year on multiple counts of covering up to congressional investigators, as well as a count of witness intimidation for pressuring an associate to refuse to cooperate with Congress. Lawmakers sought Stone's testimony regarding his attempts to act as an intermediary between Wikileaks and the Trump campaign, but he repeatedly refused to tell House members about his multiple efforts to contact Wikileaks head Julian Assange, denying he had communications with certain associates that were later discovered to be voluminous.

It will also likely reach the receptive ears of the president, who has repeatedly amplified criticism of Jackson and repeated false claims about the nature of the charges against Stone.

Trump's allies are agitating for the president to issue a pardon or commute Stone's sentence, and though Trump is widely expected to do so eventually, the timing is uncertain. Jackson also used her sentencing comments to underscore that Stone's overarching effort in impeding Congress was to protect Trump from scrutiny.

Jackson delivered her sentence Thursday but delayed it until after she considers Stone's motion for a new trial. Though the motion was filed under seal, Stone's team indicated that it will focus on a juror.

"Stone's Motion for New Trial is directly related to the integrity of a juror. It is alleged that a juror misled the Court regarding her ability to be unbiased and fair and the juror attempted to cover up evidence that would directly contradict her false claims of impartiality," his lawyers argued.

"The premature statement blessing the "integrity of the jury" undermines the appearance of impartiality and presents a strong bias for recusal," they added.

According to the February 5th order issued by Judge Jackson, Roger Stone cited a problem with a juror, however his motion was denied.

The details of the juror are unknown because the order released Wednesday was redacted, however, [Roger Stone's defense team in November tried to strike down] several potential jurors who were overt Trump-hating leftists.

Several potential jurors in Stone's case ended up being Trump-hating, Obama-era officials who admittedly voted for Hillary Clinton in 2016 so Stone's lawyer's tried to strike them as potential jurors.

One of the potential jurors actually had a husband who worked in the DOJ and played a role in the Russian collusion hoax that ultimately took down Roger Stone — and Judge Jackson allowed her to remain as a potential juror!

Being that Amy Berman Jackson denied Stone's motion for a new trial last week, it occurred before the DOJ backed down from the excessive sentencing handed down by Mueller's thugs.

The order is about a potential issue with a juror and it's dated Feb. 5, so this all occurred before the resignations and withdrawals and Trump's intervention.

— Kyle Cheney (@kyledcheney) February 12, 2020

Amy Berman Jackson is a corrupt liberal Obama judge who imposed a very strict gag order on Roger Stone even though he did nothing wrong.

Stone was caught up in Mueller's abusive Russia witch hunt simply because he helped Trump win the White House in 2016.

Federal Prosecutors on Monday recommended Trump confidante Roger Stone serve 7-9 years in prison for process crimes during the Mueller witch hunt.

In a rare move, the Department of Justice backed down from its abusive sentencing recommendation for Roger Stone.

All four prosecutors who signed Roger Stone's sentencing memo seeking an excessive prison term of 7 to 9 years resigned like cowards on Tuesday after AG Bill Barr stepped in and smacked them down.

Mueller's prosecutors and this corrupt judge made for a very toxic and abusive case against Roger Stone.

President Trump torched Demon Judge Amy Berman Jackson on Tuesday night.


Is this the Judge that put Paul Manafort in SOLITARY CONFINEMENT, something that not even mobster Al Capone had to endure? How did she treat Crooked Hillary Clinton? Just asking! https://t.co/Fe7XkepJNN

— Donald J. Trump (@realDonaldTrump) February 12, 2020

We reported months ago and again in May 2018, that Obama appointed liberal activist Judge, Amy Berman Jackson, was assigned to the most important court case in US history, the Manafort case in the Trump-Russia hoax investigation.

Sadly, Judge Jackson has a horrible far left record on the bench. **In 2013 Judge Jackson rejected arguments from the Catholic Church that Obamacare's requirements that employers provide cost free coverage of contraceptive services in spite of being contrary to their religious beliefs. This was overturned by the Supreme Court.**

**In 2017 Judge <u>Jackson dismissed the wrongful death suit against Hillary Clinton</u> filed by two of the families who lost loved ones in Benghazi.** The families argued that Clinton had done little to help their sons and then lied to cover it up.

Then on January 19, 2018, Paul Manafort's case was <u>reassigned to Judge Jackson on January 19th</u>, a few weeks after being filed.

**It is unknown how she was assigned to the Manafort case or by whom. What is clear is that with her atrocious and slanted record to date, the Deep State and the Mueller team certainly wanted Judge Jackson overseeing the Manafort case.**

**On January 3, 2018, <u>we reported</u> that Paul Manafort filed a suit against the "Deep State" DOJ (Jeff Sessions), Assistant AG Rod Rosenstein and Corrupt Investigator Robert Mueller that should have shut down Mueller's corrupt investigation!**

# Immigrant Who Became Hotshot Chicago DNC Judge Sentenced To Jail For $1.4m Mortgage Fraud

By [Lukas Mikelionis](#)

Jessica Arong O'Brien, 51, broke down into tears after the judge sent her to prison after the federal jury convicted her in February of two counts alleging that she took part in a scheme in which several lenders were scammed. (Facebook)

The first Filipina judge in Cook County, Chicago, who came to the U.S. with almost nothing and no education, was sentenced on Thursday to a year in prison after being found guilty to participating in a $1.4 million mortgage fraud scheme a decade ago.

Jessica Arong O'Brien, 51, broke down into tears after the judge sent her to prison following her February conviction of two counts alleging that she took part in a scheme in which several lenders were scammed, the Chicago Tribune [reported](#).

She was convicted of lying to lenders to obtain more than $1.4 million in mortgages on two investment properties that she sold while she owned a real estate company.

O'Brien reportedly made money by selling the two homes in 2007 after paying kickbacks to a straw purchaser. Personally, she made a profit of at least $325,000 from the sales, prosecutors said.

The lenders, meanwhile, lost money as the straw purchaser defaulted on payments and properties were foreclosed.



Jessica Arong O'Brien with Supreme Court Justice Ruth Bader Ginsburg. (Facebook)

Prior to the sentencing, O'Brien said she was "an embarrassment" and said the scheme was a mistake. "Of course, I have remorse as to my stupidity," O'Brien said.

Her lawyer Steve Greenberg argued for probation, pointing to her true American dream story, where a Filipina immigrant, who came to the U.S. without anything, educated herself and became a judge.

According to the Tribune, after O'Brien came to the U.S., she earned degrees in culinary arts and restaurant management. She later went to John Marshall Law School, graduating in 1998.

With a law degree, she went on to become the first Asian elected president of the Women's Bar Association of Illinois and served on the board of governors for the Illinois State Bar Association. She also co-founded a group in 2008 that gives scholarships to law students from diverse backgrounds.

"It is an inspirational story. She has fallen as far as she can fall. She has lost everything. … There is absolutely no reason to send this poor lady to jail."

— Lawyer Steve Greenberg

"It is an inspirational story," Greenberg said. "She has fallen as far as she can fall. She has lost everything. … There is absolutely no reason to send this poor lady to jail."

But U.S. District Judge Thomas Durkin denied the request for probation, arguing that her fraud scheme wasn't just a mistake but a rather elaborate fraudulent scheme.

"This wasn't stupid," Durkin said, according to the newspaper. "This was a crime… You really didn't need to do this."

"This wasn't stupid. This was a crime. … You really didn't need to do this."

— U.S. District Judge Thomas Durkin

Prosecutors, meanwhile, used O'Brien's story to push for a harsher sentence, saying that she committed fraud despite not having the financial needs to do it.

After sentencing, O'Brien blamed family issues that prompted her to get into real estate business and reiterated that she acted foolishly.

"Of all those things that everyone has told you about me, one thing was missing — stupid," O'Brien, according to the Tribune. "I mean, seriously. This whole process is crazy. I can't put my hands on it."

"I hope some day when I am six feet under, they will learn from what happened here," she added, hoping other lawyers will learn that they will be held to a higher standard.

# California Judges

This site is based on many of these actual events which this one best depicts the abuse and miscarriage of justice experienced by all included on our pages

Click on the above image to see the movie (Or watch the trailer below)

SUMMARY OF A REAL "I CARE A LOT"

This is a movie about a disturbed person, which happens to be exactly what occurred to me in real life. I grew up with a psychopath (con-artist, liar, fraud and master manipulator) who learned at an early age how to get what she wants by guilt trips or charming the weak. It's just an act, a guilt trip, a con job by a immoral beast. You see in public she pretends to be caring, kind and a good person. But those who see through her act and con job know what she really is. A monster that hides behind "I Care A Lot". I grew up with this beast that has no business walking around in the free world. Yet it's obvious I'm not alone these beasts are common. Worse they cheat and lie their way into roles of authority and power. People today don't care about the facts, evidence or truth they follow a fake image which is how these monsters survive. Down at the bottom of this page is an audio file which is an example of how this con-artist looks for weakness by saying how much she cares and when that does not work seconds later switches to who she really is "Don't make me pull the trigger because I really do love you". But it's all an act by a cold blooded psychopath. An insect who has no empathy or heart. Welcome to my world and how a child from birth destroyed her father, hated her brother because he was competition and used the court system, mail fraud, identity theft to embezzle $200,000.00 from her own mother's bank accounts. Then force her mother into a conservatorship via a fraudulent petition based on perjury. How her husband who with his background as corporate coach, fired health provider CEO and CPA background helped find corrupt lawyers and judges to ignore evidence, elder abuse, fraud, perjury and full documentation of (2) missing bank accounts. All ignored by a Judge Candace J Beason

**America, LYING DOES PAY and very well. It's no longer about a GOOD lawyer that knows law but about finding a connected lawyer who can bribe the judge.** (This one happened to be the X President of the Pasadena Bar) and frequented the Judges dinners (conflict of interest?). In fact this same lawyer was found to feed cases to one of the most corrupt judges of Los Angeles County Superior Court Probate department Judge Aviva K. Bobb Who was exposed by a series of Probate abuse articles by the Los Angeles Times back in early 2000. Which the court "PRETENDED" to clean up but in fact just dug in deeper and allowed worse corruption. Judge Bobb and Pasadena Lawyer Philip Barbaro Jr. Would form a conspiracy to try and shut me up via a fraudulent Police report claiming I was terrorizing them by posting my opinion on the internet. I spent 3 days in jail then released stating I was only detained. Fact is police told me my version of what took place exposing a corrupt judge and lawyers appeared to be the truth because they could not find any other reason. But like all other authorities FBI,

DOJ, APS, LAPD, Los Angeles Bar, California Bar no one did anything when provided with evidence. No one wants to think a judge could be a criminal or a lawyer who "pretends" to fight against elder abuse is a fraud. Like "I Care A Lot" the concept is LIE, put on a fake image,  smile and pretend you're not who they say you are. My version of events is "Factual, backed up by documents and court records" I've even got original emails from my sister back as far as 1995, cards, letter and audio recordings. Witness statements as well and missing bank account numbers which she claims never existed but in her petition wastes no time claiming "if the court found $200K in missing bank accounts" she blames her brother "Me" who was responsible. However never supplies one ounce of evidence or documentation. In fact the entire petition is based on hearsay, lies and perjured info by her and her Glendale  lawyer Christopher E. Overgaard of La Crescenta CA who perjure his own petition in the case even going so far as to claim his lawyer partner Michael Jay was a PI and searched for me but could not find me. This is typical how probate courts operate. Even the lawyer the court forces upon the person conserved works for the court but is paid by the conservator. Meet Pacific Palisades PVP Violet M. Boskovich who helped the conservator cover up her fraud, perjury and lies. Never represented her client and worked hard to keep her silent and away from appearing in court. Point is "It's all about the money" Follow the money because the participants all are paid by the person made (in charge of the money). The actual owner has zero say, freedom, rights or control of anything. They're made out to be mentally incompetent (but in reality are over medicated). The game is "Isolate, Medicate and Liquidate" while they smile all the way to the bank.



The Superior Court system in Los Angeles has become a joke for a city that has so much,yet so little,California is ranked F, at present and the Superior Court system here is next to third world as far as fraud, corruption and justice for profit. This system is denying its residents/Taxpayers their due process on so many levels, Banks, Escrow companies and title companies own the courts and they are attempting to own the land. Lawyers wont take a stand against these courts and their judges that's how bad it has become.Please do the right thing and investigate and replace those who don't want to play fair.

Apr 4th, 2019
**Someone from San Gabriel, CA writes:**
My husband was an employee at Los Angeles Department of Warer and Power. He has a Ph.D. and has done exceptional job as a chemist for the department by training other employees. But because of the

ongoing discriminary and retaliatory actions against him for filing an internal grievance about the corrupt and discriminatory promotion process, he never got promoted even though he is only one of the few working there with a Ph.D. degree. He was physically assaulted by an assistant supervisor who got promoted ahead of him despite not having as much job experience and degree credential. Not only was he denied proper justice, he was further retaliated against with excessive amount of work, excessive monitoring with his supervisors' attempts to force him to commit errors with his work. When he was finally forced to make a mistake which could have been easily avoided had he not been piled so much work, he was denied the chance to correct the mistake (every employee is allowed to correct mistakes as part of the work protocol) and his mistake was grossly exaggerated to one that cannot be scientifically and evidentially supported. He is terminated because he was demoted to do the task of peeling labels and discarding sample waste which resulted in an additional workplace injury. When he reported this additional injury, he was immediately terminated with that supposed "mistake" that he so wanted to avoid and correct from a year ago. The Skelly Meeting and the city appeals both before a supposed arbitrator (Joseph Duffy) and some city commissioners went absolutely nowhere as they refused to consider any scientific evidence. They only consider what LADWP management colluded to say (a bunch of shameless and corrupt PERJURERS), as if a lie repeated many times by enough people, it would become the truth. LADWP went to strike our lawsuit down recently at the Superior Court. I have been following through this case for several years and the corruption and collusion within the whole judicial system is astounding. They have the appearance and facade of "due process" without the real substance. Everything they did was only formality. Whatever LADW managers and supervisors colluded to say (that is, to say only, WITHOUT EVIDENCE) becomes "evidence", but whatever real object scientific and forensic evidence we present with my husband being also an eyewitness is brushed aside. I guess if I bring over all of my friends and relatives from all over the globe and say LADWP supervisors murdered someone, it would become the truth just because there are enough people repeating the same accusation, then by all means I can lock all of these managers and supervisors up for murders. With the same logic, the judicial system in Los Angeles is such that they consider enough perjurers repeating the same false accusations or claims to be "good evidence" and so they used such "evidence" (whatever they collide together to defame and perjure) to wrongfully terminate my husband and continue to deny him justice. These "judges" and "commissioners" who hold law degrees or have studied law should be utterly ashamed of themselves for such blatant distortion of justice. We should call the judicial system in Los Angeles CORRUPTION SYSTEM.

Aug 29th, 2016
**Someone from South El Monte, CA writes:**
I Lost my inheritance and my mom and our homes thanks to the court system I was never heard didn't have an attorney wrote letters filed forms because of how much they have to benefit from the elderly there the ones who win win it all them the attorney and fiduciary's judges when I'm reporting elder abuse and it's ignored but my mom is being taken for money when both conservators are passing out money and not to caregivers

Mar 11th, 2017

**Patrick M. from Los Angeles, CA writes:**

The Los Angeles Superior Court is in my opinion a band of judicial gangsters, that are blatantly denying due process, ignoring valid evidence, violating the Constitution and extorting money from the people of Los Angeles all while being paid off by whichever party has the right price. as a pro se litigant I went up against a lawyer who claim to not be representing any of the defendants yet drafted every Motion in the case and they were all granted and my case was dismissed, even though the court had no jurisdiction as the defendant had no lawyer they had defaulted. A total joke…if you want justice stay away from these people. …you have better luck dealing directly with the Mob.Dec 6th, 2016

**Jose H. from Alhambra, CA writes:**

I totally agreed since i been emotionally financially and even mentally affected since i got so physical stressed knowing how this court will take my ex wife's side since she all the time was a step forward in our case and always hiring a lawyer that I couldn't afford for myself but i had all the time to pay for her attorney since I didn't have on attorney the judges never pay attention to me and side by side with her lawyer always loosing case by case i little by little lost it all this court left me empty pocket and even my part of the divorce was then giving wrongfully to my ex wife she stole she kicked me out of my own house took my part of the half and half assets and properties and all thanks to the her lawyer that was in a deal with the judge at each case my ex even failed to report to court over payments she fail to follow the court orders she trespass and stole from a property she gave false testimony and i reported all this to the court and to the judge and they ignored me cause they were no getting profits from me as with my ex because the lawyer soplits with the judge they move in a way that I couldn't believe i have another big story how the judge even moved a clerk from his desk then sent me to talk to a person who all she did was discouraged me from appealing the decision and only hand me the papers without helping me when the usual clerk helps people filling up the papers for people without attorney but this lady the judge sent one throw the papers to me in a very rude way please i need my case to be review as per i ended up on the streets thanks

PLEASE SIGN THE PETITION

California is one of the most corrupt Judicial states in America today, from the days of 1996-2011 Ronald M. George who named his own successor Tani Cantil-Sakauye.

Victims go into the millions with police, government and the courts in a huge cover up protecting a manipulated Justice system that is nothing about justice. The legal system in California is designed to destroy family, estates, children's lives and freedom via dishonest judges and lawyers controlled by a gang called the ABA American Bar Association.

**Be sure to scroll down the page for info how to report and file complaints.**

Mar 13th, 2017

**Someone from Los Angeles, CA writes:**

Appellate court denies challenge to LA judges' 'double-dipping' practice Los Angeles County provides Superior Court judges more than $46,400 each in annual benefits, including supplemental health and retirement benefits, while judges in other counties receive substantially fewer supplemental benefits or none at all. The legal fight began in April 2006, when Sturgeon filed suit in Los Angeles Superior Court asking that the county be stopped from paying benefits to judges because they were also receiving them from the state through legislation passed in 1997. Mr. Trump is right, the system is rigged.

- Los Angeles Judges
  - Alternative Resolution Center
  - Judge Anthony B. Drewry
  - Judge Armen Tamzarian
  - Judge Aviva K. Bobb
    - 2005 Complaint filed against Judge Bobb in the Marshall Stern Case
    - Aviva K Bobb ERASED PROOF
    - FrumehLabow.com ERASED PROOF
    - JohnTRogersJr.com ERASED PROOF
    - Ricky Ritch et al v. Aviva Bobb et al Central District of California, cacd-2:2006-cv-04795 MINUTES
    - Ricky Ritch v. Aviva Bobb (2:06-cv-04795-CAS-JWJ)
    - Ruling Over Someone' Has Paid Off Handsomely Guardians for Profit
  - Judge Barbara R. Johnson
  - Judge Brenda J Penny
  - Judge Candace J Beason
  - Judge David J. Cowan
  - Judge David Yaffe
  - Judge Elizabeth A. Lippitt
  - Judge James Bascue
  - Judge John W. Ouderkirk

- Judge Joseph DeVanon
- Judge Kevin C. Brazile
- Judge Luna Ana Maria
- Judge Mary Thornton House
- Judge Michael I. Levanas
- Judge Mitchell L. Beckloff
- Judge Patrick T. Madden
- Judge Randolph M. Hammock
- Judge Reva G. Goetz
  - JudgeRevaGoetz.com ERASED PROOF
- Judge Scott M. Gordon
- Judge Stanley Blumenfeld
- Judge Tamara E. Hall
- Judge Thomas Long
- Judge William P. Barry
- Judge Zaven Sinanian
- Los Angeles Superior Court LAUSD Fraud
- Superior Court Probate Division
- Mariposa County Judges
  - Judge Dana Walton
- Martinez Judges
  - Judge Bruce C. Mills
- Pomona Judges
  - Judge Bruce F. Marrs
- Redding Judges
  - Judge Jack Halpin
- Riverside Judges

Page 48   – NORTHERN CA DISTRICT COURT CASE   - PACER FILE - 22-cv-1107-TSH

- Judge Dale R Wells
- Sacramento Judges
  - Judge Jaime R. Roman
  - Judge Peter J. McBrien
  - Judge Sharon Lueras
  - Judge Valeriano Saucedo
  - Judge William Shubb
- San Diego Judges
  - Judge Daniel B. Goldstein
  - Judge Joseph Brannigan
  - Judge Judith McConnell
  - Judge Richard Huffman
- San Francisco Judges
  - Chief Justice Tani Cantil Sakauye
  - Judge Patrice McElroy
  - Judge Robert A. O'Farrell
- San Jose Judges
  - Judge David A. Cena
  - Judge James E, Towery
  - Judge Michael B. Dufficy
  - Judge Scott Jeremiah Stuart
  - Judge Socrates Peter Manoukian
    - Judge Socrates Manoukian's Elder Abuse State Appellate Court Review
- Santa Barbara Judges
  - Judge Donna D. Geck
  - Judge James E. Herman

**Who to report unethical, corrupt or dishonorable judges to:**



How Do I File a Complaint?

Complaints must be in writing. You may use the commission's Complaint Form or write a letter to the commission. Electronic filing of complaints is not available; complaints must be submitted to the commission office:

**COMMISSION ON JUDICIAL PERFORMANCE**
**455 Golden Gate Avenue, Suite 14400**
**San Francisco, California 94102** File a complaint to the Commission on Judicial Performance
**With the Commission on Judicial Performance make sure before you file you read the "HOW TO" Below:**

**HOW TO MAKE A COMPLAINT AGAINST A CALIFORNIA JUDGE: STEP 1 – READ AND RE-READ THE CODE OF JUDICIAL ETHICS, THE RULES OF THE CJP, and THE STATE AUDITOR REPORT**

Do you want to make a complaint against a California judge? We get asked this a lot: "How do I do it?" If you really want to do it, first there is homework to do. If you don't do the homework, you are wasting your time making a half-baked complaint to the Commission on Judicial Performance.

The first homework assignment consists of four things:

**(1) Read the ANNOTATED Code of Judicial Ethics published by the California Supreme Court Committee on Judicial Ethics Opinions, here:** https://www.judicialethicsopinions.ca.gov/wp-content/uploads/2016/08/CJEO-Annotated-California-Code-of-Judicial-Ethics.pdf

**(2) Read the Rules of the Commission on Judicial Performance, here:** https://cjp.ca.gov/wp-content/uploads/sites/40/2016/08/CJP_Rules.pdf

**(3) Read the Commission on Judicial Performance audit results published by the California State Auditor, here:** https://www.auditor.ca.gov/pdfs/reports/2016-137.pdf

**(4) Watch this video of the former CJP director forced by the legislature to describe how the agency internally handles complaints against judges.**
https://www.facebook.com/groups/CommissionOnJudicialPerformance/permalink/2762097630526450/

**If you're not willing to put in the time to do this homework you are setting yourself up for disappointment when you make a complaint against a judge. If you do the homework, there is a chance that your complaint will get somewhere.**

**It's that simple.**

Use the "County Law Library – Self-Help – How To" topic tag, or this link, for more self-help and how-to subjects: https://www.facebook.com/groups/976343352435229/post_tags/?post_tag_id=2790181641051382&ref=story_subtitle

**Question: What do superior court presiding judges do? A: The duties and obligations of presiding judges are listed here in our virtual county law library:**

https://www.facebook.com/groups/CommissionOnJudicialPerformance/permalink/1484749754927917/

Among other things, presiding judges handle complaints against all the judges in the county, including temporary judges (judge pro tem), and private judges. If you want to make a complaint against a superior court judge, you can make the complaint with the presiding judge or the Commission on Judicial Performance, or both.

**Q: Who is the presiding judge in my county?** The link below goes to a Judicial Council webpage that includes a list of presiding judges for each county.

**Q: How do I make a complaint to the presiding judge in my county?** Our virtual county law library includes a sample complaint to a presiding judge letter, at this link:

https://www.facebook.com/groups/CommissionOnJudicialPerformance/permalink/1432526423483584/

https://www.courts.ca.gov/tcpjac.htm#panel26380

**Government Agencies:**
File a report with your City Attorney
You will have to google your City Attorney
File a report with your State Attorney
File with the US Government
File with Department of Justice
File with the Federal Bureau of Investigation Find your field Officer
File FBI ONLINE COMPLAINT NOW

**Complain and ask for help from your congressman or congresswoman.**
Above you can enter you address to find your rep or search a list of reps

**If Identity theft took place** file a report HERE

**MORE**
Use the form at the bottom of the page and send your judge and case info to us to add a page to Uglyjudge.com

Search Your Tube for your judges name

**Enter you Judge to be Monitored HERE**

**Make sure you file a review for your judge to warn others:**
The Robing Room "Where Judges are Judged"

**MAKE NOISE, SHARE YOU STORY WITH THE WORLD:**
Bad judges don't like being exposed for their crimes, bribery and abuse.
**SOCIAL MEDIA**
1. Create a dedicated website
2. Get on Facebook to find other victims


**Corrupt California Judges**
If you're a victim of an unethical Judge you need to find support and network with other victims. Where there is one unethical judge there are usually more.

The American Legal System is based on MONEY not Justice, remember that when paying your $250 and up lawyer. Remember that when the judge rules in favor of MONEY not justice or what is morally correct.

Richard Fine exposed many in his quest to expose the corruption in California courts.

Remember judges are no better than anyone else on the street. They're often bad lawyers who found their way via perhaps not so ethical means to the bench where they continue their crimes and abuse of the people. The problem is the immunity and protection given to them. The fact that police are their muscle and rarely to never will act against them. This is how criminal hide behind a black rob of shame and the word "LAW".

**Corrupt California Judges**
Judge David P. Yaffe
Judge Ann Jones Bar 114921
Judge Robert O'
Judge Elihu Berle,
Judge Carolyn B. Kuhl Bar 85236
Judge Joesph Brannigan  Bar 65276
Judge Aviva K. Bobb Bar 50146
Judge Socrates Manoukian Bar 77289

**More unethical judges with questionable histories**

**Report Corrupt California  Judges to:**
State of California Commission on Judicial Performance
Complaints Against California Judges
Lawless America Corruption Reports for Judges
Judges as Criminals

Judges above the Law
Center for Judicial Excellence

**Other helpful Info**
How To Deal With A Bad Judge
Citizens for Criminal Justice
The Black Wall of Silence



Join FACEBOOK and find other victims and Network

**News Stories**
43 California judges were reprimanded for misconduct last year

Videos supporting an epidemic of Corruption and crime by California judges
Watch the video account of a father destroyed by finding out almost all California judges are accepting bribes


SUBMIT YOUR ABUSE, CRIMES OR ABUSERS CLICK ON THIS LINK


☐ **https://californiajudicialcorruption.wordpress.com**

Exposing Corrupt **California Judges**, Courts and more. **judges** Socrates Manoukian, His wife Patricia Bamratte-Manoukian and Erica Yew, Commission on Judicial Performance.Nepotism, Corruption and Fraud in **California's** Courts.

**43 California judges were reprimanded for misconduct last ...**

https://www.latimes.com › local › california › la-me-judges-discipline-20150404-story.html

Apr 4, 201543 **California judges** were reprimanded for misconduct last year By Maura Dolan Staff Writer April 4, 2015 7:37 PM PT Reporting from SAN FRANCISCO — Two **judges** had sex with women in their chambers,...

**Corrupt Judges are out of control in America**

https://uglyjudge.com › judges

Santa Clara County **California** is a hotbed of Corruption that focuses on one **judge** Socrates Peter Manoukian where several documented cases have been sabotaged by the **judge**. There is even an official **Judge** Socrates Manoukian web site which documents the corruption and crimes.

**5 Corrupt Judges & The Countless Lives They Tried To ...**

https://www.investigationdiscovery.com › crimefeed › bad-behavior › 5-corrupt-judges-the-countless-lives-they-tried-to-destroy

Thomas J. Maloney was a **judge** in Cook County, Illinois from 1977 to 1991. Maloney and numerous fellow Cook County **judges** were the focus of an investigation named Operation Greylord. The o peration was a joint investigation by the FBI, IRS, USPS and the Illinois State Police to track down corrupt **judges**.

**Corrupt Judges - Judiciary Report**

https://judiciaryreport.com › corrupt_judges.htm

The Corrupt Visiting **Judge Judge** Richard Markus is openly violating the constitutional rights of citizen Elsebeth Baumgartner for simply exercising her right to free speech in a non-threatening, peaceful manner. The lengths this just has gone to is sickening and appalling and is another black

**How Corrupt Judges are Destroying Our Society**

https://www.citywatchla.com › index.php › 2016-01-01-13-17-00 › los-angeles › 15903-how-corrupt-judges-are-destroying-our-society

To add insult to the indignity of being preyed upon by corrupt **judges**, Californians have to endure the Commission of Judicial Performance [CJP], which is the watchdog agency where the wolves monitor the wolves who are feasting inside the hen house.

**Thousands of U.S. judges who broke laws or oaths remained ...**

https://www.reuters.com › investigates › special-report › usa-judges-misconduct

The country's approximately 1,700 federal **judges** hear 400,000 cases annually. The nearly 30,000 state, county and municipal court **judges** handle a far bigger docket: more than 100 million new ...

**Corrupt justice: what happens when judges' bias taints a ...**

https://www.theguardian.com › us-news › 2015 › oct › 18 › judge-bias-corrupts-court-cases

Oct 18, 2015Corrupt justice: what happens when **judges'** bias taints a case? ... **California's** score, 77, the highest of any state, was seven points below the federal government's grade of 84.

**Directory of Judges - The Superior Court of California ...**

www.sanmateocourt.org › general_info › judges › directory.php

Effective September 10, 2021. Hon. Leland Davis, III, Presiding **Judge** Department 1, Courtroom 2H 400 County Center Redwood City, CA 94063 (650) 261-5101

# Thousands of U.S. judges who broke laws or oaths remained on the bench



REUTERS ILLUSTRATION/Jason Schneider

In the past dozen years, state and local judges have repeatedly escaped public accountability for misdeeds that have victimized thousands. Nine of 10 kept their jobs, a Reuters investigation found – including an Alabama judge who unlawfully jailed hundreds of poor people, many of them Black, over traffic fines.

By MICHAEL BERENS and JOHN SHIFFMAN in MONTGOMERY, ALABAMA

Filed

Judge Les Hayes once sentenced a single mother to 496 days behind bars for failing to pay traffic tickets. The sentence was so stiff it exceeded the jail time Alabama allows for negligent homicide.

Marquita Johnson, who was locked up in April 2012, says the impact of her time in jail endures today. Johnson's three children were cast into foster care while she was incarcerated. One daughter was molested, state records show. Another was physically abused.

"Judge Hayes took away my life and didn't care how my children suffered," said Johnson, now 36. "My girls will never be the same."

Fellow inmates found her sentence hard to believe. "They had a nickname for me: *The Woman with All the Days*," Johnson said. "That's what they called me: *The Woman with All the Days*. There were people who had committed real crimes who got out before me."

In 2016, the state agency that oversees judges charged Hayes with violating Alabama's code of judicial conduct. According to the Judicial Inquiry Commission, Hayes broke state and federal laws by jailing Johnson and hundreds of other Montgomery residents too poor to pay fines. Among those jailed: a plumber struggling to make rent, a mother who skipped meals to cover the medical bills of her disabled son, and a hotel housekeeper working her way through college.

Hayes, a judge since 2000, admitted in court documents to violating 10 different parts of the state's judicial conduct code. One of the counts was a breach of a judge's most essential duty: failing to "respect and comply with the law."

 Despite the severity of the ruling, Hayes wasn't barred from serving as a judge. Instead, the judicial commission and Hayes reached a deal. The former Eagle Scout would serve an 11-month unpaid suspension. Then he could return to the bench.

Until he was disciplined, Hayes said in an interview with Reuters, "I never thought I was doing something wrong."

This week, Hayes is set to retire after 20 years as a judge. In a statement to Reuters, Hayes said he was "very remorseful" for his misdeeds.

Community activists say his departure is long overdue. Yet the decision to leave, they say, should never have been his to make, given his record of misconduct.

"He should have been fired years ago," said Willie Knight, pastor of North Montgomery Baptist Church. "He broke the law and wanted to get away with it. His sudden retirement is years too late."

Hayes is among thousands of state and local judges across America who were allowed to keep positions of extraordinary power and prestige after violating judicial ethics rules or breaking laws they pledged to uphold, a Reuters investigation found.

Related content



1. 
The Teflon Robe: Read the series



2. 
Reuters database: Judges who were publicly disciplined – and what they did

3. 

[Methodology and Q&A: How we examined misconduct](#)

4. 

[How to use the searchable database to explore the disciplinary files of judges across America](#)

Judges have made racist statements, lied to state officials and forced defendants to languish in jail without a lawyer – and then returned to the bench, sometimes with little more than a rebuke from the state agencies overseeing their conduct.

Recent media reports have documented failures in judicial oversight in [South Carolina](#), [Louisiana](#) and [Illinois](#). Reuters went further.

In the first comprehensive accounting of judicial misconduct nationally, Reuters identified and reviewed 1,509 cases from the last dozen years – 2008 through 2019 – in which judges resigned, retired or were publicly disciplined following accusations of misconduct. In addition, reporters identified another 3,613 cases from 2008 through 2018 in which states disciplined wayward judges but kept hidden from the public key details of their offenses – including the identities of the judges themselves.

All told, 9 of every 10 judges were allowed to return to the bench after they were sanctioned for misconduct, Reuters determined. They included a [California judge who had sex](#) in his courthouse chambers, once with his former law intern and separately with an attorney; [a New York judge who berated domestic violence victims](#); and [a Maryland judge](#) who, after his arrest for driving drunk, was allowed to return to the bench provided he took a Breathalyzer test before each appearance.

The news agency's findings reveal an "excessively" forgiving judicial disciplinary system, said Stephen Gillers, a law professor at New York University who writes about judicial ethics. Although punishment short of removal from the bench is appropriate for most misconduct cases, Gillers said, the public "would be appalled at some of the lenient treatment judges get" for substantial transgressions.

Among the cases from the past year alone:

PUBLIC WARNING (2019)



Jack Robison

District Court, Texas

Burst into a jury deliberation room, exclaiming that God told him the defendant was innocent.
**The Herald-Zeitung/Handout via REUTERS**

In Utah, a judge texted a video of a man's scrotum to court clerks. He was reprimanded but remains on the bench.

In Indiana, three judges attending a conference last spring got drunk and sparked a 3 a.m. brawl outside a White Castle fast-food restaurant that ended with two of the judges shot. Although the state supreme

court found the three judges had "discredited the entire Indiana judiciary," each returned to the bench after a suspension.

In Texas, a judge burst in on jurors deliberating the case of a woman charged with sex trafficking and declared that God told him the defendant was innocent. The offending judge received a warning and returned to the bench. The defendant was convicted after a new judge took over the case.

"There are certain things where there should be a level of zero tolerance," the jury foreman, Mark House, told Reuters. The judge should have been fined, House said, and kicked off the bench. "There is no justice, because he is still doing his job."

Judicial misconduct specialists say such behavior has the potential to erode trust in America's courts and, absent tough consequences, could give judges license to behave with impunity.

"When you see cases like that, the public starts to wonder about the integrity and honesty of the system," said Steve Scheckman, a lawyer who directed Louisiana's oversight agency and served as deputy director of New York's. "It looks like a good ol' boys club."

That's how local lawyers viewed the case of a longtime Alabama judge who concurrently served on the state's judicial oversight commission. The judge, Cullman District Court's Kim Chaney, remained on the bench for three years after being accused of violating the same nepotism rules he was tasked with enforcing on the oversight commission. In at least 200 cases, court records show, Judge Chaney chose his own son to serve as a court-appointed defense lawyer for the indigent, enabling the younger Chaney to earn at least $105,000 in fees over two years.



In February, months after Reuters repeatedly asked Chaney and the state judicial commission about those cases, he retired from the bench as part of a deal with state authorities to end the investigation.

Tommy Drake, the lawyer who first filed a complaint against Chaney in 2016, said he doubts the judge would have been forced from the bench if Reuters hadn't examined the case.

"You know the only reason they did anything about Chaney is because you guys started asking questions," Drake said. "Otherwise, he'd still be there."



Bedrock of American justice

State and local judges draw little scrutiny even though their courtrooms are the bedrock of the American criminal justice system, touching the lives of millions of people every year.

The country's approximately 1,700 federal judges hear 400,000 cases annually. The nearly 30,000 state, county and municipal court judges handle a far bigger docket: more than 100 million new cases each year, from traffic to divorce to murder. Their titles range from justice of the peace to state supreme court justice. Their powers are vast and varied – from determining whether a defendant should be jailed to deciding who deserves custody of a child.



Each U.S. state has an oversight agency that investigates misconduct complaints against judges. The authority of the oversight agencies is distinct from the power held by appellate courts, which can reverse a judge's legal ruling and order a new trial. Judicial commissions cannot change verdicts. Rather, they can investigate complaints about the behavior of judges and pursue discipline ranging from reprimand to removal.

REPRIMANDED (2017)



Sam Benningfield

General Sessions Court, Tennessee

Granted jail credit to women who received surgical implants for birth control and men who received vasectomies.
**TNcourts.gov/Handout via REUTERS**

Few experts dispute that the great majority of judges behave responsibly, respecting the law and those who appear before them. And some contend that, when judges do falter, oversight agencies are effective in identifying and addressing the behavior. "With a few notable exceptions, the commissions generally get it right," said Keith Swisher, a University of Arizona law professor who specializes in judicial ethics.

Others disagree. They note that the clout of these commissions is limited, and their authority differs from state to state. To remove a judge, all but a handful of states require approval of a panel that includes other judges. And most states seldom exercise the full extent of those disciplinary powers.

As a result, the system tends to err on the side of protecting the rights and reputations of judges while overlooking the impact courtroom wrongdoing has on those most affected by it: people like Marquita Johnson.

Reuters scoured thousands of state investigative files, disciplinary proceedings and court records from the past dozen years to quantify the personal toll of judicial misconduct. The examination found at least 5,206 people who were directly affected by a judge's misconduct. The victims cited in disciplinary documents ranged from people who were illegally jailed to those subjected to racist, sexist and other abusive comments from judges in ways that tainted the cases.

The number is a conservative estimate. The tally doesn't include two previously reported incidents that affected thousands of defendants and prompted sweeping reviews of judicial conduct.

> "If we have a system that holds a wrongdoer accountable but we fail to address the victims, then we are really losing sight of what a justice system should be all about."

In Pennsylvania, the state examined the convictions of more than 3,500 teenagers sentenced by two judges. The judges were convicted of taking kickbacks as part of a scheme to fill a private juvenile detention center. In 2009, the Pennsylvania Supreme Court appointed senior judge Arthur Grim to lead a victim review, and the state later expunged criminal records for 2,251 juveniles. Grim told Reuters that every state should adopt a way to compensate victims of judicial misconduct.

"If we have a system that holds a wrongdoer accountable but we fail to address the victims, then we are really losing sight of what a justice system should be all about," Grim said.

In another review underway in Ohio, state public defender Tim Young is scrutinizing 2,707 cases handled by a judge who retired in 2018 after being hospitalized for alcoholism. Mike Benza, a law professor at Case Western Reserve University whose students are helping identify victims, compared the work to current investigations into police abuse of power. "You see one case and then you look to see if it's systemic," he said.

The review, which has been limited during the coronavirus pandemic, may take a year. But Young said the time-consuming task is essential because "a fundamental injustice may have been levied against hundreds or thousands of people."



'Special rules for judges'

Most states afford judges accused of misconduct a gentle kind of justice. Perhaps no state better illustrates the shortcomings of America's system for overseeing judges than Alabama.

CENSURED (2014)



Scott Steiner

Superior Court, California

Had sex in his chambers with his intern and with an attorney practicing before his court.
**Twitter/Handout via REUTERS**

As in most states, Alabama's nine-member Judicial Inquiry Commission is a mix of lawyers, judges and laypeople. All are appointed. Their deliberations are secret and they operate under some of the most judge-friendly rules in the nation.

Alabama's rules make even filing a complaint against a judge difficult. The complaint must be notarized, which means that in theory, anyone who makes misstatements about the judge can be prosecuted for perjury. Complaints about wrongdoing must be made in writing; those that arrive by phone, email or without a notary stamp are not investigated, although senders are notified why their complaints have been summarily rejected. Anonymous written complaints are shredded.

These rules can leave lawyers and litigants fearing retaliation, commission director Jenny Garrett noted in response to written questions.

"It's a ridiculous system that protects judges and makes it easy for them to intimidate anyone with a legitimate complaint," said Sue Bell Cobb, chief justice of the Alabama Supreme Court from 2007 to 2011. In 2009, she unsuccessfully championed changes to the process and commissioned an American Bar Association report that offered a scathing review of Alabama's rules.

In most other states, commission staff members can start investigating a judge upon receiving a phone call or email, even anonymous ones, or after learning of questionable conduct from a news report or court filing. In Alabama, staff will not begin an investigation without approval from the commission itself, which convenes about every seven weeks.

By rule, the commission also must keep a judge who is under scrutiny fully informed throughout an investigation. If a subpoena is issued, the judge receives a simultaneous copy, raising fears about witness intimidation. If a witness gives investigators a statement, the judge receives a transcript. In the U.S. justice system, such deference to individuals under investigation is extremely rare.

> "It's a ridiculous system that protects judges and makes it easy for them to intimidate anyone with a legitimate complaint."

"Why the need for special rules for judges?" said Michael Levy, a Washington lawyer who has represented clients in high-profile criminal, corporate, congressional and securities investigations. "If judges think it's fair and appropriate to investigate others for crimes or misconduct without providing those subjects or targets with copies of witness statements and subpoenas, why don't judges think it's fair to investigate judges in the same way?"

Alabama judges also are given an opportunity to resolve investigations confidentially. Reuters interviews and a review of Alabama commission records show the commission has met with judges informally at least 19 times since 2011 to offer corrective "guidance." The identities of those judges remain confidential, as does the conduct that prompted the meetings. "Not every violation warrants discipline," commission director Garrett said.

Since 2008, the commission has brought 21 public cases against judges, including Hayes, charging two this year.

*496 =* Number of days Judge Hayes sentenced Marquita Johnson to jail for unpaid traffic tickets.

Two of the best-known cases brought by the commission involved Roy Moore, who was twice forced out as chief justice of the Alabama Supreme Court for defying federal court orders.

Another Alabama justice fared better in challenging a misconduct complaint, however. Tom Parker, first elected to the state's high court in 2004, pushed back when the commission investigated him in 2015 for comments he made on the radio criticizing the U.S. Supreme Court's decision legalizing gay marriage.

Parker sued the commission in federal court, arguing the agency was infringing on his First Amendment rights. He won. Although the commission had dropped its investigation before the ruling, it was ordered to cover Parker's legal fees: $100,000, or about a fifth of the agency's total annual budget.

In 2018, the people of Alabama elected Parker chief justice.

These days, Parker told Reuters, Alabama judges and the agency that oversees them enjoy "a much better relationship" that's less politically tinged. "How can I say it? It's much more respectful between the commission and the judges now."



"Gut instinct"

Montgomery, Alabama has a deep history of racial conflict, as reflected in the clashing concepts emblazoned on the city's great seal: "Cradle of the Confederacy" and "Birthplace of the Civil Rights Movement."

Jefferson Davis was inaugurated here as Confederate president after the South seceded from the Union in 1861, and his birthday is a state holiday. As was common throughout the South, the city was the site of the lynchings of Black men, crimes now commemorated at a national memorial based here. Police arrested civil rights icon Rosa Parks here in 1955 for refusing to give up her seat on a city bus to a white passenger.

Today, about 60% of Montgomery's 198,000 residents are Black, U.S. census records show. Even so, Black motorists account for about 90% of those charged with unpaid traffic tickets, a Reuters examination of court records found. Much of Judge Hayes' work in municipal court involved traffic

cases and the collection of fines. Hayes, who is white, told Reuters that "the majority of people who come before the court are Black."

City officials have said that neither race nor economics have played a role in police efforts to enforce outstanding warrants, no matter how minor the offense.



In April 2012, Marquita Johnson was among them. Appearing before Hayes on a Wednesday morning, the 28-year-old single mother pleaded for a break.

Johnson had struggled for eight years to pay dozens of tickets that began with a citation for failing to show proof of insurance. She had insurance, she said. But when she was pulled over, she couldn't find the card to prove it.

Even a single ticket was a knockout blow on her minimum-wage waitress salary. In addition to fines, the court assessed a $155 fee to every ticket. Court records show that police often issued her multiple tickets for other infractions during every stop – a practice some residents call "stacking."

Under state law, failing to pay even one ticket can result in the suspension of a driver's license. Johnson's decision to keep driving nonetheless – taking her children to school or to doctor visits, getting groceries, going to work – led to more tickets and deeper debt.

"I told Judge Hayes that I had lost my job and needed more time to pay," she recounted.

By Hayes' calculation, Johnson owed more than $12,000 in fines. He sentenced Johnson to 496 days in jail. Hayes arrived at that sentence by counting each day in jail as $25 toward the outstanding debt. A different judge later determined that Johnson actually owed half the amount calculated by Hayes, and that Hayes had incorrectly penalized her over fines she had already paid. To shave time off her sentence, Johnson washed police cars and performed other menial labor while jailed.

Hayes told Reuters that he generally found pleas of poverty hard to believe. "With my years of experience, I can tell when someone is being truthful with me," Hayes said. He called it "gut instinct" -- though he added, in a statement this week, that he also consulted "each defendant's criminal and traffic history as well as their history of warrants and failures to appear in court."

Of course, the law demands more of a judge than a gut call. In a 1983 landmark decision, Bearden v. Georgia, the U.S. Supreme Court ruled that state judges are obligated to hold a hearing to determine whether a defendant has "willfully" chosen not to pay a fine.

According to the state's judicial oversight commission, "Judge Hayes did not make any inquiry into Ms. Johnson's ability to pay, whether her non-payment was willful."

From jail, "I prayed to return to my daughters," Johnson said. "I was sure that someone would realize that Hayes had made a mistake."

She said her worst day in jail was her youngest daughter's 3rd birthday. From a jail telephone, she tried to sing "Happy Birthday" but slumped to the floor in grief.

"She was choking up and crying," said Johnson's mother, Blanche, who was on the call. "She was devastated to be away from her children so long."

When Johnson was freed after 10 months in jail, she learned that strangers had abused her two older children. One is now a teenager; the other is in middle school. "My kids will pay a lifetime for what the court system did to me," Johnson said. "My daughters get frantic when I leave the house. I know they've had nightmares that I'm going to disappear again."

Six months after Johnson's release, Hayes jailed another single Black mother. Angela McCullough, then 40, had been pulled over driving home from Faulkner University, a local community college where she carried a 3.87 grade point average. As a mother of four children, including a disabled adult son, she had returned to college to pursue her dream of becoming a mental health counselor.

Police ticketed her for failing to turn on her headlights. After a background check, the officer arrested McCullough on a warrant for outstanding traffic tickets. She was later brought before Hayes.

"I can't go to jail," McCullough recalled pleading with the judge. "I'm a mother. I have a disabled son who needs me."

Hayes sentenced McCullough to 100 days in jail to pay off a court debt of $1,350, court records show. Her adult son, diagnosed with schizophrenia, was held in an institution until her release.



McCullough said she cleaned jail cells in return for time off her sentence. One day, she recalled, she had to clean a blood-soaked cell where a female inmate had slit her wrists.

She was freed after 20 days, using the money she saved for tuition to pay off her tickets, she said.

Jail was the darkest chapter of her life, McCullough said, a place where "the devil was trying to take my mind." Today, she has abandoned her pursuit of a degree. "I don't think I'll ever be able to afford to go back."

SUSPENDED 6 MONTHS (2017)



Chris Kunza Mennemeyer

Circuit Court, Missouri

Deliberately postponed the appointment of public defenders in probation violation cases.
**Pike County News/Handout via REUTERS**

A clear sign that something was amiss in Montgomery courts came in November 2013, when a federal lawsuit was filed alleging that city judges were unlawfully jailing the poor. A similar suit was filed in 2014, and two more civil rights cases were filed in 2015. Johnson and McCullough were plaintiffs.

The lawsuits detailed practices similar to those that helped fuel protests in Ferguson, Missouri, after a white police officer killed a Black teenager in 2014. In a scathing report on the origins of the unrest, the

U.S. Department of Justice exposed how Ferguson had systematically used traffic enforcement to raise revenue through excessive fines, a practice that fell disproportionately hard on Black residents.

"Montgomery is just like Ferguson," said Karen Jones, a community activist and founder of a local educational nonprofit. Jones has led recent protests in Montgomery in the wake of the killing of George Floyd, the Black man whose death under the knee of a cop in Minneapolis set off worldwide calls for racial justice.

In Montgomery, "everybody knew that the police targeted Black residents. And I sat in Hayes' court and watched him squeeze poor people for more money, then toss them in jail where they had to work off debts with free labor to the city."

It was years before the flurry of civil rights lawsuits against Hayes and his fellow judges had much impact on the commission. The oversight agency opened its Hayes case in summer 2015, nearly two years after plaintiffs' lawyers in the civil rights cases filed a complaint with the body. Hayes spent another year and a half on the bench before accepting the suspension.



Under its own rules, the commission could have filed a complaint and told its staff to investigate Hayes at any time. Commission director Garrett said she is prohibited by law from explaining why the commission didn't investigate sooner. The investigation went slowly, Garrett said, because it involved reviewing thousands of pages of court records. The commission also was busy with other cases from 2015 to early 2017, Garrett said, issuing charges against five judges, including Moore.



"Slap in the face"

A few months after Judge Hayes' suspension ended, his term as a municipal judge was set to expire. So, the Montgomery City Council took up the question of the judge's future on March 6, 2018. On the agenda of its meeting: whether to reappoint Hayes to another four-year term.

> Judge Hayes failed to comply with the Constitution of the United States, the dictates of the United States Supreme Court, federal and state case law, the Alabama Constitution, Alabama statutes, and the Alabama Rules of Criminal Procedure.

Hayes wasn't in the audience that night, but powerful supporters were. The city's chief judge, Milton Westry, told the council that Hayes and his colleagues have changed how they handled cases involving indigent defendants, "since we learned a better way of doing things." In the wake of the suits, Westry said, Hayes and his peers complied with reforms that required judges to make audio recordings of court hearings and notify lawyers when clients are jailed for failing to pay fines.

As part of a settlement in the civil case, the city judges agreed to implement changes for at least two years. Those reforms have since been abandoned, Reuters found. Both measures were deemed too expensive, Hayes and city officials confirmed.

Residents who addressed the council were incredulous that the city would consider reappointing Hayes. Jones, the community activist, reminded council members that Hayes had "pleaded guilty to violating the very laws he was sworn to uphold."

The city council voted to rehire Hayes to a fifth consecutive term.

Marquita Johnson said she can't understand why a judge whose unlawful rulings changed the lives of hundreds has himself emerged virtually unscathed.

"Hiring Hayes back to the bench was a slap in the face to everyone," Johnson said. "It was a message that we don't matter."

On Thursday, Hayes will retire from the bench. In an earlier interview with Reuters, he declined to discuss the Johnson case. Asked whether he regrets any of the sentences he has handed out, he paused.

"I think, maybe, I could have been more sympathetic at times," Hayes said. "Sometimes you miss a few."

Additional reporting by Isabella Jibilian, Andrea Januta and Blake Morrison. Edited by Morrison.

# A watchdog accused, a pattern of rulings delayed, a repeat offender

*By* *JOHN SHIFFMAN*

*Three recent cases illustrate how Alabama judges who were cited for wrongdoing were able to remain on the bench for years.*

Judge Chaney: Enforced, broke rules



AUDIO)

*What happened when a trial judge who also served on the state's judicial oversight board was accused of misbehavior.*

Alex Chaney was just a year out of law school in 2015 when he started receiving lucrative appointments at taxpayer expense. A district judge began assigning him to represent people too poor to afford a lawyer.

That judge was his dad, Kim Chaney.

Judge Chaney is a powerful figure in rural Cullman County, where he was first elected to the bench in 1992. Chaney serves on a local bank board and has led several statewide justice associations.

In 2012, the governor honored Chaney by selecting him to also serve on Alabama's nine-member Judicial Inquiry Commission, which investigates misconduct by judges. While on the commission, Chaney broke its ethics laws in his own courtroom.

In 2016, local attorney Tommy Drake filed a complaint against Chaney, alleging that the judge was appointing his son to represent indigent defendants, violating ethics rules that prohibit nepotism. Alex Chaney was paid $105,000 from 2015 to 2017 by the state for such court-appointed work, accounting records show.

Because Judge Chaney served on the judicial commission, Drake sent his complaint to a different state watchdog agency, the Alabama Ethics Commission. On October 4, 2017, the Ethics Commission found that Judge Chaney violated ethics rules and referred the case to the state attorney general.

The following day, records show, Judge Chaney resigned from the Judicial Inquiry Commission. But he remained a trial judge in Cullman. Eighteen months passed.

Last summer, a Reuters reporter began asking state officials about the status of the case. The officials declined to comment.

In November, Reuters sent Judge Chaney and his son queries. They did not respond. The judge's lawyer, John Henig Jr, wrote to Reuters: "Judge Chaney is a person of remarkably good character and would never knowingly do anything unethical or wrong."

Henig said that Judge Chaney appointed his son from a rotating list of lawyers to represent indigent defendants. Henig called the appointments "ministerial" in nature.

"If Judge Chaney's son's name was the next name on the list for appointments, Judge Chaney would call out his son's name and thereafter immediately recuse himself from the case," Henig wrote.

A Reuters review of court records showed otherwise: Judge Chaney participated in several cases after appointing his son and issued substantive decisions. For example, records show that the judge reduced bond for one of his son's clients, and approved another's motion to plead guilty. Henig did not respond to questions about these records.

This February 7 – eight months after Reuters began inquiring about Chaney – the commission charged the judge with appointing his son to more than 200 cases and making rulings in some of them. Chaney struck a deal with the commission and retired from the bench, avoiding a trial.

During a hearing to approve the deal, commission lawyer Elizabeth Bern said Chaney should have known better than to appoint his son, especially given that he did so while a member of the oversight agency. During Chaney's tenure, the commission had disciplined two judges who abused their office to benefit a relative.

"The nepotism provision is clear and unequivocal without exception," she said.

Chaney did not speak during the hearing.

Drake, the lawyer who filed the complaint in 2016, said that absent the Reuters inquiries, he doubts Chaney would have retired from the bench because he is so politically powerful.

Indeed, shortly after the judge stepped down in disgrace for steering work to his son, the local bar association issued a resolution praising him.

Of Chaney, the local lawyers said, "He has always maintained the highest ethical and moral standards of the office and has been an example to all, what a judge should represent."

Judge Kelly: "Callous indifference"



*How a judge left children in limbo by repeatedly failing to perform her most basic duty: ruling on cases.*

Montgomery Circuit Court Judge Anita Kelly hears time-sensitive family matters such as child custody, adoption and divorce – cases in which a child remains in limbo until she rules.

Starting in 2014, court and judicial commission records show, word of years-long delays in her cases began to emerge from foster parents, lawyers, social workers and appeals court judges. Commission officials are barred by law from discussing the case, but Reuters pieced together the scope of the investigation through juvenile court records, public documents and interviews with people involved.

In May 2014, foster parents Cheri and Travis Norwood filed a complaint about Kelly with the judicial commission. They alleged the judge's incompetence led to a traumatic, years-long delay in which a foster child who began living with the Norwoods as an infant was taken away from them at age 3 ½ and returned to live with her teenage biological mother.

"If Judge Kelly thought they should have been together, fine," Travis Norwood said in an interview. "Why didn't this happen sooner? Because children can't wait. You can't freeze a child, hold her in suspended animation until her mother is ready."

Social workers who heard about the Norwood complaint forwarded their own concerns about Kelly's conduct in several other cases. Nonetheless, the commission dismissed the Norwood complaint in early 2015, finding "no reasonable basis to charge the judge."

Over the next year, more red flags emerged. State appeals court judges raised concerns about Kelly's "continued neglect of her duty," citing at least five cases that had untenable delays. In November 2015, a supreme court justice criticized the nearly three years it took to determine one child's fate.

 "I refuse to be another adult who has totally failed this child," Justice Tommy Bryan wrote.

 Another 20 months passed before the judicial commission took action. In August 2017, it charged Kelly with delays that "manifest a callous indifference or lack of comprehension" to children's well-being. One child's case, it noted, had dragged on for five years.

 Kelly took her case to trial before the Court of the Judiciary, the special tribunal that weighs charges against judges. Her attorney argued that the judge worked hard and had shown no ill intent.

In 2018, [the tribunal found Kelly failed to "maintain professional competence](#)." Kelly was suspended for 90 days. Still, she kept her job. The court said it likely would have removed Kelly from the bench if not for two factors: Voters re-elected her in 2016, and she exhibited "good character and the lack of evidence of scandal or corruption on her part."

 Her lawyer, Henry Lewis Gillis, applauded her reinstatement and said the delays never affected the quality of her decisions.

"Judge Kelly cannot change yesterday," Gillis said. "Rather, she chooses to learn from her past experiences as she continues to handle the many, many, many cases that come before her today."

Judge Wiggins: Give blood or go to jail



*A judge who is a repeat offender – four times over – remains on the bench.*

Circuit Judge Marvin Wiggins has been hit with misconduct charges by Alabama's judicial conduct commission four times over the past decade. In 2009, he was reprimanded and suspended for 90 days for failing to recuse himself from a voter fraud investigation involving his relatives.

"The public must be able to trust that our judges will dispense justice fairly and impartially," the Court of the Judiciary concluded. "Judge Wiggins, by his actions, disregarded that trust."

In 2016 – in a case that made global headlines – Wiggins was censured for offering defendants the option of giving blood instead of going to jail for failing to pay fines. A local blood drive happened to be taking place at the courthouse that day.

"If you do not have any money and you don't want to go to jail, as an option to pay it, you can give blood today," Wiggins told dozens of defendants, according to a recording. "Consider that as a discount rather than putting you in jail, if you do not have any money."

Forty-one defendants gave blood that day, and the commission called Wiggins' conduct "reprehensible and inexcusable." Wiggins acknowledged that his comments were inappropriate, but noted he did not send anyone to jail that day for failure to pay fines.

ALERT US TO WRONGDOING

1. 

   Not all judges who have violated their oaths of office, broken the law or misbehaved on the bench have been brought before their states' oversight commission. If you know of a judge who may have committed misconduct, please send us details at tips@thomsonreuters.com. Include the name of the judge, the state, details of what the judge may have done wrong, and a way for us to contact you. Reuters investigates such tips and will contact you before publishing.

Wiggins' lawyer, Joe Espy III, said that the judge "has always tried to cooperate" with authorities. Espy noted that Wiggins is a community leader, an ordained pastor and has been repeatedly re-elected to the bench for more than 20 years.

"He is not only a good judge but a good person," Espy said.

Last year, Wiggins was reprimanded for directly calling the father in a custody dispute – a conversation that violated a rule prohibiting a judge from discussing a case without both sides present. A recording of the call became a key piece of evidence against Wiggins.

In preparation for trial in that case, the commission said it found a "pattern and practice" of similar one-sided calls. The commission also said it found evidence that Wiggins was meeting with divorce litigants in his chambers without lawyers present.

In November, this prompted a new commission case against Wiggins – his fourth in 10 years.

"At a very minimum," the commission alleged, his track record indicates a "pattern of carelessness or indifferent disregard or lack of respect for the high standards imposed on the judiciary."

But at a pretrial hearing in January, and in a subsequent order, Wiggins scored a victory before the Alabama tribunal that issues final judgment on such cases, the Court of the Judiciary. The presiding judge raised questions about whether proper procedures had been followed in the case against Wiggins.

Three weeks later, the commission dropped the case. And Wiggins returned to the bench.