1
2  **Name: SD Redmond**
   **Address: 210 S. Ellsworth Ave, #1275**
3  **San Mateo, CA 94401**
   **Phone Number: 510-868-2862**
4
5  **EVIDENCE/EXHIBIT COPIES AT:**
   **https://www.majestic111.com**
6  **http://www.the-truth-about-the-dept-of-energy.com**
   **https://san-francisco-news.com**
7  **https://federal-report.com**
8  *PLAINTIFF, A Pro Se, disabled, non-lawyer, federal witness who has requested Court appointed counsel*
9
10                  **UNITED STATES DISTRICT COURT**
11               **NORTHERN DISTRICT OF CALIFORNIA**
                     **(UNLIMITED CIVIL JURISDICTION)**
12

| | |
|---|---|
13 | **SD REDMOND, a Pro Se non-lawyer federal whistle-blower/witness** | ) **CASE NO.: 22-cv-1107-TSH** |
14 | | ) **FINAL VERSION AMENDED COMPLAINT** |
   | **PLAINTIFF,** | ) **PER 5.2.22 LETTER FROM JUDGE HIXSON** |
15 | | ) |
   | v. | ) **INTENTIONAL FRAUD; CONCEALMENT** |
16 | | ) **FRAUD; NEGLIGENT** |
   | | ) **MISREPRESENTATION; INTENTIONAL** |
17 | **UNITED STATES OF AMERICA** | ) **INFLICTION OF EMOTIONAL DISTRESS;** |
   | | ) **RICO RACKETEERING;** |
18 | | ) **ANTI-TRUST/MONOPOLY;  COURT** |
   | | ) **ORDER DEMANDED FOR FULL SSDI** |
19 | | ) **BACK PAYMENTS; AND SUCH OTHER** |
   | **DEFENDANTS.** | ) **CLAIMS LISTED HEREIN UNDER** |
20 | ——————————————————— | **"CLAIMS" SECTION** |
21 | **Filed: May 20, 2022** | **DEMAND FOR JURY TRIAL** |
22
23 | | **ADDITIONAL EXHIBITS TO BE FILED** |
   | | **ELECTRONICALLY AND NOW** |
24 | | **AVAILABLE, ON THE WEB, TO THE** |
   | | **PUBLIC, GLOBALLY, AT LINKS** |
25 | | **ABOVE AND MIRROR SITES** |

26        **FINAL VERSION AMENDED COMPLAINT PER 5.2.22 LETTER FROM JUDGE HIXSON**
27
28           **Per Judges May 20, 2022 Order  - Table of Contents On Last Page**

NOW comes Plaintiff, *in pro per, a disabled, low-income, senior without legal representation and with no legal training who has been targeted by Government officials for reporting crimes by certain Government officials*, and files this amended civil complaint, per Plaintiff's understanding of the written orders of Judge Hixson filed by Judge Hixson on May 2, 2022.

New and dramatic game-changing evidence has emerged in the last two weeks from a huge volume of document leaks and other Court hearings. Plaintiff presents this case, not only as a claim for damages, but also as an anti-corruption effort public-service. Harms and damages have been accelerated against Plaintiff, as recently as this week, due to the proximity to elections.

The charges are filed against Defendant, THE UNITED STATES OF AMERICA, a representative entity which has a 1.) command-and-control, 2.) financing, 3.) legal authority and 4.) management influence over the actions and claims of harm described herein and has been proven, in thousands of past court cases, to use reprisal attacks against A.) whistle-blowers and B.) the competitors to political campaign financiers of high-level government officials. Plaintiff has no knowledge of, or ability to, accurately quote or include any citation to a statute, rule, or order or 'little lawyer numbers in parentheses' unless a lawyer is supplied to Plaintiff. Plaintiff maintains that the ongoing blockading of Plaintiff's representation by a qualified lawyer is a violation of his Constitutional rights to a fair hearing which is caused by Defendants who seek to engage in further cover-ups.

Plaintiff founded and owned a United States government-financed electric vehicle manufacturing energy business effort. His technology and metrics surpassed every: A.) price metric, B.) safety metric, C.) driving range metric, D.) national security metric, E.) debt Ratio metric, F.) non-bribery assertion metric, G.) 100% domestic worker hiring proof and EVERY other issue, which burdened Tesla and Fisker. Plaintiff worked as an employee and contractor for the USA. Tesla And Fisker were financed by the family and investors of Presidents Obama and Biden, as proven by Congressional investigators and email leaks. Government officials ordered attacks on Plaintiff, de-funding and reprisal because Plaintiff reported corruption at the White House,

Department of Energy, and other government offices, and because Plaintiff's technology could obsolete the technologies that government officials were illicitly receiving bribes from via insider trading. The attacks and harms against Plaintiff used government resources paid for by taxpayers.

At a high level: Trillions of dollars of stock trades and direct payola bribes were exchanged using the White House as a broker and government agencies as a stock market manipulation platform. Politicians turned the government into a cheap garage sale of cronyism! This kind of crime illicitly and illegally manipulates the power over who runs the United States Government and who profits from government decisions which are a matter of many trillions of dollars. The act and veracity of this crime enterprise will be proven to the Jury. Based on that assertion it will then be proven that:

1.) Plaintiff exposed and reported the crime to proper authorities through proper channels.

2.) Some of those authorities used government resources to operate reprisal attacks against Plaintiff, using government resources to operate the attacks, as revenge for reporting the crimes.

3.) The state-sponsored attacks were supported by the political campaign financiers of the government authorities in order to protect their payola conduits and stock market manipulations.

4.) Over 40 harms, each to be detailed and examined in Court, were documented against Plaintiff by the actions of corrupt government authorities.

5.) In a vast number of previous lawsuits, including one won by Plaintiff and his peers, it was proven that government offices infected with corruption regularly attack and harm citizens in reprisal.

6.) The government, having been caught in these illicit actions, must now pay Plaintiff for his losses, damages, harms, back-pay fees and other compensation.

This case is about hit-jobs and attacks on Plaintiff via the operators of a profiteering organized crime activity in government offices. Racketeering-motivated political 'mobsters', in Government offices, attacked and harmed Plaintiff, using taxpayer-paid resources because he did

not cooperate with their crimes, which were based out of government offices, and because Plaintiff reported those crimes to law enforcement when Plaintiff witnessed those crimes.  Plaintiff's case matter has been covered in so many Congressional hearings, documentary investigations, FBI investigations and news reports that it is impossible for the Court to not accept the fact that sufficient evidence exists for Plaintiff to more than prove every assertion. The Court has refused to supply legal representation to Plaintiff and Defendants have otherwise blockaded Plaintiff from acquiring legal representation.

## JURISDICTION AND VENUE

1.      Venue is proper in this judicial district in that, always relevant herein, defendants resided and /or transacted business in the Counties of Alameda, Marin, Santa Clara, San Mateo and San Francisco and is within the authority of this Court for purposes of service of process. This Court has authority in that the amount in controversy exceeds the jurisdictional limits of this Court according to proof at trial.

2.      Authority and venue are proper in this Court because all the claims alleged herein arose in San Francisco, Alameda, San Mateo and Santa Clara County, and always relevant herein, all the defendants were and/or are residents of San Francisco County or were and/or are doing business in San Francisco County, and/or their principal place of business is in Santa Clara, San Francisco and San Mateo County.

3.      The Plaintiff lives in San Mateo County And Marin County and previously lived in San Francisco County until the attacks by Defendant, upon Plaintiff, began.

4.      The Defendants are a governmental entity, both overt and covert, doing business in San Francisco County and their associates also live in and/or do business there.

5.      This complaint covers issues which the Court has the power to decide, such as RICO, Anti-trust monopoly violations, 28 U.S.C. &1331; 18 U.S.C. §§ 1961(5), 1962(c),  18 U.S.C. §§ 1961(5), 1962(d) 773. ; and many other matters which attorney-less, pro-se, low-income, senior, disabled Plaintiff is not skilled enough to properly cite, at this time, but could cite, with perfection,

with a great court-appointed lawyer. Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as Plaintiff's claims arise under the Constitution and laws of the United States. This Court has jurisdiction to grant relief in this action pursuant to 28 U.S.C. § 1346(b), as Plaintiff brings claims under the Federal Tort Claims Act. This case also presents a federal matter within this Court's jurisdiction under Article III of the United States Constitution, 28 U.S.C. § 1331, and the Administrative Procedure Act, 5 U.S.C. § 702, and under other related law acts and precedents. This Court has authority to grant declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., and to award damages, costs, and attorneys' fees under 28 U.S.C. § 2412, and under other related acts and precedents. Venue is proper in this district under 28 U.S.C. § 1391(e), and under other related acts and precedents. The venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because a substantial part of the acts or omissions that give rise to the Plaintiffs' claim occurred or will occur in the area. RICO charges by Plaintiff, against Defendant are verified as valid by Plaintiff and by reviewing third parties. Plaintiff is also requesting relief under the United States Constitution, the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2672 and related jurisdictions and applicable rights. Jurisdiction arises and venue is proper under 28 U.S.C. § 1498(a) and 28 U.S.C. § 1346. This is a civil action which includes breach of fiduciary duty, right to due process of law as enumerated in the Fifth and Fourteenth Amendment, Art 1§ 7, violation of the Fourth Amendment unlawful detention; Fourth and Fourteenth Amendment of the U. S. Constitution, 42 U.S.C.§ 1983, unjust enrichment and negligence.

# **PARTIES**

6.      At all times relevant herein, Plaintiff, (hereafter "plaintiff  "Plaintiff") was, and is, a resident of the County of San Mateo, Marin County And San Francisco County, State of California. Plaintiff has served his nation all of his career. Plaintiff has saved his nation hundreds of billions of dollars by halting active corruption. He has been awarded dozens of '**first-to-invent**' issued *United States federal patents* on products and services in use by millions of people around the globe. Supporter of *US INVENTOR* organizations.  He is Commended in: Citizenship Awards; writing

contest awards; Deans List; Robb Report; White House letters of commendation by Vice President Al Gore; Department of Defense, Defense Advanced Research Projects Agency (DARPA)- "Scientists Helping America" Award; US Congress- Iraq War Bill, Commendation; US Dept. of Energy- Contract/grant to build America's energy back-up plan; US Department of the Interior- Commendation; California State Assembly- Proclamation; Mayors of San Francisco- Multiple proclamations; 3D Design Magazine- National Award for Producer/Director; A-List, Nob Hill Gazette commendations and hundreds of letters of reference and commendation. He has worked on top law enforcement and IC project deployments. Producer of top anti-corruption lawsuits that interdicted major bribery and political stock market manipulation efforts by public officials. Creator of citizen sleuth and open-source public forensics software and systems that track every bribe and payola red flag. He is an advocate, advisor, promoter for the Congressional ***THE STOCK ACT***, and ***THE AMERICAN JOBS ACT*** crowd-funding section, The ***Silicon Valley Class Action Cartel Lawsuits***, The ***SOLYNDRA CONGRESSIONAL investigation,*** and ongoing Congressional investigations of Big Tech crimes and corruption. He is the Producer of over 100 major public programs attended by millions of participants. He has Decades of work with The White House, Congress and major community agencies. Plaintiff has been in the Bay Area Big Tech community since the 70's and participated in organizing and planning meetings for activities, politicians and events described herein; thus he has 'expert first-hand knowledge'.

7.      On information and belief, always relevant herein, the **UNITED STATES OF AMERICA; including The White House, The White House Press Office, The Department Of Energy, The Office Of The Special Counsel at OSC.gov and related agencies and offices;** which includes those entities that are financier/beneficiary oligarchs that have been illicitly incorporated into the government as "White House Advisors" and "Special Staff", as well as; Secretary of Energy, AKA, "SOE"; Jennifer Granholm in her official and personal capacities ("Jennifer"), "Defendants").  Defendants are sued jointly and severally. Plaintiff does not know the true names of Defendants DOES 1 through 10 and therefore sues them by those fictitious names. Plaintiff on information and belief alleges, that each of those Defendants was in some manner

legally responsible for the events and happenings alleged in this Complaint and for Plaintiff's

damages. Plaintiff will identify the names and capacities and relationships of DOES 1 through 10

by amendment to this Complaint when and if Plaintiff subsequently ascertains and learn such

information. Each reference to a named Defendant herein below includes a reference to the

fictitiously named Defendants. FBI, DOJ, FTC, FINCEN, NSA and other law enforcement,

regulatory and private investigators have tracked the payments, and command-and-control of the

20+ attackers from the Defendants offices to the attackers and their deployments. Federal law

enforcement will be subpoena' in this case to disclose that financial data.


8.     The governmental agency is Plaintiff's former employer, contractor and competitor:

The United States Government. The address for the Defendant  is: ***United States; Attorney General***

***Of The United States; Attn: Process Clerk – DOJ; 950 Pennsylvania Ave., NW, Washington, D.C.***

***20530***

9.     The service of process has been served at this address and associated addresses to

Defendant.


## *STATEMENT OF FACTS*


This case is about hit-jobs and attacks on Plaintiff via the operators of a profiteering

organized crime activity in government offices. Racketeering-motivated political 'mobsters', in

Government offices, attacked and harmed Plaintiff, using taxpayer-paid resources because he did

not cooperate with their crimes, which were based out of government offices, and because Plaintiff

reported those crimes to law enforcement when Plaintiff witnessed those crimes.

Since 2008, Plaintiff filed whistleblower complaint's under Section 211 of the Energy Act

of 1974, as amended, 42 U.S.C. 5851 ("ERA") and every other known whistle-blower reporting

entity, with every known law enforcement and regulatory agency. Over one year has passed since

these complaints were filed. The agencies has not issued a final decision within one year of the filing of the complaints, and the delay is not due to the bad faith of Plantiff. Thus, under the ERA, the Federal District Court now has jurisdiction over this matter.

The original complaint was filed by Email on 2.22.22 . Plaintiff's income, housing, brand and businesses were attacked and cut-off in reprisal for his aid to the government in criminal '*stimulus*' scam investigations involving profiteering with foreign rare earth mining schemes, the energy and internet industries and the stock market. Defendants spent over $60+ million dollars (proven by their own banking records, comps from Presidential campaigns, and opposition research group's past billings as shown in provided EXHIBITS) using spy agency-type dirty tricks contracted from such attack services as ***Cardinal & Pine; Pacronym, Acronym;  The Americano; Investing in US; Shadow Inc; Courier Newsroom; IN-Q-Tel; Gawker Media; Jalopnik; Gizmodo Media; K2 Intelligence; WikiStrat; Podesta Group; Fusion GPS; Clearview AI Face Tracking, Google; YouTube; Alphabet; Facebook; Twitter; Think Progress; Media Matters); Black Cube; Correct The Record; Orbis Business Intelligence, Undercover Global Ltd; Stratfor; Jigsaw; ShareBlue/Acronym; Versa LLC; American Ledger; Supermajority News; New Venture Fund; Sixteen Thirty Fund; Cambridge Analytica; Sid Blumenthal; States Newsroom; Hopewell Fund; Open Society.; Palantir, Kroll, David Brock; AmpliFire News; American Bridge; Plouffe Consulting; Pantsuit Nation; MotiveAI; American Bridge 21st Century Foundation; Priorities USA; PR Firm Sunshine Sachs; The American Independent Foundation; Covington and Burling; Buzzfeed; The American Independent; Perkins Coie; Secondary Infektion; Wilson Sonsini*** and thousands more are hired to scan EVERY database, every hour to run hit-jobs, character assassinations, dirty tricks and economic reprisal attacks on Plaintiff, and any targets who reported the crimes. Defendants used former intelligence agency (ie: See Ronan Farrow's Book: ***CATCH AND KILL***) personnel to harm Plaintiff as revenge/vendetta/reprisal because Plaintiff was

a whistle-blower, a direct competitor and the inventor of technologies that Defendants financiers had not, themselves, invented.

These public official racketeer 'mobsters' run part of the United States Government and used government resources, that Plaintiffs tax dollars paid for, to operate their crimes and to attack Plaintiff for whistle-blowing. These racketeering officials rely on schemes with Elon Musk, Jeff Bezos, Bill Gates, Lauren Powell Jobs, Tim Draper, Steve Jurvetson, Larry Page, Eric Schmidt, The Zuckerbergs and other windfall profiteers, coordinated by private banks such as Goldman Sachs, corrupt CPA firms like Mossack and dirty law firms like Perkins Coie as consigliere-type coordinators of the schemes.

On November 11, 1620, Plaintiff's blood relatives signed the Declaration of Government, on the Mayflower, which, in part, created the United States Government. Plaintiff is, thus, suing the United States Government, on behalf of the United States Government in order to fix the United States Government.


Some of the most famous politicians in the world covertly joined together to engage in a profiteering and racketeering 'enterprise' (not unlike the 'Mafia') in order to optimize bribes based around stock market manipulation of securities assets owned by politicians and their family members. The many thousands of news articles about the reasons for the STOCK ACT, in Congress, detail the harms of this via massive public documentation. White House and Congressional staff (ie: Plouffe, Axelrod, Mcdonough, Carney, Spinner, Emanual, Rattner, Schmidt, Westly, et al) advised them on how to set-up and prosper in these illegal machinations in exchange for political campaign financing and percentages of said financing.

The Patent Office has awarded Plaintiff dozens of issued federal patents as first-to-invent the core products that run Silicon Valley. Plaintiff, and his partners, spent decades of their lives and millions of dollars creating those inventions. Then the Defendant sabotaged the commercialization

of those patents because 90% of them obsoleted Defendant's employee's, contractor's and financier's stock market holdings.

A patent is a fight with the U.S. Government over who invented a thing. You file a paper saying: "*I invented this thing*" and the Government generally sends you a letter saying: "*We aren't sure you were the first: PROVE IT!*" You go back and forth with the Patent Office in a federal investigation that can last years, and spend vast amounts of money on lawyers, until you have absolutely proven to the Patent Office that you were the first to invent something. Then the Patent Office awards you the patent.

In Plaintiffs case, the patent office said that he invented the things that Google, YouTube, Netflix, Tesla and Facebook - Meta are based on. The Patent Office, Plaintiffs emails, contracts, NDA's and other evidence; including leaks and whistle-blowers from Silicon Valley, proves that Plaintiff invented those things, and launched the companies offering those products and services, years before those competing companies even existed.

At the same time, federal and news media investigators discovered that Google, YouTube, Netflix, Tesla and Facebook – Meta.et al, are the LARGEST PROVIDERS OF BRIBES TO U.S. SENATORS AND WHITE HOUSE STAFF. It is impossible for the Court or the Plaintiffs to argue otherwise because the public documentation confirming this fact is so vast.

Plaintiff discovered, later, that those competitors hired moles to spy on his companies and their technologies and engage in RICO-violating anti-competitive attacks. **Even worse**: Plaintiff found out that later after a number of broadcast *60 Minutes CBS News* reports and Congressional tips from U.S. Senators family members, that ***his government officials covertly owned those companies***!!! Yes, His elected officials turned out to be either financed by, friends, with, sleeping with, dating the staff of, holding stock market assets in, promised a revolving door job or government service contracts from, partying with, personal friends with, photographed at private events with, exchanging emails with, business associates of or directed by; our business adversaries,

or the Senators and politicians that those business adversaries pay campaign finances to, or supply political digital search manipulation services to. Criminal U.S. Senators and White House staff coordinated and profited in these schemes. For example; One California Senator's family owned and controlled A.) Government trained attack 'spies' formerly with the CIA, NSA, etc., B.) The leasing contracts for Tesla and Solyndra, C.) Their office staff that threatened Plaintiff in writing and in-person to Plaintiff's Washington DC staff, D.) the financing for Tesla and Solyndra, E.) The construction services for Tesla and Solyndra, F.) The staffing company for Tesla and Solyndra, G.) The adjacent railroad services for  Tesla and Solyndra, H.) Key suppliers for Tesla and Solyndra, I.) Goldman Sachs cooperative relationships for Tesla and Solyndra, J.) Transitions from their own Senate Office staff to revolving door jobs at Tesla and Solyndra, K.) Government decisions for Tesla and Solyndra, L.) The relationship incentives between Google, Tesla and Solyndra and that Senator's campaign financing to that Senator; and other illicit conflicts of interest. Plaintiff owned the competing electric car company and technology that would have obsoleted Tesla, Google and Solyndra and was the first to begin negotiations with the factory that Tesla later took over at the insistence of that Senator, even though Elon Musk appears in news reports, previously stating that he saw no use for the building for Tesla.

Silicon Valley has had the largest number of Congressional hearings against it, BUT the least number of regulations imposed on it. Why? You can look no further than the covert ownership of Silicon Valley by elected officials. Our politicians get paid bribes, by Silicon Valley, to keep the political corruption alive and well while they operate, with impunity, as the biggest threats to society ever manifested.

Government politicians protect Silicon Valley and allow it to keep producing child suicides, racism, misogyny, child mental health threats, domestic spying, data harvesting, sex trafficking, election manipulation, tax evasion, censorship, i***ntellectual property theft***, political bribery and many other crimes! Why? Because crime pays...**for U.S. Government officials!**

Certain Government officials, listed by name in the evidence documents, have knowingly formed a RICO-law violating 'criminal enterprise' in order to operate monopolies against the public, including Plaintiff and his companies, that place criminal greed over ethical governance. The highest levels of DOJ, FEC, OSC, and other enforcement agencies have been proven, BY CONGRESS, to have been blockaded by cronyism and corruption in their required duties to arrest these officials.

Plaintiff's letter to Senator Bingham and the Energy and Commerce Committee began part of the Solyndra and Cleantech Crash investigations as shown on the referenced ***CBS NEWS 60 MINUTES*** segments (Plaintiff worked with Bob Simon at 60 Minutes) and other documents in the attached and linked **EXHIBITS,** and created the **'The Stop Trading on Congressional Knowledge (STOCK) Act'** which Senator Bingham and Plaintiff both aggressively pushed to create.

There are 8 billion people in the world and over 5 million companies in the world. Why are the same 20 people; from the same 6 companies; that are all within 10 blocks of each other; that all went to the same frat houses; that all go to each other's parties; that control the same crooked *'Panama Papers'*-type CPA's, Law Firms, Media Attackers and Lobbyists; that operate all this felonious larceny connected in this way unless it is a "criminal enterprise" in violation of RICO laws?

i.        On top of that, Defendants confided to Plaintiffs (Later proven in their leaked emails) that "*they are the new Mafia*" and produced Mafia documents and Mafia photo tributes to themselves (attached herein). They said that they "*...sought to control The White House and Sacramento Government offices so they could steer all the taxpayers public funds and power to their personal pockets…*" , an act they fully accomplished! A deep state is a type of governance made up of potentially secret and unauthorized networks of power operating independently of a state's political leadership in pursuit of their own agenda and goals. In popular usage, the term carries overwhelmingly negative connotations.[2] The range of possible uses of the term is similar to that for shadow government. The expression state within a state is an older and similar concept.

Historically, it designated a well-defined organization which seeks to function independently,[3] whereas the deep state refers more to a hidden organization seeking to manipulate the public state. Congressional and other government officials have confirmed that a portion of the UNITED STATES OF AMERICA is operated by and organized as this Deep State operation including the administrators of this section of the government, listed by name, in the related **EXHIBITS.**

The United States Patent Office (https://uspto.gov) has awarded Plaintiff dozens of seminal issued patents as first-to-invent the core technologies, of modern Silicon Valley, years before Defendants sinister company partners even existed. Billions of people use Plaintiff's technologies worldwide.

Who hasn't ordered a high-definition movie on the internet, on-demand, and watched it in full-screen, full-color, on the web? *The United States Patent Office and public records say one of Plaintiff's company's did it first!*

Who hasn't enjoyed social networking on the web. *The United States Patent Office and public records say one of Plaintiff's company's did it first* and the USPTO hearing that occurred said that Plaintiff did it BEFORE Zuckerberg or Yahoo engineers had thought of it!

Who hasn't experienced immersive virtual reality in a fantastic synthetic computerized world. *The United States Patent Office and public records say one of Plaintiff's company's did it first!*

Who has hasn't dreamed of an electric car that can solve all of America's energy problems, gets all of it's fuel from clean sources INSIDE of America, is the safest car ever made, is affordable to the average person and relies on no foreign sourcing? *The United States Patent Office and public records say one of Plaintiff's company's did it first!* ...AND, on top of that, Plaintiff was awarded nearly a billion dollars of issued patents in commendation by the government. ...AND on top of that, Congress awarded Plaintiff a Congressional award for it in The Iraq War Bill ...AND The United States Government contracted Plaintiff to build it….. BUT then the U.S. Government sabotaged the whole thing, including all the patents and the rest of Plaintiff's funding because it was about to obsolete their insider's car: The deadly, stock market pump-and-dumped and contrived "Tesla". Law enforcement and news investigators then informed Plaintiff he had been defrauded by

a government scam and insider crony slush-fund.

There are a vast volume of other similar examples of "Firsts" created and placed on the market by Plaintiff and then spied-on, stolen and copied By Defendants who then launched harms against because Plaintiff refused to participate in their protection rackets.

Defendants broke RICO laws by, in part, attacking and destroying Plaintiff's companies because he did not participate in Defendants protection rackets and because his products and technologies obsoleted theirs.

Defendants spied on Plaintiff companies (with honey-traps, listening devices that were found, hacked servers, Microsoft Outlook email re-directs, moles who actually worked for the Defendants and other tricks), copied the patents, technologies and trade secrets and made hundreds of billions of dollars from them. Defendants blockade Plaintiff from getting a law firm, as detailed in the attached and hot-linked **EXHIBITS** and blockade his litigation attempts to get to Jury Trial against him. There is even a New York Times expose' article about how Google boss: Larry Page ('boyfriend' of Elon Musk – They share an apartment, lobbyists and own the same Senators), skulks around at tech events stealing ideas for Google/Alphabet. Page stole many of Google's technologies from Plaintiff. It is difficult for Plaintiff to watch Defendants buy mutiple homes, race cars, private islands, private jets, celebrity parties, exotic resort vacations and other fine things, based on profits from Plaintiff's inventions, while Plaintiff is allowed to have none of these things, and is blockaded from even getting a single home, because Defendants Cartel 'Enterprise' won't allow him to. In full compliance with RICO requirements, Defendants attacked Plaintiffs A.) Record-breaking Global Televsion Network, B.) Energy Processing Company, C.) Electric Vehicle Manufacturing Company, D.) Social Media company and harrassed, black-listed, and put them out of business because they had products that Defendants copied and Plaintiff had them years Before Defendants efforts even existed.

In the "Case X POLITICAL CORRUPTION INVESTIGATION" matter, the United States agencies, university and news reports have stated that the United States and it's taxpayers lost tens of billions of dollars. **THE UNITED STATES OF AMERICA OWES PLAINTIFF MONEY FOR SAVING THE UNITED STATES OF AMERICA MONEY. *If not for the***

14

1   *actions of Plaintiff, they would have lost tens of billions of dollars more. Plaintiff is OWED some*

2   *consideration for serving his nation, overtly and covertly, and getting attcked and harmed for it*

3   *by reprisal-oriented corrupt government officials who got caught!*

4       Verifications and proofs of all assertions are provided in the attached ***EXHIBITS***.

5       Plaintiff, and his co-investors, previously sued the U.S. for political reprisal and won their

6   (massivly media covered) case under (Supreme Court nominee) Judge Ketanji Brown Jackson,

7   wherein Plaintiff and his peers ***proved that political reprisal hit-jobs had been ordered against***

8   ***Plaintiff*** by Executives in The White House, The Department of Energy and via at least three West

9   Coast U.S. Senators, all of whom had hundreds of millions of dollars of 'unjust gains' expected

10  from their illicit participations in "Case X POLITICAL CORRUPTION INVESTIGATION" and

11  the stock market gains they sought therefrom. The Secretary of Energy, Mutiple Attorney General's

12  and the Director of the FBI were fired for corruption during the "Case X POLITICAL

13  CORRUPTION INVESTIGATION" timeframe and according to law-firm Covington And Burling,

14  who claims (in emails to Plaintiff) to have placed those appointees in office, they were all connected

15  to "Case X POLITICAL CORRUPTION INVESTIGATION" ill-gotten gains.  ***Plaintiff's exposure***

16  ***of the crimes, notifications to the perpetrators that they had been caught, lock-down of the loop-***

17  ***holes used to engage in the crimes, creation of massive press coverage of the corruptions,***

18  ***creation of legal precedents, mass posting of the evidence to citizens world-wide, and other***

19  ***efforts, is said to have saved the United States Of America over $200 Billion dollars in losses***

20  ***from future and ongoing versions of these crimes.***

21      Plaintiff received a Congressionaly awarded grant and delivered in full, his work product, to

22  the United States; unlike all of the other Dept of Energy program peers, who grabbed the federal

23  money and instantly went bankrupt and profiteered on the tax write-offs. ***Plaintiff alleges reprisal,***

24  ***vendetta, and revenge by government officials as retribution for reporting violations of RICO***

25  ***laws, Anti-Trust Laws and other crimes, in a criminal program involving U.S. public officials.***

26  ***Plaintiff also alleges RICO-organized business harms to his companies and issued patents.***

27      Plaintiff's losses from said state-sponsored vendetta reprisal attacks operated The White

28  House, government agencies and Congress wherein those bodies were infected by corruption as

1  reported by the FBI, DOJ, SEC, OSC, FEC, FINCEN, INTERPOL, ICIJ, WIKILEAKS, CBS

2  NEWS, CONGRESSIONAL ETHICS COMMITTEES AND hundreds of other government bodies.

3  Plaintiff in no way aserts that the U.S. government is "bad". Plaintiff simply asserts that there are

4  some bad people, with criminal intentions, working in the government.

5         Plaintiff asks the Court to **re-consider** Plaintiff's request for protection via the more detailed

6  threat explanations, below, which proves that Plaintiff has threats of death, was attacked, has

7  extreme vulnerability to retaliation, has already had his life destroyed by Defendants attacks and

8  that it is in the public's interest for Plaintiff to stay alive and unharmed so that he can continue to

9  protect taxpayers from corruption. Plaintffs attacks are now detailed in the body of the complaint as

10  well as the attached **EXHIBITS which are part and parcel of this filing**. The details are now less

11  broad and much more specific. The actual threats and attacks are detailed, herein, to a greater

12  degree. Actual evidence of harassemet, shadow-bans and cyberstalking are provided. Plaintiff has

13  over 3 million pages of evidence and many hours of video evidence posted online. Any appearance

14  of Plaintiff's name on any server, dating site, government site or other electronic location damages

15  Plaintiff because these hired attack companies use computerized cyber-assassin software: ***Cardinal***

16  ***& Pine***; *Pacronym, Acronym;*  ***The Americano***; ***Investing in US***; *Shadow Inc; Courier*

17  *Newsroom; IN-Q-Tel; Gawker Media; Jalopnik; Gizmodo Media; K2 Intelligence; WikiStrat;*

18  *Podesta Group; Fusion GPS; Clearview AI Face Tracking, Google; YouTube; Alphabet;*

19  *Facebook; Twitter; Think Progress; Media Matters); Black Cube; Correct The Record; Orbis*

20  *Business Intelligence, Undercover Global Ltd; Stratfor; Jigsaw; ShareBlue/Acronym; Versa*

21  *LLC; American Ledger; Supermajority News; New Venture Fund; Sixteen Thirty Fund;*

22  *Cambridge Analytica; Sid Blumenthal;* ***States Newsroom***; *Hopewell Fund;  Open Society.;*

23  *Palantir, Kroll, David Brock; AmpliFire News; American Bridge; Plouffe Consulting; Pantsuit*

24  *Nation; MotiveAI; American Bridge 21st Century Foundation; Priorities USA; PR Firm*

25  *Sunshine Sachs; The American Independent Foundation; Covington and Burling; Buzzfeed;*

26  ***The American Independent***; *Perkins Coie; Secondary Infektion; Wilson Sonsini* and thousands

27  more are hired to scan EVERY database, every hour to run hit-jobs, character assassinations, dirty

28  tricks and economic reprisal attacks on Plaintiff, and any targets who reported the crimes. For his

own security, Plaintiff has helped to place an "insurance" policy data set on servers around the globe, on in-orbit satellites launched by others and in torrent files that look like movie files but are actually encrypted data sets, residing around the globe. Agents for Plaintiff will release those data sets upon the untimely death, coma-state harm or severe interdiction harm to Plaintiff.

Plaintiff has been diagnosed with numeric dyslexia AKA Dyscalulia and Aspberger Syndrome as well as cellular-level radiation and nano-toxin blood poisoning from his Congressionally awarded work for the U.S. Department of Energy helping to build America's energy back-up plan chemistry, including solvents and micro-particulants detailed in his issued federal patents as well as EMF, beta-voltaic, terra-hertz radiations and other radiation technologies such as that associated with thorium, plutonium, uranium and other radioactives used for energy storage and deployment. The Dyscalculia prevents him from numeric processes beyond 3 digts. The Aspberger gives him incredible investigative skills but prevents him from fully understanding legal language which is a non-organic, non-emotive communications form. The blood poisoning makes him tired at different intervals. The Court's indulgence in these medical issues is requested. Plaintiff, his entire life, has been required to use a CPA and a lawyer for all activites relating to the specialties of those two positions due to the Dyscalculia so it is odd (and "exceptional") that he is denied an attorney to represent him in this case. Plaintiff has also suffered from PTSD caused by Defendants actions, threats and harms and the suspicious deaths of those other victims/whistle-blowers known to Plaintiff and listed, by name, herein.

Plaintiff still maintains it is in the best interest of the Court and the public to appoint a qualified lawyer, equitable to the legal counsel used by Defendants, for Plaintiff. Plaintiff can't understand "legalese', can't make a logical trial hearing sound as good as a real lawyer could, to the Jury, when the emotional stress of this case has devastated Plaintiff and Defendant has billions of dollars at their disposal while Plaintiff has none.

Plaintiff's entire knowledge base as to when to shout out the word "objection", comes from watching a few TV episodes of "***Law and Order***". Also, Plaintiff is not articulate in such settings. Plaintiff can't recall dates and numbers in person and on-the-spot. He must go back and look at his notes. Where Plaintiffs other goal, aside from getting his money and his house back, is to expose

this corruption on public record, ON BEHALF of the public, it only makes sense that a lawyer could do that best for all concerned. Plaintiff absolutely does not understand legal issues. His latest help in drafting this comes from buying law students a sandwich at Hastings and Santa Clara law schools. That hardly counts as 'adequate legal resources'. Plaintiff is suing THE LARGEST, MOST RESOURCED, DEFENDANTS ON EARTH and has no lawyer. **Really?!!... does that actually seem like a fair fight?** Those circumstances seem pretty "exceptional" and the law says that individual, public-interest, senior, low-income, disabled plaintiffs fighting for justice on behalf of the public and themselves are "exceptional", present "exceptional" circumstances and should be given the "exception" by the Court, to be fairly represented by a Court Appointed Counsel paid for by the Court. The Court gives murderers a free Court appointed lawyer every day. Why does a person, such as Plaintiff, who put his life on the line for his nation not get a lawyer from the Court when scumbag animals that take the lives of innocent children get a free one from the Court all day long? Plaintiff does not have the slightest clue how to look up legalese or cite case numbers or which laws were violated according 'citation numbers' and lawyer codes and his Dyscalculia makes it restrictively hard to do so. There is no justice for the Plaintiff if he can't understand the secret language of lawyers. The CIA told Plaintiff "*Learn Russian*".. then years later they said: *"nawwww, forget about learning Russian. Learn Syrian"*. The Court is asking Plaintiff to learn a language (lawyer talk, which is as hard as learning Russian from scratch) that he will never use again, that takes ten+ years to learn properly and that lawyer language changes every year with new laws. Everybody else has a lawyer in these monster, giant, lawsuits. Most of them have 20+ lawyers per side. Plaintiff has no desire to become a lawyer. There are plenty of lawyers. If you killed all of the lawyers in one generation, there would be just as many in the next generation. Plaintiff should be allowed to have at least one of those lawyers from the vast pool of already existing lawyers in America. This whole case is about FAIRNESS and DISCRMINATION and REPRISAL. Defendants have people representing them that are lawyers 24/7. They just sit around and fight mobsters all day. They should be helping Plaintiff fight mobsters and NOT fight against Plaintiff, who is fighting the same mobsters THEY are supposed to be fighting. Defendants have an unfair advantage because they have a building full of lawyers, unlimited cash and they know all of the

legal tricks and meanings of all the legal phrases which Plaintiff has no clue about. It seems discriminatory to not let Plaintiff have a lawyer after Defendants blocked EVERY possible way for Plaintiff to have acesss to a lawyer because they fear his TRUTH and EVIDENCE. After going through all of the state-sponsored harms and hardships detailed here, and in **THE EXHIBITS**, it is not **fair**, **just** or **reasonable** for Plaintiff to still be blockaded from having a knowledgeable legal represenrave. Judge Hixson is a famous and popular Judge with expert knowledge in the areas that Plaintiff is suing over. It is not right to have Judge Hixson spend his valuable time teaching Plaintiff lawyering 101. Just for the Judge's sake, The Court should appoint a lawyer to Plaintiff to save the Judge time and frustration. The earlier drafts of parts of this complaint were written by White House Lawyers, The huge Reed/Rubenstein Dinsmore law firm, and government legal people. When asked about some of their top tier legal language Plaintiff will have no clue what their citations and arguments means. Most of Plaintiff's past lawyers have been hired away by the Defendants. How are all of these circumstances not "exceptional". Plaintiff is fighting for his rights AND for the American Public. How does he not deserve a lawyer under all of these "exceptional" circumstances? As the Judge pointed out, Plaintiff's get a free court appointed lawyer under "exceptional" circumtances. Plaintiff has listed over 100 "exceptional" circumstances in this filing supportive of his need and right to a have one and the public will always ask why the Court let Plaintiff go on a "death march" against the biggest Defendants anyone on Earth could possibly sue without a single qualified, unconflicted, lawyer helping in. It will look like, to the public, that Plaintiff is being "set-up" by The Defendants Cartel. If ony for public optics, providing a lawyer for Plaintiff will be best. It could be that the Court is thinking what the SF Bar and San Mateo bar represenraives told him: *"Well, it will be really hard to find a lawyer around here who isn't in the Cartel's pocket…"* That's kind of the whole point of the lawsuit, though, isn't it. There are certainly some lawyers around who are not Silicon Valley's stooges. This is an "exceptional" circumstance.

Plaintiff exhausted every possible, and impossible, option to obtain counsel as shown, below, in the detailed section of the attached **EXHIBITS**. Under "exceptional" attack by Defendants, the Defendants set out to tactially deprive Plaintiff from getting an attorney using Government resources. This ALSO makes Plaintiff's situation "exceptional" in that few other

Plaintiff's in this Court have ever had the entire resources of the U.S. government arrayed against them to try to keep them from getting justice. The Defendants are blocking Paintiff's legal right to adequate counsel because some of them will go to prison, some will be shamed, some will lose their jobs, some will be revealed to be sex traffickers, and some will get into other kinds of trouble.

Government officials no longer have the immunity they once thought they had. Plaintiff's STOCK ACT in Congress proves part of that assertion as the STOCK ACT punishes most government officials for doing the crimes Plaintiff asserts. Also, Plaintiff created a legal Precedent by suing the Acting Secretary of Energy. Steven "SOE" and Lachlan Seward said they had "Qualified immunity", yet Plaintiff got them kicked to the curb. That's a "win" for Plaintiff AND the taxpayers! He and his investors sued Steven "SOE", The Secretay of Energy, The U.S. and other government officials and got them fired for corruption. Other recent cases prove that dirty politicians will always, now be taken down, either in, or around the Court. To dismiss Plaintiffs case may discourage the public that nobody can get justice and may make the world say: "See, they ran another reprisal on him...it's Seth Rich all over again". .."there is no justice.." "Everybody that tries to DO THE RIGHT THING gets screwed by Uncle Sam.." etc. Give the people some hope and don't let this case get dismissed. EVERYBODY said: *"You can't sue the Secretary of Energy personally and get him kicked out"* Plaintiff did it! There are hundreds of things Plaintiff was told were "IMPOSSIBLE.." and Plaintiff still pulled them off. Look at Plaintiffs resume website, who else do you know that has been so productive against such impossible odds? It would be a crime to dismiss a public-interest lawsuit designed to stop corruption against the public! Plaintiff set new legal precedents which make it easier to sue public officials and hundreds of public service groups are now doing the same thing. Did you notice that 35+ Congressional members just decided to up and quit Congress just prior to the upcoming election? That is from these new "immunity reduction" efforts targeting crooks working in Plaintiff's government. Crooked officials can no longer put their dirty eggs in the "but I'm immune.." basket. Google-Alphabet-YouTube will, likely, trot out their old ploy: *"...but we work for the CIA, see all these secret wire trasnfers we get from the government..and…. and, the CIA funded us.. We are IMMUNE"* BS!! Micheal Painter can testify about who paid for Google Maps and their sateliite sysem: The American Taxpayer! Nearly 500 ex-

employes are prepared to come forward and testify to what Google REALLY is. The one thing that Google, and the other co-conspirators, are NOT is immune! Eric Schmidt, Larry Page and Elon Musk, as covert operators of the deep state within the U.S., have no such immunity. The FBI AND Plaintiff both have the evidence, training, credentialing and rapid ability to produce arrest documents for any party listed herein and those Defendant bad actors MUST be arrested and charged. Mobsters in the U.S. government engaged in RICO violations and organized crime are NOT immune from prosecution!

Related cases confirming Plaintiff's assertions include: Criminal Case No. **21-582 (CRC)**; Task Force cases known as: "Durham Investigations"; "The Solyndra Investigation"; "The Afghanistan Rare Earth Minng Corruption Investigations";SFPD Case # **150528148**  ( - Company E (Northern District) Per Officer Liu – Badge # 4742 ) is relevant. Police incident report # **25119268** is relevant. OSC Case File No. **MA-19-002006** is relevant. OSC Case File **DI-15-4541** is relevant. California Victim Compensation & Government Claims Board Claim # **G628261** is relevant. Also relevant are: Case No. **1:20-cv-03010** ( Google monopoly and competitor attacks case); Case No. **11-CV-2509**  ( https://www.cand.uscourts.gov/judges/koh-lucy-h-lhk/in-re-high-tech-employee-antitrust-litigation/  ); Task force Case No. **20-xyz2020a** ( http://www.case-xyz2020a.com/ ); Case No. **20-03664** (  https://www.insurancejournal.com/app/uploads/2020/06/brown-v-google.pdf ); Case No. **1:12-CV-00774-mms** and related cases. ( https://thehill.com/blogs/congress-blog/the-administration/250109-a-case-study-in-pay-to-play-cronyism. Criminal referrals against the attackers have been filed with the FBI, DOJ, SEC, FEC, FTC ); Case No. **18-cv-8865** (S.D.N.Y.) (SEC v. Elon Musk for lies and scams ); Case No. **18-cv-8947** (S.D.N.Y.)( SEC v. Tesla, Inc. for lies and scams ); Case No. **1:14-cv-270143** ( Google racketeering charges - https://artistrightswatch.com/2017/10/08/googles-racketeering-challenge/ ); Case No. **1:19-cr-00490** ( United States v. Epstein - Big tech sex cult crimes case ); Case No. **129 So.3d 1196** (Fla. 2d DCA 2014); 170 So.3d 125 (Fla. 2d DCA 2015) ( Gawker Media, LLC v. Bollea in which Gawker, Deadspin, Gizmodo, Jalopnik, Jezebel, Kotaku and Lifehacker were exposed as character assassination and money-laundering fronts working for notorious third parties); Case No. **19-cv-343672** James Martin (on behalf of ALPHABET INC) v Larry Page et al (Sex Cults In Silicon

1   Valley ); Case No. **CGC-11-508414**, California Superior Court, San Francisco (Plaintiff v Google );

2   Case No. **3:16-cv-03061** U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA,

3   San Francisco Division ( Plaintiff V. Google/Alphabet/YouTube); Case No. **18-CIV05380** Rubin

4   Vs. Rubin (Google sex cult and sex slave charges ); Case No. : **1:17 - cv - 06404**  Vs. Rubin

5   (Organized crime sex trafficking stock market manipulators ); Case No. D.C. No. **3:17-cv-05369 -**

6   VC (Big tech harassment of outsiders);Case No. **3:21-cv-00077**  (Another of many lawsuits proving

7   that the Silicon Valley Cartel conspires to manipulate media and markets) and the SFPD Roger

8   Boas case records. David Drummond, Elon Musk, Larry Page, Eric Schmidt, David Rubin, and

9   other, oligarchs advised and, lierally, ran the White House, were charged with sex trafficking by

10  their spouses, tax evasion by the IRS, money laundering by FINCEN, DOJ, INTERPOL, or other

11  agencies. They ran the White House to such a degree that many news reports stated that *"you*

12  *couldn't swing a cat at the White House without hitting a Google or Facebook insider."* ( ie: The

13  Intercept – The Google Administration) The U.S. sought, solicited, encouraged, paid, traded

14  influence and web services with these known mobsters of the tech industry and gave these

15  sociopaths full credentials and authority under the U.S

16          For over a decade, the U.S. had full and complete evidence to arrest the Cartel members

17  referenced herein yet the U.S. did not arrest them because they were "*friends of the White House*"

18  and they kept the pig trough of insider trading and crony capitalism flowing like a tsunami of skull-

19  duggery. Thus the U.S. is responsible for all harms and damages to Plaintiff in addition to the other

20  reasons mentioned, herein, as to why the U. S. must pay Plaintiff. On top of that, The U.S.

21  sponsored, operated, financed and provided the taxpayer-paid resources to harm Plaintiff. The

22  government argument that *"...oh, that was just all that crazy Eric Schmidt, Elon Musk and Larry*

23  *Page and Zuckerberg doing all that stuff.. they are just insane little frat house boyfriends that are*

24  *out-of-control…"* , does not hold water based on the facts herein. The U.S. had direct financing and

25  command-and-control executive management over all of the harms against Plaintiff. In fact, top

26  FBI, DOJ, SEC, FTC, CIA and other investigative officers have quit their agencies over this crony

27  favoritism and failure to arrest. On March 22, 2022 in a related case, # **1:21-mc-00813-AT in U.S.**

28  **District Court, Southern Division New York;** Paul A. Calli and Charles P. Short, lawyers for the

Plaintiffs filed a letter of the same date, provided in the EXHIBITS. In that letter to Honorable

Judge Analisa Torres and in related national news articles, it has been revealed that the DOJ lied to,

and concealed facts and evidence form the Judge. This is of concern as Plaintiff, is also a reporter

and nationally published news publisher. On the same day, and at nearly the same time DOJ *leaked*

***government exhibit #3217 (GX 3217)*** which was admitted **under seal**, This leaked evidence

provided the names of 121 famous sex cult partipants in the U.S. v. Ray sex cult case. The news

organizations of the world have now published that list. It seems that someone at DOJ is trying to

help Plaintiff's case, while others at DOJ are trying to harm Plaintiff. These two recent occurences

further prove two of Plaintiff's claims:

1. That government officials hack citizens simply in reprisal and lie to Judges about it. In

that other case, simply because some girl lost her diary.

2. That an active and 'Deep State' sex cult exists nationwide. That affiliated insiders operate

and sex traffick in it and the government is fully aware of it.

The Defendants are 100% liable for the charges herein and for the harms to Plaintiff listed

herein.

3. In one of the matters of harm to Plaintiff, we examine the use of The United States

Department of Energy as a political crony payola slush-fund under the direction of White House

staff. White House staff use various government agencies to conduit payola to high-net worth

parties to pay them back as quid pro quo for financing political camapigns.

4. Pursuant to §136 of the Energy Independence and Security Act of 2007, 42 U.S.C. §

17013, the U.S. Department of Energy ("DOE") administers the Advanced Technology Vehicle

Manufacturing (ATVM) loan program to support the manufacture of advanced technology vehicles

and components in the United States.  In 2008, Congress authorized DOE to make $25 billion in

ATVM loans.  DOE currently has approximately $16 billion of unused lending authority.

5. At all times relevant, Defendants knew that DOE's ATVM loans had evaporated the

private capital markets because venture capital and institutional lenders could not compete with

government interest and repayment terms (1% - 3% and up to 35 years).  At all times relevant,

Defendants also knew that unduly delaying or denying a small, innovative technology company's

ATVM loan application would likely mean a business death sentence.

6. Pursuant to §1703 of Title XVII of the Energy Policy Act of 2005, 42 U.S.C. §§ 16511, 16513, DOE also administers the §1703 loan guarantee program ("LGP") to support innovative clean energy technologies that are typically unable to obtain conventional private financing due to high technology risks.  Under LGP, DOE guarantees up to eighty percent of a loan for projects that "avoid, reduce, or sequester air pollutants or anthropogenic emissions of greenhouse gases; and employ new or significantly improved technologies as compared to commercial technologies in service in the United States at the time the guarantee is issued."  DOE currently has approximately $34 billion in loan authority, with an additional $170 million in appropriated credit subsidy carried over from previous years.

Plaintiff's program' ATVM Loan Application

7. Plaintiff obtained its first Department of Energy ("DOE") grant in 2005 for advanced automotive  energy storage technology.

8. On or about November 10, 2008, Plaintiff applied for a $40 million ATVM loan to build a scalable, innovative and efficient electric SUV-format vehicle, as requested by Congress and DoD for their use.  DOE's own Sandia National Laboratory ("Sandia") was identified as a project subcontractor.

9. This application was in response to a DOE solicitation and at the request of officials from the Pelosi, Feinstein and Boxer Senate offices.  DOE was supposed to evaluate loan applications on a "first in, first out" basis and to make ATVM loan funds available in January, 2009 for successful applicants.

10. Plaintiff's car design used advanced "hot-swap cartridges" to provide nearly unlimited range, cost less than $20,000 in base configuration, required no gasoline or extension cords to charge, required no garage, could be used by apartment dwellers, was easy to repair and build, and used "damp down" crash effect reduction materials. His design and metrics beat every competing car company except for one factor: Plaintiff refused to pay the requested bribes to get the funds!

11. Plaintiff's program had operations in Detroit, the Midwest and the San Francisco Bay area. Its design team included highly experienced automotive designers and senior Detroit

automotive management staff, the senior creation staff for the Corvette and the Mustang and aerospace industry professionals.

12. A critical Plaintiff innovation, based on a decade of research, was the use of next-generation polymer plastics in the automotive body. By replacing metal doors, body panels, hoods and roofs with lightweight polymer plastics on a carbon fiber and lightweight alloy frame, Plaintiff could build a four-seat, SUV-format vehicle with a curb weight of less than 1,400 pounds, or approximately one-third the weight of a Toyota Prius.  This, in turn, enhanced vehicle efficiency and performance. Plaintiff's patent issued tehnology is now installed as the bumpers of every Toyota Prius and other modern cars.

13. The polymer plastic construction also added to vehicle safety, with the foam skinned membranes functioning as a wraparound, predeployed, airbag to withstand impacts and "damp out" crash damage.

14. Plaintiff's pressure membrane technology was well proven and widely used in a variety of applications, including zodiac (inflatable) boats used in leisure, commercial and military applications, airbags, Mars landing equipment and even buildings and arenas with polymer membrane coverings.

15. All of the Plaintiff car's key parts were built and tested, or already existed in off-the-shelf components proven in the industry for over a decade.  Autodesk invested it's full range of software, without charge, and other engineering software which allowed for full virtual prototyping and operational testing of the design.

16. Plaintiff's financial and technical partners included a development foundation (a 501(c)(3) nonprofit), ZAP and Detroit Electric, major automobile manufacturers and national laboratories.

17. Plaintiff offered DOE asset collateral of over $100 million to secure the ATVM loan.

18. Plaintiff's ATVM loan application revealed sensitive and confidential technical and business information as defined by 10 CFR §§ 1004.10(b)(4), 11 and 5 U.S.C. § 552(b)(4) to DOE. This information included fuel cell and hydrogen storage technologies, fuel cassettes and pressure membrane body parts.

19. Plaintiff also disclosed patents for a solid-state NAHL hydrogen storage system and an inflatable electric and hybrid vehicle system, including U.S. Patent No. 7,169,489 with an estimated value of $17,291,568.64; U.S. Patent No. 7,279,222, with an estimated value of $10,524,792.26; U.S. Patent No. 7,399,325, with an estimated value of $5,607,695.94; U.S. Patent No. 7,011,768 with an estimated value of $104,072,538.36; and Patent 8,297,686 for an Inflatable Electric and Hybrid Vehicle System.

20. In consideration for Plaintiff's ATVM loan application, Defendants promised to protect Plaintiff's technical and business secrets and not to infringe its patents.

21. On December 2, 2008, Seward wrote to Plaintiff acknowledging receipt of its application and requesting certain additional information.  See Exhibits

22.  Plaintiff provided this information.

23. On December 31, 2008, Seward informed Plaintiff that its application was substantially complete, and that DOE would advise Plaintiff if it needed additional information during the application review process.  See Exhibits.

24. Upon information and belief, Plaintiff's ATVM loan application was the first to be deemed substantially complete. In fact DOE did not have an application form, yet, and asked Plaintiff to create one for them. Brent, the main DOE aide, and Gerbsman, all verified that Plaintiff was the very first Applicant t submit and, thus, the frst-in-line.

25. At all times relevant, Plaintiff qualified for the ATVM loan under DOE's published underwriting criteria.  For example:

a. Plaintiff was an "automobile manufacturer" that demonstrated "improved fuel economy" as defined at 10 C.F.R. § 611.100(a)(1).

b. Plaintiff was "financially viable" as defined at 10 C.F.R. § 611.100(a)(2).

c. Plaintiff's application satisfied all of DOE's requirements under 10 C.F.R. § 611.101 et seq.

d. Plaintiff's product satisfied all of DOE's evaluation criteria under 10 C.F.R. §611.103(b).  Among other things, Plaintiff's car used no gasoline and traveled over 125 miles on a single charge.

e. Plaintiff met all of DOE's environmental requirements under 10 C.F.R. § 611.106 et seq.

f. Plaintiff was a "covered firm" as defined by DOE at 10 C.F.R. § 611.207(a), and eligible for the set aside specified at 10 C.F.R. § 611.207(b).

g. DOE internal staff Excel comparison matrices placed Plaintiff in the top 5% in over-all comparison metrics of all applicants.

26. DOE ostensibly began processing Plaintiff's ATVM loan application in or about Dec. 2008.  This process should have taken no more than several weeks.

27. However, DOE did not promptly underwrite Plaintiff's application.

28. Plaintiff was unaware that its application had been "set aside" in favor of applications from politically-connected government cronies which were Solyndra, Tesla, Fisker and Abound.

29. Plaintiff was unaware that Defendants had "fixed" the ATVM loan process to benefit political donors because Plaintiff was being used as a cover story, by the government, due to his appearance on NPR, New York Times, Wall Street Juornal and other news outlets which made DOE "look good".

30.  Plaintiff also was unaware that Defendants had no intention of approving Plaintiff's ATVM loan application under any circumstances.

31. Instead, Plaintiff assumed Defendants were acting in good faith and in accordance with law.

32. Therefore, Plaintiff repeatedly contacted DOE to provide engineering, financial and other information in support its application.

33. On April 23, 2009, Jason Gerbsman, the Chief of Staff and Senior Investment Officer, at the Loan Programs Office, Automotive Division, of DOE,  notified Plaintiff that:

Plaintiff has submitted a substantially complete application and has been assigned to both a technical eligibility and merit review team, as well as a financial viability analysis team. The technical team is very close to finishing their evaluations on both eligibility and project merit, and the financial team will be launching a more detailed and interactive due diligence phase of the Plaintiff application review very soon. Following the technical and financial evaluation under the

second stage of the process, we will move into the underwriting phase where our goal is to negotiate a conditional commitment, including a detailed term sheet. This will be followed by the fourth phase of the loan process where the final details will be negotiated and the loan will be closed.

34. On May 26, 2009, Gerbsman offered an in-person meeting to discuss "Plaintiff's next steps."

35. On May 28, 2009, Plaintiff flew a delegation from California to meet with Gerbsman, who said that DOE had determined "everything was in order" with Plaintiff's ATVM loan application, that "everything looked good" and that Plaintiff "appeared to be fully complaint and passed technical review."

36. Shortly thereafter, Plaintiff discovered that Tesla Motors, Inc. ("Tesla") and Fisker Motors, Inc. ("Fisker") had received and were receiving special assistance from DOE staff with the ATVM loan application process. Plaintiff had met, In Washington DC, with Micheal Carr, who stated that he "had written the funding bill". Carr had advised Plaintiff that Tesla and Fisker were not bothering to submit paperwork on time: "...because those companies knew they had already been hard-wired in, in advance.."

37. Plaintiff asked for similar assistance from DOE staff but was denied it, ostensibly because the quality of its application was so high that no assistance was needed.

38. At all times relevant, Plaintiff was actively worked with other financing sources, including Wells Fargo Bank, to leverage the ATVM loan and fund product production.

39. Notwithstanding DOE's delays and the bankruptcy of other industry players due to the U.S. economic collapse, Plaintiff continued to grow throughout 2009.

40. On June 15, 2009, Plaintiff informed DOE that it was a semi-finalist in the Forbes "America's Most Promising Companies List" for 2009.

41. On or about June 22, 2009, DOE advised Plaintiff that a Northern California solar energy company had requested a copy of Plaintiff's ATVM loan application from DOE through the Freedom of Information Act ("FOIA").

42. Plaintiff contacted this company to see why it was interested in Plaintiff's ATVM loan.

43. Plaintiff spoke with the company's principal, who said that he had been "screwed over" by DOE and wanted to know if others had similar experiences.

44. He said that the company had suffered "bad dealings" with Matt Rogers, a "stimulus advisor" to "SOE" from McKinsey & Company, and Steven Spinner, a key player in DOE's loan program office.  Spinner, an Obama campaign bundler who raised millions for the President and who had been appointed to his government position in exchange for his fund raising, also had worked at McKinsey & Company and, according to his biography posted by the Center for American Progress, had served as an active advisor and investor to Tesla.

45. Plaintiff was told that Rogers and Spinner were "rigging the game."  It was given Spinner's phone number and told to call Spinner and ask him why Plaintiff's ATVM loan application was not moving forward.

46. Plaintiff texted Spinner and then called him.  Spinner answered the phone and told Plaintiff words to the effect of "Do not ever call me again.  The awards have already been decided."

47. On June 24, 2009, DOE announced $8 billion in ATVM loans to Ford Motor Company ("Ford"), Nissan North America, Inc. ("Nissan") and Tesla.  Tesla -- an Plaintiff competitor -- received an ATVM loan of $465 million at a rate of 1.6% from DOE to manufacture an expensive electric car.

48. On June 29, 2009, Plaintiff wrote to Gerbsman again asking for action on its ATVM loan application, pointing out that other lenders were hanging back until after DOE issued its term sheets, the offering document issued by DOE that specifies the detailed terms and conditions under which DOE may enter into a Conditional Commitment with the Applicant.

49. In the following weeks, authorized DOE representatives repeatedly assured Plaintiff that "everything was fine", "everything is on-track", and "you [Plaintiff] appear to meet every criteria" with respect to an ATVM loan.  Plaintiff was even told that "we [DOE] should be able to announce [an approved ATVM loan] any day now…"

50. However, on August 21, 2009, Seward denied Plaintiff's ATVM loan application. See Exhibit 3.

51. Seward said Plaintiff's application was "determined to be eligible" in accordance with

the "evaluation criteria" in 10 C.F.R. §611,103 but DOE was "not in a position to award every eligible application [an ATVM loan]."  He also said necessity required DOE to "choose applications that are most likely to use [ATVM loan] proceeds in a way that will best achieve the goals of the program" and that Plaintiff's application was rejected on this basis.  He did not disclose the criteria DOE used to weigh competing qualified applications or explain why Plaintiff fell short in the merit review.

52. Plaintiff then asked DOE to specify its reasons for denial.

53. In an email to DOE's Chris Foster, Plaintiff requested DOE's merit review documents and asked how DOE technical evaluators could reasonably conduct a ten month comparative merit review of Plaintiff's ATVM loan application without speaking to any single company engineers or senior project staff member for more than 1% of the time that DOE staff attended to Tesla, Nissan Ford and Fisker during the same review period.

54. On or about August 26, 2009, Plaintiff called Foster

55.  Foster said DOE had denied the application because Plaintiff's electric car did not use E85 gasoline, Plaintiff was not planning on building "enough" cars, Plaintiff was not planning on selling cars to the government, Plaintiff's electric motors and batteries were too futuristic and not developed for commercial use, Plaintiff's car was a "hydrogen car," and Plaintiff had underestimated the cost of metal body fabrication.

56. These "reasons" were baseless pretexts.

a. None of Plaintiff's competitors that were given ATVM loans to build electric cars used E85 gasoline in their vehicles.

b. Plaintiff's car was designed to be easily scalable, using "off the shelf" parts from existing commercial sources with multiple points of supply.

c. Plaintiff's business plan specifically provided for large government and fleet sales.

d. Plaintiff's "futuristic" electric motor and battery configuration had been in commercial and government use for decades.

e. Plaintiff's car was an electric car not a hydrogen car.

f. Plaintiff's car body contained minimal amounts of metal, using safer and easier to

source and fabricate polymers and plastics.

57. Foster never provided Plaintiff with DOE's merit review documents or described the applicable evaluation criteria.

58. On September 21, 2009, Plaintiff wrote to "SOE" requesting reconsideration of DOE's ATVM loan denial.  See Exhibit 4.

59. Plaintiff demonstrated that the stated reasons for DOE's denial were false. It asked "SOE" to explain why DOE staff repeatedly assured Plaintiff that approval would be forthcoming and that no additional information was necessary (leading Plaintiff and its principals to expend huge sums of money in reliance thereon), and why government-crony companies that applied after Plaintiff were reviewed earlier, given the benefit of extensive access to and interaction with DOE staff (a benefit denied to Plaintiff), and then awarded funds.

60. On October 23, 2009, Seward replied to Plaintiff.  See Exhibit 5.  He did not answer Plaintiff's questions.   Instead, he backfilled with new but equally baseless reasons for Plaintiff's rejection.

61. To begin with, Seward said that Plaintiff's application was "deemed Substantially Complete on November 10, 2009."  In fact, Plaintiff's application had been deemed substantially complete on December 31, 2008.

62. Seward said that the "proposed technology appeared…to be at a development stage and not yet ready for commercialization" and that the "assumption that the vehicle concept would be ready for production in three years" was a "significant weakness" due to the "high level of risk associated with the design."   In fact, the Plaintiff vehicle's technology had been in use commercially for years by the U.S. Department of Defense, NASA and the automobile industry; the politically-connected companies that were awarded ATVM loan funds were no further ahead in production than Plaintiff; and elements of Plaintiff's "high risk design" were already in use by Toyota and Nissan.

63. Seward said "the proposed project's impact on fuel economy…was determined to be weak."  In fact, non-gasoline powered automobiles are uniformly recognized to offer the most significant impact on fuel economy performance.  And, the Plaintiff vehicle promised even better

fuel economy than any of the ATVM loan "winners" (Tesla, Nissan, Ford or Fisker) proposed or actually offers to this day.

64. Seward said "A review of the advanced fuels in your project and the feasibility of that energy source…was [sic] questionable."  In fact, the fuels, products and sub parts of the "questionable" energy source are readily available to consumers at REI Sporting Goods, Amazon.com and Safeway supermarkets.

65. Seward said "A review of the calculations and assumptions supporting your claims for reductions in petroleum use were deemed to be unrealistic."  In fact, over 200 institutional research and white papers from respected government and university agencies from around the world supported Plaintiff's claimed reductions.

66. Seward said that Plaintiff's project "may be commercializable [sic] in the future, but is far too early in the development process to qualify" for an ATVM loan.  In fact, Plaintiff was further along in the "development process" than the politically-connected companies DOE funded.

67. Seward's letter was the first time any of these issues had been raised by DOE with Plaintiff, notwithstanding ten months of "underwriting," and multiple meetings, phone calls, and emails.  Incomprehensibly, DOE had refused to consult with any of Plaintiff's engineers and denied Plaintiff the "interactive" review that had promised in April and had in fact been provided to Tesla, Fisker, Nissan and Ford. Seward was a shill for the White House. Plaintiff's staff spoke to White House staffer Steven Rattner, who sat next to the Oval Office, about the log-jam. Mr. Rattner told Plaintiff's staff: "I am only concerned about making the Detroit collectives happy, You little companies are no concern of mine.." Rattner, a covert owner of Plaintiff's competitors in the process, was later indicted in New York for stock market manipulation and placed under long-term surveillance by the SEC and other agencies.

68. Defendants did not review Plaintiff's ATVM loan application in good faith and in accordance with its regulations, policies and promises.  Instead, it stonewalled Plaintiff.

Energy Team One's ATVM Application

69.  Or about February 1, 2009, Plaintiff (through Energy Team One) applied for a $15 million ATVM loan to help fund work with DOE's own Sandia National Laboratories ("Sandia") to

1    produce a "best of breed and state of the art" automobile energy storage system using Plaintiff's

2    patented energy production and storage technology.

3        70. On April 10, 2009, Seward denied this application on the grounds that it "[did] not

4    appear to be designed for installation in an advanced technology vehicle…"  See Exhibit 6. At all

5    times relevant, Defendants knew Seward's claim was false and a mere pretext to preserve ATVM

6    loan funds for government-favored companies.

7        71. On April 11, 2009, Plaintiff requested reconsideration, reminding Seward that the

8    relevant patents provided the technology was for use in advanced technology vehicles, that Sandia's

9    vehicle technologies group was the prime subcontractor for the project, and that DOE had funded

10   the technology specifically for use in advanced technology vehicles.  See Exhibit 7.

11       72. On May 13, 2009, Seward again denied the application because the technology was

12   "not installed in the advanced technology vehicle." This time, though, he asked for more

13   information.  See Exhibit 8.

14       73. On June 3, 2009, Plaintiff again requested reconsideration, pointing out that the device

15   "must be installed prior to use in an advanced technology vehicle and are, accordingly, designed for

16   such installation, and therefore…'qualifying components'" and answering Seward's other

17   questions.  See Exhibit 9.

18       74. Defendants never responded to this letter.

19    Energy Team One's LGP Application

20       75. At all times relevant, Plaintiff qualified for a LGP guarantee.

21       76. At all times relevant, DOE recognized that the LGP application fees and process were

22   unduly onerous and burdensome.

23       77. On or about February 1, 2009, Plaintiff participated in a conference call with John

24   Podesta, "SOE" and Interior Secretary Kenneth Salazar during which "SOE" promised to waive the

25   application fee.

26       78. On or about February 10, 2009, Plaintiff (through Energy Team One) filed a LGP

27   application with a cover letter stating that it was Plaintiff's understanding that DOE had waived the

28   application fee.

79. On February 26, 2009, DOE's Myrtle Gross called and said that the application fee of $18,000 had to be paid and that funds needed to be wired by midnight for the LGP application to be considered.  This was Plaintiff's first notice from DOE that the agency had reneged on its promise to waive the LGP application fee.

80. Plaintiff had access to the funds to make payment but could not complete the transaction by the midnight deadline.

81. On February 27, 2009, Daniel Tobin, DOE's Loan Programs Office Senior Investment Officer, called and said that there were "a few days of flexibility" to send in the application fee and promised to provide wire instructions.

82. Tobin also promised to "pre-review" the application and to call back with feedback.

83. Plaintiff never heard back from Tobin or anyone else at DOE.

84. Plaintiff repeatedly contacted Tobin by email, phone call and messenger, but neither he nor anyone else at DOE would respond or provide wire instructions.

85. Instead, on April 9, 2009, Tobin dismissed Plaintiff from the LGP without recourse, writing Plaintiff that "due to non-remittance of the required application fee, your application will not be reviewed." See Exhibit 10.

86. DOE ignored Plaintiff's request for reconsideration.

Defendants' Loan Program Abuses

87. Because DOE's ATVM loan program and LGP were not transparent, and DOE's underwriting criteria were easily skewed and manipulated by political officials, these programs became cash cows for government cronies.

88. To begin with, Plaintiff discovered in or about October or November of 2009 that Seward, angered at Plaintiff's public complaints about DOE's ATVM loan and LGP administration told his staff  on or in the end of December 2008 that it would be "a cold day in hell before I let [Plaintiff] get any money."  Seward used his power to arbitrarily and wrongly blackball Plaintiff's ATVM loan and LGP applications.

89. In February, 2011, GAO issued an investigative report on DOE's ATVM program. See Exhibit 11 "Advanced Technology Vehicle Loan Program Implementation Is Under Way, but

Enhanced Technical Oversight and Performance Measures Are Needed," GAO-11-145 (Feb 28, 2011)(the "GAO ATVM Loan Report").  It found that DOE had made billions in loans without engaging "engineering expertise needed for technical oversight.… As a result, DOE cannot be adequately assured that the projects will be delivered as agreed.  [Furthermore], DOE has not developed sufficient performance measures that would enable it to fully assess the extent to which it has achieved its…program goals."

90. In truth, DOE's ATVM loan program was nothing more than a veil for political officials to steer hundreds of millions of taxpayer dollars to government cronies, including Tesla and Fisker.

91. For example, Tesla's loan of $465 million was announced on June 24, 2009.

92. This loan was obtained in material part through the efforts and influence of Steven Westly who had "bundled" hundreds of thousands of dollars in political contributions.   Westly sat on Tesla's board from March 2007 to December 2009, the time period in which DOE made the ATVM loan.

93. In consideration for his financial contributions, Westly was given unusual Executive Branch access and an appointment on a key advisory board counseling "SOE". This allowed Westly to help shape DOE policy to advance his personal business interests.

94.  DOE's Spinner, who played a key role in the ATVM loan program, was also a political "bundler," and a former Tesla investor and advisor.

95. Additionally, Tesla's founder and CEO also made large political contributions to Democrats, including President Obama, in or about 2008.

96. On November 12, 2012, Tesla notified the Securities and Exchange Commission that:

On January 20, 2010, we entered into a loan facility with the Federal Financing Bank (FFB), and the Department of Energy (DOE), pursuant to the Advanced Technology Vehicles Manufacturing (ATVM) Incentive Program. This loan facility was amended in June 2011 to expand our cash investment options, in February 2012 to modify the timing of certain future financial covenants and funding of the debt service reserve account, and in June 2012 to allow us to effect certain initiatives in our business plan. We entered into another amendment with the DOE in

September 2012 to remove our obligation to comply with the current ratio financial covenant as of September 30, 2012 and amend the timing of pre-funding the principal payment due in June 2013. Under the DOE Loan Facility, the FFB has made available to us two multi-draw term loan facilities in an aggregate principal amount of up to $465.0 million. Up to an aggregate principal amount of $101.2 million had been made available under the first term loan facility to finance up to 80% of the costs eligible for funding for the powertrain engineering and the build out of a facility to design and manufacture lithium-ion battery packs, electric motors and electric components (the Powertrain Facility). Up to an aggregate principal amount of $363.9 million has been made available under the second term loan facility to finance up to 80% of the costs eligible for funding for the development of, and to build out the manufacturing facility for, our Model S sedan (the Model S Facility). Under the DOE Loan Facility, we are responsible for the remaining 20% of the costs eligible for funding under the ATVM Program for the projects as well as any cost overruns for each project. As of August 31, 2012, we have fully drawn down the aforementioned facilities.

97. Also on November 12, 2012, with $465 million of taxpayer money spent, Tesla reported delivering a grand total of 256 vehicles for sale to customers.

98. Fisker's ATVM loan of $528.7 million was announced on September 22, 2009, approximately a month after Seward rejected Plaintiff's application for a $40 million ATVM loan.

99. This loan was obtained in material part through the efforts and influence of John Doerr, a major political contributor and government crony.  At all times relevant, Doerr was a partner in the investment firm of Kleiner, Perkins, Caufield & Byers, along with former Vice President Al Gore, among others.

100. Kleiner, Perkins was a major Fisker investor. Doerr and his partners donated millions to the 2008 Obama campaign and related political causes, obtaining in exchange preferential access and treatment for their business interests.  Among other things, Doerr's political contributions produced high-level Executive Branch access and a seat on the President's Council on Jobs and Competitiveness.

101. When DOE announced Fisker's half-a-billion dollar loan facility, it claimed that

Fisker's ATVM loan would "create or save about 5,000 jobs for domestic parts suppliers" by funding "two lines of plug-in hybrids." Approximately $169.3 million of taxpayer funds were for "engineering integration" need for final assembly of a high-cost electric luxury car in Finland. Approximately $359 million of taxpayer funds was for manufacturing a low-cost plug-in hybrid sedan in the U.S. through "Project Kx."  See Exhibit 12 "Conditional Commitment Letter by and between United States Department of Energy and Fisker Automotive, Inc. – Execution Copy (September 18, 2009).

102. When DOE approved Fisker's loan, the Project Kx car did not exist, not even in prototype.  Upon information and belief, DOE lacked even detailed engineering and production specifications for the car.  Nevertheless, Defendants parroted Fisker's claim that "up to 75,000-100,000 [Project Kx] vehicles will roll off assembly lines in the U.S. every year beginning in late 2012" to justify the Kx loan.

103. In 2011, Fisker promised that the Kx vehicle, which had yet to be publicly show, would be in mass production by the end of 2012.

104. In or about February, 2012, after Fisker had borrowed over $170 million, DOE froze Fisker's ATVM loan credit facility because Fisker missed key production milestones.

105. In or about June, 2012, Fisker finally revealed the Project Kx prototype, a "low cost" $55,000 auto called the "Atlantic."

106. On or about October 18, 2012, Fisker reported that Atlantic production would be delayed until 2014 or 2015.  Hunter Biden controlled funding for Fisker and had relationships with the financiers of Tesla and Fisker during both the Obama and Biden Administrations.

107. Since 2008, Fisker has sold approximately 1,500 vehicles world-wide.

108. Upon information and belief, the over $170 million in taxpayer money DOE has given to Fisker has "saved or created" fifty or fewer jobs.

Defendants' LGP Abuse

109. In March, 2012, and in response to complaints by Plaintiff and others, GAO issued an investigative report on DOE's LGP performance.  See Exhibit 13 "DOE Loan Guarantees: Further Actions Needed to Improve Tracking and Review of Applications," GAO-12-157 (March,

1    2012).  GAO found that DOE treated LGP applicants inconsistently, favoring some and

2    disadvantaging others; lacked systematic mechanisms for LGP applicants to administratively appeal

3    its decisions; often ignored its own underwriting standards and skipping review steps; and re-

4    reviewed rejected applications on an ad hoc basis.  In fact, DOE's "Omitting or poorly documenting

5    reviews reduces LGP's assurance that it has treated applicants fairly and equitably."

6          110. In October, 2012, emails were released confirming that at least a number of LGP

7    decisions were based on political factors not DOE's stated evaluation criteria.  See e.g. Exhibit 14

8    (Email from Jonathan Silver, former Executive Director, DOE Loan Programs Office, to James C.

9    McCrea, DOE LPO credit adviser, dated June 25, 2010, stating "WH wants to move Abound

10   [project] forward.  Policy will have to wait…"); Exhibit 15 (Email from James C. McCrea to B.

11   Oakley stating "Pressure is on real heavy…due to interest from VP"); Exhibit 16 (Email from

12   Monique Fridell to Kimberly Heimert, et al. dated May 25, 2010 stating "DOE has made a political

13   commitment to get Unistar through the approval process by 6/15"; Exhibit 17 (Email from James C.

14   McCrea to Monique Fridell dated June 1, 2010 stating "Secretary [of Energy]…is adamant that this

15   transaction is going to OMB by the end of the day Fri if not sooner.  Not a way to do things but a

16   direct order")

17         111. DOE bent the rules for political allies such as Sen. Harry Reid and Rep. Steny

18   Hoyer, while government crony companies received special personal access to high-ranking DOE

19   officials.  See e.g. Exhibit 18 (Email from James C. McCrea to "barbiar" dated December 5, 2009

20   stating "[Harry] Reid may be desperate.  WH may want to help.  Short term considerations may be

21   more important than long term considerations and what's a billion anyhow?"); Exhibit 19 (Email

22   from James C. McCrea to Julie Stewart dated May 25, 2010 stating "7th Floor has decided mid June

23   CRB…there has been a commitment from S1 [Secretary "SOE"] to Steny Hoyer on this.  Nothing

24   like over committing and under delivering"; Exhibit 20 (Email from Brightsource Chairman John

25   Woolard, an LGP applicant, to Jonathan Silver, DOE Loan Office Director dated November 10,

26   2010 stating "Thanks for offering to meet at your house tomorrow morning." Silver replied "Came

27   [sic] anytime.  Guest bedroom is ready.")

28         Defendants' Abuse of Plaintiff

112. Defendants' wrongdoing abused and severely damaged Plaintiff.

113. To begin with, when Defendants "fixed" the ATVM loan and LGP programs to benefit government cronies, they knowingly and intentionally rendered the ATVM loan and LGP applications by Plaintiff and other similarly situated companies futile and meaningless.

114. Defendants intentionally induced Plaintiff and others similarly situated though multiple written and verbal representations from DOE officials with actual and apparent authority to bind DOE, to spend hundreds of thousands of dollars and invest thousands of hours of engineering and professional time on a meaningless snipe hunt.

115. Defendants' administration of the ATVM loan program effectively dried up all alternative sources of capital and denied Plaintiff and others similarly situated access to private financing by delaying term sheets and/or wrongly denying ATVM loans, among other things. Defendants had actual or constructive knowledge that delaying or denying a small company's ATVM loan application would be as a business death sentence.

116. At all times relevant, "SOE" and Seward had actual or constructive knowledge that there was an existing and valid contractual or other business relationship between DOE and Plaintiff, and that DOE had assured Plaintiff that it qualified for an ATVM loan.

117. Nevertheless, "SOE" and Seward skewed, manipulated and fixed DOE's ATVM loan review process against Plaintiff and other companies similarly situated to protect and advance the business and political interests of government cronies and caused the rejection of Plaintiff's ATVM loan and LGP applications on false bases and flimsy pretexts.

118. For example:

a. Government cronies who applied for the ATVM loan after Plaintiff were reviewed earlier, walked through the "underwriting" process by DOE staff and given the benefit of unique agency interaction, and then awarded funds.

b. DOE staff first issued over 20 documents, public statements, policy notices, powerpoints and other materials verifying that ATVM loans would be processed on a "first-come, first served" basis.  Because crony companies did not submit applications in a timely fashion, DOE subsequently altered this policy in mid-stream.

c. DOE paid outside, unqualified technical reviewers to conduct pre-textual diligence and application reviews.  Plaintiff spoke with Carol Battershel, who stated she was the due diligence technical lead on Plaintiff's application.  She said she had gotten everything she needed "off [Plaintiff's] website."  DOE reviewers never talked to Plaintiff's founder, inventor, engineers, project leads or primary contractors, and refused to speak with Plaintiff's engineers, even after Plaintiff's engineers called and visited them to offer data and other information.

d. DOE employees were ordered by senior DOE and Executive Branch political officials to ignore non-favored applicants until deadlines had passed to shrink the applicant pool.

e. DOE ignored standard commercial bank loan processes, including the use of competent engineers to carry out technical review and the consistent application of the same underwriting criteria to each loan application.  Instead, the "loan review process" was intentionally manipulated, bypassed or stalled, to ensure that funds were given to government favored "winners" but not to Plaintiff or other companies that lacked large political contributions and special Executive Branch access.

f. The ATVM loan funds distribution date was repeatedly manipulated by Defendants to frustrate Plaintiff and other similarly situated companies' efforts to attract private investors, thereby starving Plaintiff of capital.

g. Political officials made review and "underwriting" decisions.

h. DOE staff told Plaintiff and others that DOE was out of money and thus ATVM loan applications could not advance.  However, the ATVM loan fund was never out of money and, indeed, a "carve out" of appropriated funds was "held" for government cronies who made political contributions and hired political fixers to obtain "top-tier status" and "special relationships" with DOE.

i. DOE eased expectations for projected car sales volume by Fisker, a favored crony company with close ties to senior political officials in the White House, after DOE had conditionally approved an approximate $560 million loan, and then made allowances for scaling back projections in the final loan agreement, and then renegotiated loan terms to ameliorate Fisker's cash flow crisis in the weeks before the 2012 Presidential election.

j. DOE applied different metrics to ATVM loan applicants based on political connections and contributions.

k. DOE promised to waive the LGP application fee.  Within hours of the due date, DOE reneged.  The next day, DOE contacted Plaintiff promising to accept late payment.  Again, DOE reneged.

l. DOE hid the "merit review" data, reviewer identities, reviewer work histories, and other information from Plaintiff, all other ATVM loan applicants and the public.  This information, if disclosed, would have allowed for an open and transparent loan process and allowed Plaintiff and others to evaluate the efficacy of DOE's merit review.

m. DOE willfully, intentionally and substantially overestimated government crony company production capabilities and sales performance to justify its approval of ATVM loans.  For example, DOE promised that Fisker alone would have "75,000 – 100,000" ATVM loan-funded cars rolling off of U.S. assembly lines.  In 2012, Ford, Nissan, Fisker and Tesla (the ATVM loan "winners") combined sold fewer than 25,000 ATVM loan-funded vehicles nationwide.

119. Defendants wrongfully denied Plaintiff's ATVM loan applications and breached their promises to Plaintiff by wrongfully manipulating the technical review and underwriting process for the purpose of protecting favored government crony companies, including Tesla and Fisker.

120. DOE's wrongful refusal to keep its promises and review Plaintiff's LGP application, which met all applicable DOE criteria, has impaired Plaintiff's competitive position and caused it significant direct and consequential damages.

121. As a direct consequence of Defendants' wrongdoing, broken promises and cronyism Plaintiff was improperly denied ATVM loans and LGP guarantees, denied the opportunity to compete on a level playing field, and prevented from creating good American jobs through the production, marketing and sale of its products to ready and willing buyers.

DOE's Disregard For its Confidentiality Agreements

122. Plaintiff had collaborated with DOE on advanced technology vehicle systems for over a decade.

41

123. At all times relevant, DOE was contractually bound to protect Plaintiff's intellectual property and patents from disclosure, unauthorized use and infringement.

124. For example, on March 8, 2002, Plaintiff (through Energy Team One) signed a non-disclosure agreement with Sandia regarding fuel cell technology for use in advanced technology vehicles.

125. On May 24, 2006, Plaintiff (through Energy Team One) contracted with Sandia for consulting and paid $10,000 for tests of fuel cell chemistry.  This work was conducted under a non-disclosure agreement.

126. On July 11, 2008, Plaintiff (through Energy Team One) signed yet another non-disclosure agreement with Sandia.

127. On or about September 11, 2008, Plaintiff's CEO was invited to Sandia for a facility tour.  There, in a room where large glove-boxes and chemical testing equipment were used, he saw a table with a presentation set-up for another group. On that table were duplicates of a hydrogen vehicle energy system Plaintiff had built, tested and patented and had given to DOE.  The signs on the Plaintiff system read: "General Motors hydrogen vehicle production system" and "NALH General Motors Reversible Hydrogen Vehicle Energy System built by General Motors and Sandia."

128. However, the "NALH" system was Plaintiff's chemistry provided under a confidentiality agreement to Sandia.

129. When Plaintiff made Sandia scientists Chris Moen and Daniel Dedrick aware of its discovery, they admitted that there might be "a problem with that" and suggested Plaintiff contact GM to seek a "partnership" so that "there was no acrimony."

130. On November 10, 2008, Defendants agreed to protect Plaintiff's confidential business information, including its fuel cell and other intellectual property and patents, as consideration for submission of an ATVM loan application.  Plaintiff, in turn, submitted confidential business information to DOE regarding fuel cells and inflatable seats, seat belts and inflatable body parts, among other things.

131. On December 12, 2008, a non-disclosure agreement was made between Plaintiff and DOE (Sandia) under Contract Number DE-AC04-94AL85000 with respect to Plaintiff's proprietary

fuel cell chemistry and technology.

132. On January 6, 2009, Sandia advised Plaintiff that Sandia had validated the efficacy of Plaintiff's fuel cell power system and that it was "well situated to exceed the performance of battery systems…[Plaintiff's] energy storage densities..may improve [performance over batteries] by a factor of 3.…"  See Exhibit 20 Sandia Memorandum dated January 6, 2009 at 5.

133. In or about 2011, Plaintiff began seeing uncorroborated reports in technology news sources that General Motors Company ("GM") was using a fuel cell system built by Sandia.

134. At all times relevant, GM was substantially owned by the United States as the result of the taxpayer bail-out.  Therefore, GM received uniquely favorable treatment from DOE and other government agencies. Sandia senior executives assigned one of their financial staff to date Plaintiff and "keep an eye on him". This was during the period known as the "ground squirrel crisis at Sandia Livermore. Security was so lax at Sandia Livermore that a red fox regularly broke into the facilites and was found sleeping on the desks on many mornings. (See photos). Sandia/DOE was known to have leaked Plaintiff's patented technology to General Motors. Plaintiff saw a copy of his technology in the back labs at Sandia (See photos) with General Motors signs on it.

135. On or about March 12, 2012 Plaintiff began seeing articles about Ford planning to ship inflatable seats, seat belts and inflatable membrane body parts. Ford Motors head of technology contacted Plaintiff and said she had quite Ford and wanted to work for Plaintiff getting him his DOE funding. After working for Plaintiff, it was discovered that she had never quit, or stopped working for Ford and appears to have been a shill sent in by DOE. Defendants DID NOT treat Plaintiff's intellectual property with any care or diligence. If wild animals are able to come and go, at will, inside the buildings where nuclear triggers and alien technologies are managed at Sandia/Lawrence Livermore, then how can anyone believe that Plaintiff's intellectual property and designs were properly cared for?

136. Plaintiff has discovered other companies are selling products using Plaintiff's proprietary technology provided by Plaintiff to DOE under confidentiality agreements without paying Plaintiff for the right to do so.

137. Some of these companies obtained Plaintiff's technology via DOE funding.  Others

had been hired as "reviewers" for Plaintiff's technology by DOE.  Still others were government cronies.

# LIST OF HARMS TO PLAINTIFF BY DEFENDANTS

### HARM #1: MANIPULATION AND BLOCKADE OF PLAINTIFFS EARNED GOVERNMENT FUNDS

In 2007 and 2008, Plaintiff applied for SSDI and a HUD home certificate. In 2008, SSA stated that all 19 disabling conditions existed but that Plaintiff must confirm they will last more than a year. Plaintiffs SSDI and HUD certificate were blockaded by public officials in reprisal for Plaintiff helping law enforcement in the "Case X POLITICAL CORRUPTION INVESTIGATION" matter.

From, at least, 2007, forward, Plaintiff was reporting to law enforcement and regulatory officials about "Case X POLITICAL CORRUPTION INVESTIGATION", the previously noted national anti-corruption matter.

In 2008, contractors from The White House and California Senators, all of whom have vast documented court and news report records of hiring attackers from spy agencies for reprisal attacks on whistle-blowers, used their resources to stop all funding in Plaintiffs SSDI funding as reprisal for whistle-blowing.  They got SSA to say that Plaintiff WAS permanently disabled, but that because he could not work, he lost his SSA credits waiting the one year and one day that SSA required to prove that his disabilites would last longer than a year. Dianne Feinsteins own staff and family, who had cohabitated with Plaintiff, confessed to these 'dirty-tricks' actions as reprisal for Plaintiff's testimony accidentally cutting off $120 million+ of potential profit the family expected in ""Case X POLITICAL CORRUPTION INVESTIGATION"". Her staff have been exposed by CIA staff as "*the masters of dirty tricks reprisals...even as good as the ones we (THE CIA) pull off..*"

In 2007 Plaintiff applied for his HUD Mortgage coupon. It is now 2022 and he still has not received it after over 100 inquiries as to the status. City and County officials have stated that they have "never seen it take so long". According to all experts, the only way it could have been stone-

walled this long is if a public official had ordered it slow-walked as part of the politial reprisal attacks on Plaintiff. Three different counties have checked on this and said that Plaintiffs records 'went missing" in a Lois Lerner type of error set.

*The cut-off of Plaintiff's finances and benefits coincides, exactly, with his whistle-blower testimony AND to the reprisal threats and promises by THE ONLY PEOPLE IN THE WORLD capable of accomplishing such state-sponsored attacks. Defendants were the only entity with the means, the motivation and the proven history of such actions on a regular historical basis.*

*Feinstein's current and former staff members (See the Dossier on Daniel Jones) (See the fact that Plaintiff lived with, dined with and partied with her family and senior staff) have stated that the Feinstein and Pelosi offices commonly order citizens government funding to be cut off as political reprisal. The White does it almost every other day. In this case they did it to Plaintiff at least three times. Kathryn Feinstein runs the Courts in San Francisco and used to romp in Plaintiff's hot tub. Plaintiff used to live at the home of Dianne Feinstein's office manager. Feinstein relatives and staff were constantly soliciting Plaintiff for work and offered "insider tips" as incentives. Nancy Pelosi's aide dated Plaintiff. Plaintiff ran a San Francisco Mayoral campaign and had the resources of the Palladino detective agency on call. Plaintiff certainly has had the connections to verify his assertions, as he had, to the FBI, DOJ, FTC GAO, et a.*

Plaintiff, had an industry standard pay rate of $10,000.00 per month, based on Salary.com, his patent issuances and accomplishment records in Silicon Valley contrasted with the salaries of less experienced executives at Google, Facebook, Netflix and Tesla. The U.S. Government states, via all of its agencies, that the minimum survivable cost-of-living in the Bay Area is $3200.00 per month. By intentional actions of government officers, in reprisal, Plaintiffs income was reduced to $300.00 per month for most of the past decades. Two SSA officials confessed to assisting in hit jobs on him including Mario U from the San Mateo SSA office and an official who worked at the San Francisco SSA office and who then went to work for a Senator who assisted in the attacks on Plaintiff. When asked for Plaintiff's medical records SSA sent a huge number of medical records for two strange women in massive violation of federal medical privacy rights. The SSA Inspector General has shown Plaintiff thousands of cases of politicians using SSA for political reprisal

1  punishments. FBI IT experts and 'Black Hat' hackers can hack into every SSA server in minutes

2  and change records, files and decisions. Rahm Emanual, Nancy Pelosi and Dianne Feinstein can do

3  it with a single phone call. It should be noted by the Court that EVERY background check file in

4  AMERICA was hacked and stolen by China within a few hours and that every hacking tool of the

5  NSA and CIA was hacked by Russia and posted on the internet. It is IMPOSSIBLE for anyone to

6  ever assert that "nobody can hack SSA". That would be a remarkable lie. In fact, Plaintiff has

7  agency confimation that 95% of the Silicon Valley oligarchs entire family tax records, stock

8  accounts, political payments and payola and pretty much everything that would destroy them, has

9  been hacked and is in the hands of ICIJ (Panama Papers investigators), Propublica, FINCEN and

10  pretty much everybody they would not want to have it.

11      *Plaintiff demands that the Court order SSA to award Plaintiff his full SSDI backpay from*

12  *2007 to today, with interest, based on the fact that SSA was used to harm Plantiff as a reprisal*

13  *tool. The Inspector General has proven this happens regularly and hundreds of other whistle-*

14  *blowers are prepared to confirm this fact.*

15      Plaintiff has received multiple threats of death, personal, resource or physical harm.

16

17

18  ### HARM #2: THREATS OF DEATH AND ACTUAL MURDERS OF PEERS

19      Plaintiff has actually been attacked as enumerated below and has active cases with SFPD,

20  FBI, OSC and other agencies. Twice Plaintiffs car was rammed. The first time the attacker

21  performed a PIT maneuver, flipping Plaintiffs car onto the concrete median wall on the Freeway

22  across from Marin Joe's restaurant in Marin County, causing massive damage. The attacker sped

23  away. A car next rammed Plaintiffs parked car on Wildomar in Mill Valley and, at the same

24  location, a man tried to drive has car through the fence into Plaintiff's cottage. Two other times,

25  strangers pulled up along Plaintiff, pointed at him and yelled "you are dead". Plaintiff has received

26  threats by email and voicemail and had dead animals tossed over his fence. Further proving the at-

27  risk claims of Plaintiff. Plaintiff, and his peers, had contact with the following persons in "Case X

28  POLITICAL CORRUPTION INVESTIGATION": *Rajeev Motwani; Gary D. Conley; Seth Rich;*

*Philip Haney; David Bird; Doug Bourn; Misti Epstein; Joshua Brown; Kenneth Bellando; Moritz Erhardt; Imran Aliev; Kate Matrosova; David Drye; Vincent Foster; Kathy Ferguson; Duane Garrett; Eric S. Fox; Judi Gibbs; Berta Caceres; Suzanne Coleman; L.J. Davis; John Hillyer; Stanley Huggins; Sandy Hume; Shawn Lucas; Gary Johnson; John Jones; John F. Kennedy, Jr.; Stephen Ivens; Mary 'Caity' Mahoney; Eric Butera; Danny Casolara; John Ashe; Tony Moser; Larry Nichols; Joseph Rago; Ron Brown; Bob Simon; Don Adams; Peter Smith; Victor Thorn; Lori Klausutis; Gareth Williams; Daphne Caruana Galizia; James D Johnston; Dave Goldberg; Loretta Fuddy; Paul Wilcher; Gary Webb; Beranton J. Whisenant Jr; Stanley Meyer; Jon Parnell Walker; Tyler Drumheller; Barnaby Jack; Dominic Di-Natale; Barbara Wise; Ilya Zhitomirskiy; Jeff Joe Black; Robin Copeland; John Wheeler; Ashley Turton; Michael Hastings; Antonin Scalia; David Koschman; David Werner; Alex Okrent; Kam Kuwata; Larry Frankel;* **And hundreds more connected to this case who suddenly, and strangely, turned up dead in this case and, ironically, their deaths all benefit the suspects in this case….Rajeev Motwani** taught Google how to Google. Suddenly, in perfect health, he was found floating face-down, dead, in his Silicon Valley swimming pool. It helps certain people that he can no longer talk. **Gary D. Conley** was the CleanTech competitor to, and whistle-blower on, the suspects. He was suddenly found with a bullet in his head behind Beale Air Force base. It helps certain people that he can no longer talk. He TOLD Plaintiff that someone from Google was going to kill him. Google programmer **Forrest Hayes**, who worked on Google search engine rigging, was suddenly found dead with the story that "he was overdosed by a Google hooker on his sex yacht". Google associate and Tesla Investments founder **Ravi Kumar** was also killed by his hooker. Deep Google investor VC liason and husband of Facebook executive **Cheryl Sandberg** was suddenly found dead with a hole is his head. The "official" story is that he was the first person in history to be killed by his treadmill. **David Bird** was the Wall Street Journal energy reporter who was working on a story that involved Cleantech energy connections of some of the suspects. He was working on a story about who controlled the modern energy industry and cleantech. He went for a walk and was found a long time later, dead,

floating in a pond. It helps certain people that he can no longer talk. One **Mr. Breitbart** was

a famous blogger, who railed on the web about the political manipulations of the suspects. Suddenly, he had a "heart attack" in his shower and died. It helps certain people that he can no longer talk on the blogs. Mr. **Karl Slym** , with Tata Motors was involved in a car deal with some of the suspects for one of the biggest Indian auto-makers. Suddenly he was a stain on the sidewalk, accomplished by his fall from the top of a skyscraper hotel. It helps certain people that he can no longer talk. **Doug Bourn**, The senior electrical engineer at Tesla (Google's covert partner), **Andrew Ingram** of Palo Alto, a top systems electrical engineer at Tesla; and **Brian M. Finn** the senior manager of interactive electronics, at Tesla, had deep knowledge of financial misdeeds and technical cover-ups at Tesla Motors. They were key parts of the Tesla operation. For some reason, they all got into a private airplane, in perfect health, and then the airplane plowed into the ground, killing all three at once. It helps certain people that they can no longer talk. They wrote, and helped describe, in Tesla's own federal patent filings, the fact that Tesla's batteries would kill you, maim you and/or burn your house down. Tesla did not realize this when they paid the federal patent filing fees. When Tesla, later realized this, they were forced to give all of their patents away for free. These three senior engineers had deep inside knowledge of the Tesla Motors operations. Their aircraft suffered an "Engineering failure". This case involves potential crimes by two Presidents of The United States, their staffs, U.S. Senators and the Silicon Valley oligarchs that financed and controlled them, two wars and trillions of dollars of manipulated U.S. Treasury monies and stock marke monies. How could anyone think this was NOT a life-endanging situation for the Plaintiff?

The other attacks, which only state-sponsored attackers would seem to be capable of, were:

### HARM #3:  THE GOVERNMENT DEFRAUDED PLAINTIFF OVER AND OVER:

Government agency bosses solicited Plaintiff with false promises of future loans, carbon credit sales, billions of dollars of stock market valuation profits, contracts and/or grants from their agencies and caused the Plaintiff and his associates to expend millions of dollars and years of their time for projects which those government bosses had covertly promised to their friends. They used Plaintiff's 'nice guy' brand as a "smokescreen" to cover their illegal government slush-funds for Plaintiffs competitors and personal enemies who were OWNED

by government officials. By using this tactic, the attackers drained the Plaintiff's funds and forced Plaintiff into an economic disaster, without the government bosses fearing any reprisal for their scam. The crony insiders made hundreds of billions of dollars in profit in the notorious Solyndra-type scandals as seen in the CBS 60 Minutes episode: "***The Cleantech Crash***", thousands of TV news segments and the related GAO and Congressional corruption reports.

### HARM #4: THE PLACING OF MOLES AND SPYING ON PLAINTIFF:

White House financier Kleiner Perkins placed moles inside of Plaintiff's companies in order to sabotage, delay and misdirect operations. The moles were discovered to be staff of Kleiner Perkins. The main offices of Kleiner Perkins were broken into, per San Mateo County police reports, and records of corruption copied or duplicated by a state-sponsored intelligence agency entity, which provided further proof that Kleiner Perkins and the White House were exchanging Quid Pro Quo. Tom Perkins, one of the founders of Kleiner Perkins told Plaintiff that he was on "A government hit-list" for exposure the corruption of Silicon Valley titans and government executives. John Doerr, another partner, told Scott at a, VC conference, that he will make sure the government kills of any effort to support fuel cells (which compete with his and Elon Musk's lithium batteries)

### HARM #5: BLOCKADES OF PLAINTIFF ACCESS TO LEGAL COUNSEL:

***Detailed further in the EXHIBITS, below***, Defendants used every trick in the book to keep Plaintiff from gaining equitable legal justice or representation because exposure of Defendants crimes would shame them Government officials and the federal agency: Legal Services Corporation (LSC corporation -A federal agency dedicated to providing legal services to citizens) blockaded Plaintiffs rights to legal representation in order to prevent Plaintiffs from personally suing the attackers because such a lawsuit would have embarrassed corrupt public officials. High tech law firms that were discussing a services agreement with Plaintiffs were threatened and ordered to not help Plaintiffs or "*they would*

*be black-listed or be cut-off from tens of millions of dollars of Google, Netflix, Facebook and government contracts*". Individual lawyers were threatened with black-listing and getting "*flooded with more filings than you could ever respond to in your life-time...*" LSC officials, who were almost entirely Obama Administration associates, refused to assist with lawyer referrals. That is a violation of their federal contract with The U.S. Government .

### HARM #6: HIRED CHARACTER ASSASSINATION AND DEFAMATION SERVICES THAT DEFENDANTS USED TO DESTROY PLAINTIFF'S LIFE

Defendants purchased over $30 Million dollars of attacks against Plaintiff with Media Matters, The Gawker/Gizmodo Tabloid empire and Google. This attack is detailed in the attached EXHIBITS. It was equal in scope and cost to an attack on a Presidential candidate by another Presidental candidates opposition research task force.A sophisticated animated attack film was produced by Google/Youtube and Nicholas Denton attacking Plaintiffs. An animated film is an expensive effort involving considerable time and expense. An attacker must be well financed to undertake such an effort. The film was published on YouTube and locked onto the very top search result line on every YouTube search in front of 7.5 billion internet users for over a decade. The damage to Plaintiffs reputation is estimated in the tens of millions of dollars. YouTube steadfastly refused to remove or adjust the search results even though YouTube executives knew Plaintiffs and knew that the video represented a character assassination attempt against Plaintiffs because YouTube owners finance the political campaigns of the public officials who ordered the attacks. While Google/YouTube stated to Congress that all of it's search results are arbitrary, the never-moving search result of this attack video proved that Google's and YouTube's search results are manually manipulated by human maintained black-lists. The corrupt officials hired Nicholas Guido Denton and his character-assassination-for-hire sleazy tabloid publication empire known as Gawker Media AKA Gizmodo Media. They own Gawker, Gizmodo, Jalopnik and a number of fake news sites based in the USA and near-Russian regions. The offshore sites are used for money laundering and tax evasion. The FBI has been asked to interview and financially trace the payments and command-and-control orders back and forth between Nicholas

Guido Denton and his attacker/operatives: Ian Fette, Adrian Covert, Nick Cook, Gabrielle Darbyshire, John Hermann, Patrick George, et al and Google. All of whom transferred payments and communications between each other to conspire, operate, produce and publish the articles, videos, blogs and server manipulations for the attacks against the victims around the world. These attacks resulted in billions of dollars of damages to the victims. The orders for these attacks can be traced back to The White House. This ended Plaintiff's life but created an enemy for the DOES and ROES that has lots of of investigator contacts and nothing to lose. The Defendents have caused the deaths of more children than any other entities. Harassment is harassment - whether it happens at school, at the playground, on the job, or on the internet. But online bullying is downplayed. Victims are stigmatized, mocked as oversensitive snowflakes who can't take a joke. Plenty of people are unwilling to accept that victims can be seriously hurt by this behavior. Internet harassment is not only real and damaging, it represents a threat to the most vulnerable among us: children. Cyberbullying statistics show the high cost of online harassment. From increased depression and suicide rates to social anxiety and alienation, the pain and consequences of online harassment are as severe as they are undeniable. Imagine every new friend, potential date, your fiance', your bank, anybody.. typing your name on the internet and seeing that Google says that you are a scumbag. Nobody will ever talk to you, hire you or help you ever again. Google, Gawker and Gizmodo are now known to partner together on character assassination efforts. One of their bloggers hired to "kill" Plaintiff even advertises himself on Facebook, globally, as an assassin-for-hire. Plaintiff has acquired the banking records of these Co-conspirators showing that they, and the U.S. government wired millions and millions of dollars between each other for these "spy agency" dirty tricks hit jobs.

Google knows Plaintiff personally. Plaintiff went to school and events with the founders. It was a lie for Google and YouTube to say over-and-over that they never heard of Plaintiff so they "can't remove the attacks because it is 'just how their algorithm works'…" The founder's teacher: Rajeev Motwani, revealed to Plaintiff that Google manually sets all of their key search results BY HAND. Rajeev died ~~was murdered~~ for telling the truth about Google's insidious plans and internet

manipulations. Investigators suspect shell fish toxin or a reverse taser-like electronic heart-attack inducing defib device was used to kill him.

Plaintiffs charges proved that Google manually rigs search results based on cronyism and that Google/YouTube lied to Congress about not doing so. This allowed Plaintiff to drive U.S. agencies and State AG's to sue Google/Alphabet/Youtube for being lying, manipulate, society-abusing, child-killing, monopolistic monsters.

Take note of this letter from one of Plaintiff's past lawyers to those attackers that were hired by THE WHITE HOUSE to produce fake articles, animated videos and fake blogger comments, all tracked back to the same servers and attackers:

# Judd**LawGroup**

**Jeffrey M. Judd**
PARTNER
415.597.5500
888.308.7686 FAX
jeff@JuddLawGroup.com

BY EMAIL (joe@gizmodo.com)

Mr. Joe Brown
Features Editor
GIZMODO

Re:    **GIZMODO's 1/13/11 Post Entitled, *"The Greatest Scam in Tech,"* by John Herrman and Adrian Covert**

Dear Mr. Brown:

Scott Redmond has asked me to address the harm caused by GIZMODO's self-described "exposé of Peep Wireless," entitled "The Greatest Scam in Tech," by John Herrman and Adrian Covert. This "exposé" was originally posted on January 13, 2011. At the time this letter was written the original post had over 207,000 views, with over 400 comments; Mr. Redmond's January 14 email to you, posted on GIZMODO January 18, 2011, has had over 97,000 views, with almost 900 comments. The Herrman-Covert post claims that Scott Redmond

> . . . shows up whenever there is a bubble or hot trend in the tech business world that has yet to make it to the marketplace. Then he strings together a bunch of technical jargon that hardly informs what he's doing, and presumably gets some kind of funding. After that, he forms not one but two companies around said bubble. (Peep Telephony has Peep Wireless; Limnia, a fuel cell company, Fuel Sell; Clever Homes, FabModern). All the companies are listed at the same address in San Francisco. Ultimately, the companies just disappear, legacies reduced to comically vague blurbs in Redmond's resume – if that. * * * Point is, these ventures rarely – if ever – work. And through the harsh lens of hindsight, some look like they weren't ever meant to.

While GIZMODO does not clearly engage in traditional investigative journalism, more than a few viewers apparently consider this "exposé" to be an authoritative, fact-based report. Many comments praise this as the kind of investigative article GIZMODO should publish more often (e.g., "I vote for more journalism and less press releases"). When GIZMODO publishes such an article, which clearly impugns the integrity of an individual like Mr. Redmond and subjects him to ridicule, a strong argument can be made that GIZMODO should apply the same journalistic standards that investigative reporters follow:  At a minimum, neither GIZMODO nor its editors or authors should recklessly ignore the truth, as has been the case here.

GIZMODO reported a "pattern" that Mr. Redmond allegedly follows to scam investors that is demonstrably false, as a few simple Internet searches would have revealed. First, Mr. Redmond does not "show up whenever there is a bubble or hot trend in the tech business world that has yet to make it to the marketplace." Mr. Redmond's companies have largely been based on his inventions. The United States Patent & Trademark Office has to date issued 11 patents to Mr. Redmond, and additional patents have been applied for. As I'm sure you know, a patent, by definition, describes an invention that is new, not obvious, and is either useful or has industrial application. The inventions disclosed in his patents have formed the technological basis for several companies that Mr. Redmond has founded. In each case Mr. Redmond's companies have attempted to commercialize his inventions. Some ventures have been

www.juddlawgroup.com                    222 Sutter Street, Suite 600   San Francisco, CA 94108

53

Page 2 – Mr. Joe Brown –

more successful commercially than others, but in every case they have been "*real*." For example:

- **Limnia, Inc.,** formerly named Fuelsell Technologies, Inc., is a Delaware corporation in good standing that was incorporated on March 5, 2002 (Del. File No. 3498785) (www.limniaenergy.com). Limnia's business address is 601 Van Ness Avenue, Suite E3613, San Francisco, CA 94102. This is the location where Mr. Redmond operates his start-up incubator, Clever Industries LLC, which has been around since 1978. Limnia used venture capital funds, Mr. Redmond's personal funds, and a U.S. Department of Energy grant (approx. $900,000) to develop a working prototype of a hydrogen fuel cassette storage and retrieval system. The venture capital investor made a substantial return on its investment when it cashed out in 2006. Limnia's hydrogen cassette prototype has been tested and verified by Sandia Labs, and is the subject of a funding proposal currently in negotiation with the U.S. Department of Energy. A non-disclosure agreement between Limnia and Scandia Labs prevents public disclosure of the Sandia document that validates Limnia's hydrogen fuel cassette and demonstrates superior performance to traditional energy storage and retrieval devices. Sandia determined that a Limnia hydrogen fuel cartridge the same size and weight of a Lithium ion battery or traditional metal hydride system stores substantially more energy than either the Li-ion battery or the MH system. Limnia's technology is based on four of Mr. Redmond's U.S. Patents:  No. 7,399,325 (Method and apparatus for a hydrogen fuel cassette distribution and recovery system—Filed 3/15/02, Issued 7/15/08); No. 7,279,222 (Solid-state hydrogen storage systems; co-inventor Andrew K. Hearley—Filed 3/21/04, Issued 10/9/07); No. 7,169,489 (Hydrogen storage, distribution, and recovery system—Filed 12/4/02, Issued 1/30/07); and No. 7,011,768 (Methods for hydrogen storage using doped alanate compositions; co-inventor Craig M. Jensen—Filed 6/16/03, Issued 3/14/06).

- **Peep Wireless Telephony Company** is a Delaware corporation in good standing that was incorporated on November 5, 2010 (Del. File No. 4894388). Peep Wireless is located at 555 California Street, 12th Floor, San Francisco, CA 94104 (www.peeptelephony.com). Peep Wireless, initially funded by Mr. Redmond personally, is an early stage company developing software intended to replace the current system of server racks and cell towers employed by wireless network carriers. In addition to the patent portfolio acquired from WiMoto, Peep's technology is based on the technology described in Mr. Redmond's application to the USPTO, entitled "Mesh Based Network Architecture." Earlier versions of the technology have been deployed by multiple companies, including the Swedish company TerraNet. According to a September 11, 2007, BBC News Report, in 2007 TerraNet launched demonstration projects in Tanzania and Ecuador and obtained £3 million in financing from the mobile phone manufacturer Ericsson to develop its wireless mesh technology. (See http://news.bbc.co.uk/2/hi/technology/6987784.stm. ) TerraNet has reportedly since been acquired by Nokia. A search of the term "wireless mesh" yields many hits, including a Wikipedia page that includes references to U.S. military use of the technology (see http://en.wikipedia.org/wiki/Wireless_mesh_network#cite_note-4; see also http://www.meshdynamics.com/military-mesh-networks.html ). Peep Wireless believes it has solved the problems that have prevented other wireless mesh companies from achieving commercial success. It is too early to determine whether there is a viable business model that can succeed, but there is no question the technology is *real*.

- **RPI Advanced Technology Group** (RPI) developed, manufactured, and sold a variety of virtual reality devices, including what at the time was the smallest wearable computer display and the first 360°

Page 3 – Mr. Joe Brown –

personal computer-based human gyroscopic flight simulator. These devices were based on several of Mr. Redmond's U.S. Patents:  No. 5,759,044 (Method and apparatus for generating and processing absolute real time remote environments – Filed 7/6/95, Issued 6/2/98); No. 5,513,130 (Method and apparatus for generating and processing absolute real time remote environments – Filed 10/18/93, Issued 4/30/96);and No. 5,255,211 (Method and apparatus for generating and processing absolute real time remote environments—Filed 2/22/90, Issued 10/19/93). In 1996, Mr. Redmond sold RPI to a European holding company.

- **Clever Homes LLC** is an active California limited liability company that was registered December 1, 2003 (California Entity No. 200333810077). Clever Homes™ business address is 665 3rd St # 400, San Francisco, CA 94107-1968 (www.cleverhomes.net). Clever Homes™ is a designer and builder of environmentally responsible, energy efficient, prefabricated homes. Mr. Redmond founded the company and was the initial investor. The company website shows more than 20 homes have been designed, with the majority currently in residential use. In 2005, Mr. Redmond sold his interest in Clever Homes™ to the current owners. The designs and methods currently in use by Clever Homes™ are based on Mr. Redmond's inventions. A well-known green demonstration home, dubbed The NowHouse, was unveiled by Clever Homes™ at the San Francisco Giant's SBC Park in October 2004. The NowHouse was subsequently donated to the City and County of San Francisco, and is currently in use as the Bayview Hunters Point Alice Griffith Community Center. **FabModern** was not a company, but rather an online design portfolio of Mr. Redmond's green home designs and personal building site.

Mr. Redmond's projects are well-documented in scores of magazine, online, newspaper and television reports. I could go on and describe additional tech projects that Mr. Redmond has successfully developed on a contract basis for many well-known consumer product manufacturers, but the majority of these contracts were performed on a confidential basis for market-testing purposes. In any event, the four examples described above make the point: Scott Redmond has a successful track record inventing and commercializing a wide range of companies, events, services, and products. As anyone even remotely familiar with the tech industry knows, investors and product developers place a premium on discretion and privacy. This prevents Mr. Redmond from responding as fully as he could: It would simply be inappropriate to expose to the GIZMODO treatment the companies and individuals with whom Mr. Redmond has contracted in the past.

GIZMODO, John Herrman, and Adrian Covert simply got it wrong, because they failed to check the facts. Had you made even a token effort to determine whether Mr. Redmond has fleeced investors with vague, pie-in-the-sky promises followed by a disappearing act, you would have found that was decidedly **not** the case. Of course, a post about a clever, generally successful, ethical inventor does not have as much prospect of going viral as a snarky exposé of an alleged scam artist.

A brief review of the posted comments makes clear that GIZMODO's recklessness has exposed Mr. Redmond to ridicule and damaged his professional reputation. At a minimum, GIZMODO should correct the record, and provide a public apology to Mr. Redmond. Given the longevity of posts on the internet, however, it is extremely unlikely that GIZMODO could meaningfully remedy the harm it has done to Mr. Redmond, even if it is so inclined.

Please contact the undersigned if the content of this letter has not persuaded you that GIZMODO has done a terrible disservice to Scott Redmond. We will be happy to meet with you to provide further evidence of Mr. Redmond's track record as a successful and ethical inventor, entrepreneur, project

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Page 4 – Mr. Joe Brown –

manager, and event organizer, among other things. Mr. Redmond has a record of achievement that even the most cynical visitors to GIZMODO would envy.

Please also provide this letter to GIZMODO's attorneys, so that they can discuss with me appropriate means by which you, GIZMODO, John Herrman, and Adrian Covert might rectify the damage you have caused Mr. Redmond. Thank you.

Sincerely,

Jeffrey M. Judd

cc:     Remy Stern (by email (remy@gawker.com))
        Brian Lam (by email (blam@gizmodo.com))
        Scott Redmond (by email (scottsfo200@gmail.com))

Even though the Google/Gawker/Gizmodo produced and hosted attack articles and animated videos were completely discredited as a "*character assassination hatchet job paid for by politicians*"; by every known expert, Defendants still post them on their servers with hidden "P8" codes covertly embedded in the search engines to trick the public, in front of 7 billion internet readers as "payback", in order to operate their reprisal attacks. No other servers or publishers in the world host and lock this attack media on their search results EXCEPT DEFENDANTS MEDIA COMPANIES. This ALONE would seem to prove that Defendants did the harms that they are charged with doing as Defendants are the only ones running, hosting and operating the attacks on Plaintiff on all of Earth!

Plaintiff has, over and over, demanded that the FBI, POLICE, FINCEN and other enforcement investigators reveal what they discovered when they traced the compensation routes and command-and-control management of these attackers. ***Plaintiff demands that this Court order the FBI, FINCEN and the NSA to reveal those compensation path records on the attackers from their investigations.***

One might wonder why it has been so hard to get this information from the authorities. If the FBI reveals that the path-of-compensation goes from Adrian Covert, Nicholas Guido Denton and John Herrman right to the Oval Office in the White House, then the question is asked and answered. White House staff members Jay Carney, David Axelrod and Robert Gibbs have said "maybe". White House staff insider Jofi Joseph has said "without a doubt". Rahm Emanual's White House staff say that, while in the White House, Rahm ordered all kinds of hit-jobs on whistle-blowers.

Gawker Media and Gizmodo Media have engaged in the origination of, production of and global broadcast of compensated character assassination videos and articles as a reprisal-service-for-hire (like Fusion GPS, Black Cube, Black Water and other related services) because we were FBI and GAO witnesses against Gawker and Gizmodo financiers. As 1.) the only publishing group

on Earth to have engaged in such attacks and 2.) since the attacks were financed by complainants business competitors and 3.) since adversaries own staff have admitted to the scheme and 4.) since communications, FBI records and previous litigation records prove complainants assertions, complainants are justified in their demands.

The attacks and broadcast of multiple defamation attack articles and videos by Gawker Media, Google, YouTube and Gizmodo Media has been operating as recently as this today, thus the statutes of limitations are not exceeded. Well known U.S. government political figures and political financiers hired Gawker Media, Gizmodo Media and "Nick" Denton to undertake these ongoing attacks and to manipulate web servers to operate those attacks globally and permanently. The attackers hired Gawker Media, Gizmodo Media, "Nick Guido Denton", Univision/Unimoda, Google and YouTube (essentially all the same people) to engage in reprisals because of the Plaintiff's testimony against the Cartel in federal investigations and because the plaintiff had superior technologies that the attackers could not compete with. Transaction documents showing payments between the "bad guys" in this case, were recently uncovered in other court cases.

Defendant adversaries produced a series of videos and defamation articles and used internet server technology tricks to place those attack materials in front of 7.5+ billion people day after day, year after year, refreshing the attack daily. This is, essentially, a "hit-job" service that Univision provides as a side gig through it's TV networks and it's offensive tabloid brands of: Gizmodo, Jalopnik, Jezebel, Gawker and other Univision/Unimoda assets along with it's partnership with Google for the operation of such attacks. "Univision uses this service as a political-payback tool for politicians as well as an anti-trust violating anti- competition tool for its clients", claim Plaintiffs. The Plaintiffs are informed and believe and, based on that information and belief, allege that the named Defendants herein and each of the parties designated as a "DOE" and every one of them, are legally responsible jointly and severally for the Federal RICO Statute violating events and happenings referred to in the within Complaint for Intentional Interference with Contractual Relations, Intentional Interference with Prospective Economic Advantage, Cyberstalking, Fraud, Invasion of Privacy, Unfair Competition and Theft of Intellectual Property and RICO statute

violations. In particular, Defendants took compensation for, and engaged in, malicious and coordinated tactics to seek to destroy, damage, harm and ruin Plaintiffs via an illicit media "hit-job" service which Defendants regularly offered in covert commerce and engaged in regularly against targets that Defendants were hired to seek to ruin as part of reprisal, vendetta, retribution programs operated for business and political competitors of the targets. Historical facts and other history-making lawsuits by third parties, has proven Defendants to be the single largest core violator of human rights, in this manner, in the world. Defendants offer the service of creating and publishing contrived "hatchet job" movies, fake news articles, faked comments and repercussion backlinks describing the Plaintiffs in horrific descriptors. Defendants media holdings manipulate national elections.

Let's be clear on this: Plaintiff does swear, warrant and certify that Google, Facebook, YouTube, The Elon Musk Group, Twitter and Linkedin plan and operate the conscious and manual manipulation of national American elections and international elections.

The attack material is reposted, "impression accelerated", "click-farm fertilized" and Streisand array cloned over-and-over by Defendants massive character assassination technology via servers, algorithms and technical internet manipulation, daily, as recently as yesterday. Defendants also embed the article in job hiring databases on Axciom, Palantir, Taleo and other databases used by all hiring and recruiting services in order to prevent Plaintiffs from ever receiving income for W2 or 1099 work ever again. Defendants own staff then post thousands of fake comments, below each attack item, under fake names, designed to make it appear as if a broad consensus of the public agreed with the defamation messages by Defendants. Almost all of the fake comments were created by a handful of Defendants own staff pretending to be a variety of outside voices. Defendants provide the service of delivering "weaponized text and media to corporate clients". Defendants replicated various versions of these attack items across all of their different brands and facade front publications and addedadditional fake comments to each on a regular basis.


A. Defendants have formed a business and political and industry manipulation "Cartel" intended to inflict corruption upon the United States Federal Government, The State Government

and the California State authorities, as defined by law under RICO Racketeering Statutes for the purpose of manipulating the value of stock market holdings and controlling political policy decisions.

B. In exchange for financing, Defendants Clients gave Defendants Associates business monopolies and government contract monopolies and media distribution exclusives worth trillions of dollars. This was an illegal quid-pro-quo arrangement. Plaintiffs designed, produced, received patent awards on, received federal commendations for, received federal funding for and first marketed the very products which Defendants copied and made billions of dollars on and which Defendants felt might beat them in hundreds of billions of dollars of competitive market positions and stock market trades. Companies operated by Plaintiffs included automobile design and manufacturing companies, global television broadcasting companies and energy companies which are commonly known to have generated hundreds of billions of dollars in profits, revenue and stock market transactions for Defendants competing holdings at Plaintiffs expense. Defendants operated a criminal CARTEL as defined by RICO LAWS and that Cartel ran an an anti-trust market rigging and crony political payola operation. Defendants spent tens of millions of dollars attacking Plaintiffs because Defendants were not clever enough to build better products. Defendants chose to "CHEAT RATHER THAN COMPETE" and to try to kill Plaintiffs lives, careers, brands, revenues, assets, businesses and efforts via malicious and ongoing efforts.

C. The U.S. Attorney General has been informed, in writing, of these charges and Plaintiffs understand that DOJ officials have an ongoing investigation into these matters.Under  investigation for these crimes, New York State attorney general Eric Schniderman was recently forcedto quit over corruption and sexual cult charges involving the NXIUM group and related matters.

D. Due to Defendants fears of the loss of up a trillion dollars of crony payola from their illegal abuse of taxpayer funds, Defendants engaged in felonious actions in order seek to intimidate others.

E. Just as, over time, the Watergate crimes are now intimately documented and detailed; over time The "Cleantech Crash Scandal" as featured on CBS News 60 MINUTES TV Show, has been detailed and exposed in numerous federal, news media and public investigations. Significant barriers to justice were illicitly placed in front of Plaintiffs by Defendants.

F. Defendants organized and operated a series of malicious attacks and thefts against Plaintiffs as reprisals and competitive vendettas. Defendants report to the FBI, GAO, FTC, SEC, Congressional Ethics Committees, The White House and other entities on a regular basis.

G. Defendants and their associates Elon Musk, Jon Doerr, Eric Schmidt, Larry Page, Steve Jurvetson, Vinod Khosla and other members of the "Silicon Valley Cartel" are documented in tens of thousands of news reports, federal law enforcement reports and Congressional reports in their attempts to infiltrate and corrupt the U.S. Government in an attempt to route trillions of tax dollars to Defendants private accounts. Defendants perceived Plaintiffs as a threat to their crimes. Federal investigators, news investigators and whistle-blowers have reported to Plaintiffs that Defendants were the financiers and/or beneficiaries and/or command and control operatives for the crimes and corruption disclosed in the CBS NEWS 60 Minutes investigative reports entitled: "The Cleantech Crash", "The Lobbyists Playbook" and "Congress Trading on Insider Information"; The Feature Film: "The Car and the Senator" Federal lawsuits with case numbers of: USCA Case #16-5279; and over 50 other cases including the ongoing "Solyndra" investigation and federal and Congressional investigations detailed at:

http://greencorruption.blogspot.com

and

https://theintercept.com/2016/04/22/googles-remarkably-close-relationship-with-the-obama-white-house-in-two-charts/

… and thousands of other documentation sites. Plaintiffs are charged with engaging in these crimes and corruptions against Plaintiffs and financing and ordering attacks on Plaintiffs. Plaintiffs

engaged in U.S. commerce and did everything properly and legally. Unlike Defendants, Plaintiffs did not steal technology. Unlike Defendants, Plaintiffs did not bribe elected officials in order to get market exclusives. Unlike Defendants, Plaintiffs did not poach Defendants staff. Unlike Defendants, Plaintiffs were the original inventors of their products. Unlike Defendants, Plaintiffs did not operate "AngelGate Collusion" schemes and "High Tech No Poaching Secret Agreements" and a Mafia-like Silicon Valley exclusionary Cartel. Unlike Defendants, Plaintiffs did not place their employees in the U.S. Government, The California Government, The U.S. Patent Office and The U.S. Department of Energy in order to control government contracts to Defendants exclusive advantage. Unlike Defendants, Plaintiffs did not place moles inside of competitors companies. Unlike Defendants, Plaintiffs did not hire Gawker Media and Think Progress to seek to kill Plaintiffs careers, lives and brands. Unlike Defendants, Plaintiffs did not rig the stock market with "pump-and-dump", "Flash Boy" and "Google-stock/PR-pump" schemes. Plaintiffs engaged in hard work every day of their lives for the time-frame in question under the belief that the good old American work ethic and just rewards for your creations was still in effect in the U.S.A., and that the thieves and criminals that attempted to interdict Plaintiffs would face Justice. In a number of circumstances Defendants took advantages of Plaintiffs hard work via come-ons; Defendants then made billions of dollars from Plainiffs work at Plaintiffs expense and attacked Plaintiffs in order to reduce Plaintiffs competitive and legal recovery options.

H. Defendants exchanged payments for services via cash, stock warrants, illicit personal services, media control and a technology known as a "Streisand Effect Massive Server Array" which can control public impressions for, or against a person, party, ideology or issue. Defendants StreisandEffect internet system was used to destroy Plaintiffs in reprisal, retribution, and vendetta for Plaintiffs help with law enf ment efforts in the case and because Plaintiffs companies competed with Defendants companies with superior technologies.

I. Defendants have used their Streisand Effect technology to build a character assassination ring of bloggers and hired shill "reporters" who engage in a process called a "Shiva". This process

is named after a Plaintiff in a similar case named: Shiva Ayyadurai, the husband of Actress Fran

Drescher. Shiva Ayyadurai holds intellectual property rights to part of Defendants email

technology. In fact, the people most threatened by the Shiva Ayyadurai patent right claims,

ironically turn out to be Defendants and, in particular, Defendants associates Elon Musk, Jon Doerr,

Eric Schmidt, Larry Page, Steve Jurvetson, Vinod Khosla and other members of the "Silicon Mafia"

who own most of the main companies exploiting email technology. Were Shiva Ayyadurai to

prevail in his claims, Defendants would owe him billions of dollars. "Running A Shiva" involves

the production of a series of Defamation articles by bloggers who act asif they are independent from

Defendants but are in fact, not. Defendants used "the Shiva" to attack and seek to destroy Donald

Trump, Shiva Ayyadurai, Plaintiffs, and numerous political figures. Univision, Unimoda,Jalo pnik,

Gawker Media, Gizmodo and over a hundred stealth-ed, and overt, assets of Defendants have been

using "The Shiva" network to attack Donald Trump, Shiva Ayyadurai, Plaintiffs, and numerous

political figures as recently as this morning, thus, the time bar restarts every day. Plaintiffs have

pleaded with Defendants to cease their attacks but Defendants have refused to comply. Even with

Fran Drescher's ongoing royalty payments from her popular television series, friends have reported

that the attacks on the Ayyadurai family have been devastating and have caused massive damages

and personal and emotional devastation.


    J. Defendants produced animated movies, attack articles, fake blog comments, DNS routes,

"Shiva" Campaigns, and other attack media against Plaintiffs and expended over $30 million dollars

in value, as quantified by Defendants partner: Google, in placing the attack material in front of 7.5

billion people on the planet for the rest of Plaintiffs lifetime. No person could survive such an attack

and in the case of Plaintiffs, lives were destroyed and multiple companies invested into by

Plaintiffs, which Defendants made over $50B off of the copies of, were destroyed because they

competed with Defendants.


    8. The Plaintiffs are informed and believe, and based on that information and belief allege

that at all times mentioned in the within Complaint, all Defendants were the agents, owners and

employees of their affiliated insiders and, in doing the things alleged in this Complaint, were acting within the course and scope of such agency and employment.


9. As to any corporate employer specifically named, or named as a "DOE" herein, the Plaintiffs are informed and believe and therefore allege that any act, conduct, course of conduct or omission, alleged herein to have been undertaken with sufficient, malice, fraud and oppression to justify an award of punitive damages, was, in fact, completed with the advance knowledge and conscious disregard, authorization, or ratification of and by an officer, director, or managing agent of such corporation. The Statute of Limitations and time bar on this case has not expired. Plaintiffs only became aware of *all* of the facts recently due to the FBI, Congressional and hacker-exposed investigation data on Defendants operating and receiving cash, rewards and assets from an illegal and illicit set of political slush-funds established to compensate them for financing political campaigns. The Sony, Clinton, DNC, HSBC, Panama Papers and other hacks and publication of all of the relevant files and the Congressional investigation of illicit activities and the continuing issuance of federal documents to Plaintiffs confirming Plaintiffs intellectual property areall vastly WITHIN the statutes of limitations to allow this case to proceed to Jury Trial. Plaintiffs has had a long, ongoing and high-level interaction with Defendant in both the work effort and the monetization and collection effort. Plaintiffs has been continually interactive with Defendant in order to try to collect his money. Attacks and interference with Plaintiffs has occurred as recently as this week by Defendants. The Plaintiffs, whose multiple businesses ventures had already suffered significant damage as the result of the online attacks of the Defendants, contacted renowned experts, and especially Search Engine Optimization and forensic internet technology (IT) experts, to clear and clean the internet of the false, defamatory, misleading and manufactured information belittling the Plaintiffs, attacking them and discrediting their reputation as an inventor, product developer and project director from their websites.

None of the technology experts hired by the Plaintiffs, at substantial expense, were successful in their attempts to clear, manage or even modify the false, defamatory, misleading and manufactured information belittling the Plaintiffs, attacking him and discrediting their reputation as

an inventor, product developer and project director which only Defendants, the controlling entity of the internet, refused to remove. In fact, those experts were able to even more deeply confirm, via technical forensic internet analysis and criminology technology examination techniques that Defendants was rigging internet search results for its own purposes and anti-trust goals.

All efforts, including efforts to suppress or de-rank the results of a name search for "Plaintiffs" failed, and even though tests on other brands and names, for other unrelated parties did achieve balance, the SEO and IT tests clearly proved that Defendants was consciously, manually, maliciously and intentionally rigging its search engine and adjacent results in order to "mood manipulate" an attack on Plaintiffs.

In fact, the experts and all of them, instead, informed the Plaintiffs, that, not only had Defendants locked the false, defamatory, misleading and manufactured information belittling the Plaintiffs, attacking them and discrediting their reputation as an inventor, project developer and project director into its search engine so that the information could never be cleared, managed or even modified, Defendants had assigned the false, defamatory, misleading and manufactured information belittling the Plaintiffs, attacking them and discrediting their reputation as an inventor, project developer and project director "PR8" algorithmic internet search engine coding embedded in the internet information-set programmed into Defendantsinternet architecture. [See, Information received from one of over 30 IT, forensic network investigators and forensic SEO test analysts, a true and correct copy of which is attached hereto in the Exhibits.]

Per the many world-wide search engine results forensic analysis experts Plaintiff hired – They had never seen search engines results that were locked so maliciously, manually and unmovably into Google's and YouTube's search results. "It was as if the CIA, or Larry Page himself, was doing this", said one. Plaintiff placed associates inside of Google and, among other things, acquired bank records proving Google and the attackers were exchanging millions of dollar with each other.

Plaintiff even went to the effort of placing nearly a thousand virtual forensic test servers around the globe, using empty space on third-party existing servers owned by hundreds of other

people, in order to monitor and metricize the manipulations of search results of examples of the Plaintiffs name in comparison to the manipulations for PR hype for Defendants financial partners, for example: the occurrence of the phrase "Elon Musk", Defendants business partner and beneficiary, over a five year period. The EU, China, Russia, and numerous research groups (ie: http://www.politico.com/magazine/story/2015/08/how-google-could-rig-the-2016-election-121548 By Robert Epstein ) have validated these forensic studies of Defendants architect-ed character assassination and partner hype system .

The "PR8" codes are hidden codes within the Defendants software and internet architecture which profess to state that a link is a "fact" or is an authoritative factual document per Defendants research. By placing "PR8" codes in the defamatory links that Defendants was manipulating about Plaintiffs, Defendants was seeking to tell the world that the links pointed to "Facts" and not "Opinions". Defendants embedded many covert codes in their architecture which marketing the material in the attack links and video as "facts" according to Defendants.

The "PR8" codes are a set of codes assigned and programmed into the internet, by the Defendants to matters it designates as dependable and true, thereby attributing primary status as the most  Defendants is known to have provided tens of millions of dollars to this tabloid chain per Defendants financial staff, SEC filings and disclosures in other legal cases.

Plaintiff also used CIA technology call "Steganography" to embed text-based messages and codes into photos and videos in order track Google and YouTube's global impression manipulations and create a significant and important link to be viewed by online researchers regarding the subject of their search.

Defendants were fully aware that all of the information in the attack articles against Plaintiffs was false,Defendants promo ted these attacks as vindictive vendetta-like retribution against Plaintiff.

At all times Defendants maintained it had no subjective control or input into the rankings of links obtained by online researchers as the result of a search on its search engines and that its search engine algorithms and the functions of its media assets were entirely "arbitrary" according to the owners and founders of Defendants.

In or about April 15, 2015, The European Union Commission took direct aim at Defendants charging the their Internet-search giant with skewing and rigging search engine results in order to damage those who competed with Defendants business and ideological interests.

In those proceedings, although Defendants continued to maintain that it has no subjective control or input into the rankings of links obtained by online researchers as the result of a search on its search engines and that its staff had no ability to reset, target, mood manipulate, arrange adjacent text or links, up-rank, down-rank or otherwise engage in human input which would change algorithm, search results, perceptions or subliminal perspectives of consumers, voters, or any other class of users of the worldwide web, also known as The Internet, the court, in accord with evidence submitted, determined that Defendants, ***does*** in fact have and does in fact exercise, subjective control over the results of information revealed by searches on its search engine.

Defendants has a variety of such hidden codes and has various internal names for such codes besides, and in addition to, "PR8". Defendants has been proven to use these fact vs. fiction rankings to affect elections, competitors rankings, ie: removing the company: NEXTAG from competing with Defendants on-line; or removing political candidates from superior internet exposure and it is believed by investigators and journalists, that Defendants are being protected from criminal prosecution by public officials who Defendants have compensated with un-reported campaign funding. As a result of receiving this information, the Plaintiffs became convinced of the strength and veracity of their original opinion that the Defendants, had, in fact posted the false, defamatory, misleading and manufactured information belittling the Plaintiffs, attacking them and discrediting Plaintiffs reputation as inventor, project developer and project designer had been intentionally designed, published, orchestrated and posted by them in retaliation to the true testimony provided by the Plaintiffs, to the Government Office of Accountability of the United States in May of 2005, and to the Securities and Exchange Commission, The Federal Bureau of Investigation, The United States Senate Ethics Committeeand other investigating parties, and had been disseminated maliciously and intentionally by them in an effort to do damage to their reputation and to their business prospects and to cause him severe and irremediable emotional distress.

In fact, the Plaintiffs, has suffered significant and irremediable damage to their reputation and to their financial and business interests. As a natural result of this damage, as intended by the Defendants, Plaintiffshas also suffered severe and irremediable emotional distress.

To this day, despite the age of the false, defamatory, misleading and manufactured information belittling the Plaintiffs, attacking him and discrediting their reputation as an inventor, project developer and project director, in the event any online researcher searches for information regarding the Plaintiffs, the same information appears at the top of any list of resulting links.

In addition, due to their control of all major internet database interfaces, Defendants have helped to load negative information about Plaintiffs on every major HR and employment database that Plaintiffs might be searched on, thus denying Plaintiffs all reasonable rights to income around the globe by linking every internal job, hiring, recruiter, employment, consulting, contracting or other revenue engagement opportunity for Plaintiffs back to false "red flag" or negative false background data which is designed to prevent Plaintiff from future income in retribution for Plaintiffs assistance to federal investigators.

### HARM #7: DEFENDANTS USED FACTORY-PROCESSED SOCIAL MEDIA ATTACKS AGAINST PLAINTIFF:

In the attached book: "***ATTACKED***", the Court will see the CIA, FSB and MI6 tactics and techniques that are trained and practiced, illicitly, by political officials. Social networking sites including MeetUp, Match, Facebook, etc. and all other IAC-owned, or similar, sites (IAC is managed by Hillary Clinton's daughter, whose Mother knew Plaintiffs) have had their profiles, texts, and inter-member communications, since those companies were started, hacked or purchased. The financiers of almost everyone of these sites are also the financiers of the suspects. The attack service providers use Palantir, Acronym, In-Q-Tel financed data analysis software to analyze every activity in those services in order to find honey-trap, blackmail and social conflict exploitation opportunities. Your social life will, essentially,

68

end. Every photo on every social site is cross checked with every other photo on the internet in order to cull your Facebook, Linkedin, Snapchat and other social media together to create a total manipulation profile data file on you. New contacts on these sites were contacted by the attackers and told to "avoid" the Plaintiffs in order to damage Plaintiffs. These attacks were all documented and operated against Plaintiff as detailed in the **EXHIBITS** and evidence repositories. Defendants bought these services from Eastern Bloc nations, China and South America. "The Agency", in Russia does much of this work. They are hard at work, even as recently as today according to the CIA, pushing a "positive spin" on Russia's invasion of the Ukraine based on Hunter Biden's computer leaks.

### HARM #8: GOVERNMENT OFFICIALS CAUSED SSA AND HUD BENEFITS BLOCKADES AND MANIPULATIONS AS REPRISAL AGAINST PLAINTIFF:

Social Security, SSI, SDI, Disability and other earned benefits were stone-walled. Applications for benefits for the Plaintiffs were intentionally "lost" like a "Lois Lerner hard drive". Files in the application process "disappeared". A U.S. Senator ordered Plaintiffs benefits to "never be approved" even though Plaintiffs worked 60 hour+ weeks for decades in service to their nation and their community. A SSA official in the local SSA office, who had a devout expressed hatred against one United States President ordered a benefits blockade against Plaintiffs because he found out that Plaintiffs ex-lawyer now worked in the White House. Forensic evidence and backgrounders on every person who worked on, or had access to, Applicants files, records, benefits decisions and related data sets shows that a number of those employees and contractors were members, financiers, web promoters or supporters of ANTIFA anarchy groups or KKK or Proud Boys related political activist-type groups. In San Francisco and Marin Counties SSA offices, in employees workspaces and on their Facebook and MySpace sites, many employees proudly display pictures of themselves wearing their pink "pussy hats", black riot gear and sporting political tattoos. FBI records and IG investigations show that SSA has the highest percentage of political activist employees of any federal agency. Such persons are inclined to become drunk with power when allowed access to the trillions of dollars of government technology on the SSA file and

decisions systems. A number of these persons have worked for, or with, U.S. Senators and other politicians who targeted Applicant in political reprisal. At least 3 persons in the San Francisco SSA office, at least 2 persons in the San Mateo SSA office and at least 2 persons in Marin SSA office are known to have engaged in such actions. Applicants funding and benefits were manipulated, so as to harm Applicant, as political reprisal as vendetta for his provision of testimony to federal investigators in a trillion dollar political corruption matter involving famous political figures featured in global news coverage. A vast number of agency abuse cases and lawsuits are now on public record in the Inspector General's offices and federal courts. It is an indisputable fact that some government agencies run "hit-jobs" on citizens on orders from certain corrupt politicians.

These actions are felony violations of the law. Federal and State Agencies including SSA, FEC, GOVT, HHS, VA, CIA, HUD, SA, SEC, FBI, DOJ and many others, have been charged, and found guilty, in these crimes against citizens. In the Congressional investigation published by the United States Congress in review of the U.S. Department of Energy LGP/ATVM programs, it is clearly proven that the U.S. Department of Energy was used as a slush-fund by some GOVT executives in order to pay off campaign financiers by attacking and sabotaging their competitors. The GOVT Paducah Gaseous Diffusion Plant under contracts with The U.S. Government and the government-owned U.S. Enrichment Corp paid $5M whistle-blower awards to those whistle-blowers who were attacked, using government agency resources, for reporting a crime. Dept. of Energy Hanford URS has agreed to settle a lawsuit brought by former employee Walter Tamosaitis for $4.1 million. The settlement in the whistle-blower case comes almost one year before the case was set for a jury trial in federal court in Richland and compensates Tamosaitis for attacks against him, by GOVT officials, in retribution for reporting a crime. VA officials attacked hundreds of citizens who reported corruption, ie:

https://www.thenewamerican.com/usnews/health-care/item/18610-va-whistleblowers-facing-retribution. As shown in this report: https://www.pogo.org/analysis/2018/08/new-report-confirms-whistleblower-retaliation-is-alive-and-well-at-department-of-veterans-

affairs/, Agencies attack often and harshly. CIA and NSA executives have been widely shown to use spy tools to attack domestic citizens they don't like, ie: https://www.dailymail.co.uk/news/article-2435011/NSA-employees-used-phone-tapping-tools-spy-girlfriends-cheating-husbands.html , and hundreds of other news links that can be provided. Elon Musk and Tesla, as well as Eric Schmidt and Larry Page at Google, have been proven to use the CIA group: IN-Q-TEL, to run government sponsored/financed attacks on business competitors. In Civil Action No. 1:13-cv-00777-RBW GOVERNMENT AGENCIES WERE CAUGHT BEING USED FOR ATTACKS AGAINST CITIZENS AND PUNISHED IN THE COURT AND THE MEDIA! The IRS, and hordes of other government agencies have been caught and proven, IN COURT, to target and attack people for presumed political differences.

Why should we assume that the Social Security Administration is not ALSO doing this too to harm citizens who speak out? The Lois Lerner IRS attacks took many years to resolve. In an unprecedented victorious conclusion to a four year-long legal battle against the IRS, the bureaucratic agency admitted in federal court that it wrongfully targeted citizens, during the Obama Administration, because of their political viewpoints and issued an apology to those people for doing so. In addition, the IRS is consenting to a court order that would prohibit it from ever engaging in this form of unconstitutional discrimination in the future. In a proposed Consent Order filed with the Court, the IRS has apologized for its treatment of U.S. citizens including organizations from 20 states that applied for 501(c)(3) and (c)(4) tax-exempt status with the IRS between 2009 and 2012 -- during the tax-exempt determinations process. Crucially, following years of denial by the IRS and blame-shifting by IRS officials, the agency now expressly admits that its treatment of our clients was wrong and a total violation of our Democracy. As set forth in the proposed Order: "The IRS admits that its treatment of Plaintiffs during the tax-exempt determinations process, including screening their applications based on their names or policy positions, subjecting those applications to heightened scrutiny and inordinate delays, and demanding of some Plaintiffs' information that TIGTA determined was unnecessary to the agency's determination of their tax-exempt

status, was wrong.

For such treatment, the IRS expresses its sincere apology." Throughout litigation of this case, activists have remained committed to protecting the rights of the public who faced unlawful and discriminatory action by the IRS and other agencies. The objective from the very beginning has been to hold agencies accountable for corrupt practices.

This Consent Order represents a historic victory for the public and sends the unequivocal message that a government agency's targeting of citizens organizations, or any organization, on the basis of political viewpoints, will never be tolerated and that revenge will be swift and vast. The Order will put an end, once and for all, to the abhorrent practices utilized against citizens, as the agreement includes the IRS's express acknowledgment of – and apology for – its wrongful treatment of the public. While this agreement is designed to prevent any such practices from occurring again, rest assured that all public interest lawyers will remain vigilant to ensure that the IRS, SSA, DOJ or SEC does not resort to such tactics in the future. Per detailed reports, in March of 2012 lawyers began being contacted by literally dozens of citizens and groups who were being harassed by the Obama IRS after submitting applications for tax-exempt status. Their tax-exempt applications were held up for years (over seven years in some cases), and they began receiving obtrusive and unconstitutional requests for donor and member information. That began a now more than five and a half year fight with the burgeoning bureaucracy at the IRS. Then on May 10, 2013, Lois Lerner, the then head of the IRS Tax Exempt Organizations Division, publicly implicated the IRS in one of the worst political targeting scandals of the century.

This is an extraordinary victory against government agency abuse. It sends a powerful warning to the deep state bureaucracy that it will not be allowed to violate the Constitution in order to silence and shut down the whistle-blowers. In addition to the IRS's admissions of and apology for its wrongful conduct, the Consent Order would specifically award Plaintiffs the following: - A declaration by the Court that it is wrong to apply the United States tax code to any tax-exempt applicant or entity based solely on such entity's name, any lawful

positions it espouses on any issues, or its associations or perceived associations with a particular political movement, position or viewpoint; - A declaration by the Court that any action or inaction taken by the IRS must be applied evenhandedly and not based solely on a tax-exempt applicant or entity's name, political viewpoint, or associations or perceived associations with a particular political movement, position or viewpoint; and - A declaration by the Court that discrimination on the basis of political viewpoint in administering the United States tax code violates fundamental First Amendment rights.

Disparate treatment of taxpayers based solely on the taxpayers' names, any lawful positions the taxpayers espouse on any issues, or the taxpayers' associations or perceived associations with a particular political movement, position or viewpoint is unlawful. In the Order, the IRS has also agreed that (unless expressly required by law) certain actions against the Plaintiffs– i.e. the sharing, dissemination, or other use of information unnecessarily obtained by the IRS during the determinations process (such as donor names, the names of volunteers, political affiliations of an organization's officers, etc.) – would be unlawful. In addition, the IRS promises not to take any retaliatory action against our clients for exposing the targeting scheme. Finally, and of crucial significance, the IRS admits it targeted persons and groups based on their viewpoints (i.e., "policy positions") and that such viewpoint discrimination violates fundamental First Amendment rights. This is the first time the IRS has admitted that its targeting scheme was not just "inappropriate" – as TIGTA found – but, as alleged, blatantly unconstitutional. To ensure consistency and uniformity within the agency's operations going forward, the IRS is required, pursuant to the Order, to inform all employees within the Exempt Organizations Division, as well as the Commissioners and Deputy Commissioners within other divisions, of the Order's terms. This Order not only validates allegations about their treatment at the hands of the corrupt Obama-era IRS but also provides important assurances to the American public that the agency understands its obligation to refrain from further such discriminatory conduct. As Attorney General Sessions acknowledged in this regard, "[t]here is no excuse for [the IRS's] conduct," as it is "without question" that the First Amendment prohibits the conduct that occurred here, i.e.,

subjecting American citizens to disparate treatment "based solely on their viewpoint or ideology." Sessions further confirmed his Department's commitment to ensuring that the "abuse of power" in which the IRS engaged here "will not be tolerated." It is impossible to overstate the importance of this victory.

This marks a years-long fight for justice in defense of the constitutional rights of the public. This is an extraordinary victory against abuse of power and corruption. It sends a powerful warning to the deep state bureaucracy that it will not be allowed to violate the Constitution and manipulate the IRS, SSA and other agencies in order to silence and shut down those who speak out about political corruption crimes. In the wake of  Wisconsin Watchdog's investigation into SSA staff allegations of incompetence, misconduct, and retaliation in Social Security disability appeals offices, several employees have taken their complaints to a Senate committee led by Wisconsin Sen. Ron Johnson.


An official with knowledge of the complaints said the Senate Homeland Security and Governmental Affairs Committee, chaired by the Oshkosh Republican, has received emails and other contacts from "certain people" inside the Social Security Administration's Office of Disability Adjudication and Review. The initial complaints came from an employee inside the Milwaukee office following Wisconsin Watchdog's opening investigative report that found some claimants waiting more than 1,000 days for an appeals decision on their disability benefits claim. Following Wednesday's story of a whistle-blower in the Madison ODAR office, the committee has received more specific complaints about retaliation against employees, the source said. Committee staff members sent the latest Watchdog piece to SSA administrators hoping they will "cooperate," the source said. To date, the agency has been less than cooperative. "This is an ongoing process, and they are not always as forthcoming as we'd like them to be," the source said. "Hopefully with your continued reporting, this is an issue they can't duck." A Senate committee member said officials there are working with the Office of Special Counsel on "multiple whistle-blower retaliation claims." The committee continues to request information from the SSA. The whistle-blower in the

Madison office claims management retaliated against her after she was called to testify in a misconduct case.

The incident involved "inappropriate behavior" by an administrative law judge, she said. "They are so corrupt. It's absolutely horrible," said the woman, a lead case technician in the Madison Office of Disability Adjudication and Review. She spoke on condition of anonymity, fearing more retribution from her supervisors. While she said recounting her particular experiences will more than likely betray her identity anyway, the ODAR case worker insisted she has had enough. "I'm at point where they don't care about me, I don't see why I'm protecting them. This is my last resort," she said. "I want to do my work without fear of retaliation." She said she has contacted the Senate committee. "I forwarded my information to them and I got an email back from them. See these reports:

- **WSJ: 131 Federal Judges Broke Law by Hearing Cases Where They Had Financial Interest...**

  **D***irty profits from bench...*
  ***https://www.wsj.com/articles/hidden-interest-judges-financial-conflicts-graphic-11632834079***

-
  https://www.wsj.com/articles/131-federal-judges-broke-the-law-by-hearing-cases-where-they-had-a-financial-interest-11632834421

- They said people are coming out of the woodwork with their complaints (about ODAR) following your story," the whistle-blower said. Ronald Klym, a long-time senior legal assistant in the Milwaukee ODAR office, alleges he has been retaliated against by supervisors for going public with his charges of incompetence and misconduct in the agency. The federal employee, who has worked for SSA for 16 years, provided Wisconsin Watchdog with documents showing extremely long wait times for claimants appealing their denied applications for benefits. Doug Nguyen, SSA regional spokesman, in a previous story said the agency acknowledges that Milwaukee ODAR has a "high average processing time

for disability appeal hearings, and we are working to address the issue." Beyond the delays is what Klym calls the "shell game," the wholesale transferring of cases to other parts of the country by administrators to make the Milwaukee office's numbers look better than they are. The Madison office whistle-blower confirmed Klym's allegations, saying at one point she saw 2,000 cases from the Milwaukee office handed off to the Oak Brook operation. There are over 10,000 SSA disability manipulation charges against SSA executives and staff.

### HARM #9: DEFENDANTS USED BLACKLISTING AGAINST PLAINTIFF:

ie: <u>The U.S. Stops Silicon Valley's 'No Poaching' Deals. . . a ...</u>

<u>https://www.aol.com › 2010 › 09 › 26 › doj-stops-silicon-valleys-no-poaching-deals-a-few-years-t</u>

DOJ Stops **Silicon Valley's 'No Poaching'** Deals. ... But anyone on the ground in **Silicon Valley** knows that a full-blown war for talent is under way, with checkbooks blazin.

- Government officials and tech oligarchs contacted members of the National Venture Capital association (NVCA) and created national "black-lists" to blockade Plaintiffs from receiving investor funding. This was also confirmed in a widely published disclosure by Tesla Motors Daryl Siry and in published testimony. If Silicon Valley political campaign finance oligarchs black-list you (see the "AngelGate" Scandal and the "High Tech No Poaching Class Action Lawsuit" cases) you will never get investor funding again.

### HARM #10: DEFENDANTS ORDERED FOIA OBFUSCATION OF PLAINTIFF'S FOIA AND STILL HAVE NOT RESPONDED TO MANY FOR YEARS BECAUSE THEY SHAME DEFENDANTS:

Federal FOIA requests were hidden, frozen, stone-walled, delayed, lied about and only partially responded to in order to seek to hide information and run cover-ups. In once instance, even though GOVT FOIA staff had the requested FOIA files in their top desk drawers, they delayed handing the FOIA copies over for nearly a decade in order to run a cover-up.

1

2 ***HARM #11: DEFENDANTS ENGAGED IN ARBITRARY DEADLINE MANIPULATION:***

3        Crony state and federal officials play an endless game of Catch-22 by arbitrarily determining

4        that deadlines had passed that they, the government officials, had stonewalled and

5        obfuscated applications for, in order to force these deadlines that they set, to appear to be

6        missed. DOE's PATTERN OF SUPPORTING WHISTLEBLOWER RETALIATION:

7

8        In case # 2:11-cv-05157-LRS ECF; it was proven that when a DOE contractor employee

9 files a complaint alleging whistleblower retaliation, it is the practice of the DOE to align itself with

10 the contractor and to assert attorney client privilege. For example, in an eleven-plaintiff

11 whistleblower retaliation case litigated against Fluor Federal Services, Inc., DOE attorney Robert

12 Carosino refused to disclose evidence relating to meetings between DOE and the offending

13 contractors claiming attorney client privilege because DOE and the contractor share a common

14 interest in the litigation. A13-18. This practice prevents the DOE from effective oversight of

15 contractor retaliation and creates a culture of fear among the Hanford workforce.

16 Upon Dr. Tamosaitis filing a whistleblower complaint with the DOL in 2010, the DOE, Bechtel and

17 URS asserted attorney client privilege as to their discussions concerning Dr. Tamosaitis' claim

18 owing to their common interest. This fact has been verified by the sworn testimony of Jean Dunkirk

19 in her deposition, which was taken in connection with the state claim (transcript available).

20        There is a practice of DOE managers, and most other government agency managers,

21 supporting retaliation against contractor employees who oppose unsafe practices. For example, in

22 2008, then URS Chief Nuclear Engineer and Manager of Nuclear Safety Donna Busche, was

23 terminated from her position at the Waste Isolation Pilot Plant in Carlsbad, New Mexico, with the

24 approval of DOE officials, after she refused to rescind a Technical Safety Violation report that she

25 had filed regarding the improper handling of a drum from Hanford that contained transuranic waste.

26

27

28        In 2009, Ms. Busche was reassigned to the WTP as Manager of Environmental and Nuclear

Safety. A155-6. In October 2010, she was berated by Ines Triay, the DOE EM1, after giving truthful testimony at a hearing a by the DNFSB. A198-199. At a post-hearing meeting with Ms. Triay and numerous URS managers, Triay said, "If your intent was to piss people off, you did a very good job. You pissed people off." A199. Ms. Bushe has suffered retaliation since then, which has been compounded by her having been a witness in this case. 2.60 In 2010, DOE WTP Federal Project Director Dale Knudson submitted a sworn statement to the DOL indicating that he "did not direct BNI or URS to take any specific actions with regards to Dr. Tamosaitis." A14. In fact, Knudson was directly involved in the decision to terminate Dr. Tamosaitis from the WTP. A114. He also participated in the decision that Dr. Tamosaitis not be returned to the WTP after hearing that Dr. Tamosaitis was a whistleblower.  Throughout the Tamosaitis retaliation, DOE managers supported Bechtel and URS efforts to stop necessary design changes to the WTP so that artificial deadlines could be met, and did nothing to protect, or supported, retaliation by contractors against employees who opposed those improper decisions.

PLACING A CONTRACTOR EMPLOYEE INTO AN OVERSIGHT POSTION CREATED AN INHERENT CONELICT OF INTEREST: In 2010, DOE placed PNNL manger Dale Knudson into the position of DOE Federal Project Director of the WTP. A52-3. This created an inherent conflict of interest in that a contractor employee who, on information and belief, is not motivated by government service and placing the public interest before profit, is placed in a temporary position, overseeing the work of other contractors. On information and belief, after about two years, Knudson will return to his position at PNNL or to another position in the private sector.


*HARM #12: POLITICAL POISONING & TOXIC EXPOSURE BY DEFENDANTS HARMED PLAINTIFF:*

Plaintiffs were found to be strangely poisoned, not unlike the Alexander Litvenko case, The Salisbury Case and hundreds of other political poisoning cases. Heavy metals and toxic materials were found right after Plaintiffs work with The U.S. Government  weapons and energy facilities. Many wonder if Plaintiffs was intentionally exposed to toxins in retribution for their testimony. The federal MSDS documents clearly show that a number of Plaintiffs

were exposed to deadly compounds and radiations, via GOVT, without being provided with proper HazMat suits which GOVT officials knew were required. Plaintiff was awarded an exceptional number of issued patents on the energy technologies he had developed for the Dept of Energy. 3rd Party outside legal valuation experts appriased the value of these patents at over $200,000.000.00. The patents, clearly visible in full detail, on the US Patent office website, list many of the chemicals and compounds Plaintiff was working with without adequate hazmat resources of Sandia, Argonne or other National Labs safety oversight.

### HARM #13: WORKPLACE SABOTAGE AND OBSTRUCTION OF PLAINTIFFS RIGHT TO WORK:

Plaintiffs contacts at ARTECH and KAISER PERMANENTE were called, and faxed, and ordered to fire target Plaintiffs from their places of employment, in the middle of the day, with no notice, as a retribution tactic.

### HARM #14: MEDIA ASSASSINATION PROGRAMS WERE CONTRACTED BY DEFENDANTS TO HARM PLAINTIFF:

On orders from Obama White House officials Google, YouTube, Gawker Media and Gizmodo Media produced attack articles. Google locked these contrived attack articles from the Nicholas Guido Denton tabloid empire on the top line, of the front page of all Google searches for a decade in front of 7.5 billion people, around the world. This attack-type uses over $40 million dollars in server farms, production costs and internet rigging. The forensic data acquired from tracking some of these attacks proves that Google rigged these attacks against Plaintiffs on the internet and that all of Google's "impressions" are manually controlled by Google's executives who are also the main financiers and policy directors of the Obama Administration. This data was provided to the European Union for it's ongoing prosecution of Google's political manipulation of public perceptions. Hired attackers Nicholas Guido Denton, John Herman, Adrian Covert, Ian Fette, Patrick George, Gabrielle Darbyshire and John Cook have been referred to the FBI for surveillance, tracking and

interview relative to the command, control and compensation for those attacks.

### HARM #15: COMMERCIAL EMPLOYMENT DATABASE POISONING AND RED-FLAGGING OF PLAINTIFFS HR DATABASE REFERENCES WERE CREATED TO HARM PLAINTIFF'S INCOME POTENTIAL:

Plaintiffs HR and employment records, on Taleo, Palantir and EVERY recruiting and hiring database, was embedded with negative keywords and "flags" in order to prevent the Plaintiffs from ever gaining future employment.

### HARM #16: ATTEMPTS ON THE LIVES OF WHISTLE-BLOWERS BY DEFENDANTS WERE MEANT TO FRIGHTEN PLAINTIFF:

Gary D. Conley, Seth Rich, Rajeev Motwani who Plaintiffs knew, and many other whistle-blowers in these matters, turned up dead under strange circumstances. Plaintiffs has received ongoing death threats for his help to federal investigations in the larger organized crime investigation relative to this matter. See the list of over 120 dead victims, lower down in this document, 1/3 of whom worked with Plaintiffs and were threatened in advance of their deaths.

### HARM #17: DEFENDANTS ENGAGED IN REVENUE BLOCKADES AND INTERNET INCOME RE-DIRECTION TO MINIMIZE PLAINTIFF RESOURCES SO HE COULD NOT FIGHT BACK:

Paypal, and other on-line payments for on-line sales by Plaintiffs are de-platformed, delayed, hidden, or re-directed in order to terminate income potential for target who competed with the attackers interests and holdings. This further denied Plaintiffs income. As a test, Plaintiffs built an online store with hundreds of thousands of products and marketed it globally. Trackers, placed by Plaintiffs technicians, on servers, discovered that Paypal and an outside "Virgina-based system" were DNS and payment re-directed all traffic away from the store so that Plaintiffs received no traffic and no income. In DNS redirection, "website spoofing" sends target Plaintiffs websites to dead ends where no sales orders or customer inquiries actually get back to the target. These internet revenue activity manipulations are conducted using outside covert servers operated by the attackers and revealed in the

Snowden Leaks. All commercial storefronts and on-line sales attempts by target Plaintiffs, had their sites hidden, or search engine de-linked by a massively resourced facility located in Virginia, Texas or Palo Alto, California in order to terminate revenue potentials for the Plaintiffs.

### HARM #18: DEFENDANTS USED THE TROLL FARM DEPLOYMENTS AGAINST PLAINTIFF THAT THEY USE AGAINST PRESIDENTIAL OPPOSITION CANDIDATES:

Contracted trolls, shills, botnets and synth-blog deployments are deployed to place defamatory statements and disinformation about Plaintiffs in front of 7.5 billion people around the world on the internet in order to seek to damage their federal testimony credibility by a massively resourced facility. Some of these troll farms were uncovered in Russia, Ukraine, Israel and Brazil. Renown author Farrow writes about this technique in his book: "*Catch And Kill*".  **FUSION GPS, BLACK CUBE and MEDIA MATTERS** Brand, Reputation and Credibiity "KILL" CONTRACTS were executed by Defendants targeting Plaintiff. Campaign finance dirty tricks contractors were hired by campaign financiers to attack the friends and family members of the target Plaintiffs in order to create low morale for the target Plaintiffs psyche and motivation. The Fusion GPS Scandal implicates Gawker and Gizmodo Media In Pay-To-Publish Scheme. A court filing from the U.S. district court for DC shows that Fusion GPS paid several journalist to run hit jobs on political adversaries and was paid by a media organization. All of those players were attackers hired to attack Plaintiff. FBI interviews can verify this.

### HARM #19: MANUAL SEARCH ENGINE LOCK-IN ATTACKS WERE CONTRACTED FROM GOOGLE AND YOUTUBE, BY DEFENDANTS, TO HARM PLAINTIFF:

In one case covert political partner: Google, transferred large sums of cash to dirty tricks contractors and then manually locked the media portion of the attacks into the top lines of the top pages of all Google searches globally, for years, with hidden embedded codes in the links and web-pages which multiplied the attacks on Plaintiffs by many magnitudes.

### HARM #20: THE U.S. PATENT OFFICE MANIPULATION WAS USED TO BLOCKADE REVENUE FROM PLAINTIFF'S INVENTIONS:

Facebook and Google executives sit on the boards and run The United States Patent Office. That fact alone says it all. For details see https://www.usinventor.org

- Covert Cartel financier: Google, placed Google's lawyer: Michelle Lee, in charge of the U.S. Patent Office and she, in turn, stacked all of the U.S. Patent Office IPR and ALICE review boards and offices with Google-supporting employees in order to rig the U.S. Patent Office to protect Google from being prosecuted for the vast patent thefts that Google engages in. Google has hundreds of patent lawsuits for technology theft and a number of those lawsuits refer to Google's operations as "Racketeering", "Monopolistic Cartel" and "Government Coup-like" behaviors. Thousands of articles and investigations detail the fact that Google, "essentially" ran the Obama White House and provided over 80% of the key White House staff. A conflict-of-interest unlike any in American history. Google's investors personally told Plaintiffs they would "kill him". Google and the Obama Administration were "the same entity". Plaintiffs testified in the review that got Michelle Lee terminated and uncovered a tactical political and social warfare group inside Google who were financed by Federal and State funds. For additional proof, SEE THE VIDEO at:

The_Battle_to_Save_Inventing.m4v

Silicon Valley has taken over the U.S. Patent Office with lobbyists and influence payments. Per Randy Landreneau, the President the U.S. Inventor guild: " *Independence Day is that special time when we Americans remember and celebrate our country's freedom. While it may mean different things to many people, suffice to say, it is the reason we are Free, we have Liberty.* Founder, writer, statesman and inventor Benjamin Franklin wrote, "On Historical occasions, Questions of Right and Wrong, Justice and Injustice, will naturally arise." Here, on this honored day, we take a quick look at Invention and our Independence. Towards the beginning of the Declaration of Independence, whose principal author was our eventual third president, Thomas Jefferson, the very purpose of our Founders' quest was established. It is stated: "We hold these truths to be self-evident, that all men are created

equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness." These were men and women of incredible vision, of intense courage, and they succeeded in accomplishing their seemingly insurmountable task, rising up and defeating perhaps the most powerful global Empire of the time, Great Britain. The United States of America eventually became the beacon of hope and individual freedom around the world. People from virtually every land came to this country to seek the American Dream, which ideals include individual and property rights, religious freedom, liberty, equality and the opportunity for upward mobility, achieved through dedication and hard work. One of the reasons America became the world leader in nearly all categories is due, in no small part, to how our Founders recognized and encouraged invention and innovation. They understood what builders, creators and designers could mean to a small, fledgling country with such a noble purpose. After declaring our independence and fighting a long and bloody war to establish it, our Founders gathered once again in Philadelphia for the Constitutional Convention to form a government that would embody those ideals embodied in our Declaration of Independence. The Father of our Constitution and eventual fourth President, James Madison wrote, in Federalist 43 (January 23, 1788): "A power 'to promote the progress of science and useful arts, by securing, for a limited time, to authors and inventors, the exclusive right to their respective writings and discoveries.' "The utility of this power will scarcely be questioned. The copyright of authors has been solemnly adjudged, in Great Britain, to be a right of common law. The right to useful inventions seems with equal reason to belong to the inventors. The public good fully coincides in both cases with the claims of individuals. The States cannot separately make effectual provisions for either of the cases, and most of them have anticipated the decision of this point, by laws passed at the instance of Congress." Thus, within our U.S. Constitution is that short item, located in Article I Section 8 as Clause 8: "To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." That clause is, in reality, a significant and powerful part of the American Dream, allowing people from all walks of life

who have a bright and useful idea to capitalize on their innovations and creations. For more than two centuries that which our Founders established for inventors and patent holders held true, for the most part. However, the biggest blow to true Independence for Inventors came with passage of the America Invents Act of 2011 (AIA). Due to ambiguous language and loopholes in that piece of legislation, multinational conglomerates and Big Tech have all but wiped out what our Founders had set up, which they hoped would endure - patent holder property rights. When any form of poor legislation is passed and enacted we are reminded of what Samuel Adams, Sons of Liberty founder and a leader of the Boston Tea Party, said; "The grand end of civil government, from the very nature of its institution, is for the support, protection, and defense of those very rights; the principal of which, as is before observed, are Life, Liberty, and Property."

Indeed, Jefferson states it quite succinctly, "Our legislators are not sufficiently apprized of the rightful limits of their power; that their true office is to declare and enforce only our natural rights and duties, and to take none of them from us." Madison adds to that, "A Government is instituted to protect property of every sort...This being the end of government, that alone is a just government, which impartially secures to every man, whatever is his own." As we celebrate Independence Day, and all that our Founders provided for our great country, we at US Inventor are working to correct the wrongs and injustices that have befallen inventors, particularly since the AIA was enacted, by revitalizing the spirit of our Declaration of Independence ("...Life, Liberty and the pursuit of Happiness.") through restoration of patent rights and protection as guaranteed in Article I Section 8 Clause 8 of our United States Constitution ("securing, for a limited time, to ... inventors, the exclusive right to their respective ... discoveries."). We will not rest until the rights of inventors have been restored. We're gaining ground, but our enemies are powerful. We need your help in forwarding our cause and becoming involved when it matters. This isn't just for us, it's for our children, our grandchildren, and the future existence of the American Dream."

Silcon Valley oligarchs have spent billions of dollars to put their people inside the United

States Patent Office and to manipulate patent rulings in order to harm WITNESS and his peers for the purposes of: 1.) cheating instead of competing by stealing technologies and not paying for them and, 2.) operating reprisal, vendetta, retaliation campaigns against competitors and political enemies. Plaintiff was awarded an exceptional number of issued patents on the energy technologies he had developed for the Dept of Energy. 3rd Party outside legal valuation experts appriased the value of these patents at over $200,000.000.00. By it's actions, The U.S. Government made Plaintiff's patents unusuable for monetization by causing black-listing of those patents with NVCA investors and by using online trolls to make the marketing for those patents close off. Plaintiff demands that the U.S. Government now purchase ALL of Plaintiff's patents at fair market value to partially offset his loss.

### HARM #21: HONEY-TRAPS WERE PLACED ON SOCIAL MEDA SITES BY DEFENDANTS SPY OPERATIVES TO HARM PLAINTIFF:

"Honeytraps" and moles were employed by the attackers. In this tactic, people who covertly worked for the attackers were employed to approach the "target" in order to spy on and misdirect the subject. Match.com and other dating sites are owned by famous politicians and election campaign financier involved with Jeffrey Epstein and those sites were used to source girls for Epstein and Honey-traps to lure political adversaries.

### HARM #22: A FAKE NEWS TABLOID EMPIRE WAS CREATED JUST FOR DEFAMATION ATTACKS, BY DEFENDANTS, AND USED TO HARM PLAINTIFF:

Gawker Media, Gizmodo Media, Snopes, SPLC and other hired media assassins were retained to produce "hatchet job" character assassination articles about Plaintiffs. Then those articles were faxed, mailed and emailed to Kaiser Permanente and investors with a note saying: "You don't want to have anything to do with this person, do you..?" in order to get Plaintiffs fired from their job and get Plaintiffs loans or financing pulled. The attackers use their round one attack media, that they authored, to create a round two second wave attack designed to end Plaintiffs life status via economic warfare. All of the other attack victims received between $100,000.00 to $75,000,000.00 but Plaintiff received ZERO DOLLARS

because the Judge was friends with the Defendants.

### HARM #23: HOUSING BLOCKADES WERE DEPLOYED BY DEFENDANTS TO HARM PLAINTIFF:

Mortgage and rental applications had red flags added to them in databases to prevent the targets from getting homes or apartments. HUD applications were manipulated or stalled from 2007 to today, as reprisal.

### HARM #24: HACKING OF PLAINTIFFS DEVICES OCCURRED ON ORDERS OF DEFENDANTS:

Krebs On Security, Wired, Ars Technica, The Wall Street Journal and most major IT publications have reported that hundreds of spy "back-doors" have been found on every Intel, AMD, Apple, Xfinity, Cisco, Microsoft, Juniper Networks motherboard, chip-set and hardware component set. This means that the attackers used a "key" code can open any of Plaintiffs computer, server, router, cloud-network or other network connected device and read every file, photo, video, your calendar and email on devices at any time from any location on Earth. This has been widely reported on by Glenn Greenwald, Edward Snowden, Scahill, Cheryl K of CBS News and others. Plaintiffs was hacked at least 10 times. In a number of instances, people, who Plaintiffs had been communicating with online, were mysteriously contacted by a third party who sent them the Gizmodo attack article or phoned them with warnings to avoid Plaintiffs. These kinds of Man-In-The-Middle interceptions would only have been possible from hacking and MITM surveillance tactics.

### HARM #25: TECH INDUSTRY BLACK-LIST COORDINATION AGAINST PLAINTIFF HAD COMMAND-AND-CONTROL OUT OF DEFENDANTS OFFICES:

McCarthy-Era "Black-lists" were created and employed against target Plaintiffs who competed with Obama Administration executives and their campaign financiers to prevent them from getting funding and future employment. This White House process is known as "RatFucking", a tactic that is documented in a variety of published reports and on Wikipedia. Using Gust, Google Docs, Dropbox and secret meetings, a black-list has been

maintained to attack Plaintiffs for whistle-blowing. Plaintiff has named specific individuals to this court and demanded that the Court request the FBI 302 reports on those individuals. Additional, Plaintiff demands the FINCEN financial mapping records for those Defendant parties. That data, cross referenced in the XKEYSCORE database, provides indisputable, fully incriminating, follow-the-money evidence about every single party mentioned in this complaint.

### HARM #26: HUD AND USDA MORTGAGE RIGHTS BLOCKADES TO HARM PLAINTIFF HOUSING IN REPRISAL AS DIRECTED BY DEFENDANTS VIA THEIR 'DIRTY TRICKS' TEAM:

The housing rights of Plaintiffs were stalled in reprisal. Public records show that tens of thousands of other Plaintiffs were moved ahead of Plaintiffs even though Plaintiffs validation metrics exceeded those of almost every other Plaintiffs. Plaintiffs was "black-listed".

1.   Additional 'dirty tricks' efforts were used per: https://www.justice-integrity.org/634-intelligence-agencies-use-social-media-for-dirty-tricks-propaganda-new-report
2.   https://www.commondreams.org/news/2014/02/07/gchqs-dirty-tricks-revealed-false-flags-virus-attacks-and-honey-traps
3.   https://theintercept.com/2014/02/24/jtrig-manipulation/
4.   https://www.salon.com/2011/02/11/threats_against_glenn_greenwald_wikileaks/
5.   https://www.theguardian.com/commentisfree/2013/jun/24/surveillance-us-national-security
6.   https://www.straight.com/news/482846/government-trolls-use-psychology-based-influence-techniques-social-media
7.   http://federal-report.com/public/The_Political_Reprisal_Vendetta_Playbook.pdf
8.   https://thedailybanter.com/2014/02/05/greenwalds-latest-snowden-revelation-the-british-gchq-is-waging-war-on-hackers/
9.   ***https://www.cia.gov/library/readingroom/docs/CIA-RDP89-01258R000100010002-4.pdf***
10. ...and thousands of additional reports proving the attacker assertions.

Plaintiff is aware of the FBI procedure of the filing of FBI '302' Reports on subjects.

Plaintiff has, on multiple occasions, via the DC and SFO FBI offices, requested that the FBI interview, observe and track the attackers and confirm the command and control communications authority authorizing, managing and financing their attacks and the paths of compensation of those attacks. The FBI has had the full capacity and resources to easily confirm who ordered and operated the attacks on Plaintiff via an interview and investigation of the Defendants hired attackers, specifically ***Nicholas Guido Denton, John Herrman, Gabrial Darbyshire, Patrick George, Jay Carney, Robert Gibbs, Adrian Covert, Eric Schmidt, Larry Page, Perkins Coie, John Cook, Elon Musk***, ***The Secretary of Energy Jennifer Granholm,*** et. al; and those other parties listed within the main complaint..

The FBI '302' reports on those attackers is hereby requested, and a request for the Court to demand those reports is hereby requested for review by all parties concerned.

**(G) Court ordered back payments from SSA from 2007 to today because public officials ordered blockade of Plaintiff's SSDI payments as political reprisal for whistle-blowing in 2007 as proven by Inspector General and attached Exhibits:**

Plaintiff hereby places a plea before the Court for the Court to order the Social Security Administration to pay Plaintiff  back payments from SSA for SSDI from 2007 to today because, as proven in the Master Complaint, public officials, including White House staff and California Senators with intelligence agency access to government 'dirty tricks' teams, ordered the blockade of Plaintiff's SSDI payments as political reprisal for whistle-blowing in 2007 as proven by Inspector General and attached Exhibits in the Master Complaint. Some SSA officials now work for the charged Defendants. This illicit federal reprisal circumvention of Plaintiff's income cost him his house and all many of the damages listed, in detail, in the Master Complaint. It has been proven, in the evidence, that Senator's Pelosi, Harris, Reid, Feinstein, and other senior public officials regularly order hacking, data manipulation and de-funding of political whistle-blowers. Dianne Feinstein's staffer: Daniel Jones, is world known as the 'CIA Master of Dirty Tricks'. In fact,

Plaintiff and his peers, previously won federal lawsuits, as detailed in the Master Complaint, proving that, "government agencies infected by corruption use their resources to put reprisal hit-jobs on citizens". Any Senate aide can hack or manipulate SSA, DOE, HUD and other agency decision files within minutes and order ANY citizen to have their funds cut-off with a single phone call. That happened in this case, as Plaintiff, and federal evidence has sworn, certified and verified as to the veracity of such dirty tricks operations within the Government. Senator's staff and family cohabited with Plaintiff and revealed such tactics.

## CLAIMS AND LIST OF CAUSES OF ACTION

### ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

Plaintiff is a law-abiding U.S Citizen of the United State of America.

Plaintiff has worked as a Business Consultant for over 40 years.

Plaintiff's experience and expertise have allowed him to work for a variety of clients, including the U.S. federal government, the California State government, the New York State government, and several Fortune 100 corporations.

Defendant, the U. S. Government, and DOES 1-20, who are big tech oligarchs that are their political financier/beneficiaries, formed an organized crime, quid-pro quo, insider trading RICO violating, anti-trust law violating crminal "enterprise". The Defendants are all entities that do business in, amd engage in corruption in,  the state of California.

The Plaintiff has suffered emotional and financial distress including, but not limited to, emotional pain, suffering, mental anguish, humiliation, and hopelessness from the coordinated attacks and income blockades produced by the Defendants in reprisal for whistle-blowing, assisting law enforcement and placing superior products in the marketplace. ***Defendants are an illicit organized crime, felony-grade, covert market manipulation entity whose participants and 'made members' are named, individually, in the attached exhibits.***

The Plaintiff seeks fair and equal justice in the Court of law and from Jury members considering the facts stated in this complaint and on the facts which will be discovered during the due process of civil discovery and the trial process.

## CLAIM FOR RELIEF:  BREACH OF CONTRACT (CONFIDENTIALITY)

Plaintiff repeats paragraphs above

Defendants breached their contractual duty to protect Plaintiff's confidential business information. As a result, Plaintiff has suffered direct and consequential damages in excess of $200 million.

## CLAIM FOR RELIEF:  FIFTH AMENDMENT TAKING

Plaintiff repeats paragraphs above.

Defendants have taken Plaintiff's property, in the form of confidential business information, intellectual property and patents, for the benefit of the government and government crony companies without paying Plaintiff compensation, in violation of the Fifth Amendment of the U.S. Constitution.   The value of Plaintiff's property taken by Defendants exceeds $200 million.

## CLAIM FOR RELIEF: DUE PROCESS VIOLATIONS BY GRANHOLM AND GOVERNMENT STAFF

Plaintiff repeats paragraphs above.

Plaintiff satisfied DOE's ATVM loan criteria, and its applications should have been approved. Also, Plaintiff was entitled to have its ATVM loan applications considered fairly on the merits without regard for political contributions or political influence.

"SOE" and Seward, in furtherance of an agreement and pursuant to common scheme with Westly, Doerr and other senior Executive Branch political officials, skewed and manipulated the loan underwriting process to steer ATVM loan funds to government cronies and to deny Plaintiff and other similarly situated companies a fair opportunity to obtain same.

Seward sought to punish Plaintiff for raising public concerns about irregularities and inefficiencies in DOE's loan programs.

1    "SOE" and Seward did not have either the legal authority or the bureaucratic

2    discretion to wrongly and unlawfully steer ATVM loan funds to government cronies such as Tesla

3    and Fisker at the expense of Plaintiff and other similarly situated companies, or to punish Plaintiff

4    for speaking out.

5    Plaintiff was constitutionally entitled both to a fair and objective ATVM loan

6    underwriting process and to protection of its substantive property interests.

7    However, "SOE" and Seward, by fixing the DOE ATVM loan process to benefit

8    government cronies and to punish Plaintiff for speaking out regarding Defendants' program abuses

9    wrongfully and unlawfully violated Plaintiff's due process rights.

10   "SOE"'s and Seward's wrongful conduct, jointly and severally, has damaged

11   Plaintiff in excess of $225 million.

12   **CLAIM FOR RELIEF:  ESTOPPEL (ATVM LOANS)**

13   Plaintiff repeats paragraphs above.

14   Defendants promised Plaintiff and others that it would fairly and objectively evaluate

15   ATVM loan applications and that it would process, approve and lend funds to those companies

16   without respect for political contributions or connections.

17   Defendants reasonably expected and intended for Plaintiff to rely on these promises,

18   and Plaintiff in fact did so.

19   Plaintiff qualified for ATVM loans.

20   But for affirmative misconduct by "SOE", Seward, and/or by those working for them

21   -- intended to benefit government cronies and to punish Plaintiff for publically expressing its

22   concerns about DOE's underwriting process -- Plaintiff's loan applications would have been

23   granted.

24   Defendants stated that they would blockade Plaintiff from all government funds as reprisal for him

25   reporting their crimes.

26   Defendants are therefore estopped from denying Plaintiff's ATVM loan applications.

27

28

## CLAIM FOR RELIEF:  ESTOPPEL (LGP APPLICATION)

Plaintiff repeats paragraphs above

"SOE" promised Plaintiff that he would waive the LGP application fee and Tobin promised to allow Plaintiff to make payment after the February 26, 2009 deadline.

Defendants reasonably expected and intended for Plaintiff to rely on these promises, and Plaintiff in fact did so.

However, Defendants breached their promises, refusing to acknowledge Plaintiff's communications and rejecting Plaintiff's LGP application without recourse.

This rejection was the result of affirmative misconduct by "SOE" and Seward to protect the interests of government crony companies and to punish Plaintiff for publically expressing its concerns about DOE's loan program administration.

Defendants are therefore estopped from refusing to fairly review Plaintiff's LGP application.


## CLAIM FOR RELIEF:  IMPLIED-IN-FACT CONTRACT (FAIR REVIEW OF ATVM LOANS)

Plaintiff repeats paragraphs above

There was an implied-in-fact contract between Plaintiff and DOE with respect to Plaintiff's ATVM loan applications.

DOE offered and Plaintiff accepted the opportunity to submit the applications.

In consideration for these applications, which required Plaintiff to expend substantial sums for accounting, business and technical information, including a National Environmental Policy Act ("NEPA") review, DOE agreed to provide a fair process and a "level playing field" among the applicants, whether the applicants were politically-connected and had made donations to President Obama's campaign or not.

At all times relevant, DOE's representatives had actual authority to, and in fact did, bind the government to this contract.

At all times relevant, Plaintiff fully performed its obligations and submitted all information required or requested by DOE.

1    However, Defendants breached this implied-in-fact contract and denied Plaintiff the

2  fair opportunity and objective underwriting review that Plaintiff had bargained for and DOE had

3  agreed to provide, by skewing and manipulating the ATVM loan underwriting process; by wrongly

4  denying Plaintiff's LGP application without recourse; and by favoring government cronies over

5  companies that did not make political contributions or have connections to senior Executive Branch

6  political officials.

7    Plaintiff has suffered direct and consequential damages, including but not limited to

8  lost profits, in excess of $225 million.

9

10   **CLAIM FOR RELIEF:  BREACH OF THE DUTY OF GOOD FAITH AND FAIR**
   **DEALING (CONFIDENTIALITY)**

11

12   Plaintiff repeats paragraphs above

13   The contracts between Plaintiff and DOE contained an implied duty of good faith and fair

14 dealing which obligated the parties not to do anything which would have the effect of destroying or

15 injuring the right of the other party to receive the fruits of their contractual bargain with respect to

16 the relevant confidentiality and non-disclosure provisions of their various contracts.

17   Defendants, however, intentionally evaded the spirit of their confidentiality and non-

18 disclosure agreements, willfully rendered imperfect performance, and otherwise acted in bad faith,

19 all to favor and benefit government cronies. The President and Vice President of the United States,

20 and/or their family members and financiers, covertly owned Plaintiff's competitors, in the

21 government programs, as did California Senators and their families. These covert actions were illicit

22 and/or criminal on the part of those government figures.

23   Defendants therefore breached their duties of good faith and fair dealing.

24   Because Defendants' breached their duties of good faith and fair dealing, Plaintiff suffered

25 substantial direct and consequential damages, including but not limited to lost profits, in excess of

26 $225 million.

27

28

### CLAIM FOR RELIEF:  BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING (IMPLIED-IN-FACT CONTRACT)

Plaintiff repeats paragraphs above

The implied-in-fact contracts between Plaintiff and DOE regarding provision of a fair and level playing field with respect to Plaintiff's ATVM loan applications contained an implied duty of good faith and fair dealing, which obligated the parties not to do anything which would have the effect of destroying or injuring the right of the other party to receive the fruits of their contractual bargain.

Defendants, however, intentionally evaded the spirit of this contract, willfully rendered imperfect performance, and otherwise acted in bad faith, all to favor government cronies and to prevent Plaintiff from obtaining funds that were "hard-wired" or reserved for the benefit of companies and individuals with political connections to President Obama's administration.

Defendants therefore breached their duties of good faith and fair dealing.

Because Defendants' breached their duties of good faith and fair dealing, Plaintiff suffered substantial direct and consequential damages, including but not limited to lost profits, in excess of $225 million.

### CLAIM FOR RELIEF: CAUSE OF ACTION FOR INTENTIONAL FRAUD

Plaintiff repeats the allegations contained in Paragraphs above in this complaint, by incorporation of and reference to said allegations, as if they were set forth in full herein.

Defendant committed Intentional Fraud under the laws of the state of California and the United States against Plaintiff by their actions as detailed in this full document including it's attached EXHIBITS.

There was a misrepresentation which was false, concealment, or nondisclosure:

There was knowledge of the falsity.

There was an intent to defraud.

There is justifiable reliance.

Damages: Defendant has harmed plaintiff because there was a false misrepresentation which was false, and they concealed and failed to disclose the true facts.

Defendant had knowledge of the falsity.

There was an intent by Defendant to defraud Plaintiff.

Plaintiff was justified in relying upon the information of Defendant.

Plaintiff is entitled to damages.

## CLAIM FOR RELIEF: CAUSE OF ACTION FOR CONCEALMENT FRAUD

Plaintiff repeats the allegations contained in Paragraphs above this complaint, by incorporation of and reference to said allegations, as if they were set forth in full herein. Defendant has committed Concealment Fraud under the laws of the state of California and the United States against Plaintiff as detailed in this full document including it's attached EXHIBITS.

The Defendant has concealed or suppressed a material fact including the facts about the financial and stock market relationships of government officials who profiting in the alleged schemes.

The Defendant was under a duty to disclose the fact to Plaintiff. Defendant intentionally concealed and suppressed the fact with the intent to defraud Plaintiff.

The Plaintiff was unaware of the fact and would not have functioned as he did if he had known of the concealed or suppressed fact.

Defendant used Plaintiff as a legitimizing "smoke screen" and window dressing to make Defendants political slush fund money laundering stock market profiteering scam look legitimate but never let Plaintiff in on the secret, thus defrauding Plaintiff into expending millions of dollars and years of his life on an effort that was a government sponsored stock market profiteering scam.

As a result of Defendant's action by the concealment or suppression, Plaintiff is entitled to damages.

95

As a proximate result of Defendant's action toward Plaintiff, Plaintiff has suffered and will continue to suffer, damages, and other pecuniary losses. Moreover, the foregoing acts of Defendant were knowingly conducted with conscious disregard for Plaintiff's rights, subjecting Plaintiff to cruel and unjust hardship.

 Defendant's actions were egregious and continued with willful and conscious disregard of Plaintiffs' rights.

In accord, Plaintiff is entitled to exemplary and punitive damages from the Defendants and for which Defendants are additionally liable in their capacity either as employees, partners, joint venturers, agents, alter egos, and/or successors of Defendant

## CLAIM FOR RELIEF: CAUSE OF ACTION FOR
## NEGLIGENT MISREPRESENTATION

Plaintiff repeats the allegations contained in Paragraphs above of this Complaint about Damages, by incorporation of and reference to said allegations, as if they were set forth in full herein.

Defendant actions against Plaintiff are considered Negligent Misrepresentation under the laws of the state of California and the United States against Plaintiff as detailed in this full document including it's attached EXHIBITS.

A.  There was a misrepresentation of a past or existing material fact,

B.  It was without reasonable grounds for believing it to be true,

C.  It was with intent to induce another's reliance on the fact misrepresented,

D.  The ignorance of the truth and justifiable reliance thereon by the party to whom the the misrepresentation was directed. (*Fox v. Pollack* (1986) 181 Cal.App.3d 954, 962) Plaintiff is entitled to damages.

As a proximate result of Defendant 's action Plaintiff has suffered and will continue to suffer, damages and other pecuniary loss. Plaintiff 's damages will be ascertained at trial according

to proof.


In accord, Plaintiff is entitled to exemplary and punitive damages for which Defendant and for which defendants are additionally liable in their capacity either as employees, partners, joint venturers, agents, alter egos, and/or successors of Defendant,


## CLAIM FOR RELIEF: CAUSE OF ACTION FOR
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiff repeats the allegation contained in Paragraphs above of this Civil Complaint for Damages, by incorporation of and reference to said allegations, as if they were set forth under the laws of the state of California and the United States against Plaintiff as detailed in this full document including it's attached EXHIBITS.

Defendants' intentional and malicious actions against Plaintiff constituted severe and outrageous misconduct and caused Plaintiff extreme emotional distress.

Defendant was aware that treating Plaintiff in the manner alleged above, including depriving plaintiff of his livelihood, would devastate plaintiff and cause him extreme hardship

As a proximate result of Defendants' extreme and outrageous conduct, Plaintiff has suffered and continues to suffer severe emotional distress. Plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits because of being emotionally distressed.

As a proximate result of Defendants' extreme and outrageous conduct, Plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to his damage in a sum according to proof.

Defendants' misconduct was committed intentionally, in a malicious, oppressive, fraudulent manner, entitling the plaintiff to punitive damages.


## CLAIM FOR RELIEF: CAUSE OF ACTION FOR BREACH OF CONTRACT

Plaintiff repeats the allegations contained in Paragraphs above this complaint, by incorporation of and reference to said allegations, as if they were set forth in full herein, under the laws of the state of California and the United States against Plaintiff as detailed in this full document including it's attached EXHIBITS.

### CLAIM FOR RELIEF: CAUSE OF ACTION FOR ABUSE OF PROCESS

Plaintiff repeats the allegations contained in Paragraphs above this complaint, by incorporation of and reference to said allegations, as if they were set forth in full herein under the laws of the state of California and the United States against Plaintiff as detailed in this full document including it's attached EXHIBITS.

### CLAIM FOR RELIEF: CAUSE OF ACTION FOR FTCA VIOLATIONS

Plaintiff repeats the allegations contained in Paragraphs above this complaint, by incorporation of and reference to said allegations, as if they were set forth in full herein under the laws of the state of California and the United States against Plaintiff as detailed in this full document including it's attached EXHIBITS.

### CLAIM FOR RELIEF: CAUSE OF ACTION FOR DEFAMATION

Plaintiff repeats the allegations contained in Paragraphs above this complaint, by incorporation of and reference to said allegations, as if they were set forth in full herein under the laws of the state of California and the United States against Plaintiff as detailed in this full document including it's attached EXHIBITS.

**CLAIM FOR RELIEF: CAUSE OF ACTION FOR FRAUDULENT MISREPRESENTATION**

Plaintiff repeats the allegations contained in Paragraphs above this complaint, by incorporation of and reference to said allegations, as if they were set forth in full herein under the laws of the state of California and the United States against Plaintiff as detailed in this full document including it's attached EXHIBITS.

**CLAIM FOR RELIEF: CAUSE OF ACTION FOR FRAUDULENT CONCEALMENT**

Plaintiff repeats the allegations contained in Paragraphs above this complaint, by incorporation of and reference to said allegations, as if they were set forth in full herein under the laws of the state of California and the United States against Plaintiff as detailed in this full document including it's attached EXHIBITS.

**CLAIM FOR RELIEF: CAUSE OF ACTION FOR INJURIOUS FALSEHOOD**

Plaintiff repeats the allegations contained in Paragraphs above this complaint, by incorporation of and reference to said allegations, as if they were set forth in full herein under the laws of the state of California and the United States against Plaintiff as detailed in this full document including it's attached EXHIBITS.

**CLAIM FOR RELIEF: CAUSE OF ACTION FOR PRODUCT DISPARAGEMENT AND TRADE LIBEL**

Plaintiff repeats the allegations contained in Paragraphs above this complaint, by incorporation of and reference to said allegations, as if they were set forth in full herein under the laws of the state of California and the United States against Plaintiff as detailed in this full document including it's attached EXHIBITS.

## CLAIM FOR RELIEF: CAUSE OF ACTION FOR CIVIL RIGHTS VIOLATIONS AND VIOLATIONS OF THE U.S. CONSTITUTION

Plaintiff repeats the allegations contained in Paragraphs above this complaint, by incorporation of and reference to said allegations, as if they were set forth in full herein under the laws of the state of California and the United States against Plaintiff as detailed in this full document including it's attached EXHIBITS.

## CLAIM FOR RELIEF: CAUSE OF ACTION FOR MISAPPROPRIATION OF TRADE SECRETS

Plaintiff repeats the allegations contained in Paragraphs above this complaint, by  incorporation of and reference to said allegations, as if they were set forth in full herein under the laws of the state of California and the United States against Plaintiff by the following actions:  Sandia National Labs, A U.S. Government facility, showed Plaintiff a secret display inside of Sandia National labs that duplicated Plaintiff's federal government patent issued energy technology. The copy cat device had been built by General Motors, who had gotten the Technology from Plaintiff's application data to the U.S. Department of Energy. On another occasion, Ford Motor Company's director of Technology contact Plaintiff to say that she was leaving Ford and wanted to "help" Plaintiff with his Energy Dept and DOT funding applications. Afterwards, her Linkedin in profile and co-workers revealed that she had been working for Ford Motor Company the whole time as a government advisor. The CIA's In-Q-Tel asked Plaintiff to "help" them and then copied his technology, gave it to their Commotion group and hacked Plaintiff's servers to shut off his version and expand theirs.



as detailed in this full document including it's attached EXHIBITS.


**CLAIM FOR RELIEF: CAUSE OF ACTION FOR TORTIOUS INTERFERENCE INCLUDING A.) TORTIOUS INTERFERENCE WITH AN EXISTING CONTRACT, B.) TORTIOUS INTERFERENCE WITH PROSPECTIVE, C.) TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS CONTRACTUAL RELATIONS**

Plaintiff repeats the allegations contained in Paragraphs above this complaint, by incorporation of and reference to said allegations, as if they were set forth in full herein under the laws of the state of California and the United States against Plaintiff as detailed in this full document including it's attached EXHIBITS.


**CLAIM FOR RELIEF: CAUSE OF ACTION FOR PATENT INFRINGEMENT**

Plaintiff repeats the allegations contained in Paragraphs above this complaint, by incorporation of and reference to said allegations, as if they were set forth in full herein under the laws of the state of California and the United States against Plaintiff as detailed in this full document including it's attached EXHIBITS.

**CLAIM FOR RELIEF: CAUSE OF ACTION FOR PERSONAL INJURY**

Plaintiff repeats the allegations contained in Paragraphs above this complaint, by incorporation of and reference to said allegations, as if they were set forth in full herein under the laws of the state of California and the United States against Plaintiff as detailed in this full document including it's attached EXHIBITS.

**CLAIM FOR RELIEF: CAUSE OF ACTION FOR UNJUST ENRICHMENT**

Plaintiff repeats the allegations contained in Paragraphs above, and all other, above, relevant allegations this complaint, by incorporation of and reference to said allegations, as if they were set forth in full herein under the laws of the state of California and the United States against Plaintiff as detailed in this full document including it's attached EXHIBITS.

**CLAIM FOR RELIEF: CAUSE OF ACTION FOR CONSPIRACY TO MONOPOLIZE**

Plaintiff repeats the allegations contained in Paragraphs above, and all other, above, relevant allegations this complaint, by incorporation of and reference to said allegations, as if they were set forth in full herein under the laws of the state of California and the United States against Plaintiff as detailed in this full document including it's attached EXHIBITS.

**CLAIM FOR RELIEF: CAUSE OF ACTION FOR ANTI-TRUST LAW VIOLATIONS**

Plaintiff repeats the allegations contained in Paragraphs above, and all other, above, relevant allegations this complaint, by incorporation of and reference to said allegations, as if they were set

forth in full herein under the laws of the state of California and the United States against Plaintiff as detailed in this full document including it's attached EXHIBITS.

## CLAIM FOR RELIEF: CAUSE OF ACTION FOR LABOR LAW VIOLATIONS AND OTHER CAUSES

Plaintiff repeats the allegations contained in Paragraphs above, and all other, above, relevant allegations this complaint, by incorporation of and reference to said allegations, as if they were set forth in full herein under the laws of the state of California and the United States against Plaintiff as detailed in this full document including it's attached EXHIBITS.

## CLAIM FOR RELIEF: CAUSE OF ACTION FOR FAILURE TO TIMELY PAY WITNESS FEES, INFORMANT FEES AND WHISTLE-BLOWER AWARDS

Plaintiff repeats the allegations contained in Paragraphs above, and all other, above, relevant allegations this complaint, by incorporation of and reference to said allegations, as if they were set forth in full herein under the laws of the state of California and the United States against Plaintiff as detailed in this full document including it's attached EXHIBITS.

## CLAIM FOR RELIEF: CAUSE OF ACTION
## LIBEL PER SE

The Plaintiff incorporates by reference the above paragraphs of this Complaint as it is set forth herein.

Plaintiff was attack by the Defendant in written statements that labeled him as a bad person.

The Attacks of the Defendants contain false statements: In fact, Plaintiff never intentionally provided any inferior quality products, nor did he make any misrepresentations while promoting his companies, or their products as approved as patents by The United States

Patent Office.

The statements in the Attacks are unprivileged.

The statements in the Attacks have a natural tendency to injure Plaintiff's business reputation because they attribute dishonesty and overly opportunistic, even predatory activities to Plaintiff. The statements in the Article otherwise impugn Plaintiff's ability to develop products and/or manage a business and/or provide truthful information about his products to investors.

The Plaintiff is a business owner and has some experience in the design and development profession and understood that this was the best way to produce and promote his patents. The Defendants published the Attacks with knowledge of the falsity of the statements contained therein, or with a reckless disregard for the truth of those statements.

At all times, the Defendants, and their co-worker, worked for and published their work in the name of  a United States Government entity.

Plaintiff's only objective was to produce his patented products for the benefit of the public

The Defendant's actions as stated above have damaged the Plaintiff in an amount to be proven at trial, but which Plaintiff estimates to be no less than $5000,000. Plaintiff further seeks the cost of suit herein, as well as exemplary or punitive damages for the malicious conduct of Defendant, and in such amount as Plaintiff may subsequently establish at trial.

**CLAIM FOR RELIEF: CAUSE OF ACTION LIBEL PER QUOD AGAINST ALL DEFENDANTS**

The Plaintiff incorporates by reference the above paragraphs of this Complaint as it is set forth herein.

The Defendants and all of them intentionally and knowingly produced and distributed the attacks on the Plaintiff in their capacity as officers of the United States Government.

Upon information and belief, Robert Gibbs, Jay Carney, John Podesta, Rahm Emanual and David Axelrod, as agents of the United States Government, as well as individually, caused the preparation of and/or the distribution of the Attacks.

## CLAIM FOR RELIEF: CAUSE OF ACTION INTENTIONAL NEGLIGENCE

Plaintiff hereby incorporates by reference and re-alleges each allegation above as though set forth herein.

At all times relevant the Defendant voluntarily undertook the duties and responsibilities in their legal capacity, The voluntary undertaking of these duties and responsibilities created a duty on the part of Defendant to exercise due care in the performance of those duties and responsibilities.

1. Defendant breached their duty of care that was owed to Plaintiff by committing the actions and omission by failing to properly inform him of the duties and responsibilities regarding assisting them Defendant breached a duty of care that was owed to Plaintiff regarding other actions and omission of which Plaintiff is currently unaware.

2. Plaintiff is informed and believes and thereon alleges that, as a proximate result of the breach of duty of care which the Defendant owes to the Plaintiff as alleged in this cause of action and because of the failure of this Defendant to operate in a manner required by law.

3. Defendant breached their duty of care to Plaintiff by failing to inform him of the total requirements and consequences if the requirements are not meet.

4.      As a result of the breach of the duty by the Defendants, the Plaintiff has been injured in

an aggregate, in an amount to be determined by jury or any amount exceeding $5,000,000.00

## DEMANDS AND PRAYER FOR RELIEF
## (AS TO ALL CAUSES OF ACTION)

**DEMAND A.** For general damages, including emotional distress damages, according to the proof of each cause of action for which such damages are available.

**DEMAND B.**  For a Court order to the Social Security Administration ordering SSA to pay Plaintiff SSDI payments, plus interest, from Jan. 1, 2007 to today as they were with-held or blockaded in reprisal for Plaintiff's assistance to the authorities. The SSA's Mario U. , a hostile witness, and other officials have acknowledge and confirmed these attacks. The referenced reports by the Inspector General have confirmed that such abuses of the SSA being "*weaponized for political reprisals*" are now commonplace.

**DEMAND C.** For special damages, according to proof on each cause of action for which such damages are available.

**DEMAND D**. For punitive damages, according to proof on each cause of action for which such damages are available.

**DEMAND E**. For income losses from 2007 to today based on the profits from Cartel members Netflix, Google/Alphabet, Linkedin, Instagram, Tesla as averaged by their combined annual profits which were derived from Applicants patents, companies, trade secrets, business intelligence and work using well-known and standard court metrics for business income loss based on RICO interference and attacks by Defendants.

**DEMAND F**. For prejudgment interest and post-judgment interest according to the law.

**DEMAND G**. For the cost of suit incurred in this action, including attorney's fees (for such time as plaintiff is no longer blockaded from having counsel and retains an attorney to assist in this case rather than representing himself *pro per*).

**DEMAND H.** For such other and further relief that the Court deems proper and just.

**DEMAND I.** For a Court order to Google and YouTube to delete all of their server held digital attack materials on Plaintiff produced and directed by Defendants.

**DEMAND J.** Compensation for each of Plaintiff's patents, Per Patent Cafe, and other third party patent valuation services, and the loss of all revenue from monetization of those patents by Defendants. All of the patents having been RICO, Anti-Trust and interference blockaded and interfered with by Defendants and their control of the NVCA and Defendants executive positions within the United States Patent office and such other interferences as described at http://www.usinventor.org. The Court can easily look at the Patents the U.S. Government has awarded Plaintiff as the seminal first inventor of common technologies exploited by Defendants for billions of dollars of annual revenue, at http://www.uspto.gov. The Court can then allocate a portion of revenues from Defendants operational years from 1978 to today, to Plaintiff, due to Defendant's RICO and Anti-trust violating attacks on Plaintiff because he refused to join their mob empire. In any case, the Court must order Defendants to pay for Plaintiff's un-sold and/or un-monetized issued and pending patents which were blockaded, black-listed and anti-trust interfered with by Defendants. Payments to Plaintiff to be, at least, at fair market rates per comparable transactions over the last ten years.

**DEMAND K.** For witness fees, informant fees, whistle-blower fees for investigative case support to the U.S. Government. For example, the FBI and SEC have been billed $5,000,000.00 for these

amounts and the case evidence files show that Plaintiff was FIRST to provide said evidence to U.S. agencies.

**DEMAND L.** For back-pay owed Plaintiff, in particular for W2 payments owed Plaintiff by companies that were attacked and put out of business, by Defendants, before they could complete all of the payments to Plaintiff.

**DEMAND M.** For a Court order to Gawker/Gizmodo Media to delete all of their server held attack materials on Plaintiff which they partnered with Google/Youtube to produce and manually place at the top of their search results for years at the behest, command and control of Defendants.

**DEMAND N**. For a Court Order to HUD and all Bay Area Counties to, today, issue Plaintiff's HUD Home Ownership certificate that Plaintiff has waited for since 2007, but that has been with-held in reprisal or blockaded in reprisal for Plaintiff's assistance to the authorities. The Court will note, that during the period from 2007, to today, over 30,000 other Applicant's, the majority of whom were less-qualified per the HUD metrics and federal laws, for the certificate, which they all received with little effort. Defendants took Plaintiff's 2 bedroom home from him in Noe Valley, San Francisco, by blockading all his SSA funds and then blockaded him from getting a home by blockading all of his HUD funds.

**DEMAND O**. A declaration pursuant to 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706(2)(B) that the denial of 'PLAINTIFF'S funding and benefits applications was unlawful, and compensatory and injunctive relief directing GOVT to approve same.

**EXHIBITS** affirming each and every assertion, numbered (1) (one) through (250) (two hundred fifty) have have previously submitted to the Court and will be submitted again upon request.

## JURY TRIAL DEMAND

PLAINTIFF, SCOTT DOE, demands trial of this matter by jury. The amount demanded exceeds $25,000.00 (Government Code § 72055). Damages claim dollar amount of $300,000,000.00 is equal to only three hours of income for Defendants and their financiers per IRS, SEC and FINCEN records.

DATED this day of the filing of 2022

Respectfully submitted,

(SIGNED ELECTRONICALLY)
**Name: SD Redmond**
**Address: 210 S. Ellsworth Ave, #1275**
**San Mateo, CA 94401**
**Phone Number: 510-868-2862**
**E-mail Address: justice@majestic111.com**
*Pro Se – A federal witness*

# Table of Contents

JURISDICTION AND VENUE....................................................................................4
PARTIES....................................................................................................................5
    STATEMENT OF FACTS.....................................................................................7
LIST OF HARMS TO PLAINTIFF BY DEFENDANTS..........................................44
    HARM #1: MANIPULATION AND BLOCKADE OF PLAINTIFFS EARNED
    GOVERNMENT FUNDS.......................................................................................44
    HARM #2: THREATS OF DEATH AND ACTUAL MURDERS OF PEERS.................46
    HARM #3: THE GOVERNMENT DEFRAUDED PLAINTIFF OVER AND OVER:.....48
    HARM #4: THE PLACING OF MOLES AND SPYING ON PLAINTIFF:......................49
    HARM #5: BLOCKADES OF PLAINTIFF ACCESS TO LEGAL COUNSEL:..............49
    HARM #6: HIRED CHARACTER ASSASSINATION AND DEFAMATION SERVICES
    THAT DEFENDANTS USED TO DESTROY PLAINTIFF'S LIFE...............................50
    HARM #7: DEFENDANTS USED FACTORY-PROCESSED SOCIAL MEDIA
    ATTACKS AGAINST PLAINTIFF:...........................................................................68
    HARM #8: GOVERNMENT OFFICIALS CAUSED SSA AND HUD BENEFITS
    BLOCKADES AND MANIPULATIONS AS REPRISAL AGAINST PLAINTIFF:........69
    HARM #9: DEFENDANTS USED BLACKLISTING AGAINST PLAINTIFF:...............76
    HARM #10: DEFENDANTS ORDERED FOIA OBFUSCATION OF PLAINTIFF'S
    FOIA AND STILL HAVE NOT RESPONDED TO MANY FOR YEARS BECAUSE
    THEY SHAME DEFENDANTS:...............................................................................76
    HARM #11: DEFENDANTS ENGAGED IN ARBITRARY DEADLINE
    MANIPULATION:...................................................................................................77
    HARM #12: POLITICAL POISONING & TOXIC EXPOSURE BY DEFENDANTS
    HARMED PLAINTIFF:..........................................................................................78
    HARM #13: WORKPLACE SABOTAGE AND OBSTRUCTION OF PLAINTIFFS
    RIGHT TO WORK:.................................................................................................79
    HARM #14: MEDIA ASSASSINATION PROGRAMS WERE CONTRACTED BY
    DEFENDANTS TO HARM PLAINTIFF:...................................................................79
    HARM #15: COMMERCIAL EMPLOYMENT DATABASE POISONING AND RED-
    FLAGGING OF PLAINTIFFS HR DATABASE REFERENCES WERE CREATED TO

HARM PLAINTIFF'S INCOME POTENTIAL:.................................................80
HARM #16: ATTEMPTS ON THE LIVES OF WHISTLE-BLOWERS BY
DEFENDANTS WERE MEANT TO FRIGHTEN PLAINTIFF:.........................80
HARM #17: DEFENDANTS ENGAGED IN REVENUE BLOCKADES AND
INTERNET INCOME RE-DIRECTION TO MINIMIZE PLAINTIFF RESOURCES SO
HE COULD NOT FIGHT BACK:.................................................................80
HARM #18: DEFENDANTS USED THE TROLL FARM DEPLOYMENTS AGAINST
PLAINTIFF THAT THEY USE AGAINST PRESIDENTIAL OPPOSITION
CANDIDATES:...........................................................................................81
HARM #19: MANUAL SEARCH ENGINE LOCK-IN ATTACKS WERE
CONTRACTED FROM GOOGLE AND YOUTUBE, BY DEFENDANTS, TO HARM
PLAINTIFF:...............................................................................................81
HARM #20: THE U.S. PATENT OFFICE MANIPULATION WAS USED TO
BLOCKADE REVENUE FROM PLAINTIFF'S INVENTIONS:...........................82
HARM #21: HONEY-TRAPS WERE PLACED ON SOCIAL MEDA SITES BY
DEFENDANTS SPY OPERATIVES TO HARM PLAINTIFF:.............................85
HARM #22: A FAKE NEWS TABLOID EMPIRE WAS CREATED JUST FOR
DEFAMATION ATTACKS, BY DEFENDANTS, AND USED TO HARM PLAINTIFF:
..................................................................................................................85
HARM #23: HOUSING BLOCKADES WERE DEPLOYED BY DEFENDANTS TO
HARM PLAINTIFF:....................................................................................86
HARM #24: HACKING OF PLAINTIFFS DEVICES OCCURRED ON ORDERS OF
DEFENDANTS:...........................................................................................86
HARM #25: TECH INDUSTRY BLACK-LIST COORDINATION AGAINST
PLAINTIFF HAD COMMAND-AND-CONTROL OUT OF DEFENDANTS OFFICES:
..................................................................................................................86
HARM #26: HUD AND USDA MORTGAGE RIGHTS BLOCKADES TO HARM
PLAINTIFF HOUSING IN REPRISAL AS DIRECTED BY DEFENDANTS VIA THEIR
'DIRTY TRICKS' TEAM:..............................................................................87
CLAIMS AND LIST OF CAUSES OF ACTION.............................................89
ALLEGATIONS COMMON TO ALL CAUSES OF ACTION..............................89
CLAIM FOR RELIEF: BREACH OF CONTRACT (CONFIDENTIALITY).........90
CLAIM FOR RELIEF: FIFTH AMENDMENT TAKING..................................90
 CLAIM FOR RELIEF: DUE PROCESS VIOLATIONS BY GRANHOLM AND
GOVERNMENT STAFF................................................................................90
 CLAIM FOR RELIEF: ESTOPPEL (ATVM LOANS)....................................91
CLAIM FOR RELIEF: ESTOPPEL (LGP APPLICATION)..............................92
CLAIM FOR RELIEF: IMPLIED-IN-FACT CONTRACT (FAIR REVIEW OF ATVM
LOANS)....................................................................................................92
CLAIM FOR RELIEF: BREACH OF THE DUTY OF GOOD FAITH AND FAIR
DEALING (CONFIDENTIALITY)..................................................................93
CLAIM FOR RELIEF: BREACH OF THE DUTY OF GOOD FAITH AND FAIR
DEALING (IMPLIED-IN-FACT CONTRACT).................................................94
CLAIM FOR RELIEF: CAUSE OF ACTION FOR..........................................94
INTENTIONAL FRAUD................................................................................94
CLAIM FOR RELIEF: CAUSE OF ACTION FOR..........................................95
CONCEALMENT FRAUD.............................................................................95
CLAIM FOR RELIEF: CAUSE OF ACTION FOR..........................................96
NEGLIGENT MISREPRESENTATION...........................................................96
CLAIM FOR RELIEF: CAUSE OF ACTION FOR..........................................97
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS..............................97
CLAIM FOR RELIEF: CAUSE OF ACTION FOR BREACH OF CONTRACT.......97
CLAIM FOR RELIEF: CAUSE OF ACTION FOR ABUSE OF PROCESS............98
CLAIM FOR RELIEF: CAUSE OF ACTION FOR FTCA VIOLATIONS.............98
CLAIM FOR RELIEF: CAUSE OF ACTION FOR DEFAMATION......................98
CLAIM FOR RELIEF: CAUSE OF ACTION FOR FRAUDULENT
MISREPRESENTATION................................................................................99

CLAIM FOR RELIEF: CAUSE OF ACTION FOR FRAUDULENT CONCEALMENT......99
CLAIM FOR RELIEF: CAUSE OF ACTION FOR INJURIOUS FALSEHOOD.................99
CLAIM FOR RELIEF: CAUSE OF ACTION FOR PRODUCT DISPARAGEMENT AND
TRADE LIBEL.............................................................................................................99
CLAIM FOR RELIEF: CAUSE OF ACTION FOR CIVIL RIGHTS VIOLATIONS AND
VIOLATIONS OF THE U.S. CONSTITUTION.........................................................100
CLAIM FOR RELIEF: CAUSE OF ACTION FOR MISAPPROPRIATION OF TRADE
SECRETS..................................................................................................................100
CLAIM FOR RELIEF: CAUSE OF ACTION FOR TORTIOUS INTERFERENCE
INCLUDING A.) TORTIOUS INTERFERENCE WITH AN EXISTING CONTRACT, B.)
TORTIOUS INTERFERENCE WITH PROSPECTIVE, C.) TORTIOUS INTERFERENCE
WITH BUSINESS RELATIONS CONTRACTUAL RELATIONS....................................101
CLAIM FOR RELIEF: CAUSE OF ACTION FOR PATENT INFRINGEMENT...............101
CLAIM FOR RELIEF: CAUSE OF ACTION FOR UNJUST ENRICHMENT...................102
CLAIM FOR RELIEF: CAUSE OF ACTION FOR CONSPIRACY TO MONOPOLIZE...102
CLAIM FOR RELIEF: CAUSE OF ACTION FOR ANTI-TRUST LAW VIOLATIONS...102
CLAIM FOR RELIEF: CAUSE OF ACTION FOR LABOR LAW VIOLATIONS AND
OTHER CAUSES......................................................................................................103
CLAIM FOR RELIEF: CAUSE OF ACTION FOR FAILURE TO TIMELY PAY WITNESS
FEES, INFORMANT FEES AND WHISTLE-BLOWER AWARDS.................................103
CLAIM FOR RELIEF: CAUSE OF ACTION...............................................................103
LIBEL PER SE...........................................................................................................103
CLAIM FOR RELIEF: CAUSE OF ACTION LIBEL PER QUOD AGAINST ALL
DEFENDANTS.........................................................................................................104
CLAIM FOR RELIEF: CAUSE OF ACTION INTENTIONAL NEGLIGENCE.................105
DEMANDS AND PRAYER FOR RELIEF.....................................................................106
(AS TO ALL CAUSES OF ACTION)..........................................................................106

EXHIBITS AND PROOFS ARE PROVIDED AS SEPARATE NUMBERED DOCUMENTS

(PAGES PAST THIS SENTENCE ARE INTENTIONALLY BLANK)