Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 1 of 102

Pg   1 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

**Name: SD Redmond**
**Address: 210 S. Ellsworth Ave, #1275**
**San Mateo, CA 94401**
**Phone Number: 510-868-2862**
**E-mail Address: justice@majestic111.com**

**EVIDENCE/EXHIBIT COPIES AT:**
**https://www.majestic111.com**
**http://www.the-truth-about-the-dept-of-energy.com**
**https://san-francisco-news.com**
*PLAINTIFF, A Pro Se, disabled, non-lawyer, federal witness who has requested Court appointed counsel*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

### (UNLIMITED CIVIL JURISDICTION)

| | |
|---|---|
| **SD REDMOND, a Pro Se non-lawyer federal whistle-blower/witness** | ) **CASE NO.: 22-cv-1107-TSH** |
| | ) |
| **PLAINTIFF,** | ) **EXHIBIT - GOVT INSIDERS ATTACKING** |
| | ) **PLAINTIFF  - 6.2.22** |
| **v.** | ) |
| | ) **INTENTIONAL FRAUD; CONCEALMENT** |
| | ) **FRAUD; NEGLIGENT** |
| | ) **MISREPRESENTATION; INTENTIONAL** |
| **UNITED STATES OF AMERICA** | ) **INFLICTION OF EMOTIONAL DISTRESS;** |
| | ) **RICO RACKETEERING;** |
| | ) **ANTI-TRUST/MONOPOLY;  COURT** |
| | ) **ORDER DEMANDED FOR FULL SSDI** |
| | ) **BACK PAYMENTS; AND SUCH OTHER** |
| **DEFENDANTS.** | ) **CLAIMS LISTED HEREIN UNDER** |
| | **"CLAIMS" SECTION** |

**Filed: June 3, 2022**                                    **DEMAND FOR JURY TRIAL**

**ADDITIONAL EXHIBITS TO BE FILED
ELECTRONICALLY AND NOW
AVAILABLE, ON THE WEB, TO THE
PUBLIC, GLOBALLY, AT LINKS
ABOVE AND MIRROR SITES**

**EXHIBIT GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22**

1

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 2 of 102

Pg   2 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

1

2      Sheryl Sandberg, the main operator of *** *FACEBOOK* *** suddenly quit *** *FACEBOOK*

3  *** due to A.) This lawsuit and the revelations it is revealing, B.) investigations of her relationship

4  with the head abuser at Activision, C.) the arranged firing of the head lawyer suing Activition, for

5  California, over sex abuse, and how *** *FACEBOOK* *** *finances the governor's campaigns,* D.)

6  investigations of her manipulations of elections, E.) the ongoing questions about the strange death

7  of her husband, F.) and other government policy manipulations in association with Larry Summers,

8  her mentor, G.) the $100M profits that *** **FACEBOOK** ***  **rakes in with each class-room**

9  **shooting which *** FACEBOOK *** helps cause in the first place**. Plaintiff was told by a senior

10  member of The National Venture Capital Association: *".. We (The NVCA) are not going to let you*

11  *get any more patents that compete with our operations. We (The NVCA) control the Patent Office*

12  *and we decide who runs the Patent Office. Kathi is "our gal".* *** *FACEBOOK* *** *is our baby*

13  *and we will destroy you if you threaten the baby. Sheryl Sandberg is our bitch and she will make*

14  *** *FACEBOOK* *** *do whatever we tell her. You have no chance against us and *** FACEBOOK*

15  ****...".* Recent evidence has proven, beyond any doubt, that the *** FACEBOOK ***, Google

16  Cartel does, indeed, run the USPTO, *and* other government operations! Nobody, though, voted Big

17  Tech into power!

18      Plaintiff has filed charges against Defendant's office known as, THE UNITED STATES

19  PATENT OFFICE, a representative entity of Defendant which has a 1.) command-and-control, 2.)

20  financing, 3.) legal authority and 4.) management influence over the actions and claims of harm

21  described herein and has been proven, in thousands of past court cases, to use reprisal attacks

22  against A.) whistle-blowers and B.) the competitors to political campaign financiers of high-level

23  government officials. Plaintiff maintains that the ongoing blockading of Plaintiff's representation by

24

25

26

27

28

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 3 of 102

Pg   3 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

a qualified lawyer is a violation of his Constitutional rights to a fair hearing which is caused by Defendants who seek to engage in further cover-ups.

When the United States Patent Office, in a federal hearing, said that Plaintiff invented the core technology operating *** FACEBOOK *** and Google and then refused to give him his patent paperwork, it seemed like the game might be rigged. After receiving tips from USINVENTOR.ORG, Wall Street Journal, TECH CRUNCH and Congress; Plaintiff hired ex FBI and CIA agents to check it out... BOY, was it ever rigged. *** FACEBOOK ***'s own staff and investors work INSIDE the U.S. Patent Office in order to protect *** FACEBOOK *** from having to pay for technology they stole. Then they showed Plaintiff that **most** of the Obama and Biden Administration COVERTLY OWN *** FACEBOOK ***. Talk about 'rigging elections' and 'rigging industries'… *** FACEBOOK *** executives even sit on USPTO boards!!!

What U.S. judge or regulator is complaining? For example, (as one example of MANY THOUSANDS) who would complain about Sands Capital's failure to file the S.E.C. Form SC 13G notices of acquisition of *** FACEBOOK ***, Baidu and Athenahealth stock?

Not S.E.C Chairman Mary L. Schapiro—she held a boatload of "dark pool" Fidelity, Vanguard, AllianceBern, TIAA-CREF and T. Rowe Price funds.

Not Commerce Secretary #1 Rebecca M. Blank—she held TIAA-CREF, Vanguard and Fidelity funds.

Not Commerce Secretary #2 Penny S. Pritzker—she holds up to $23.4 million Morgan Stanley, JPMorgan and Goldman Sachs *** FACEBOOK *** dark pools.

Not Attorney General Eric H. Holder—he held T. Rowe Price and Fidelity funds. In fact, Holder held Fidelity Contrafund, the largest single *** FACEBOOK *** mutual fund stock holder, valued at $413 million.

Who in the judiciary would complain?

Not Leader v. *** FACEBOOK ***  Chief Justice John G. Roberts, Jr.—he held  Microsoft, T. Rowe Price, Fidelity, Janus, Vanguard and Blackrockfunds, including Fidelity Contrafund.

Not Leader v. *** FACEBOOK ***  Federal Circuit Judges Alan D. Lourie, KimberlyA. Moore and Evan J. Wallach—they held Fidelity, Vanguard and T. Rowe Price funds, including Fidelity Contrafund.

Not Leader v. *** FACEBOOK ***  District Court Judge Leonard P. Stark—he held Vanguard and Fidelity funds.

Not Leader v. *** FACEBOOK ***  Patent Office Director David J. Kappos—he held over a million dollars of Vanguard funds.

Investigators uncovered a felony, organized crime-level of QUID PRO QUO media manipulation, RICO violations and anti-trust law violations between government officials and *** FACEBOOK *** blockading Plaintiffs patent and business rights. ***Over 500 high level government officials own *** FACEBOOK *** and harm it's competitors to protect their insider trading stocks***. Ask FINCEN to show you the complete family account records on EACH of the perpetrators. The financial records look like one of those mob task force prosecution flowchart's you see on the FBI television show.

Plaintiff noticed that nobody ever prosecutes these people. It is like they are protected by a crony quid pro quo protection racket running all the way up to the Oval Office!

Can you explain that USPTO? It kind of sounds like bribery, cronyism, quid pro quo and racketeering!

Here is what the Patent Office, in a federal hearing, agreed that Plaintiff invented, built and marketed, **first**: "*A method of operating a computerized multi-function social network to provide location based data files, said method comprising: using a computer system to automatically create links to other users of other mobile wireless communications devices using information from at*

4

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 5 of 102

Pg  5 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

*least one of a first user's other existing Internet social network sites; wherein said computer system is at least one server connected to the Internet; using said computer system to locate one or more mobile wireless communication devices operated by said first user; using said computer system to capture activities on the one or more mobile wireless communication devices operated by either said first user or said other users; and using said computer system to automatically provide data files to the one or more mobile wireless communication devices operated by either said first user or said other users, independent of types of the one or more mobile wireless communication devices, communication protocol and communication network providers associated with the one or more mobile wireless communication devices, wherein the data files are provided based on the activities of said first user or said other users while operating said one or more mobile wireless communication devices; wherein said activities comprise previously uploaded or downloaded data; wherein said data files to comprise information relevant to the location of the first user."*

Sound familiar? It is the system that Yahoo, *** FACEBOOK ***, and Google operate off of to make billions of dollars! In the federal hearing, Plaintiff was, by name, up against Mark Zuckerberg and the head of engineering for Yahoo as to who invented and commercialized digital social media on the web. The USPTO examiners said that, after vast comparative federal research, that: PLAINTIFF had done social media first!

Plaintiff did it first and launched the company that they copied. Now we find that almost every major Patent Office official, government official and Judge OWNS *** FACEBOOK *** STOCK and RULES IN THEIR FAVOR and that *** FACEBOOK ***'S EXECUTIVES sit on the board of the USPTO! The system was rigged! 80% of Plaintiff's patents have been stolen by Google, *** FACEBOOK ***, Netflix and the NVCA's core holdings; 100% of which are owned by senior government officials. Can we all say it together: "EPIC CONFLICT OF INTEREST!"

If Zuckerberg, and his little army of Stanford frat boy snowflakes, continue to CHEAT RATHER THAN COMPETE then they must be willing to endure the consequences of acting like social and economic criminals. Their rigging of the United States Patent Office is as bad as their manipulation of domestic elections. Classroom shootings are caused and managed via *** FACEBOOK ***. *** FACEBOOK *** makes over $100 Million dollars, per classroom shooting, in *click-profits*!

Congress AND the USPTO must send *** FACEBOOK ***/Meta to the Big Tech trash heap of history. The tech cartel is a corrupt operation owned, covertly, by California Senators and White House staff. It violates tax laws, RICO laws, antitrust laws and basic human rights. If *** FACEBOOK *** spent less time profiteering off the clicks from classroom shootings, less time bribing Patent Office lawyers... and less time even existing: The world would be a wonderful place!

Silicon Valley is working behind the scenes to secure senior roles for tech allies in lesser-known but still vital parts of president-elect Joe Biden's administration, even as the pushback against Big Tech from progressive groups and regulators grows.

The Biden transition team has already stacked its agency review teams with more tech executives than tech critics. Google's Eric Schmidt practically runs the Obama and Biden White Houses. The White House has also added to its staff several officials from Big Tech companies, which emerged as top donors to the campaign.

Now, executives and employees at tech companies such as Alphabet-owned Google, Amazon, *** FACEBOOK *** and Microsoft are pushing to place candidates in senior roles at government agencies, according to four sources with knowledge of the matter.

The agencies many of these executives are aiming for include the U.S. Commerce Department, Office of the United States Trade Representative, the USPTO, the Office of Information & Regulatory Affairs - a key agency under the White House Office of Management &

Budget which drafts policies impacting the tech industry, the State Department and the Department of Defense, according to the sources.

Many company executives, who in some cases helped raise money for the Biden campaign or have ties to those on the president-elect's transition team, still have a huge commercial interest in pushing candidates with industry ties at the Department of Justice and the Federal Trade Commission – both of which are investigating whether Big Tech abused its market power.

The formal process via which such names and recommendations are being floated by company executives to the transition team comes through law firms Perkins Coie and Covington and Burling, who sell government appointee positions to billionaire family offices. A Biden transition spokesman: Cameron French said agency review team members and future administration appointees will be committed to implementing Biden's policy ideas.

"Each member of the Biden-Harris transition and incoming administration will have values that align with the President and Vice President-elect on a host of issues including the tech sector," he said.

*** FACEBOOK *** and Microsoft declined comment. Amazon's public policy and communications chief Jay Carney told Reuters that Amazon is not trying to get anyone from the company placed in the new administration. "Any suggestion to the contrary is completely false," Carney said.

Google spokesman Jose Castaneda said "as a company, we make no recommendations and are unaware of any such communications."

Researchers, lawyers and consultants tracking the transition or working with the team told Reuters the moves are part of an effort by many large tech company officials to influence future policymaking. They are also making sure the Biden administration is not captive to the ideas of

progressive Democrats and a growing anti-monopoly movement, who have consistently pushed for higher scrutiny of such companies.

"….appointing the CEO or top executives of a tech company directly in to your cabinet is bad optics and bad politics," said Max Moran, a researcher with the Revolving Door Project. He added that allies of Big Tech have begun to emerge as candidates for Biden jobs.

For example, Google's former Chief Executive Eric Schmidt, a billionaire who is a Silicon Valley titan, has been making personnel recommendations for appointments to the Department of Defense - as the company tries to pursue military contracts and defense work, according to three sources.

Schmidt chairs the National Security Commission on Artificial Intelligence (NSCAI). His vice-chairman on the commission, former deputy secretary of defense Robert Work, has briefed the Biden transition team on national security issues. Schmidt's name has also come up in discussions to lead a Biden White House technology task force, a suggestion that has been opposed by progressives, according to three sources.

One of the names Schmidt has floated for a senior defense department role is Christopher Kirchhoff, a former aide to the Chairman of the Joints Chiefs of Staff under the Obama administration who currently works at Schmidt Futures, two sources said. Schmidt has also pushed for Jared Cohen, the chief executive of Jigsaw, a tech incubator that operates as an independent unit under Google, for a role inside the state department or the defense department, according to two sources. Cohen has previously served at the State Department. Schmidt's science advisor: Eric Lander, turned out to be a disaster of "asshole-ism" for Biden.

A spokeswoman for Eric Schmidt declined comment. A NSCAI spokeswoman said any work being done by Schmidt and Work in their personal capacity is not associated with the NSCAI.

Similarly, two Amazon officials have landed spots on the president-elect's agency review teams for the State Department and the Office of Management and Budget.

Now, executives with Amazon are pushing allies for roles inside the Biden administration, according to sources who work with the transition. Names that have emerged as a result include Indra Nooyi, former chairwoman of Pepsi, who now sits on Amazon's board and whose name has been floated to run the Commerce Department, three sources said.

*** FACEBOOK ***, unlike the other companies, has already made significant inroads into the Biden transition team, multiple sources said.

For example, former *** FACEBOOK *** director Jessica Hertz is the Biden transition's general counsel. Austin Lin, a former program manager at *** FACEBOOK ***, is on an agency review team for the Executive Office of the President. Erskine Bowles, a former *** FACEBOOK *** board member, is already advising the transition team, along with Jeff Zients, another former *** FACEBOOK *** board member, who has now been picked to become Biden's COVID-19 czar.

Another ally for some large tech companies is Biden's pick for Secretary of State, Antony Blinken, who has ties with both Amazon and Google, according to four sources. Google was a client at WestExec Advisors, which was founded by Blinken. Blinken also helped Amazon's public policy and communications chief Jay Carney get hired into Joe Biden's media team in 2008.

Google's Castaneda said the company's relationship with West Exec lasted one month in 2018 and the company did not retain any member of the firm. Carney declined comment. WestExec Advisors declined comment. Blinken did not respond to requests for comment.

Four sources said names floated by tech companies have been discussed during meetings held by the Biden transition's agency review teams. These teams have made several hiring recommendations, they said.

While Silicon Valley reaches for a bigger seat at the table, the pushback from progressive groups is notable.

**THIRTY TWO** antitrust, consumer advocacy, labor and related groups sent a letter to Biden asking him to reject the influence of Big Tech companies on his administration.

Many of these groups are now banding together and advocating more forcefully. For example, several of the 32 are part of a new coalition that is designed to expand the number of groups that care about the industry's influence on government. Alex Harman, who oversees competition policy for Public Citizen, an advocacy group which is part of the coalition, said he has been in meetings with Biden's agency review teams with a clear goal: making sure such hires are not made by the administration.

At a high level: Trillions of dollars of stock trades and direct payola bribes were exchanged using the White House as a broker and government agencies, including the UNITED STATES PATENT OFFICE, as a stock market manipulation platform. Politicians turned the government into a cheap garage sale of cronyism! This kind of crime illicitly and illegally manipulates the power over who runs the United States Government and who profits from government decisions which are a matter of many trillions of dollars. The act and veracity of this crime enterprise will be proven to the Jury. Based on that assertion it will then be proven that:

1.) Plaintiff exposed and reported the crime to proper authorities through proper channels.

2.) Some of those authorities used government resources to operate reprisal attacks against Plaintiff, using government resources to operate the attacks, as revenge for reporting the crimes.

3.) The state-sponsored attacks were supported by the political campaign financiers of the government authorities in order to protect their payola conduits and stock market manipulations.

4.) Over 40 harms, each to be detailed and examined in Court, were documented against

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 11 of 102

Pg   11 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

Plaintiff by the actions of corrupt government authorities.

5.) In a vast number of previous lawsuits, including one won by Plaintiff and his peers, it was proven that government offices infected with corruption regularly attack and harm citizens in reprisal.

6.) The government, having been caught in these illicit actions, must now pay Plaintiff for his losses, damages, harms, back-pay fees and other compensation.

This case is about intellectual property and media hit-jobs and attacks on Plaintiff via the operators of a profiteering organized crime activity in government offices. Racketeering-motivated political 'mobsters', in Government offices, attacked and harmed Plaintiff, using taxpayer-paid resources because he did not cooperate with their crimes, which were based out of government offices, and because Plaintiff reported those crimes to law enforcement when Plaintiff witnessed those crimes.  Plaintiff's case matter has been covered in so many Congressional hearings, documentary investigations, FBI investigations and news reports that it is impossible for the Court to not accept the fact that sufficient evidence exists for Plaintiff to more than prove every assertion. The Court has refused to supply legal representation to Plaintiff and Defendants have otherwise blockaded Plaintiff from acquiring legal representation.

## JURISDICTION AND VENUE

1.      Venue is proper in this judicial district in that, always relevant herein, defendants resided and /or transacted business in the Counties of Alameda, Marin, Santa Clara, San Mateo and San Francisco and is within the authority of this Court for purposes of service of process. This

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 12 of 102

Pg   12 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

Court has authority in that the amount in controversy exceeds the jurisdictional limits of this Court according to proof at trial.

2.      Authority and venue are proper in this Court because all the claims alleged herein arose in San Francisco, Alameda, San Mateo and Santa Clara County, and always relevant herein, all the defendants were and/or are residents of San Francisco County or were and/or are doing business in San Francisco County, and/or their principal place of business is in Santa Clara, San Francisco and San Mateo County.

3.      The Plaintiff lives in San Mateo County And Marin County and previously lived in San Francisco County until the attacks by Defendant, upon Plaintiff, began.

4.      The Defendants are a governmental entity, both overt and covert, doing business in San Francisco County and their associates also live in and/or do business there.

5.      This complaint covers issues which the Court has the power to decide, such as RICO, Anti-trust monopoly violations, 28 U.S.C. &1331; 18 U.S.C. §§ 1961(5), 1962(c),  18 U.S.C. §§ 1961(5), 1962(d) 773. ; and many other matters which attorney-less, pro-se, low-income, senior, disabled Plaintiff is not skilled enough to properly cite, at this time, but could cite, with perfection, with a great court-appointed lawyer. Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as Plaintiff's claims arise under the Constitution and laws of the United States. This Court has jurisdiction to grant relief in this action pursuant to 28 U.S.C. § 1346(b), as Plaintiff brings claims under the Federal Tort Claims Act. This case also presents a federal matter within this Court's jurisdiction under Article III of the United States Constitution, 28 U.S.C. § 1331, and the Administrative Procedure Act, 5 U.S.C. § 702, and under other related law acts and precedents. This Court has authority to grant declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., and to award damages, costs, and attorneys' fees under 28 U.S.C. § 2412, and under other related acts and precedents. Venue is proper in this district under 28 U.S.C. § 1391(e), and

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 13 of 102

Pg   13 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

under other related acts and precedents. The venue is proper in this district pursuant to 28 U.S.C. §

1391(b), because a substantial part of the acts or omissions that give rise to the Plaintiffs' claim

occurred or will occur in the area. RICO charges by Plaintiff, against Defendant are verified as valid

by Plaintiff and by reviewing third parties. Plaintiff is also requesting relief under the United States

Constitution, the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2672 and related

jurisdictions and applicable rights. Jurisdiction arises and venue is proper under 28 U.S.C. § 1498(a)

and 28 U.S.C. § 1346. This is a civil action which includes breach of fiduciary duty, right to due

process of law as enumerated in the Fifth and Fourteenth Amendment, Art 1§ 7, violation of the

Fourth Amendment unlawful detention; Fourth and Fourteenth Amendment of the U. S.

Constitution, 42 U.S.C.§ 1983, unjust enrichment and negligence.


# PARTIES


6.      At all times relevant herein, Plaintiff, (hereafter "plaintiff  "Plaintiff") was, and is, a

resident of the County of San Mateo, Marin County And San Francisco County, State of California.

Plaintiff has served his nation all of his career. Plaintiff has saved his nation hundreds of billions of

dollars by halting active corruption. He has been awarded dozens of **'first-to-invent'** issued *United

States federal patents* on products and services in use by millions of people around the globe.

Supporter of **US INVENTOR** organizations.  He is Commended in: Citizenship Awards; writing

contest awards; Deans List; Robb Report; White House letters of commendation by Vice President

Al Gore; Department of Defense, Defense Advanced Research Projects Agency (DARPA)-

"Scientists Helping America" Award; US Congress- Iraq War Bill, Commendation; US Dept. of

Energy- Contract/grant to build America's energy back-up plan; US Department of the Interior-

Commendation; California State Assembly- Proclamation; Mayors of San Francisco- Multiple

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 14 of 102

Pg   14 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

proclamations; 3D Design Magazine- National Award for Producer/Director; A-List, Nob Hill Gazette commendations and hundreds of letters of reference and commendation. He has worked on top law enforcement and IC project deployments. Producer of top anti-corruption lawsuits that interdicted major bribery and political stock market manipulation efforts by public officials. Creator of citizen sleuth and open-source public forensics software and systems that track every bribe and payola red flag. He is an advocate, advisor, promoter for the Congressional *THE STOCK ACT,* and **THE AMERICAN JOBS ACT** crowd-funding section, The **Silicon Valley Class Action Cartel Lawsuits,** The **SOLYNDRA CONGRESSIONAL investigation,** and ongoing Congressional investigations of Big Tech crimes and corruption. He is the Producer of over 100 major public programs attended by millions of participants. He has Decades of work with The White House, Congress and major community agencies. Plaintiff has been in the Bay Area Big Tech community since the 70's and participated in organizing and planning meetings for activities, politicians and events described herein; thus he has 'expert first-hand knowledge'.

7.      On information and belief, always relevant herein, the **UNITED STATES PATENT OFFICE under the direction of The White House, The White House Press Office, The Department Of Energy, The Office Of The Special Counsel at OSC.gov and related agencies and offices;** which includes those entities that are financier/beneficiary oligarchs that have been illicitly incorporated into the government as "White House Advisors" and "Special Staff", as well as; Director, AKA, "SOE"; Kathi Vidal in her official and personal capacities as, "Defendants"). Defendants are sued jointly and severally. Plaintiff does not know the true names of Defendants DOES 1 through 10 and therefore sues them by those fictitious names. Plaintiff on information and belief alleges, that each of those Defendants was in some manner legally responsible for the events and happenings alleged in this Complaint and for Plaintiff's damages. Plaintiff will identify the

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 15 of 102

Pg   15 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

names and capacities and relationships of DOES 1 through 10 by amendment to this Complaint

when and if Plaintiff subsequently ascertains and learn such information. Each reference to a named

Defendant herein below includes a reference to the fictitiously named Defendants. FBI, DOJ, FTC,

FINCEN, NSA and other law enforcement, regulatory and private investigators have tracked the

payments, and command-and-control of the 20+ attackers from the Defendants offices to the

attackers and their deployments. Federal law enforcement will be subpoena' in this case to disclose

that financial data.

8.     The address for the Defendant  is: ***United States Patent Office, Office of the
General Counsel, Madison Building East, Room 10B20, 600 Dulany Street, Alexandria, VA
22313-1450***

9.  The service of process has been served at this address and associated address of: ***Office of
the General Counsel, United States Patent and Trademark Office, P.O. Box 1450
Alexandria, VA 22313-1450,*** to Defendant.

## *STATEMENT OF FACTS*

This case is about economic and media hit-jobs and attacks on Plaintiff via the operators of a

profiteering organized crime activity in government offices. Racketeering-motivated political

'mobsters', in Government offices, attacked and harmed Plaintiff, using taxpayer-paid resources

because he did not cooperate with their crimes, which were based out of government offices, and

because Plaintiff reported those crimes to law enforcement when Plaintiff witnessed those crimes.

Former and current USPTO staff have been bribed with revolving door jobs, stock market profits,

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 16 of 102

Pg   16 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

career favors, raises, job promotions and the other bribes listed in the exhibits. In the course of this trial, most members of the NVCA and senior USPTO will be called before the jury and recordings of deceased members will be played.

Since 2008, Plaintiff filed whistleblower complaints under Section 211 of the Energy Act of 1974, as amended, 42 U.S.C. 5851 ("ERA") and every other known whistle-blower reporting entity, with every known law enforcement and regulatory agency. Over one year has passed since these complaints were filed. The agencies have not issued a final decision within one year of the filing of the complaints, and the delay is not due to the bad faith of Plantiff. Thus, under the ERA, the Federal District Court now has jurisdiction over this matter.

Plaintiff's income, housing, brand and businesses were attacked and cut-off in reprisal for his aid to the government in criminal '*stimulus*' scam investigations involving profiteering with various industries and the stock market. Defendants spent over $60+ million dollars (proven by their own banking records, comps from Presidential campaigns, and opposition research group's past billings as shown in provided EXHIBITS) using spy agency-type dirty tricks contracted from such attack services as *Cardinal & Pine; Pacronym, Acronym;  The Americano; Investing in US; Shadow Inc; Courier Newsroom; IN-Q-Tel; Gawker Media; Jalopnik; Gizmodo Media; K2 Intelligence; WikiStrat; Podesta Group; Fusion GPS; Clearview AI Face Tracking, Google; YouTube; Alphabet; \*\*\* FACEBOOK \*\*\*; Twitter; Think Progress; Media Matters); Black Cube; Correct The Record; Orbis Business Intelligence, Undercover Global Ltd; Stratfor; Jigsaw; ShareBlue/Acronym; Versa LLC; American Ledger; Supermajority News; New Venture Fund; Sixteen Thirty Fund; Cambridge Analytica; Sid Blumenthal; States Newsroom; Hopewell Fund;  Open Society.; Palantir, Kroll, David Brock; AmpliFire News; American Bridge; Plouffe Consulting; Pantsuit Nation; MotiveAI; American Bridge 21st Century Foundation; Priorities USA; PR Firm Sunshine Sachs; The American Independent Foundation; Covington and*

*Burling; Buzzfeed; The American Independent; Perkins Coie; Secondary Infektion; Wilson Sonsini* and thousands more are hired to scan EVERY database, every hour to run hit-jobs, character assassinations, dirty tricks and economic reprisal attacks on Plaintiff, and any targets who reported the crimes. Defendants used former intelligence agency (ie: See Ronan Farrow's Book: *CATCH AND KILL*) personnel to harm Plaintiff as revenge/vendetta/reprisal because Plaintiff was a whistle-blower, a direct competitor and the inventor of technologies that Defendants financiers had not, themselves, invented.

These public official racketeer 'mobsters' run part of the United States Government and used government resources, that Plaintiffs tax dollars paid for, to operate their crimes and to attack Plaintiff for whistle-blowing. These racketeering officials rely on schemes with Elon Musk, Jeff Bezos, Bill Gates, Lauren Powell Jobs, Tim Draper, Steve Jurvetson, Larry Page, Eric Schmidt, The Zuckerbergs and other windfall profiteers from the NVCA, coordinated by private banks such as Goldman Sachs, corrupt CPA firms like Mossack and dirty law firms like Perkins Coie as consigliere-type coordinators of the schemes.

On November 11, 1620, Plaintiff's blood relatives signed the Declaration of Government, on the Mayflower, which, in part, created the United States Government. Plaintiff is, thus, suing the United States Government, on behalf of the United States Government in order to fix the United States Government.

Some of the most famous politicians in the world covertly joined together to engage in a profiteering and racketeering 'enterprise' (not unlike the 'Mafia') in order to optimize bribes based around stock market manipulation of securities assets owned by politicians and their family members. The many thousands of news articles about the reasons for the STOCK ACT, in Congress, detail the harms of this via massive public documentation. White House and Congressional staff (ie: Plouffe, Axelrod, Mcdonough, Carney, Spinner, Emanual, Rattner,

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 18 of 102

Pg   18 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

Schmidt, Westly, et al) advised them on how to set-up and prosper in these illegal machinations in exchange for political campaign financing and percentages of said financing.

The Patent Office has awarded Plaintiff dozens of issued federal patents as first-to-invent the core products that run Silicon Valley. Plaintiff, and his partners, spent decades of their lives and millions of dollars creating those inventions. Then the Defendant sabotaged the commercialization of those patents because 90% of them obsoleted Defendant's employee's, contractor's and financier's stock market holdings.

A patent is a fight with the U.S. Government over who invented a thing. You file a paper saying: "*I invented this thing*" and the Government generally sends you a letter saying: "*We aren't sure you were the first: PROVE IT!*" You go back and forth with the Patent Office in a federal investigation that can last years, and spend vast amounts of money on lawyers, until you have absolutely proven to the Patent Office that you were the first to invent something. Then the Patent Office awards you the patent… unless the USPTO officials are bribed!

In Plaintiffs case, the patent office said that he invented the things that Google, YouTube, Netflix, Tesla and *** FACEBOOK *** - Meta are based on. The Patent Office, Plaintiffs emails, contracts, NDA's and other evidence; including leaks and whistle-blowers from Silicon Valley, proves that Plaintiff invented those things, and launched the companies offering those products and services, years before those competing companies even existed.

At the same time, federal and news media investigators discovered that Google, YouTube, Netflix, Tesla and *** FACEBOOK *** – Meta.et al, are the LARGEST PROVIDERS OF BRIBES TO U.S. SENATORS AND WHITE HOUSE STAFF. It is impossible for the Court or the Plaintiffs to argue otherwise because the public documentation confirming this fact is so vast.

Plaintiff discovered, later, that those competitors hired moles to spy on his companies and their technologies and engage in RICO-violating anti-competitive attacks. **Even worse**: Plaintiff

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 19 of 102

Pg   19 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

found out that later after a number of broadcast **60 Minutes CBS News** reports and Congressional

tips from U.S. Senators family members, that ***his government officials covertly owned those***

***companies***!!! Yes, His elected officials turned out to be either financed by, friends, with, sleeping

with, dating the staff of, holding stock market assets in, promised a revolving door job or

government service contracts from, partying with, personal friends with, photographed at private

events with, exchanging emails with, business associates of or directed by; our business adversaries,

or the Senators and politicians that those business adversaries pay campaign finances to, or supply

political digital search manipulation services to. Criminal U.S. Senators and White House staff

coordinated and profited in these schemes. For example; One California Senator's family owned

and controlled A.) Government trained attack 'spies' formerly with the CIA, NSA, etc., B.) The

leasing contracts for Tesla and Solyndra, C.) Their office staff that threatened Plaintiff in writing

and in-person to Plaintiff's Washington DC staff, D.) the financing for Tesla and Solyndra, E.) The

construction services for Tesla and Solyndra, F.) The staffing company for Tesla and Solyndra, G.)

The adjacent railroad services for  Tesla and Solyndra, H.) Key suppliers for Tesla and Solyndra, I.)

Goldman Sachs cooperative relationships for Tesla and Solyndra, J.) Transitions from their own

Senate Office staff to revolving door jobs at Tesla and Solyndra, K.) Government decisions for

Tesla and Solyndra, L.) The relationship incentives between Google, Tesla and Solyndra and that

Senator's campaign financing to that Senator; and other illicit conflicts of interest. Plaintiff owned

the competing electric car company and technology that would have obsoleted Tesla, Google and

Solyndra and was the first to begin negotiations with the factory that Tesla later took over at the

insistence of that Senator, even though Elon Musk appears in news reports, previously stating that

he saw no use for the building for Tesla.

Silicon Valley has had the largest number of Congressional hearings against it, BUT the

least number of regulations imposed on it. Why? You can look no further than the covert ownership

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 20 of 102

Pg  20 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

of Silicon Valley by elected officials. Our politicians get paid bribes, by Silicon Valley, to keep the political corruption alive and well while they operate, with impunity, as the biggest threats to society ever manifested.

Government politicians protect Silicon Valley and allow it to keep producing child suicides, racism, misogyny, child mental health threats, domestic spying, data harvesting, sex trafficking, election manipulation, tax evasion, censorship, i***ntellectual property theft***, political bribery and many other crimes! Why? Because crime pays...**for U.S. Government officials!**

Certain Government officials, listed by name in the evidence documents, have knowingly formed a RICO-law violating 'criminal enterprise' in order to operate monopolies against the public, including Plaintiff and his companies, that place criminal greed over ethical governance. The highest levels of DOJ, FEC, OSC, and other enforcement agencies have been proven, BY CONGRESS, to have been blockaded by cronyism and corruption in their required duties to arrest these officials.

Plaintiff's letter to Senator Bingham and the Energy and Commerce Committee began part of the Solyndra and Cleantech Crash investigations as shown on the referenced ***CBS NEWS 60 MINUTES*** segments (Plaintiff worked with Bob Simon at 60 Minutes) and other documents in the attached and linked **EXHIBITS,** and created the **'The Stop Trading on Congressional Knowledge (STOCK) Act'** which Senator Bingham and Plaintiff both aggressively pushed to create.

There are 8 billion people in the world and over 5 million companies in the world. Why are the same 20 people; from the same 6 companies; that are all within 10 blocks of each other; that all went to the same frat houses; that all go to each other's parties; that control the same crooked *'Panama Papers'*-type CPA's, Law Firms, Media Attackers and Lobbyists; that operate all this

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 21 of 102

Pg   21 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

felonious larceny connected in this way unless it is a "criminal enterprise" in violation of RICO laws?

**i.**        On top of that, Defendants confided to Plaintiffs (Later proven in their leaked emails) that "*they are the new Mafia*" and produced Mafia documents and Mafia photo tributes to themselves (attached herein). They said that they "*...sought to control The White House and Sacramento Government offices so they could steer all the taxpayers public funds and power to their personal pockets…",* an act they fully accomplished! A deep state is a type of governance made up of potentially secret and unauthorized networks of power operating independently of a state's political leadership in pursuit of their own agenda and goals. In popular usage, the term carries overwhelmingly negative connotations.[2] The range of possible uses of the term is similar to that for shadow government. The expression state within a state is an older and similar concept. Historically, it designated a well-defined organization which seeks to function independently,[3] whereas the deep state refers more to a hidden organization seeking to manipulate the public state. Congressional and other government officials have confirmed that a portion of the UNITED STATES OF AMERICA is operated by and organized as this Deep State operation including the administrators of this section of the government, listed by name, in the related ***EXHIBITS.***

The United States Patent Office (https://uspto.gov) has awarded Plaintiff dozens of seminal issued patents as first-to-invent the core technologies, of modern Silicon Valley, years before Defendants sinister company partners even existed. Billions of people use Plaintiff's technologies worldwide.

Who hasn't ordered a high-definition movie on the internet, on-demand, and watched it in full-screen, full-color, on the web? ***The United States Patent Office and public records say one of Plaintiff's company's did it first!***

Who hasn't enjoyed social networking on the web. ***The United States Patent Office and***

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 22 of 102

Pg   22 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

*public records say one of Plaintiff's company's did it first* and the USPTO hearing that occurred said that Plaintiff did it BEFORE Zuckerberg or Yahoo engineers had thought of it!

Who hasn't experienced immersive virtual reality in a fantastic synthetic computerized world. *The United States Patent Office and public records say one of Plaintiff's company's did it first!*

Who has hasn't dreamed of an electric car that can solve all of America's energy problems, gets all of it's fuel from clean sources INSIDE of America, is the safest car ever made, is affordable to the average person and relies on no foreign sourcing? *The United States Patent Office and public records say one of Plaintiff's company's did it first!* ...AND, on top of that, Plaintiff was awarded nearly a billion dollars of issued patents in commendation by the government. ...AND on top of that, Congress awarded Plaintiff a Congressional award for it in The Iraq War Bill ...AND The United States Government contracted Plaintiff to build it….. BUT then the U.S. Government sabotaged the whole thing, including all the patents and the rest of Plaintiff's funding because it was about to obsolete their insider's car: The deadly, stock market pump-and-dumped and contrived "Tesla". Law enforcement and news investigators then informed Plaintiff he had been defrauded by a government scam and insider crony slush-fund.

There are a vast volume of other similar examples of "Firsts" created and placed on the market by Plaintiff and then spied-on, stolen and copied By Defendants who then launched harms against because Plaintiff refused to participate in their protection rackets.

Defendants broke RICO laws by, in part, attacking and destroying Plaintiff's companies because he did not participate in Defendants protection rackets and because his products and technologies obsoleted theirs.

Defendants spied on Plaintiff companies (with honey-traps, listening devices that were found, hacked servers, Microsoft Outlook email re-directs, moles who actually worked for the

Defendants and other tricks), copied the patents, technologies and trade secrets and made hundreds of billions of dollars from them. Defendants blockade Plaintiff from getting a law firm, as detailed in the attached and hot-linked **EXHIBITS** and blockade his litigation attempts to get to Jury Trial against him. There is even a New York Times expose' article about how Google boss: Larry Page ('boyfriend' of Elon Musk – They share an apartment, lobbyists and own the same Senators), skulks around at tech events stealing ideas for Google/Alphabet. Page stole many of Google's technologies from Plaintiff. It is difficult for Plaintiff to watch Defendants buy mutiple homes, race cars, private islands, private jets, celebrity parties, exotic resort vacations and other fine things, based on profits from Plaintiff's inventions, while Plaintiff is allowed to have none of these things, and is blockaded from even getting a single home, because Defendants Cartel 'Enterprise' won't allow him to. In full compliance with RICO requirements, Defendants attacked Plaintiffs A.) Record-breaking Global Televsion Network, B.) Energy Processing Company, C.) Electric Vehicle Manufacturing Company, D.) Social Media company and harrassed, black-listed, and put them out of business because they had products that Defendants copied and Plaintiff had them years Before Defendants efforts even existed.

In the "Case X POLITICAL CORRUPTION INVESTIGATION" matter, the United States agencies, university and news reports have stated that the United States and it's taxpayers lost tens of billions of dollars. **THE UNITED STATES OF AMERICA OWES PLAINTIFF MONEY FOR SAVING THE UNITED STATES OF AMERICA MONEY.** *If not for the actions of Plaintiff, they would have lost tens of billions of dollars more. Plaintiff is OWED some consideration for serving his nation, overtly and covertly, and getting attcked and harmed for it by reprisal-oriented corrupt government officials who got caught!*

Verifications and proofs of all assertions are provided in the attached *EXHIBITS*.

Plaintiff, and his co-investors, previously sued the U.S. for political reprisal and won their

(massively media covered) case under (Supreme Court nominee) Judge Ketanji Brown Jackson,

wherein Plaintiff and his peers *proved that political reprisal hit-jobs had been ordered against*

*Plaintiff* by Executives in The White House, The USPTO and via at least three West Coast U.S.

Senators, all of whom had hundreds of millions of dollars of 'unjust gains' expected from their

illicit participations in "Case X POLITICAL CORRUPTION INVESTIGATION" and the stock

market gains they sought therefrom. The Secretary of Energy, Mutiple Attorney General's and the

Director of the FBI were fired for corruption during the "Case X POLITICAL CORRUPTION

INVESTIGATION" timeframe and according to law-firm Covington And Burling, who claims (in

emails to Plaintiff) to have placed those appointees in office, they were all connected to "Case X

POLITICAL CORRUPTION INVESTIGATION" ill-gotten gains.  *Plaintiff's exposure of the*

*crimes, notifications to the perpetrators that they had been caught, lock-down of the loop-holes*

*used to engage in the crimes, creation of massive press coverage of the corruptions, creation of*

*legal precedents, mass posting of the evidence to citizens world-wide, and other efforts, is said to*

*have saved the United States Of America over $200 Billion dollars in losses from future and*

*ongoing versions of these crimes.*

Plaintiff received a Congressionaly awarded grant and delivered in full, his work product, to

the United States; unlike all of the other Dept of Energy program peers, who grabbed the federal

money and instantly went bankrupt and profiteered on the tax write-offs. *Plaintiff alleges reprisal,*

*vendetta, and revenge by government officials as retribution for reporting violations of RICO*

*laws, Anti-Trust Laws and other crimes, in a criminal program involving U.S. public officials.*

*Plaintiff also alleges RICO-organized business harms to his companies and issued patents.*

Plaintiff's losses from said state-sponsored vendetta reprisal attacks operated The White

House, government agencies and Congress wherein those bodies were infected by corruption as

reported by the FBI, DOJ, SEC, OSC, FEC, FINCEN, INTERPOL, ICIJ, WIKILEAKS, CBS

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 25 of 102

Pg   25 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

NEWS, CONGRESSIONAL ETHICS COMMITTEES AND hundreds of other government bodies.
Plaintiff in no way aserts that the U.S. government is "bad". Plaintiff simply asserts that there are
some bad people, with criminal intentions, working in the government.

Plaintiff asks the Court to **consider** Plaintiff's request for protection via the more detailed
threat explanations, below, which proves that Plaintiff has threats of death, was attacked, has
extreme vulnerability to retaliation, has already had his life destroyed by Defendants attacks and
that it is in the public's interest for Plaintiff to stay alive and unharmed so that he can continue to
protect taxpayers from corruption. Plaintffs attacks are now detailed in the body of the complaint as
well as the attached **EXHIBITS which are part and parcel of this filing**. The details are now less
broad and much more specific. The actual threats and attacks are detailed, herein, to a greater
degree. Actual evidence of harassemet, shadow-bans and cyberstalking are provided. Plaintiff has
over 3 million pages of evidence and many hours of video evidence posted online. Any appearance
of Plaintiff's name on any server, dating site, government site or other electronic location damages
Plaintiff because these hired attack companies use computerized cyber-assassin software: *Cardinal
& Pine*; *Pacronym, Acronym;*  *The Americano*; *Investing in US*; *Shadow Inc; Courier
Newsroom; IN-Q-Tel; Gawker Media; Jalopnik; Gizmodo Media; K2 Intelligence; WikiStrat;
Podesta Group; Fusion GPS; Clearview AI Face Tracking, Google; YouTube; Alphabet; ***
FACEBOOK ***; Twitter; Think Progress; Media Matters); Black Cube; Correct The Record;
Orbis Business Intelligence, Undercover Global Ltd; Stratfor; Jigsaw; ShareBlue/Acronym;
Versa LLC; American Ledger; Supermajority News; New Venture Fund; Sixteen Thirty Fund;
Cambridge Analytica; Sid Blumenthal; States Newsroom; Hopewell Fund;  Open Society.;
Palantir, Kroll, David Brock; AmpliFire News; American Bridge; Plouffe Consulting; Pantsuit
Nation; MotiveAI; American Bridge 21st Century Foundation; Priorities USA; PR Firm
Sunshine Sachs; The American Independent Foundation; Covington and Burling; Buzzfeed;*

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 26 of 102

Pg   26 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

*The American Independent; Perkins Coie; Secondary Infektion; Wilson Sonsini* and thousands more are hired to scan EVERY database, every hour to run hit-jobs, character assassinations, dirty tricks and economic reprisal attacks on Plaintiff, and any targets who reported the crimes. For his own security, Plaintiff has helped to place an "insurance" policy data set on servers around the globe, on in-orbit satellites launched by others and in torrent files that look like movie files but are actually encrypted data sets, residing around the globe. Agents for Plaintiff will release those data sets upon the untimely death, coma-state harm or severe interdiction harm to Plaintiff.

Plaintiff maintains it is in the best interest of the Court and the public to appoint a qualified lawyer, equitable to the legal counsel used by Defendants, for Plaintiff. Plaintiff can't understand "legalese', can't make a logical trial hearing sound as good as a real lawyer could, to the Jury, when the emotional stress of this case has devastated Plaintiff and Defendant has billions of dollars at their disposal while Plaintiff has none.

Plaintiff's entire knowledge base as to when to shout out the word "objection", comes from watching a few TV episodes of "*Law and Order*". Also, Plaintiff is not articulate in such settings. Plaintiff can't recall dates and numbers in person and on-the-spot. He must go back and look at his notes. Where Plaintiffs other goal, aside from getting his money and his house back, is to expose this corruption on public record, ON BEHALF of the public, it only makes sense that a lawyer could do that best for all concerned. Plaintiff absolutely does not understand legal issues. His latest help in drafting this comes from buying law students a sandwich at Hastings and Santa Clara law schools. That hardly counts as 'adequate legal resources'. Plaintiff is suing THE LARGEST, MOST RESOURCED, DEFENDANTS ON EARTH and has no lawyer. **Really?!!... does that actually seem like a fair fight?** Those circumstances seem pretty "exceptional" and the law says that individual, public-interest, senior, low-income, disabled plaintiffs fighting for justice on behalf of the public and themselves are "exceptional", present "exceptional" circumstances and should be

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 27 of 102

Pg   27 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

given the "exception" by the Court, to be fairly represented by a Court Appointed Counsel paid for by the Court. The Court gives murderers a free Court appointed lawyer every day. Why does a person, such as Plaintiff, who put his life on the line for his nation not get a lawyer from the Court when scumbag animals that take the lives of innocent children get a free one from the Court all day long? Plaintiff does not have the slightest clue how to look up legalese or cite case numbers or which laws were violated according 'citation numbers' and lawyer codes and his Dyscalculia makes it restrictively hard to do so. There is no justice for the Plaintiff if he can't understand the secret language of lawyers. The CIA told Plaintiff "*Learn Russian*".. then years later they said:  *"nawwww, forget about learning Russian. Learn Syrian"*. The Court is asking Plaintiff to learn a language (lawyer talk, which is as hard as learning Russian from scratch) that he will never use again, that takes ten+ years to learn properly and that lawyer language changes every year with new laws. Everybody else has a lawyer in these monster, giant, lawsuits. Most of them have 20+ lawyers per side. Plaintiff has no desire to become a lawyer. There are plenty of lawyers. If you killed all of the lawyers in one generation, there would be just as many in the next generation. Plaintiff should be allowed to have at least one of those lawyers from the vast pool of already existing lawyers in America. This whole case is about FAIRNESS and DISCRMINATION and REPRISAL. Defendants have people representing them that are lawyers 24/7. They just sit around and fight mobsters all day. They should be helping Plaintiff fight mobsters and NOT fight against Plaintiff, who is fighting the same mobsters THEY are supposed to be fighting. Defendants have an unfair advantage because they have a building full of lawyers, unlimited cash and they know all of the legal tricks and meanings of all the legal phrases which Plaintiff has no clue about. It seems discriminatory to not let Plaintiff have a lawyer after Defendants blocked EVERY possible way for Plaintiff to have acesss to a lawyer because they fear his TRUTH and EVIDENCE. After going through all of the state-sponsored harms and hardships detailed here, and in ***THE EXHIBITS***, it is

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 28 of 102

Pg   28 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

not **fair**, **just** or **reasonable** for Plaintiff to still be blockaded from having a knowledgeable legal

represenative. The Court should appoint a lawyer to Plaintiff to save the Judge time and frustration.

The earlier drafts of parts of this complaint were written by White House Lawyers, The huge

Reed/Rubenstein Dinsmore law firm, and government legal people. When asked about some of their

top tier legal language Plaintiff will have no clue what their citations and arguments means. Most of

Plaintiff's past lawyers have been hired away by the Defendants. How are all of these circumstances

not "exceptional". Plaintiff is fighting for his rights AND for the American Public. How does he not

deserve a lawyer under all of these "exceptional" circumstances? As the Judge pointed out,

Plaintiff's get a free court appointed lawyer under "exceptional" circumstances. Plaintiff has listed

over 100 "exceptional" circumstances in this filing supportive of his need and right to a have one

and the public will always ask why the Court let Plaintiff go on a "death march" against the biggest

Defendants anyone on Earth could possibly sue without a single qualified, unconflicted, lawyer

helping in. It will look like, to the public, that Plaintiff is being "set-up" by The Defendants Cartel.

If ony for public optics, providing a lawyer for Plaintiff will be best. It could be that the Court is

thinking what the SF Bar and San Mateo bar representaives told him:  *"Well, it will be really hard to*

*find a lawyer around here who isn't in the Cartel's pocket…"* That's kind of the whole point of the

lawsuit, though, isn't it. There are certainly some lawyers around who are not Silicon Valley's

stooges. This is an "exceptional" circumstance.

Plaintiff exhausted every possible, and impossible, option to obtain counsel as shown,

below, in the detailed section of the attached **EXHIBITS**. Under "exceptional" attack by

Defendants, the Defendants set out to tactilly deprive Plaintiff from getting an attorney using

Government resources. This ALSO makes Plaintiff's situation "exceptional" in that few other

Plaintiff's in this Court have ever had the entire resources of the U.S. government arrayed against

them to try to keep them from getting justice. The Defendants are blocking Paintiff's legal right to

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 29 of 102

Pg  29 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

adequate counsel because some of them will go to prison, some will be shamed, some will lose their jobs, some will be revealed to be sex traffickers, and some will get into other kinds of trouble.

Government officials no longer have the immunity they once thought they had. Plaintiff's STOCK ACT in Congress proves part of that assertion as the STOCK ACT punishes most government officials for doing the crimes Plaintiff asserts. Also, Plaintiff created a legal Precedent by suing the Acting Secretary of Energy. Steven "SOE" and Lachlan Seward said they had "Qualified immunity", yet Plaintiff got them kicked to the curb. That's a "win" for Plaintiff AND the taxpayers! He and his investors sued Steven "SOE", The Secretay of Energy, The U.S. and other government officials and got them fired for corruption. Other recent cases prove that dirty politicians will always, now be taken down, either in, or around the Court. To dismiss Plaintiffs case may discourage the public that nobody can get justice and may make the world say: "See, they ran another reprisal on him...it's Seth Rich all over again". .."there is no justice.." "Everybody that tries to DO THE RIGHT THING gets screwed by Uncle Sam.." etc. Give the people some hope and don't let this case get dismissed. EVERYBODY said: *"You can't sue the Secretary of Energy personally and get him kicked out"* Plaintiff did it! There are hundreds of things Plaintiff was told were "IMPOSSIBLE.." and Plaintiff still pulled them off. Look at Plaintiffs resume website, who else do you know that has been so productive against such impossible odds? It would be a crime to dismiss a public-interest lawsuit designed to stop corruption against the public! Plaintiff set new legal precedents which make it easier to sue public officials and hundreds of public service groups are now doing the same thing. Did you notice that 35+ Congressional members just decided to up and quit Congress just prior to the upcoming election? That is from these new "immunity reduction" efforts targeting crooks working in Plaintiff's government. Crooked officials can no longer put their dirty eggs in the "but I'm immune.." basket. Google-Alphabet-YouTube will, likely, trot out their old ploy: *"...but we work for the CIA, see all these secret wire trasnfers we get from the*

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 30 of 102

Pg  30 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

government..and…. and, the CIA funded us.. We are IMMUNE"  BS!! Micheal Painter can testify about who paid for Google Maps and their sateliite sysem: The American Taxpayer! Nearly 500 ex-employes are prepared to come forward and testify to what Google REALLY is. The one thing that Google, and the other co-conspirators, are NOT is immune! Eric Schmidt, Larry Page and Elon Musk, as covert operators of the deep state within the U.S., have no such immunity. The FBI AND Plaintiff both have the evidence, training, credentialing and rapid ability to produce arrest documents for any party listed herein and those Defendant bad actors MUST be arrested and charged. Mobsters in the U.S. government engaged in RICO violations and organized crime are NOT immune from prosecution!

Related cases confirming Plaintiff's assertions include: Criminal Case No. **21-582 (CRC)**; Task Force cases known as: "Durham Investigations"; "The Solyndra Investigation"; "The Afghanistan Rare Earth Minng Corruption Investigations";SFPD Case # **150528148**  ( - Company E (Northern District) Per Officer Liu – Badge # 4742 ) is relevant. Police incident report # **25119268** is relevant. OSC Case File No. **MA-19-002006** is relevant. OSC Case File **DI-15-4541** is relevant. California Victim Compensation & Government Claims Board Claim # **G628261** is relevant. Also relevant are: Case No. **1:20-cv-03010** ( Google monopoly and competitor attacks case); Case No. **11-CV-2509**  ( https://www.cand.uscourts.gov/judges/koh-lucy-h-lhk/in-re-high-tech-employee-antitrust-litigation/  ); Task force Case No. **20-xyz2020a**  ( http://www.case-xyz2020a.com/ ); Case No. **20-03664** (  https://www.insurancejournal.com/app/uploads/2020/06/brown-v-google.pdf ); Case No. **1:12-CV-00774-mms** and related cases. ( https://thehill.com/blogs/congress-blog/the-administration/250109-a-case-study-in-pay-to-play-cronyism. Criminal referrals against the attackers have been filed with the FBI, DOJ, SEC, FEC, FTC ); Case No. **18-cv-8865** (S.D.N.Y.) (SEC v. Elon Musk for lies and scams ); Case No. **18-cv-8947** (S.D.N.Y.)( SEC v. Tesla, Inc. for lies and scams ); Case No. **1:14-cv-270143** ( Google racketeering charges -

https://artistrightswatch.com/2017/10/08/googles-racketeering-challenge/ ); Case No. **1:19-cr-00490** ( United States v. Epstein - Big tech sex cult crimes case ); Case No. **129 So.3d 119**6 (Fla. 2d DCA 2014); 170 So.3d 125 (Fla. 2d DCA 2015) ( Gawker Media, LLC v. Bollea in which Gawker, Deadspin, Gizmodo, Jalopnik, Jezebel, Kotaku and Lifehacker were exposed as character assassination and money-laundering fronts working for notorious third parties); Case No. **19-cv-343672** James Martin (on behalf of ALPHABET INC) v Larry Page et al (Sex Cults In Silicon Valley ); Case No. **CGC-11-508414**, California Superior Court, San Francisco (Plaintiff v Google ); Case No. **3:16-cv-03061** U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, San Francisco Division ( Plaintiff V. Google/Alphabet/YouTube); Case No. **18-CIV05380** Rubin Vs. Rubin (Google sex cult and sex slave charges ); Case No. : **1:17 - cv - 06404**  Vs. Rubin (Organized crime sex trafficking stock market manipulators ); Case No. D.C. No. **3:17-cv-05369 -VC** (Big tech harassment of outsiders);Case No. **3:21-cv-00077**  (Another of many lawsuits proving that the Silicon Valley Cartel conspires to manipulate media and markets) and the SFPD Roger Boas case records. David Drummond, Elon Musk, Larry Page, Eric Schmidt, David Rubin, and other, oligarchs advised and, lierally, ran the White House, were charged with sex trafficking by their spouses, tax evasion by the IRS, money laundering by FINCEN, DOJ, INTERPOL, or other agencies. They ran the White House to such a degree that many news reports stated that *"you couldn't swing a cat at the White House without hitting a Google or \*\*\* FACEBOOK \*\*\* insider."* ( ie: The Intercept – The Google Administration) The U.S. sought, solicited, encouraged, paid, traded influence and web services with these known mobsters of the tech industry and gave these sociopaths full credentials and authority under the U.S.

For over a decade, the U.S. had full and complete evidence to arrest the Cartel members referenced herein yet the U.S. did not arrest them because they were "*friends of the White House*" and they kept the pig trough of insider trading and crony capitalism flowing like a tsunami of skull-

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 32 of 102

Pg   32 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

duggery. Thus the U.S. is responsible for all harms and damages to Plaintiff in addition to the other

reasons mentioned, herein, as to why the U. S. must pay Plaintiff. On top of that, The U.S.

sponsored, operated, financed and provided the taxpayer-paid resources to harm Plaintiff. The

government argument that *"...oh, that was just all that crazy Eric Schmidt, Elon Musk and Larry

Page and Zuckerberg doing all that stuff.. they are just insane little frat house boyfriends that are

out-of-control…"* , does not hold water based on the facts herein. The U.S. had direct financing and

command-and-control executive management over all of the harms against Plaintiff. In fact, top

FBI, DOJ, SEC, FTC, CIA and other investigative officers have quit their agencies over this crony

favoritism and failure to arrest. On March 22, 2022 in a related case, # **1:21-mc-00813-AT in U.S.**

**District Court, Southern Division New York;** Paul A. Calli and Charles P. Short, lawyers for the

Plaintiffs filed a letter of the same date, provided in the EXHIBITS. In that letter to Honorable

Judge Analisa Torres and in related national news articles, it has been revealed that the DOJ lied to,

and concealed facts and evidence form the Judge. This is of concern as Plaintiff, is also a reporter

and nationally published news publisher. On the same day, and at nearly the same time DOJ *leaked*

*government exhibit #3217 (GX 3217)* which was admitted **under seal**, This leaked evidence

provided the names of 121 famous sex cult partipants in the U.S. v. Ray sex cult case. The news

organizations of the world have now published that list. It seems that someone at DOJ is trying to

help Plaintiff's case, while others at DOJ are trying to harm Plaintiff. These two recent occurences

further prove two of Plaintiff's claims:

    1. That government officials hack citizens simply in reprisal and lie to Judges about it. In

that other case, simply because some girl lost her diary.

    2. That an active and 'Deep State' sex cult exists nationwide. That affiliated insiders operate

and sex traffic in it and the government is fully aware of it.

    The Defendants are 100% liable for the charges herein and for the harms to Plaintiff listed

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 33 of 102

Pg   33 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

herein.

The largest private investigation firm of the elite's was exposed in WIKI-Leaks calling Peter Thiel: "Fu*cking Nuts". Tim Draper wanted Silicon Valley to be so elite that he tried to make it into it's own state. Joe Lonsdale is under lawsuit for rape. Mr. Hayes and Mr. Kumar were killed by Hookers. John Doerr and Vinohd Khosla are called out in national news stories for sex abuse, California Beach take-overs from the public and hundreds of billions of dollars in "Green Energy" kick-backs from their friend Steven Chu. The list of cringe-worthy news stories about these folks goes on and on.


If you are an outsider, or competitor, they can, and do,  sabotage your company in no time flat with moles, hack attacks, DDOS attacks, media character assassination attacks, "Merchants of Doubt" (See the movie) aspersions, civic awards blockades, contract terms exclusions, hire-aways, anti-poaching cartel secret deals and a host of weapons that they use daily.

Do the Justice Department, The Securities and Exchange Commission, or other federal forces do anything about this? Not much. These men pay the bribes that keep Washington floating. They have paid hundreds of billions of dollars, in "tribute", to the current Administration.  It isn't wise to bite the hand that feeds you.

The popular Web Blogs: The Corbett Report and The Alex Jones Show, along with many others,  have released a number of documentaries detailing connections between the NVCA and unethical, and somewhat illegal activites.

How does this affect you?

Got an invention? If you are not part of the Frat House club, Fahgettabout it!

Want to start a start-up? If you are not part of the Frat House club, Fahgettabout it!

Are you a woman? If you are not part of the Frat House club, Fahgettabout it!

33

Did you actually sneak your way past the golden gates and get funded but now find that some of your shareholders are forming a mutiny to toss you out. Did you really think some of those investors weren't actually part of the VC Cartel just waiting to merge their shares and toss you out after you had gotten the technology to work? Can you push back? If you are not part of the Frat House club, Fahgettabout it!

Are they not a "real" mafia-class Cartel, like the Al Capone and Columbian Cartel's. because they don't actually kill people? Do you think those 185+ sudden, mysterious, suspicious deaths that took place in the last 28 months involving bankers, reporters and technologists, who had rubbed these people side-ways, are unconnected? Fahgettabout it!

This kinds of things do affect the average person by creating more discrimination that they have to endure, a worse economy, a less favorable impression of their country, deeper misogyny, less equality, more privilege. If it bothers you, and you have ever paid taxes, call the FBI, SEC, GAO and Congressional phone numbers that you see online and ask them what they are doing about it.

Some interesting story background:

Upcoming venture capitalists collusion meeting! | Startable

Are these people colluding at the 2010 NVCA meeting? That's right. The National Venture Capital Association. Where will the collusion stop?!?

startable.com/2010/09/23/venture-capitalists-collusion-…

http://www.thenewsdaily.org/wp-content/uploads/2015/01/SPIES-WHO-WENT-ROGUE_-THE-IN-Q-

DC-based fund, Sands Capital, withheld filings that concealed Chinese influence over the White House, Patent Office, Judiciary & *** FACEBOOK ***

Contributing Writers | OPINION | AMERICANS FOR INNOVATION  |

**Why Some People (like the NVCA) Want MORE domestic spying!**

There are over 40 different agencies and data harvesters watching and recording everything you do on your phone, computer, car and anything else electronic. That does not include the hackers, foreign governments and stalkers. They analyze you, with that information they try to trick you into purchasing or voting certain ways via subliminal messaging and mood manipulation. When you say, or write, something that makes any of them concerned, they increase their monitoring of you. Everybody now has an analysis file associated with their name. You are ranked by how much trouble you are likely to cause.

*Is that George Orwell's "1984"?*

The bigger question is: "Why did so many of the people we hired to run our countries go so overboard with digital manipulation?"

It may have to do with the power of community and the abuse of the public, by a few, finally coming to light.

The power of community brought the Catholic sex abuse catastrophe to light.

The power of community changed the structure of the Middle East forever.

The power of community made the internet the internet.

Those who have chosen careers as dictators, mobsters and corrupt politicians HATE the internet and the power of community.

The biggest push-back has come from the corrupt politicians because they are so well financed, and, they are financed by the tax money from the very community that now has the power. The power of community just became equal to the power of a billionaire's bank account.

This is the greatest fear of the corrupt.The corrupt can only exist in the shadows. They can only steal tax money when nobody is looking. With the power of community, their schemes are crumbling. Their Solyndra's are crashing and burning. Their Madoff's are uncovered. Their Countrywide's are laid bare.

Some of the corrupt Senators and their campaign backer billionaires are calling for "more surveillance", more control of access and more limits of free speech. This is because they are scared.

Here is one example of a grand corruption that has recently been "outed" by the power of community:

America was always viewed as the "Great Innovator of the World". That is no longer the case, thanks to a group called the National Venture Capital Association (NVCA).

They conspire, collude, and coordinate who gets funded and who gets shut-down. If you compete with their boys,they blacklist you. If your new product might threaten their holdings, they use their Gust database and VC-Link and other data mining services to make sure you never get any money for your idea, no matter how great it is.

In a well known scandal called: "AngelGate",a group of VC's were documented having one of the weekly collusion meetings they all attend, to decide which insiders get to play the game and who gets rolled over. The founders of the NVCA are the same people involved in the sinister In-Q-Tel organization and the various "public information foundations" that are now under intense scrutiny for public policy manipulation.

Even though they helped fund the internet, the VC's are not the smartest tools in the shed. They are not the "idea guys". They move like sheep in a herd. They are the ones that steal the ideas from the actual "idea guys". They did not have the vision to see that the internet was about to become their biggest enemy.

When a VC see's an idea guy/gal's idea pitch they are thinking three things: 1.) "Can I get some free market research from this guy? 2.) Will this product compete with my portfolio and should I kill it? 3.) Is it really a good idea that I can steal and pass over to another NVCA VC so they can copy it and the idea guy will never be able to trace the theft back to me?"

There is a reason they call them "vulture capitalists". The biggest myth about Silicon Valley venture capital money is that any outsider, who isn't in the Stanford frat club, will ever see any of that money.

For the very insider, good-ole-boy, money to stay in the tight little insider circle, a facade of "the American Dream for ideas" had to be perpetrated. Now that all of the entrepreneurs can compare notes, valuations, IP thefts, patent protection sabotage and VC lies on the open internet and see that the entrepreneurs are just getting harvested and plucked like chickens.

The VC's and campaign billionaires want everybody spied on, in their country, so they can get a heads-up on when the game is up, and try to forestall that day with disinformation. Always slow to the table though, the NVCA manipulations have yet to realize that the day has already passed them by.

Investigators say that, Democratic party operatives David Plouffe, Rahm Emanual, Steven Rattner, Bill Daly, David Axelrod and Robert Gibbs arranged with Silicon Valley investors to take over the lithium battery industry in order to monopolize the trillions of dollars of lithium, and related mining deals, in Afghanistan.

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 38 of 102

Pg   38 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

They say that they traded federal funding for campaign support assisted by Harry Reid and Dianne Feinstein, who received numerous stock and cash kickbacks in the scheme.

They say they used the money to fund political campaigns. They used the Silicon Valley investors internet companies to manipulate voter perceptions and web searches in favor of their agenda. The Silicon Valley investors received: favorable federal laws, tax gifts, free federal loans, stock bumps and other perks.

The Silicon Valley investors mining resources exploitation companies: Abound, Solyndra, Fisker, Ener1, Tesla, and many, many more, that received the USPTO kickback funds, managed by Steven Chu, have all either failed, been raided, been charged with fraud or otherwise turned out to be disasters because they were based on a financial fraud skimming scheme instead of a good business plan.

All of these facts are known, in great detail, by many investigators. Nearly a million pages of evidence exist. A Special Prosecutor is required to perform proper prosecutions.

Attack specialist and Perkins Coie lawyer: Mr. Sussman, is in the news quite a bit these days in the Durham federal investigation detailing Sussman's epic cyber assassination attacks of behalf of Hillary Clinton. Nobody every heard of him, until they did. Here are some other characters that stay under-cover but pull highly questionable Sussman-like strings via just a handful of co-conspirators:

**Beijing Bedfellows** - Parker Zhang, became "Chief of Patents" at Baidu in 2012. He worked for Fenwick & West LLP,  Baidu says attorney Parker Zhang is "Chief of Patents." It is very unusual for a junior attorney to reach such a position of power. Zhang graduated from Michigan Law in 2005. He was an Associate at Fenwick & West LLP from 2006-2010. After less than a year as "IP Consultant" at Hewlett-Packard, he became "Chief of Patents" at Baidu, in about May 2012.

Marauding Obama Donors: Zhang's move to Baidu, Inc. coincides with the unreported Sands

Capital securities transactions analyzed below. Also during his move, *** FACEBOOK *** went

public, T. Rowe Price invested $190.5 million in *** FACEBOOK *** and $147 million in Baidu.

Fenwick & West LLP was *** FACEBOOK ***'s securities and patent counsel. The Leader v. ***

FACEBOOK *** case was on appeal at the Federal Circuit where the judges were heavily invested

in *** FACEBOOK ***, and the S.E.C. Chair in Baidu (e.g., T. Rowe Price PRGFX) Zhang had

only five years of experience before jumping to the top intellectual property job at Baidu. Baidu is

one of the largest technology companies with $23B in revenue and 21,000 employees. This would

place the company around 130th on the Fortune 500 list; along with U.S. Bank, Time Warner, and

Goodyear. It appears that the *** FACEBOOK *** IPO feeding frenzy was orchestrated in both the

U.S. and China. This supports the hypothesis that the NASDAQ "glitch" was a smokescreen.

Breaking News! Jan. 29, 2014—S.E.C. Chair Mary L. Schapiro held stock in both ***

FACEBOOK *** & Baidu (China) before the *** FACEBOOK *** IPO via her investment in T.

Rowe Price Growth Stock Fund (PRGFX), which was up to $600,000, according to Schapiro's

financial disclosure.


**Mary L. Schapiro,** Chair, S.E.C.; held stock in *** FACEBOOK *** and Baidu before the

*** FACEBOOK *** IPO, along with Leader v. *** FACEBOOK *** judges and Patent Office;

ignored whistleblower warnings. In addition to warnings about fabricated mobile revenues, her

S.E.C. agency also ignored numerous whistleblower warnings of improper "dark pools" activity,

including failure to disclose to investors that *** FACEBOOK *** had been judged guilty on 11 of

11 federal counts of infringing Columbus innovator Leader Technologies' U.S. Patent No.

7,139,761 for social networking—the core technology engine running *** FACEBOOK ***.

Evidently, Schapiro knew about *** FACEBOOK *** Chairman James W. Breyer's intention to

exploit Leader's technology in China also, where his father, John P. Breyer, operates IDG-Accel-

China. Sands Capital Management, LLC injected Chinese influence into Obamacare. Sands Capital,

the 7th largest fund investor in the May 2012 *** FACEBOOK *** IPO, secretly acquired over

$200 million in Athenahealth holdings just as President Obama moved Todd Y. Park,

Athenahealth's founder, from HHS to the White House, on Mar. 9, 2012.


**Gordon K. Davidson**, Fenwick & West LLP; current *** FACEBOOK *** securities and

patent counsel; Leader Technologies former corp. counsel (c.a., 2001-2004). At the same time,

Sands Capital secretly slipped in its holding in Baidu, Inc., sometimes called the Chinese ***

FACEBOOK ***. Baidu is notoriously controlled by the Chinese Communist Party. Baidu's CEO,

Robin Yangong Li, started his job in Jan. 2004—the same month Mark Zuckerberg started ***

FACEBOOK *** after stealing Leader Technologies' source code via attorney firm Fenwick &

West LLP, we believe. *** FACEBOOK *** also went public during this same time (with Fenwick

& West LLP as their lead securities and intellectual property counsel). Again, Sand Capital did not

provide proper notice of its *** FACEBOOK *** stock acquisition. The juxtaposition of these three

notice failures, combined with HealthCare.gov's claim that its software platform running on ***

FACEBOOK *** and other "open source" software, signals obvious collusion to deprive Leader

Technologies of its private property rights—government confiscation of property. It also proves

Chinese meddling in America's data infrastructure and the Obama White House cabinet. (Jan. 28,

2014)—Washington DC-based Sands Capital Management, LLC, the seventh largest fund investor

in *** FACEBOOK ***, failed to file three critical *** FACEBOOK ***, Athenahealth, and

Baidu-China ("the Chinese *** FACEBOOK ***") disclosures with the U.S. Securities and

Exchange Commission (S.E.C.) during the period of May-August 2012. These disclosures would

have signaled serious conflicts of interests within the Obama administration, especially the

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 41 of 102

Pg   41 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

complicity of Wall Street and the White House's Silicon Valley donors with likely undue Chinese
influence over Obamacare. Pres. Obama and Todd Y. Park blatantly violated conflict of interest
laws


**Todd Y. Park**, U.S. CTO; HealthCare.gov architect; Athenahealth, founder; Castlight
Health, founder. These Sands Capital filing failures occurred just as President Obama moved Todd
Y. Park as chief technology officer (CTO) of Health and Human Services to the White House on
Mar. 9, 2012. By this time, Park had already embedded his Athenahealth and Castlight Health
technology deeply into HealthCare.gov.


**Ann H. Lamont**, Director of Todd Y. Park's Castlight Health; former director of Todd Y.
Park's Athenahealth; former director of NVCA with James W. Breyer, Accel Partners, among other
*** FACEBOOK *** cartel principals; Mng. Prtnr. Oak Investment Partners; husband Edward is
grandson of JPMorgan Chase & Co. founder Thomas W. Lamont. Lamont is a heavy investor in
Goldman Sachs, Morgan Stanely and JPMorgan—*** FACEBOOK ***'s underwriters.  However,
Todd Y. Park was the founder of both Athenahealth and Castlight Health. His brother, Edward Y.
Park, is the chief operating officer of Athenahealth. JPMorgan insider and Obama campaign
financier, Ann H. Lamont, was an Athenahealth director with Park and his brother.


**NVCA: The Cesspool of White Collar Corruption And Creators Of Cyber Assassins**


**James W. Breyer**, *** FACEBOOK ***; Managing Partner. Accel Partners LLP; NVCA
Fmr. Chairman (2004).

**Ann H. Lamont** is also an investing partner with *** FACEBOOK ***'s James W. Breyer.

She is also a fellow former director with Breyer at the National Venture Capital Association

(NVCA).

Reporting new stock acquisitions to the S.E.C. is routine. "Form SC 13G" reports are an essential

tool used by investors to know when funds add new stocks to their portfolios. Without those

notices, new acquisitions can easily be missed. Independent stock analysts like Morningstar monitor

them and create daily alerts of new acquisitions to the market as well as to watchdogs.

**Frank M. Sands, Jr**., Sands Capital Management, LLC. Failed to file timely notices.

Virgina.edu. Had Sands Capital filed timely, accountability questions could have been triggered. As

it happened, they slipped the holding quietly onto their quarterly reports, thus avoiding

transparency.

The activities of these companies impact American healthcare and data security priorities.

America was not given the opportunity to scrutinize this activity until now, after the damage has

been done.

Sands Capital Management, LLC ATHENAHEALTH, INC. holdings—Holdings Reports,

SEC EDGAR. Yellow highlighted rows show reporting periods in which no notices of acquisitions

were filed by compliance officer, Robert C. Hancock. These notices are important filings for fraud

watchdogs. Sands Capital Management, LLC ATHENAHEALTH, INC. holdings—Value Reports,

SEC EDGAR. The yellow highlighted box shows the periods where no acquisition notices and no-

fraud certifications were filed. In short, Sands Capital acquired over $200 million in Athenahealth

stock without regulatory oversight. S.E.C. Chairman Mary L. Schapiro had financial holdings in

funds invested in Athenahealth, e.g., Vanguard Extended Market (VEXMX). On May 14, 2010,

506,000 shares of Athenahealth appeared out of thin air on the Sands Capital Management, LLC

quarterly report. More and more stock just started appearing each quarter, all without acquisition

notices.

Then on May 14, 2012, hundreds of millions more shares appeared out of thin air—214 million more. Just a few weeks earlier, President Obama had appointed Todd Y. Park as U.S. chief technology officer. Park had already deeply embedded Athenahealth's software code into the bowels of HealthCare.gov. In fact, no notices of acquisition were filed for Athenahealth until Feb. 2013.

**Why is this S.E.C. irregularity significant?**

The public has an interest in insuring that government vendors and officials are trustworthy. HealthCare.gov is making false "open source" intellectual property claims, but since HealthCare.gov is not a transparent development, no public scrutiny is possible.

The federal confiscation of private properties continues unabated. The agenda is very evidently being railroaded.

In addition, the involvement of the Chinese government in U.S. infrastructure raises critical national security questions. Tellingly, Parks' ethics disclosure is missing from the U.S. Office of Government Ethics website. By contrast, even Hillary R. Clinton's is there. Parks' close relationships with associates of Athenahealth, Castlight Health, Baidu-China and Sands Capital Management, LLC show that any decision he has made involving these players benefits him personally.

**Robert Kocher**, MD, Director, Castlight Health, founded by U.S. CTO, Todd Y. Park; former member, National Economic Council; special adviser to Barack Obama on Health Policy (chief architect of Obamacare). Hindsight being 20-20, it should be noted that Robert Kocher, MD, President Obama's chief healthcare policy adviser on Obamacare, had matriculated by 2011 to: (1) Castlight Health as director along with Ann H. Lamont, Todd Y. Parks' other company, (2) Park's

venture capitalist, Venrock, and (3) McKinsey & Co. and the Brookings Institution, who are both *** FACEBOOK ***'s COO, Sheryl K. Sandberg's former clients.

**Lawrence "Larry" Summer**s. Director, Square; Adviser, Andreessen-Horowitz; mentor to *** FACEBOOK ***'s Sheryl K. Sandberg, Russian oligarchs Yuri Milner and Alisher Usmanov; former director, Barack Obama's National Economic Council (2008 bailout); believed to be one of the prime movers behind the *** FACEBOOK *** cartel. Kocher's other boss at the White House, National Economic Council chairman Lawrence "Larry" Summers, also works for the Brookings Institution. In short, Kocher's post-administration job hunt appears to have been political revolving door payback. Summers is Sheryl Sandberg's insider commander while she works at *** FACEBOOK ***.

In addition, the list of funds pouring cash into Athenahealth and Castlight Health is a clone of *** FACEBOOK ***'s and Baidu's lists. Blackrock, Morgan Stanley, T. Rowe Price, Fidelity, Vanguard, Goldman Sachs, JPMorgan, etc. The evidence is clear. These funds are coordinating these events while the U.S. Congress and American people are sidelined.

It appears time for Congress to take control, pass legislation to return confiscated properties, impeach and replace many corrupted judges, change the legal discipline procedures by putting lay people in charge, put wrongdoers in jail, establish a Special Prosecutor, and call a Constitutional Convention to change the elements of our system that let this happen.

Our system of government appears to have been badly damaged by unscrupulous people, mostly lawyers, who no longer respect our laws, and clearly do not intend to follow them.


RELATED:

An Obama-era Patent and Trademark Office director and group of former and current tribunal judges are being accused of stacking the intellectual property system against inventors,

according to a lawsuit provided to Bloomberg Law.

The lawsuit marks the latest court action over the agency's Patent Trial and Appeal Board, a tribunal favored by generic drugmakers, major technology companies, and others for trying to invalidate patents they claim are obstacles for releasing their own products.

Computer engineer Martin David Hoyle, owner of B.E. Technology LLC, alleged that patent office behavior favoring Alphabet Inc.'s Google in challenges to his advertising technology patents violated his constitutional due process rights.

Core to the dispute are two patents covering user data collection processes for targeted advertising and a patent fight with Google. Former PTO Director Michelle Lee was head of patents and patent strategy at Google before being nominated to lead the agency.

Hoyle said the PTAB proceedings were "tainted by various improprieties and underhanded tactics, designed to stack the deck against them and in favor of their far more powerful opponents."

"The system had been rigged all along," Hoyle said in the complaint filed Monday in the U.S. District Court for the Western District of Tennessee. The suit is against Lee and other agency officers over allegedly "unconstitutional actions."

The PTAB has been subject to several legal challenges in recent years.

Daiichi Sankyo Inc. and AstraZeneca Pharmaceuticals LP last week asked a federal district court in Virginia to throw out PTAB rules they argue make it harder to secure challenges to rival drug patents.

Big tech has taken swings at the patent office as well. Apple Inc. and Alphabet Inc.'s Google teamed up to push the U.S. District Court for the Northern District of California to tear down a PTAB rule they also found problematic to securing tribunal challenges.

The PTAB has also faced criticism for often favoring corporations over smaller inventors,

45

particularly under the leadership of Lee, who had been nominated to the office by former President

Barack Obama.

The PTAB largely shed its reputation as a "patent death squad" under the Trump

administration, whose PTO director Andrei Iancu took steps many say made it easier to get a patent

yet more difficult to challenge it.

The Biden administration has yet to name a PTO director. The pharmaceutical industry is

closely watching the nomination, as policy watchers say the president's choice will have a

significant impact on lowering drug prices.

Former PTAB chief judge James Smith—a defendant in Hoyle's lawsuit—was previously

rumored by agency watchers to be a possible PTO director under President Joe Biden.

PTAB judges Kalyan Deshpande, Lynne Pettigrew, and Sally Medley were also named as

defendants in the lawsuit.

Silicon Valley Watcher – at the intersection of technology and media: A Top Story..

…the Attack Victims had strengthened and that it was less than a $20m settlement paid by

Lucasfilm, Intuit, and Pixar who were also part of the collusion. The National Venture Capital

Association (NVCA) and…

siliconvalleywatcher.com/mt/archives/top_stories/

National Venture Capital Association (NVCA) collusion

AFI researchers have already proven NVCA connections with James W. Breyer, Accel

Partners, LLP, *** FACEBOOK ***'s first chairman and largest shareholder, among six of the ten

top mutual fund investors in the *** FACEBOOK *** IPO, namely (1) Goldman Sachs, (3)

Fidelity, (4) T.Rowe Price, (5) Morgan Stanley, (6) Blackrock and (9) Vanguard. Sands Capital's

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 47 of 102

Pg   47 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

association with Todd Y. Park ties Sands Capital to the  NVCA as well through Castlight and

Athenahealth director, Ann H. Lamont. This now proves that at least seven out of the ten top

institutional investors in *** FACEBOOK *** were colluding with James W. Breyer to steal

Leader Technologies' social networking invention. The Baidu association shows that the collusion

also incorporates Breyer's designs for China. Sands Capital Management, LLC BAIDU, INC.

holdings, SEC EDGAR. Yellow highlighted rows show reporting periods in which no notices of

acquisition were filed by compliance officer, Robert C. Hancock. These notices are important

filings for fraud watchdogs.


**Sands Capital Management**, LLC BAIDU, INC. holdings, SEC EDGAR. The yellow

highlighted box shows that no acquisition notices and no-fraud certifications were filed. In short,

Sands Capital acquired over $2 billion in Baidu stock without regulatory oversight. These holdings

commenced concurrent to the appointment of Todd Y. Park to U.S. CTO on Mar. 9, 2012, after

Park had led the development of HealthCare.gov at Health and Human Services, including the

embedding of his Athenahealth and Castlight Health software in the HHS infrastructure.


**Jim Breyer** –  James W. "Jim" Breyer (born 1961) is an American venture capitalist,

founder and CEO of Breyer Capital, an investment and venture philanthropy firm, and a partner at

Accel Partners, a venture capital firm. He helped create spy firm and dirty tricks group: IN-Q-Tel  -

en.wikipedia.org/wiki/Jim_Breyer


RELATED:


Americans For Innovation: WHITE HOUSE SCANDAL SPREADS TO

WHITE HOUSE SCANDAL SPREADS TO LEADER V. *** FACEBOOK *** … Collusion

(Allegations) Trade Secrets Theft; Market Manipulation … James W. Breyer, Accel Partners LLP;

*** FACEBOOK *** director; client of Fenwick & West LLP since the 1990's; …


James Breyer profiles | LinkedIn

View the profiles of professionals named James Breyer on LinkedIn. There are 13 professionals

named James Breyer, who use LinkedIn to exchange information, ideas, and opportunities.

linkedin.com/pub/dir/James/Breyer


The First: Jim Breyer is speaking at Collision 2015 | COLLISION

The First: Jim Breyer is speaking at Collision 2015 Posted by: Hugh Gallagher – Posted at: 4:45 pm

on December 4, 2014 Category: News

collisionconf.com/news/jim-breyer-collision


The next Sands Capital holding to appear out of nowhere is Baidu, Inc. Closely aligned with

China's Communist government, Baidu is sometimes called "the Chinese *** FACEBOOK ***."

*** FACEBOOK *** is rumored to have partnered with Baidu. Baidu notoriously violates human

and intellectual property rights. This alliance was concurrent with James W. Breyer's movement of

tens of billions of venture capital funds out of the United States and into the control of his reclusive

father, John P. Breyer, chairman, IDG-Accel-China.


Not only did Sands Capital fail to file a notice of acquisition, but their quarterly report on

Aug. 14, 2013 reveals a whopping 12,539% jump in holdings. That is an unregulated $867 million

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 49 of 102

Pg   49 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

change in value. To our knowledge, neither the market nor regulators even noticed. This destroys the basic principle of transparency.

These risks certainly deserve serious investigation before permitting these people to get access to America's healthcare and data infrastructure. As Eric Snowden proved, it doesn't take much to copy millions of files into the hands of one's adversaries.

Most notable about the sudden appearance of the Baidu Inc. holding is that it occurs just as Athenahealth's founder, Todd Y. Park, is moving from his position as the chief architect of HealthCare.gov at HHS to Chief Technology Officer for the United States by President Obama, on Mar. 9, 2012. And, it occurred at the same time as Sands Capital's 214 million unregulated share acquisition.

On Mar. 29, 2012, just 20 days after Pres. Obama's appointment of Park, Baidu filed a Form 20-F, which is a financial disclosure equivalent to an S-1 public stock prospectus. The timing is six weeks before the *** FACEBOOK *** IPO.

Baidu discloses that its three principal shareholders are:

**Baillie Gifford** and **T. Rowe Price** were #2 and #3 behind Goldman Sachs in the *** FACEBOOK *** IPO just six weeks later.

**Robin "Handsome Reward" Yangong Li** was installed as CEO of Baidu in Jan. 2004, the very same month that Mark Zuckerberg claims to have built *** FACEBOOK *** "in one to two weeks" Leader Technologies said it took them $10M and 145,000 man-hours to invent social networking. They finished debugging a critical module on Oct. 28, 2003, the same night Zuckerberg

49

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 50 of 102

Pg   50 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

hacked the House sites at Harvard. Evidently, Baidu's Robin Yanhong Li was self-conscious about

his newfound wealth, hence the Freudian name he gave for his stock holding—Handsome Reward.

Who was doing the rewarding? The evidence is overwhelming. It is James W. Breyer and the ***

FACEBOOK *** cartel who made Robin Li their front boy in China, just like they made Mark

Zuckerberg their front boy in the U.S.


The world cannot hope to advance when its core infrastructures are founded on these Big

Lies. Any engineer worth his salt knows that a good building cannot be built upon a corrupt

foundation. This is both a law of physics, and a Law of God.


Baidu and *** FACEBOOK *** CEOs started the same month—Jan. 2004. Robin Y. Li,

CEO, Baidu, Inc.; appointed Jan. 2004, the same month James W. Breyer, Accel Partners LLP,

picked Mark Zuckerberg to start *** FACEBOOK *** with stolen code from Columbus innovator

Leader Technologies. Photo: RudeButGood.

Robin Y. Li became CEO of Baidu in Jan. 2004. Coincidentally, that is the very same month Mark

Zuckerberg claims he started *** FACEBOOK *** ("in one to two weeks") and launched it on Feb.

4, 2004. The name of his British Virgin Islands hide away for his Baidu holdings probably says it

all—Handsome Reward.


The common denominator between the Chinese and American Facebooks is James W.

Breyer. At that time was chairman of the National Venture Capital Association, managing partner

of Accel Partners LLP, soon to be if not already largest *** FACEBOOK *** shareholder, and

fellow client of Fenwick & West LLP with Columbus innovator Leader Technologies, Inc.—the

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 51 of 102

Pg   51 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

proven inventor of social networking. Robin Li's handsome reward is his willingness to be Breyer's Chinese front face.

Sands Capital appears to have been worried about the appearance of impropriety? Had they disclosed Baidu in a timely way, eyebrows would have been raised about possible Chinese involvement in the Obama cabinet, as well as in American healthcare and data infrastructure. Something is clearly amiss, otherwise, why would the Baidu nondisclosure be such an outlier in Sands Capital Management, LLC's SEC reporting?

American securities watchdogs were busy chewing on bones Breyer threw their way

Administration and Judicial Watchdogs were busy chewing on their *** FACEBOOK *** cartel bones. The United States top law enforcement officers and regulators, namely Eric H. Holder, Mary L. Schapiro, Rebecca M. Blank and David J. Kappos were silent during Sands Capital's misconduct. They were busying chewing on the bones that the *** FACEBOOK *** cartel had already thrown them.The current Commerce Secretary, Penny S. Pritzker, continues the deafening silence. Graphic: Clker.com.

But lest we wonder where our U.S. securities regulators were during this shell game, the *** FACEBOOK *** cartel had that covered too. They had already ensured for S.E.C. Chair Mary L. Schapiro, Commerce Secretary #1 Rebecca M. Blank, Commerce Secretary #2 Penny S. Pritzker, Patent Office Director David J. Kappos, Attorney General Eric H. Holder and Chief Justice John G. Roberts, Jr. were well cared for.

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 52 of 102

Pg   52 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

Among the five Obama administration senior officials alone, they hold at least 177 *** FACEBOOK *** "dark pools" funds. In fact, no one in the Obama administration or judiciary had more *** FACEBOOK *** cartel dark pool funds than Chairman Schapiro and Secretary Blank. See two previous posts. These dogs won't hunt. The're too well fed.


The next Sands Capital holding to appear out of thin air is *** FACEBOOK ***, Inc. Again, they did not file a Form SC 13G acquisition notice in their May 14, 2012 reporting, which is just four days before the May 18, 2012 *** FACEBOOK *** IPO. We're taking bets that  Sands Capital will blame it on the NASDAQ "glitch." The purpose of the glitch appears to us to be a smoke screen for these sorts of shady activities.

Then, without filing the stock acquisition notice Form SC 13G subsequently, like they did on all their other stock purchases (except Athenahealth and Baidu), on Aug. 13, 2012 they simply include their *** FACEBOOK *** holding of 11.6 million shares valued at $362 million on their quarterly report.

Why such blatant disregard for SEC disclosure rules? Rules that Sands Capital appears to follow otherwise? Because *** FACEBOOK *** is a covert government profiteering and election manipulation scam!

AFI researchers have lived with this cartel conduct for years now, and they believe Sands Capital was determined to get in on the HealthCare.gov "Datapalooza" that Todd Y. Park would bring them via Athenahealth. Datapalooza is the actual name Mr. Park gave to his dubious "open government" giveaways of healthcare data while CTO at HHS.


AFI researchers believe it is likely that Sands Capital kept the Baidu transactions below the radar screen in order to avoid awkward questions about Park's role in Baidu, Athenahealth and ***

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 53 of 102

Pg   53 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

FACEBOOK *** financings and business activity, especially surrounding Obamacare and HealthCare.gov.

Notices of stock acquisitions are part of America's securities fraud watchdog infrastructure.

Readers should know that independent stock monitoring analysts like Morningstar use automated tools that send alerts/notices when companies file notice of new acquisitions. No such alerts occurred for Athenahealth, *** FACEBOOK *** or Baidu because the notices were never filed.

When a fund compliance officer signs an S.E.C. filing, he or she is signing an affidavit that is enforceable as evidence in court. If that person lies or in some other way willfully misrepresents the facts, it is the same as lying under oath in a courtroom.The problem for Sands Capital's Robert C. Hancock is that intentional withholding of certifications, with the intent to deceive the public, is illegal since the omission misleads the public who must then rely on inaccurate information.

Sands Capital's compliance officer Robert C. Hancock avoided liability by not signing

Sands Capital's chief compliance officer, Robert C. Hancock, may have been trying to avoid personal liability by not signing what would otherwise be fraudulent representations of truthfulness. Corporate officers like Hancock can be personally liable if they sign knowingly false certifications under oath. It's the same thing as knowingly making a false statement in court.

Here's the SC 13G acquisition certification Hancock avoided signing for initial Athenahealth, Baidu and *** FACEBOOK *** stock disclosures:

53

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 54 of 102

Pg   54 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

"Item 10. Certification: By signing below I certify that, to the best of my knowledge and belief, the securities referred to above were acquired and are held in the ordinary course of business and were not acquired and are not held for the purpose of or with the effect of changing or influencing the control of the issuer of the securities and were not acquired and are not held in connection with or as a participant in any transaction having that purpose or effect.

SIGNATURE: After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct."

Here's an example of a later Athenahealth SC 13g acquisition certification that Hancock did sign on Feb.. 13, 2013, so he knows what to do, he just didn't do it when Athenahealth stock was first acquired. Hancock was probably choking on the clause in red above: "… were not acquired and are not held for the purpose of or with the effect of changing or influencing the control of the issuer of the securities and were not acquired and are not held in connection with or as a participant in any transaction having that purpose or effect."

Hancock may have refused to sign the Athenahealth, Baidu and *** FACEBOOK *** certifications because he knew that:

1. Athenahealth was an inside job among selected funds, companies and individuals to control certain markets and global events;

2. Baidu, like *** FACEBOOK ***, was a fabrication of James W. Breyer, Accel Partners LLP, and *** FACEBOOK ***'s largest shareholder; therefore, everything about these stock

54

maneuvers was designed to manipulate the cartel's global agenda, which included the creation of a

Chinese repository, potentially for exported U.S. healthcare and other data; and

3. *** FACEBOOK *** & Baidu were both running on software property stolen from Columbus

innovator, Leader Technologies; therefore, these offerings were used to generate funds for the

express purpose of misappropriation of patents, copyrights and trade secrets that would cause and

effect the manipulation of the U.S. healthcare sector, among others.


Presumably, Hancock would want to stay out of jail by refusing to put his signature on a

form where he clearly knew there was an intent to influence business and political events. Tellingly,

he signed all of his other certifications during this period.


What U.S. judge or regulator is complaining? Who would complain about Sands Capital's

failure to file the S.E.C. Form SC 13G notices of acquisition of *** FACEBOOK ***, Baidu and

Athenahealth stock?


**Not S.E.C Chairman Mary L. Schapiro**—she held a boatload of "dark pool" Fidelity, Vanguard,

AllianceBern, TIAA-CREF and T. Rowe Price funds.

- 

**Not Commerce Secretary #1 Rebecca M. Blank**—she held TIAA-CREF, Vanguard and Fidelity

funds.

- 

**Not Commerce Secretary #2 Penny S. Pritzker**—she holds up to $23.4 million Morgan Stanley,

JPMorgan and Goldman Sachs *** FACEBOOK *** dark pools.

-

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 56 of 102

Pg   56 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

**Not Attorney General Eric H. Holder**—he held T. Rowe Price and Fidelity funds. In fact, Holder held Fidelity Contrafund, the largest single *** FACEBOOK *** mutual fund stock holder, valued at $413 million.

Photos: Holder–Huffington Post; Pritzker–White House;Blank–U.S. London Embassy; Schapiro–NY Times.


Who in the judiciary would complain?


**Not Leader v. *** FACEBOOK ***  Chief Justice John G. Roberts, Jr.**—he held  Microsoft, T. Rowe Price, Fidelity, Janus, Vanguard and Blackrock funds, including Fidelity Contrafund.

- 

**Not Leader v. *** FACEBOOK ***  Federal Circuit Judges Alan D. Lourie, Kimberly A. Moore and Evan J. Wallach**—they held Fidelity, Vanguard and T. Rowe Price funds, including Fidelity Contrafund.

- 

**Not Leader v. *** FACEBOOK ***  District Court Judge Leonard P. Stark**—he held Vanguard and Fidelity funds.

- 

**Not Leader v. *** FACEBOOK ***  Patent Office Director David J. Kappos**—he held over a million dollars of Vanguard funds.


On Nov. 19, 2008, Leader Technologies filed a patent infringement lawsuit against *** FACEBOOK ***. Leader proved that *** FACEBOOK *** stole the engine that runs ***

FACEBOOK ***, yet were ruled against anyway by the biased judges mentioned above, based on fabricated evidence.

In May 2012, *** FACEBOOK *** IPO investors began filing class action lawsuits, claiming they had been defrauded and damaged by the NASDAQ "glitch."

Complaints have been filed to inspectors general seeking justice.

Others have filed complaints too, like Paul Ceglia and Rembrandt Social Media.

America's regulatory mechanisms are supposed to help prevent waste, fraud and abuse, not aid and abet it. The latter is called state-sponsored terrorism and totalitarianism.

In the case of the HealthCare.gov debacle, and the theft of Leader Technologies' social networking invention, the failure of the S.E.C. to police Sands Capital Management LLC enabled them to press their hidden agenda using fraudulent funds.

That agenda has led to a disastrous HealthCare.gov architecture, corrupted by Athenahealth conflicts of interest, using Leader Technologies' software which has become a mess of hacked pieces and parts. The agenda also threatens America's healthcare data security since Sands Capital took its *** FACEBOOK *** IPO winnings and bought $2.2 billion in the Baidu Inc. sometime between Feb-Aug 2013.

**Robert C. Hancock**, Chief Compliance Officer, Sands Capital Management, LLC. Misled the American public by failing to file stock acquisition reports in a timely manner for *** FACEBOOK ***, Baidu and Athenahealth. These failings concealed substantial Chinese influences regarding Obamacare and American data infrastructure. Photo: Sands Capital.


**Jonathan Goodman**, Chief Counsel, Sands Capital Management, LLC; former partner, Gibson Dunn LLP (*** FACEBOOK ***'s Leader v. *** FACEBOOK *** law firm, and also counsel to the Federal Circuit and Federal Circuit Bar Association).


A solid democratic house cannot be built upon a foundation of regulatory corruption.


Questions for Sands Capital's compliance officer Robert C. Hancock would be why he did not submit the notices of new stock acquisition forms with his signed certifications for Athenahealth, Baidu and *** FACEBOOK ***. If he had done this, perhaps over six million Americans would not be struggling to replace their cancelled healthcare plans because the program would never have begun.


**Thomas G. Hungar,** Gibson Dunn LLP. Failed to disclose conflicts of interest in Leader v. *** FACEBOOK ***; counsel to the Federal Circuit and Microsoft (one of *** FACEBOOK ***'s largest stockholders; Chief Justice John G. Roberts, Jr. is a personal mentor.Gibson Dunn LLP also represents the U.S. in U.S. v. Paul Ceglia (Ceglia v. Zuckerberg) where U.S. attorney Preet Bharara was formerly employed by Gibson Dunn—an obvious conflict.

Hancock's ethics counsel is none other than another former Gibson Dunn LLP attorney,

**Jonathan Goodman**. Goodman was at Gibson Dunn LLP with Thomas G. Hungar during the

Leader v. *** FACEBOOK *** case. Goodman's other former firm, Cravath, Swaine & Moore

LLP, just received David J. Kappos, former director of the U.S. Patent Office, as a new partner.

Kappos only arrived after he had ordered an unprecedented 3rd reexamination of Leader

Technologies' patent. Kappos had purchased more than a million dollars of Vanguard "dark pool"

funds, all on Oct. 27, 2009, within weeks of his appointment by President Obama.


Robert C. Hancock's ethical lapses have damaged millions of Americans. Apparently,

Hancock was advised by Goodman/Gibson Dunn LLP that it was ethically acceptable not to file the

Athenahealth, Baidu and *** FACEBOOK *** stock acquisition notices. Mr. Goodman's former

firm, Gibson Dunn LLP, swirls at the center of everything that has gone horribly wrong with this

Obama administration, including the Leader v. *** FACEBOOK *** judicial corruption scandal.


Had Hancock filed in a timely manner, questions about Todd Y. Park's Athenahealth

duplicity could have been raised. Athenahealth's close associations with Chinese interests could

have been scrutinized. Sands Capital's role in the *** FACEBOOK *** pump and dump IPO

scheme would have become visible. Hancock's failure to file and certify did not allow regulatory

mechanisms to work.


**Questions for The President:**

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 60 of 102

Pg   60 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

Given the suspicious timing of your appointment of Todd Y. Park to oversee America's healthcare and digital infrastructure:

1. How much do you know about SANDS CAPITAL'S collusion with the Chinese?

2. What are you going to do about it?

3. What assurances can you give us that the tech people you have hand picked are worthy of America's trust?

4. Will the new systems really protect Americans' privacy, property and security?

5. Did you know that your Securities Chair held stock in *** FACEBOOK *** and Baidu before the *** FACEBOOK *** IPO?

6. Why didn't your personal White House counsels from Perkins Coie LLP, namely Robert F. Bauer and Anita B. Dunn, husband and wife respectively, submit ethics pledges and financial disclosures? Did you know that *** FACEBOOK *** was one of their clients?

7. Where are Todd Y. Park's financial disclosures and written ethics pledges?

8. Did you know that a Florida judge was ordered to recuse himself from a case where he was *** FACEBOOK *** Friends with one of the litigating attorneys? What do your 50 million "likes" say about your appointment of two of the four judges in the Leader v. *** FACEBOOK *** case, not even counting all their financial holdings in *** FACEBOOK ***, or the Patent Office's "likes"?


        Summary of ethical standards to which the persons above swore solemn public oaths to uphold Judges— Code of Conduct for U.S. Judges, Canon 2:


"A judge should avoid impropriatary and the appearance of impropriety in all activities."

Judges—U.S. Courts.gov, Guide to Judiciary Policy, Ethics and Judicial Conduct, p. 20-2:

"Canon 3C(3)(c) provides that a financial interest 'means ownership of a legal or equitable interest, however small,' with certain exceptions not applicable to this situation. Ownership of even one share of stock by the judge's spouse would require disqualification." Many types of mutual fund holdings are not exempt from this policy (p. 106-1 thru 4).

"a judge who chooses to invest in such mutual funds should evaluate whether his or her 'interest' in the fund might be affected substantially by the outcome of a particular case, which would require recusal under Canon 3C(1)(c)" (p. 106-3. [If the largest tech IPO in American history—*** FACEBOOK ***—does not apply, then this policy is meaningless sophistry.]

Executive Branch Employees—Standards of ethical conduct for employees of the executive branch 5 C.F.R. §2635.501:

"avoid an appearance of loss of impartiality in the performance of his official duties"

Attorneys—Model Rules of Professional Conduct, Preamble [6]:

"a lawyer should further the public's understanding of and confidence in the rule of law and the justice system because legal institutions in a constitutional democracy depend on popular participation and support to maintain their authority."


Directors—Business Judgment Rule, Parnes v. Bally Entertainment Corp., at 1246:

"The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company [and was not based on self-dealing].'"


- Check out this FLORIDA RULING. It says a judge must disqualify himself for *** FACEBOOK ***-friending one of the attorneys in a case before him. This is kid's play compared to the abuse Leader Technologies has received…

>>>Patent Office's *** FACEBOOK *** site to 10,000+ employees,put up before the trial and reexamination.<<<

>>>Barack Obama's tens of millions of likes, probably all of the *** FACEBOOK *** attorneys.<<<

>>>Barack Obama's appointment of two of the four judges in LEADER V. *** FACEBOOK ***.<<<

>>>HealthCare.gov claiming Leader's invention is open source.<<<

http://m.washingtonpost.com/news/volokh-conspiracy/wp/2014/01/30/the-law-of-friending/


- The 2008 finance crisis was not an accident it was caused by an out of control industry and at the wheel was chief economic advisor Larry Summers, Summers who played a MAJOR role in the Deregulation of Derivatives, And became PRESIDENT of HARVARD in 2001 And New that *** FACEBOOK *** was stolen, and new of the THEFT OF Leader Technologies' when the Winklevoss made a complaint to lawrence larry summers PRESIDENT of HARVARD they where tolled to piss of summers wonted THE *** FACEBOOK *** CLUB for him self but summers needed that suck up little shit mark zuckerberg to do it, But the IDEA *** FACEBOOK *** was not the Winklevoss nor was it Mark Zuckerberg IDEA, WAYNE CHANG KNOWS HOW *** FACEBOOK *** WAS STOLEN

Wayne Chang filed a lawsuit against the Winklevoss brothers knowing that *** FACEBOOK *** was stolen, Chang said that the Winklevoss brothers merged their company, called ConnectU, with Chang's web development company to make a new company: The Winklevoss Chang Group (WCG). Chang complained that the Winklevosses "expressly agreed that the litigation between ConnectU and *** FACEBOOK *** was an asset of ConnectU and an asset of WCG," according to BusinessInsider. Chang never got any money when the Winklevosses received $65 million as part

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 63 of 102

Pg   63 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

of the settlement but the $65 million was just a fuck of from mark zuckerberg Larry Summers and

James W. Breyer. Even the "like" button was stolen from the family of the late Dutch inventor,

Johannes Van Der Meer

- Chief economic advisor Larry Summers Henry Paulson of Goldman Sachs and Geithner to pay

Goldman Sachs 100 cents on the dollar Paulson and Bernanke ask congress for $700 billion to bail

out the banks. BUT NO BAILOUT FOR LEHMAN BROTHERS GONE AND THE ORDERS

CAME FROM GOLDMAN SACHS TO LARRY SUMMERS NOT TO BAIL THEM OUT?? just

so Goldman Sachs can be number ONE? IN 1999, at the urging of Summers and Rubin congress

passed the Gramm-Leach-Bliley Act and cleared the way for future mergers, in 1998 someone tried

to regulate them it was Brooksley Born but Larry Summers kill this, Summers had 13 bankers in his

office and directing her to stop Greenspan Rubin and SEC chairman Arthur Levitt issued a joint

statement condemning Born. The securities and exchange commission agency conducted no major

investigation in to the bank during the bubble and 146 people were gutted from the securities

enforcement division?

When David contacted securities and exchange commission about LEHMAN BROTHERS

GOLDMAN SACHS AND LARRY SUMMERS AND *** FACEBOOK *** there were only four

people WORKING THERE and then down to just ONE?? and his job was to turn the lights out

OBAMA picked Mary Schapiro the former CEO of FINRA to run the securities and exchange

commission who held stock in both *** FACEBOOK *** and Baidu (China) before the ***

FACEBOOK *** IPO via her investment in T. Rowe Price the securities and exchange commission

agency also ignored numerous whistleblower warnings of improper "dark pools" activity, (PAY

OF)

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 64 of 102

Pg   64 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- Larry Summers + President Barack Obama picked Mary Schapiro the former CEO of FINRA to

run the securities and exchange commission who held stock in both *** FACEBOOK *** and

Baidu (China) before the *** FACEBOOK *** IPO via her investment in T. Rowe Price the

securities and exchange commission agency also ignored numerous whistleblower warnings of

improper "dark pools" activity, (PAY OF)

Larry Summers + President Barack Obama (appointed Leonard P. Stark to the judge's seat in

Delaware Federal District Court eight days after Stark's court allowed *** FACEBOOK *** to get

away with jury and court manipulation of an on-sale bar verdict which was attained without a single

piece of hard evidence; Barack and Michelle Obama were evidently protecting their 47 million

"likes" on *** FACEBOOK ***)

Larry Summers + President Barack Obama new found friends, *** FACEBOOK *** cartel had it

all covered, They had it all already S.E.C. Chair Mary L. Schapiro, Commerce Secretary #1

Rebecca M. Blank, Commerce Secretary #2 Penny S. Pritzker, Patent Office Director David J.

Kappos, Attorney General Eric H. Holder and Chief Justice John G. Roberts, Jr. were well cared

for.

Larry Summers + President Barack Obama + Baidu(China) All had back door keys to the NSA then

add your healthcare (Obamacare), financial (Wall Street), telephone and online data (NSA) to your

Dark Profile, and you have the ultimate Big Brother file on every person on the planet and CHINA

HAD THE BACK DOOR KEYS TO THE NSA???? with *** FACEBOOK *** and their repeated

breaches of security and their now ubiquitous intrusions on people's privacy?

Larry Summers + *** FACEBOOK *** The 2008 finance crisis was not an accident it was caused

by an out of control industry and at the wheel was chief economic advisor Larry Summers,

Summers who played a MAJOR role in the Deregulation of Derivatives, And became PRESIDENT

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 65 of 102

Pg   65 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

of HARVARD in 2001 And New that *** FACEBOOK *** was stolen, and new of the THEFT OF
Leader Technologies' when the Winklevoss made a complaint to lawrence larry summers
PRESIDENT of HARVARD they where tolled to piss of summers wonted THE *** FACEBOOK
*** CLUB for him self but summers needed that suck up little shit mark zuckerberg to do it, The
2008 finance crisis was not an accident it was caused by LARRY SUMMERS?


- Larry Summers + election manipulation on FB Since that data was not equally available to the
opposition, use of this data about you amounts to election manipulation. The fact that so many
foreigners are associated with *** FACEBOOK *** amounts to foreign influence on U.S. elections,
which is illegal. This undue influence hurts every American. Ditto for the sovereign elections in
Germany, France or any other country, like fucking Germany ASS-HOLE The *** FACEBOOK
*** Club run by Larry Summers used the promise of wild *** FACEBOOK *** IPO returns as the
currency for their plans to install Barack Obama as President and press their global data gathering
agenda

Larry Summers + FB + Robin Y. Li Robin Y. Li became CEO of Baidu in Jan. 2004.
Coincidentally, that is the very same month Mark Zuckerberg claims he started *** FACEBOOK
*** ("in one to two weeks") and launched it on Feb. 4, 2004. The name of his British Virgin Islands
hide away for his Baidu holdings probably says it all—Handsome Reward. Sands Capital appears to
have been worried about the appearance of impropriety? Had they disclosed Baidu in a timely way,
eyebrows would have been raised about possible Chinese involvement in the Obama cabinet, as
well as in American healthcare and data infrastructure. Something is clearly amiss, Robin Y. Li
NEW THAT FB WAS STOLEN and that it was Larry Summers who was running ***
FACEBOOK *** ow shit?

Larry Summers + friends chief economic advisor Larry Summers Henry Paulson of Goldman Sachs and Geithner to pay Goldman Sachs 100 cents on the dollar Paulson and Bernanke ask congress for $700 billion to bail out the banks. BUT NO BAILOUT FOR LEHMAN BROTHERS GONE AND THE ORDERS CAME FROM GOLDMAN SACHS TO LARRY SUMMERS NOT TO BAIL THEM OUT?? just so Goldman Sachs can be number ONE? Paulson was a dick who did not know how to work out shit if someone stuck a spade up his ass

THIS IS IT VERY ONE GET ON TWITTER


- President Obama claimed last night that there was "not even a smidgen of corruption" in the IRS scandal. Really now Mr. President? How can any self-respecting person make such a claim about a sprawling government agency with 106,000 employees? Such a claim telegraphs the massive corruption that we have proved exists within this administration. An administration where Yes is No and wrong is right. Given that, a No from Obama means a Yes.

Here's an excerpt from the New York Times article:

Mr. O'Reilly responded that there were "unanswered questions" and asked again if there was corruption in the I.R.S.

"There were some boneheaded decisions," the president said.

"But no mass corruption?" Mr. O'Reilly asked.

"Not even mass corruption — not even a smidgen of corruption," Mr. Obama said.

——-

SOURCE: "Obama Is Tackled by O'Reilly in Pre-Game Interview" by Peter Baker, Feb. 22, 2014, The New York Times http://www.nytimes.com/2014/02/03/us/politics/obama-is-tackled-by-oreilly-before-game.html?_r=0

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 67 of 102

Pg   67 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

- A couple of additional items to inform your congressperson about along with the overwhelming conflicts of interest already presented here:


David Kappos encouraged his employee's, of whom include the judges that work for the USPTO, to use *** FACEBOOK ***. He states on the USPTO website. "I'm confident our *** FACEBOOK *** presence will complement the USPTO Web site as a means of communicating and connecting with the public and our stakeholders in the intellectual property community.


On the other hand, Chief Justice Roberts at the Fourth Circuit Court of Appeals Annual Conference in 2011 said that he recommends to the law clerks not to use social media, *** FACEBOOK *** and Twitter, because a person could gain insight by stray comments and that would not be good. Justice Breyer, who has a Twitter and *** FACEBOOK *** account, stated at a House Appropriations Subcommittee, "Judges wear black robes so that they will resist the temptation to publicize themselves," Breyer said. "Because we speak for the law, and that is to be anonymous. So I wouldn't want to have followers on the tweeter or the *** FACEBOOK *** page but for my children, and I can get in touch with them anyway."

So the question is, If Chief Justice Roberts discourages law clerks from using *** FACEBOOK *** and Justice Breyer is against using it publicly, then why in the world would Kappos open a *** FACEBOOK *** account for the USPTO, and encourage the patent office employees, which includes 50-100 patent judges, to use it and then open a Directors reexam at the same time against Leader?

His conduct appears suspect and corrupt!


- Check out this Russian (OK, Ukrainian) risk to HealthCare.org.

Belarus link to HealthCare.gov raises concerns over possible cyber attack,

http://fxn.ws/1gJ1auQ

The Ukrainian software official, Valery Tsepkalo told a local radio station in Minsk that U.S.

Health & Human Services is "one of our clients" and that "we are helping Obama complete his

insurance reform."

HHS was run by Todd Park, the guy with the Chinese connections also. What's wrong with

American programmers for American healthcare. This breach of U.S. sovereignty by this President

is just criminal.

In another related case, the Plaintiff is the District of Columbia (the "District"), by the Office of the

Attorney General, who brings an action against Defendant Mark Zuckerberg for violations of the

District's Consumer Protection Procedures Act, D.C. Code §§ 28-3901, *et seq.* ("CPPA"). In

support of its claims, the District states as follows:1


1 In addition to the following allegations, this District is also in possession of significant evidence

that further demonstrates both the propriety of the Court's exercise of personal jurisdiction over Mr.

Zuckerberg as well as his violations of the CPPA. That evidence was obtained through discovery in

the District's litigation against Facebook (now Meta Platforms, Inc.). *District of Columbia v.*

*Facebook, Inc.* , 2018 CA 008715 B. In an excess of caution regarding the protective order issued in

that action, the District has served discovery requests with this complaint for re-production of that

material in this case, among other requests. *See*  D.C.

Super. Ct. R. 26 cmt. (a)(1) ("The Superior Court rules allow parties to begin discovery at the filing

of the complaint; this process gives parties greater options for early discovery than those available

under the Federal Rules."). Citations to that additional evidence do not presently appear in this

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 69 of 102

Pg   69 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

complaint, and the District will amend (either by right or with leave of Court) once it has obtained

that information from Defendant or Facebook directly.

**Introduction**

1. In under two decades, Facebook, Inc. (now known as Meta Platforms, Inc.) ("Facebook") has

grown from a small online social network to an implacable corporate giant.

Facebook offers a variety of products and services, including the well-known Facebook product.

Today, Facebook is larger than any single country—with more than 2.9 billion monthly active

users, nearly half the global population. To put that in perspective, Facebook has more users than

the populations of the United States, China and Brazil combined. And Facebook has become

wealthier than over 150 countries worldwide, including Switzerland, Sweden, and the UAE. Not

surprisingly, Facebook has seized enormous influence over global affairs. Facebook controls how

people communicate with friends and family, conduct business online, what news they read, and

even how they communicate with governments and elected officials. Atop it all is Mark

Zuckerberg, the unelected leader of a massive digital empire with billions of inhabitants.

2. But Zuckerberg's Facebook is far from a disinterested platform for people to communicate, stay

in touch with friends, and reconnect with old acquaintances. Instead, Facebook has become a wildly

successful and unique business, deriving enormous wealth from acquiring and monetizing the data

of those billions of people leading their lives in Facebook's digital ecosystem. But even that is not

enough. Facebook is in a relentless pursuit to expand its reach on humanity and bring an ever-

increasing number of people under its influence.

3. To that end, Mark Zuckerberg has been building his version of the Internet where the "default is

social." To him, that means building an Internet where people live their digital lives on Facebook.

The goal is to convince people to reveal the most granular details of who they are to Facebook—

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 70 of 102

Pg   70 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

their religions, their work histories, their likes—so that it can be monetized, and Zuckerberg and his company can continue to grow even wealthier.

4. Facebook—at Zuckerberg's direction—shifted its business model in this way because it recognized that it could be even more profitable if it could harness and sell the ability to dependably influence its users' behavior to third parties. Facebook therefore encouraged (and, at times, teamed up with) developers and researchers to collect and analyze Facebook user data so that it could better learn how to manipulate its own users' moods and influence what they purchase and even whether and how they vote.

5. Facebook has become among the world's leading innovators in experimenting on how to keep users engaged—meaning more data and more money for Facebook. But at Facebook's scale, these experimental decisions reverberate globally.

6. That is in part because Facebook has realized an ugly truth: its social platform becomes "stickier" (meaning people will stay on it longer and share more data) when it is filled with toxicity. What this means is that the more Zuckerberg's Facebook stokes divisiveness and polarization, destabilizes democracies, amplifies genocides, and impacts users' mental health, the more money Facebook and its leaders make.

7. Given the trillions of dollars at issue, and having no regard for the people it purports to serve, Facebook—at Zuckerberg's direction—has decided to hide these problems for as long as possible, including intentionally misleading Facebook users as well as the public, the press, and political leaders.

8. One prime example—and the one that forms the basis for the instant suit—was Facebook's 2010 decision to open up the Facebook Platform to third parties. Again the brainchild of Zuckerberg, this move helped Facebook by persuading outside developers to build eye-catching applications for Facebook—directing even more users, and user data, into the

platform. Developers, though, could access the massive trove of user data that Facebook had

collected through the "side door" of applications.

9. Zuckerberg had always been aware that the success of Facebook hinged on convincing users that

their data was private enough, while selling as much access to those users as possible without

driving them away. And Zuckerberg was fully aware that users would be concerned by this newly

vulnerable position. So Zuckerberg engaged in a decade-long campaign designed to convince users

that Facebook cared about and tried to protect users and their data.

Behind closed doors however, Zuckerberg insisted that Facebook's policies be "as simple as we can

get away with."2 Given that Facebook's platform was designed to allow abuse, Zuckerberg's

company largely operated without proper safeguards in place to protect users: policy enforcement

was lax, review of app violations was inconsistent or subjective, and the policies themselves were

unclear and confusing. But in 2018, the world learned of this sham.

10. In March 2018, whistleblower Christopher Wylie publicly revealed that a company called

Cambridge Analytica—a London-based electioneering firm—exfiltrated the personal data of more

than 70 million Facebook users in the United States, including more than 340,000 District residents,

in order to influence the results of the 2016 United States presidential election. This data trove

included Facebook users' ages, interests, pages they've liked, groups they belong to, physical

locations, political affiliation, religious affiliation, relationships, and photos, as well as their full

names, phone numbers, and email addresses.

11. In other words, Cambridge Analytica used the Facebook Platform—in a way that Facebook and

Zuckerberg encouraged—to influence and manipulate the outcome of a United 2

Email from Mark Zuckerberg to Sam Lessin (Nov. 19, 2012, 10:39 a.m.), available at

https://dataviz.nbcnews.com/projects/20191104-facebook-leaked-documents/assets/facebook-

sealed-exhibits.pdf.

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 72 of 102

Pg   72 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

States presidential election. The personal data of the more than 70 million U.S. Facebook users that Cambridge Analytica used to manipulate the election accounted for more than half the total votes during the 2016 presidential elections, in an election that was effectively decided by just a few hundred thousand people.

12. Though the data Cambridge Analytica (and many other companies) used was supposedly private and protected from disclosure by Facebook's privacy and data policies, Cambridge Analytica knew that it could access this trove of data using Facebook's existing developer tools, an open secret that was well known to Facebook's business partners using the platform. Cambridge Analytica also knew that it could leverage Facebook's lax policy enforcement to continue manipulating the Facebook data it had amassed without fear Facebook would do anything about its operations. All the while, Facebook and Zuckerberg were trying to convince users in their user-facing statements that their data was safe.

13. The Cambridge Analytica revelations shocked the world, but it was no surprise to Facebook or Zuckerberg. Facebook had both a longstanding relationship with Cambridge Analytica and also actively encouraged companies like Cambridge Analytica to use the Facebook Platform to influence and manipulate consumer behavior.

14. What is most troubling is that Facebook looked into Cambridge Analytica and determined that it posed a risk to consumer data but chose to bury those concerns rather than stop them, as that could have hurt Facebook's (and Zuckerberg's) bottom line. Instead of coming clean, Facebook continued to help Cambridge Analytica win a United States presidential election.

15.  While Facebook and Zuckerberg have, a full three years later, publicly condemned Cambridge Analytica's data collection, its condemnation, in reality, only demonstrates that what Zuckerberg

and Facebook say publicly is part of an intentional plan to mask the devastating consequences of

their actions (or inactions).

16. Zuckerberg has said time and again that he and Facebook have a responsibility to protect users,

and if they can't, then they "don't deserve to serve [them]."3

17. Accordingly, the District brings this case to ensure that Mark Zuckerberg is held accountable for

his role in Facebook violating the District's consumer protection laws by misrepresenting the

protection of user data and their blatant disregard and misuse of sensitive, personal data belonging

to District residents.

**Jurisdiction**

18. This Court has jurisdiction over the subject matter of this case pursuant to D.C.

Code §§ 11-921 and 28-3909.

19. This Court has personal jurisdiction over Defendant pursuant to D.C. Code § 13-423(a).

**Parties**

20. Plaintiff District of Columbia is a municipal corporation empowered to sue and be sued and is

the local government for the territory constituting the permanent seat of the federal government.

The District brings this case through the Attorney General for the District of Columbia, who is the

chief legal officer for the District. The Attorney General is responsible for upholding the public

interest and is also specifically authorized to enforce the District's consumer protection laws,

including the CPPA.  Mark Zuckerberg, FACEBOOK (Mar. 21, 2018),

https://www.facebook.com/zuck/posts/i-want-to-share-an-update-on-the-cambridge-analytica-

situation-including-the-ste/10104712037900071/ (last visited May 20, 2022).

21. Defendant Mark Zuckerberg is an individual residing in Palo Alto, California.

Zuckerberg was, at all times material to this Complaint, Facebook's co-founder, Chief Executive

Officer, and a member of Facebook's Board of Directors. Zuckerberg maintains his principal place

of business at Facebook's headquarters at 1 Hacker Way, Menlo Park, California, 94025. Since

2012, Zuckerberg has served as Chairman of Facebook's Board and controls approximately 60% of

the voting shares. At all times material to this Complaint, acting alone or in concert with others,

Zuckerberg was responsible for Facebook's day-to-day operations, including the product strategy of

Facebook, and formulated, directed, controlled, had the authority to control, participated in, or with

knowledge, approved of the acts or practices of Facebook, including the acts and practices set forth

in this Complaint. Zuckerberg engages in the business of supplying social networking services

through the operation of his business, Facebook, which includes the product Facebook and

maintains a website, www.facebook.com, and accompanying mobile applications, to consumers in

D.C. Zuckerberg has traveled to Washington, D.C. on numerous occasions for matters related to the

District's allegations, including to testify on Facebook's activities to various agencies and Congress.

**Facebook's Collection of Consumer Data**

22. The Facebook website4 allows consumers to build a social network with other Facebook

consumers and share information within that network. It is among the world's most heavily

trafficked websites and has over two billion active consumers around the globe.

Hundreds of thousands of D.C. residents are among Facebook's consumers.

23. To begin using the Facebook website, a consumer first creates a Facebook account. The

consumer can then add other Facebook consumers as "friends" and by accumulating Facebook

friends, the consumer builds a social network on the Facebook website.

24. As Facebook consumers grow their social networks and interact with friends on the Facebook

website, their information and activity are digitally collected, recorded, and maintained by

Facebook. Relevant here, this data can be divided into two broad categories: (i) data directly

supplied by consumers, and (ii) data pertaining to consumers' activity on and off the Facebook

website.

25. First, consumers directly provide Facebook with personal information. To create a Facebook

account, a consumer is required to supply Facebook with basic information such as their name,

phone number, email address, birthday, and gender. A consumer then has the option to customize

their "Facebook Profile" by supplying additional information to Facebook, such as their hometown,

educational history, work experience, relationship status, political and religious views, and personal

photographs. Facebook's website is designed to encourage consumers to continue supplying

information in the form of "Posts," which are shared with that consumer's In this Complaint, the

"Facebook website" refers to both (i) www.facebook.com, which is accessed through an Internet

browser, and (ii) the Facebook mobile application, which is accessed through a mobile device like a

smartphone or tablet. Many of Facebook's features and services available on www.facebook.com

are also available through the Facebook mobile application.  Posts include, but are not limited to,

written statements, photographs and videos, links to websites, and "Check Ins" to geographic

locations such as restaurants and bars.

26. Second, Facebook tracks and maintains data pertaining to consumer activity on its website, on

other websites on the Internet, and even what they do offline. For example, Facebook records what

advertisements are displayed to each consumer, as well as whether the consumer clicked on the

advertisement. Facebook also tracks the date and time each consumer logs into their account, as

well as the IP address, device, and browser they used to log in. Facebook also operates a companion

mobile application called "Facebook Messenger," which allows Facebook consumers to send and

receive messages and make phone and video calls. For users of Facebook Messenger, Facebook

maintains records of messages sent and received and the date and time of phone and video calls

made.

27. Another example of consumer activity data that Facebook collects is a consumer's "Likes," one

of Facebook's signature innovations. It allows consumers to click on a

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 76 of 102

Pg   76 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

"thumbs-up" icon to Like a vast array of online content. Among other things, Facebook consumers can Like "Posts" made by other Facebook consumers, "Pages" maintained by non-individual entities, and content on external websites.

28. Facebook's Like feature incentivizes increased activity on the Facebook website by allowing consumers to reward one another for sharing information—the more Posts a consumer makes, the more Likes they will receive. The Like also serves a broader function because over time, a consumer's allocation of Likes reveals information about them—the friends they interact with most, the brands that catch their eye, and the issues with which they identify.

Facebook records and maintains each and every one of its consumers' Likes.

29. Facebook generates much of its revenue by selling advertising space. Facebook relies on its collection of consumer data—and the personal information and preferences derived from each individual's data—to sell targeted advertising space to marketers. Facebook's business model primarily relies on using consumer data to provide advertisers the ability to run targeted ads to particular individuals and demographics. In other words, although Facebook supplies its social networking services free of direct monetary charge to consumers, in exchange, consumers provide Facebook with their personal data, which Facebook monetizes through the sale of targeted advertising.

**The Facebook Platform and Third-Party Facebook Applications**

In 2007, Facebook launched the Facebook "Platform," an extensive software environment where third-party developers can build applications that interact with the Facebook website. The Facebook Platform includes various services and tools designed to assist third-party developers to create such applications.

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 77 of 102

Pg   77 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

31. Millions of third-party applications have been developed using the Facebook Platform and made available to Facebook consumers. Some applications are social, such as those that allow consumers to play games against other consumers within their social networks. Others are functional, allowing consumers to integrate information from their calendar and email accounts with their Facebook account.

32. The Facebook Platform facilitates integration between the Facebook website and third-party applications. For example, a third-party developer can allow Facebook consumers to access their application with a service available on the Facebook Platform called "Facebook Login." Facebook Login allows a Facebook consumer to access an application directly by using their Facebook account and login credentials (username and password). The Facebook Platform also harmonizes third-party applications' look and feel with the Facebook website.

33. The Facebook Platform also includes an application program interface ("API").

An API specifies how software components interact. In practical terms, Facebook's website is built upon proprietary source code. The API refers to the code that Facebook makes available to third-party developers, which enables those developers to build applications for the Facebook website. Facebook's API allows for a third-party application to interact with the Facebook website and governs the extent to which it can access Facebook's vast collection of consumer data.

34. In sum, the Facebook Platform was designed to allow for the development of third-party applications that would seamlessly engage with Facebook consumers while at the same time allowing those applications access to Facebook's vast collection of consumer data.

**The Cambridge Analytica Data Harvest**

**The Harvest of 87 Million Facebook Consumers' Data**

35. In November 2013, Aleksandr Kogan, a researcher affiliated with Cambridge University, and his company, Global Science Research (GSR), launched a third-party application on the Facebook Platform that identified itself as a personality study for research purposes. The application was called "thisisyourdigitallife" (the "App") and ran on the Facebook Platform for over two years. The App appealed to Facebook consumers as a personality quiz and offered to generate a personality profile for consumers in exchange for downloading the App and granting access to some of the consumer's Facebook data.

36. The App was presented to Facebook as a research tool to study psychological traits. At the time of the App's launch, third-party applications could be launched on the Facebook Platform without affirmative review or approval by Facebook. Accordingly, Facebook did not review the App before it was allowed on the Facebook Platform, nor did it verify its claim that the information it collected was for academic purposes.

37. At the time of the App's launch, Facebook permitted applications to request permission to access a Facebook consumer's personal data. Prior to installation, a Facebook consumer installing the App (an "App User") was shown a screen that stated that the App would download some of the App User's own Facebook data, including their name, gender, birthdate, Likes, and a list of Facebook friends.

38. To complete the installation, an App User clicked a Facebook Login icon on the information screen. The App was then installed through the Facebook Login service, using the App User's Facebook login credentials.

39. Upon installation, the App harvested the personal information of the App User from Facebook's collection of user data, including at least the App User's name, gender, birthday, Likes, and list of Facebook friends.

40. In addition, the App also accessed data of the App User's Facebook friends   that the friend had

shared with the App User. This data included at least the Facebook friend's name, gender, birthdate,

current city, and Likes. The vast majority of these Facebook friends never installed the App, never

affirmatively consented to supplying the App with their data, and never knew the App had collected

their data.

41. In early 2014, Facebook introduced changes to the Facebook Platform that (i) limited the data

that applications could access, including data regarding the installing user's friends, and (ii)

instituted a review and approval process (called an "App Review") for applications that sought to

access data beyond what the updated Facebook Platform would allow.


In May 2014, Kogan applied to App Review to request access to consumer data beyond what the

updated Facebook Platform would allow. In only a matter of days, Facebook rejected Kogan's

application on the basis that he was seeking information beyond the App's stated research purposes.

Nevertheless, the App was not audited nor further investigated.

42. During the time that the App ran on the Facebook Platform, approximately 290,000 Facebook

consumers in the United States installed the App, including 852 consumers in D.C. Because the

App was improperly allowed to harvest the personal data of App Users as well as App Users'

Facebook friends, approximately 87 million Facebook consumers had their information collected by

the App, with more than 70 million in the United States—including over 340,000 District residents.

B. The Sale and Misuse of Consumer Data

43. In 2014, at a time when the App was fully operational on the Facebook Platform and harvesting

consumer data, Kogan entered into an agreement with Cambridge Analytica for the sale of data

collected by the App. Cambridge Analytica was a political consulting firm based in London,

England that provided consulting services to candidates running for political office in the United

States and abroad.

44. Kogan provided Cambridge Analytica with the personal data of the approximately 87 million

Facebook consumers whose data was harvested, which included almost half of all D.C. residents. In

exchange, Cambridge Analytica paid Kogan over $800,000.

45. Cambridge Analytica used the data it acquired from Kogan to, among other things, target digital

political advertising during the 2016 United States Presidential Election (the

"2016 Election"). Cambridge Analytica received millions of dollars from the Ted Cruz presidential

nomination campaign and later the Donald Trump presidential campaigns to provide digital

advertising services during the 2016 Election.

46. At relevant times, Facebook had employees embedded within multiple presidential candidate

campaigns who worked alongside employees from Cambridge Analytica.

Facebook knew, or should have known, that these presidential candidate campaigns and Cambridge

Analytica were using the Facebook consumer data harvested by Kogan throughout the 2016

Election.

**Facebook's Lack of Oversight and Enforcement of Its Own Policies**

By no later than December 11, 2015, Facebook knew that Kogan had sold Facebook consumer data

to Cambridge Analytica. At that time, Facebook also knew that the collection and sale of consumer

data violated its Platform Policy.

48. Facebook's Platform Policy, which governed its relationship with third-party application

developers throughout the App's operation on the Facebook Platform, expressly prohibited the

transfer and sale of consumer data accessed from Facebook. However, Facebook failed to exert

meaningful review or compliance mechanisms to enforce its Platform Policy. Indeed, the App itself

contained terms that directly contradicted the Platform Policy, expressly stating that collected data

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 81 of 102

Pg   81 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

could be used for commercial purposes. Nevertheless, Facebook did not take any action against the App and instead permitted it to harvest and sell Facebook consumers' data without oversight for several years.

49. The Platform Policy also permitted Facebook to audit any applications on the Facebook Platform and to take other enforcement measures if it suspected that an application was violating the Platform Policy. In addition, the Platform Policy expressly provided several methods by which Facebook could enforce non-compliance with the Platform Policy. These audit provisions were largely unenforced.

50. In late December 2015, Facebook terminated the App's access to the Facebook Platform. Nevertheless, Facebook did not ban, suspend, or limit the privileges of Kogan, Cambridge Analytica, or any of their affiliates, with respect to their access to the Facebook website or the Facebook Platform. Nor did Facebook conduct an audit of Kogan, Cambridge Analytica, or any of their affiliates, or take any other enforcement or remedial action to determine whether the Facebook consumer data that was harvested by the App had been accounted for, deleted, and protected from further use and sharing.

51. Instead, Facebook simply requested that Kogan and Cambridge Analytica delete all data that they received through the Facebook Platform and accepted their word that they had done so. Facebook did not take any additional steps to determine whether the harvested data was, in fact, accounted for and destroyed. And in fact, the data was not destroyed. It continued to be held and used by Cambridge Analytica through the 2016 Election and beyond. Facebook knew, or should have known, this fact from, among other sources, its employees embedded in presidential candidate campaigns during the 2016 Election who worked alongside Cambridge Analytica employees.

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 82 of 102

Pg   82 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

52. Facebook eventually required written certifications promising that the harvested data was accounted for and destroyed, but Facebook did not receive a certification from Kogan until June 2016 and did not receive a certification from Cambridge Analytica until April 2017.

53. Facebook further kept this data harvesting a secret from its users for years, waiting until April 2018 to finally disclose to its consumers that their personal information may have been harvested and sold to Cambridge Analytica.

54. Had Facebook and Zuckerberg disclosed in 2015 or 2016 the sale of Facebook consumer data to Cambridge Analytica, they would have provided consumers with timely material information about their use of the Facebook website. A disclosure that Facebook consumers' data had been sold to a political consulting firm and was being used to target political advertising for the 2016 Election could have influenced Facebook consumers, including those in D.C. to, among other things, share less information on the Facebook website or deactivate their Facebook accounts. Rather than make such meaningful disclosures, Facebook and Zuckerberg instead profited from Kogan's and Cambridge Analytica's misuse of this stolen consumer data by selling millions of dollars of advertising space to Cambridge Analytica and presidential candidate campaigns during the 2016 Election.

55. Facebook knew of other third-party applications that similarly violated its Platform Policy through selling or improperly using consumer data. Facebook also failed to take reasonable measures to enforce its Platform Policy in connection with other third-party applications and failed to disclose to users when their data was sold or otherwise used in a manner inconsistent with Facebook's policies.

**Facebook's Misleading Statements and Practices Regarding Third-Party Application Access to Consumer Data**

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 83 of 102

Pg   83 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

56. Facebook's failure to disclose third-party applications' access to consumer data on its platform was compounded by the fact that the limited disclosures Facebook did make were ambiguous, misleading, and deceptive. These disclosures primarily are contained in two lengthy documents, a Terms of Service and Data Policy, that consumers must agree to in order to create a Facebook account. These documents together set out the general terms of use for the Facebook website and contain some statements regarding how third-party applications could access a consumer's data. However, as shown by Facebook's actions (and inactions) in connection with third parties, including the App and Cambridge Analytica, the representations made in these documents were misleading and deceptive.

57. For the duration of the App's launch and operation on the Facebook Platform, Facebook's Terms of Service represented that Facebook required applications to respect a Facebook consumer's privacy. This representation, taken with Facebook's public statements that it would protect consumers' private information and its representations in the Platform Policy that it had the ability to audit applications and take enforcement measures against applications, gave consumers the impression that Facebook had implemented and maintained reasonable oversight and safeguards to protect consumers' privacy.

58. These representations were misleading and deceptive, as demonstrated by Facebook's lack of oversight and enforcement relating to third parties, such as the App. For example, Facebook failed to conduct meaningful oversight or enforcement of the App at several relevant times when it knew, or should have known, that the App was operating in violation of Facebook's policies: (i) when the App was first launched on the Facebook Platform; (ii) after Facebook became aware, through its receipt and rejection of Kogan's application through App Review, that the App was seeking consumer data to be used beyond the App's stated research purpose; and (iii) after it learned that data collected by the App had been sold to Cambridge Analytica.

59. In addition, Facebook's Data Policy also contained misrepresentations about third-party applications' access to Facebook consumer data. From at least November 15, 2013 to at least January 30, 2015, the Data Policy provided that if an application asks permission from someone else to access your information, the application will be allowed to use that information only in connection with the person that gave the permission, and no one else. This representation was deceptive and misleading as demonstrated by Kogan's use of the App to harvest consumer data, and then sell it to Cambridge Analytica. Facebook failed to implement and maintain reasonable oversight of applications operating on the Facebook Platform to safeguard consumers' private data, and it knew or should have known that it did not have measures in place to control how applications used and/or shared data.

60. Facebook also misled its consumers generally about third-party applications' access to their data. Facebook publicly represented that consumers controlled how their data is shared on the Facebook website. But as shown by the App, third-party applications that a Facebook consumer had never downloaded could still access their information through a Facebook friend who downloaded the App. The Facebook Platform thus afforded third parties an end-run to access consumer data, which third-party applications exploited. This was a material fact that Facebook failed to disclose, or failed to adequately disclose, to its consumers.

61. Adding to the potential customer confusion is the fact that consumers could not restrict third-party application access to their data through Facebook's Privacy Settings, even though that is where a consumer would expect to have the ability to control how their data is shared. Instead, Facebook allocated privacy settings related to applications to a separate location under a separate Application Settings tab.

62. Through Privacy Settings, a consumer controls how their Facebook information is shared with other Facebook consumers. For example, a consumer can control what kinds of other Facebook

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 85 of 102

Pg   85 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

users can view their account information. This can be manipulated to allow for sharing to all Facebook consumers (most expansive), only Facebook friends (the less expansive default), and a customized list of Facebook friends (the least expansive).

63. By contrast, through Application Settings, a consumer controls how their Facebook information is shared with third-party applications. There is a high potential for consumer confusion here. For example, from at least November 2013 through at least April 18 2014, even if a consumer restricted access to their information to only Facebook friends through their Privacy Settings, the information could still be accessible by any application that the consumer's friends downloaded.

64. In sum, Facebook's representations regarding consumer privacy in connection with applications were misleading and deceptive. Moreover, Facebook's lack of adequate disclosures and multi-tiered privacy options added to consumer confusion regarding how consumer information was shared with applications.

65. Facebook's representations to consumers that it will protect the privacy of consumers' personal information, when, in fact, it did not implement or maintain reasonable privacy safeguards and failed to take reasonable measures in response to the harvesting and use of data by Cambridge Analytica, are misrepresentations of material facts that tend to mislead consumers.

66. Facebook's representations to consumers that it requires applications and third-party developers to respect the privacy of consumers' personal information, when, in fact, it did not implement or maintain reasonable oversight of third-party applications (such as conduct appropriate audits of applications), are misrepresentations of material facts that tend to mislead consumers.

67. Facebook's representations to consumers that consumers' agreements with third-party applications will control how those applications use consumer data, when, in fact, applications were able to collect and use consumer data without regard to those agreements, are misrepresentations of material facts that tend to mislead consumers.

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 86 of 102

Pg   86 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

68. Facebook's failure to inform consumers, or to adequately inform consumers, that their personal information may be shared with third-party applications without their knowledge or affirmative consent, is a material fact, the omission of which tended to mislead consumers.

69. Facebook's failure to tell consumers for over two years that their personal information was improperly harvested and sold by Kogan to Cambridge Analytica in violation of Facebook's policies is a material fact, the omission of which tended to mislead consumers.

70. Facebook's failure to explain to consumers whether and how they could control how information is shared with third-party applications and how to change privacy settings with respect to applications, and its representations that consumers can control how their information is shared, constitute ambiguities as to material facts that have the tendency to mislead consumers.

**Mark Zuckerberg's Control Over the Facebook Platform *A*.**

Zuckerberg's role and responsibility at Facebook

71. Zuckerberg is Facebook's co-founder, CEO, and Chairman, and is inseparable from the company he founded. He continues to manage the company's day-to-day operations— at an exacting level of detail—including directing, participating in, and guiding the Facebook Platform.

72. He maintains an unparalleled level of control over the operations of Facebook as it has grown into the largest social media company in the world. In fact, throughout Facebook's inception and explosive growth, Zuckerberg has retained control of the company. Zuckerberg currently controls almost 60% of Facebook's voting shares and has the power to appoint a majority of the company's board members.

73. Zuckerberg is not just a figurehead at Facebook; he is personally involved in nearly every major decision the company makes, and his level of influence is no secret. Dave Arnold, a Facebook spokesman, recently touted Zuckerberg's "active" leadership in the *New York Times* stating, "Mark

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 87 of 102

Pg   87 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

has taken an active role in the leadership of Facebook from its founding through to today . . . We're
fortunate to have such engaged leaders, including Mark, Sheryl and the entire leadership team."

74. Zuckerberg not only manages the company, but he also serves as the driving force behind its
products. Early versions of the Facebook Platform—which promoted the "concept of openness and
transparency as the high level ideal"—arose from Zuckerberg's vision.6 According to Zuckerberg,
Facebook "actually shifted a bit more of a focus not just on directly making it so people can use
Facebook and share and be open on Facebook, but instead on making it so that the *systems
themselves have open properties*."7

75. Zuckerberg has even gone as far as claiming that privacy is no longer a "social norm" because
"[p]eople have really gotten comfortable not only sharing more information and different kinds, but
more openly and with more people[.]"8

76. Zuckerberg's vision of "open properties" directly led to developing the API tool called "Open
Graph" that Facebook launched in April 2010 as Graph API version 1.0.


Mike Isaac, Sheera Frenkel, and Cecilia Kang, *Now More Than Ever, Facebook Is a
'Mark Zuckerberg Production'*,   NEW YORK TIMES (May 16, 2020),
https://www.nytimes.com/2020/05/16/technology/zuckerberg-facebook-coronavirus.html.
Fred Vogelstein, The Wired Interview: Facebook's Mark Zuckerberg, WIRED (June 29, 2009),
https://www.wired.com/2009/06/mark-zuckerberg-speaks/.
*Id.*  (emphasis added).


*Marshall Kirkpatrick, Facebook's Zuckerberg Says The Age of Privacy Is Over, NEW*
YORK TIMES (Jan. 10, 2020),

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 88 of 102

Pg   88 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

https://archive.nytimes.com/www.nytimes.com/external/readwriteweb/2010/01/10/10readwriteweb-facebooks-zuckerberg-says-the-age-of-privac-82963.html.

Open Graph allowed consumers to personalize their user experience and "have instantly socialexperiences wherever they go."9 But to create these experiences, Facebook made information such as a person's likes, dislikes, and interests instantly viewable to the person's Facebook friends—and gave developers access to that personal data—including access to the data of a user's Facebook friends, with little to no oversight.

77. On April 21, 2010, Zuckerberg publicly unveiled Graph API version 1.0 at Facebook's annual F8 App Developer conference, saying: "We are building a web where the default is social."10 For Zuckerberg, "[t]he thing [he] really care[d] about is the mission, making the world open."

78. Shortly thereafter however, Facebook faced criticism over the growing concern from Facebook users and lawmakers that Graph API version 1.0 greatly expanded the scope of publicly available data to applications and developers by automatically allowing access to a user's current city, hometown, education, work, likes, interests, and friends list without user consent.

79. Zuckerberg responded by posting a public apology in the *Washington Post* acknowledging that "[s]ometimes we move too fast—and after listening to recent concerns, we're responding."

Erick Schonfeld, *Zuckerberg: "We are Building a Web Where the Default is Social"* , TECHCRUNCH (Apr. 21, 2010), https://techcrunch.com/2010/04/21/zuckerbergs-buildin-web-default-social/. Id.

Ryan Singel, *Mark Zuckerberg: I Donated to Open Source, Facebook Competitor*, WIRED (May 20, 2010), https://www.wired.com/2010/05/zuckerberg-interview/.

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 89 of 102

Pg   89 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

Jason Kincaid, *Senators Call Out Facebook On 'Instant Personalization', Other Privacy Issues*, TECHCRUNCH (Apr. 27, 2010), https://techcrunch.com/2010/04/27/senators-call-out-facebook-on-instant-personalization-other-privacy-issues/?_ga=2.192578537.216944569.1650296804-940477689.1650296804.

At that time, Zuckerberg promised users that both clearer and additional privacy controls were quickly coming: The biggest message we have heard recently is that people want easier control over their information. Simply put, many of you thought our controls were too complex. Our intention was to give you lots of granular controls; but that may not be what many of you wanted. We just missed the mark. We have heard the feedback. There needs to be a simpler way to control your information. In the coming weeks, we will add privacy controls that are much simpler to use. We will also give you an easy way to turn off all third-party services.

80. Within Facebook, Zuckerberg directly oversaw the product development and engineering work that was exposing consumer data to abuse: Zuckerberg is in charge of the Facebook Platform and is able to overrule any decisions made by the company. But Zuckerberg's involvement includes not only deciding just *how* open the Facebook Platform should be and what categories of user data should be shared with developers—he is also making day-to-day decisions about minute details of the Platform's operations, including specific policy changes and enforcement decisions.

81. And contrary to his public statements, Zuckerberg was intent on finding a way of leveraging Platform changes to amass more data—and accordingly more money—for Facebook.

82. In November 2012, Zuckerberg unveiled his plan for Facebook's data-sharing business model—which included giving apps and developers who spent money on Facebook or shared data back to

Facebook—access to *even more* consumer data. In a November 19, 2012, email to senior-level

Facebook executives entitled "Platform Model Thoughts," Zuckerberg discussed the value of

"pulling non-app friends out of friends.get"—in other words making 13

Mark Zuckerberg, *From Facebook, answering privacy concerns with new settings*, WASHINGTON

POST (May 24, 2010),

https://www.washingtonpost.com/wp-dyn/content/article/2010/05/23/AR2010052303828.html.

friends' data available only through private APIs, which would further obfuscate a developers'

ability to access data from Facebook consumers:

After thinking about platform business for a long time, I wanted to send out a note explaining where

I'm leaning on this. This isn't final and we'll have a chance to discuss this in person before we

decide this for sure, but since this is complex, I wanted to write out my thoughts. This is long, but

hopefully helpful. The quick summary is that I think we should go with full reciprocity and access

to app friends for no charge. Full reciprocity means that apps are required to give any user who

connects to FB a prominent option to share all of their social content within that service […] back to

Facebook.

[…]

[W]e're trying to enable people to share everything they want, and to do it on Facebook.

Sometimes the best way to enable people to share something is to have a developer build a special

purpose app or network for that type of content and to make that app social by having Facebook

plug into it. However, that may be good for the world but it's not good for us unless people also

share back to Facebook and that content increases the value of our network. So ultimately, I think

the purpose of platform—even the read side—is to increase sharing back into Facebook.

[…]

It seems like we need some way to fast app switch to the FB app to show a dialog on our side that lets you select which of your friends you want to invite to an app. We need to make sure this experience actually is possible to build and make as good as we want, especially on iOS where we're more constrained. We also need to figure out how we're going to charge for it. I want to make sure this is explicitly tied to pulling non-app friends out of friends.get.

[…]

What I'm assuming we'll do here is have a few basic thresholds of API usage and once you pass a threshold you either need to pay us some fixed amount to get to the next threshold or you get rate limited at the lower threshold.

[…]

Overall, I feel good about this direction. The purpose of platform is to tie the universe of all the social apps together so we can enable a lot more sharing and still remain the central social hub. I think this finds the right balance between ubiquity, reciprocity and  profit.

83. Zuckerberg's data-sharing business model underscores just how Facebook was able to get developers to use the Platform and why apps were able to amass so much Facebook consumer data: by leveraging access to friend data, Facebook's "most valuable data."

84. To carry out his business vision for Facebook, Zuckerberg oversaw changes to the Platform policies, including at the granular level of providing specific direction and assigning employees to the task. For example, in a November 19, 2012 email, Zuckerberg assigned specific employees, including former Harvard classmate Sam Lessin and longtime Facebook employee Javier Olivan, Head of International Growth, to the task of putting together a "real framework and process" for enforcement actions, giving them guidelines to create a process that is "minimally intrusive/annoying" and "as simple as we can get away with."

85. Zuckerberg also provided direct input on Facebook's internal policies relating to data sharing on the Platform, and was so involved that he personally reviewed certain applications' use of data. This was especially true for developers who Facebook deemed "competitors" and were therefore restricted from accessing certain categories of data, such as friend data, on the Platform. While making Facebook data generally available to developers was in Facebook's interests, that decision cut the other way when it came to competitors. Any

Email from Mark Zuckerberg to Sam Lessin (Nov. 19, 2012, 10:39 a.m.), available at https://dataviz.nbcnews.com/projects/20191104-facebook-leaked-documents/assets/facebook-sealed-exhibits.pdf.

16

*Id.*

17

*Id.*

18

Email from Douglas Purdy to Constantin Koumouzelis, Marie Hagman, Zhen Fang, Eddie O'Neil, and George Lee (Apr. 10, 2013, 8:25 p.m.), available at

https://dataviz.nbcnews.com/projects/20191104-facebook-leaked-documents/assets/facebook-sealed-exhibits.pdf.

25

changes on the Platform relating to these competitors would be escalated to Zuckerberg for approval and *only* permitted after his sign-off.

86.

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 93 of 102

Pg   93 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

For example, in an April 2013 email, Doug Purdy, Facebook's Director of Product Management,

discussed an internal plan to implement certain API restrictions stating,

"We maintain a small list of strategic competitors that Mark personally reviewed. Apps produced by

the companies on this list are subject to a number of restrictions outlined below. Any usage beyond

that specified is not permitted without Mark level sign-off."19

87.

Zuckerberg also instructed top-level executives to enforce Facebook's "policies against competitors

much more strongly."20 In January 2013, Zuckerberg confirmed a new Facebook policy blocking

competitors WeChat, Kakao, Line, and Google+ products from spending on ads or accessing friend

data on the Platform, noting "[t]hose companies are trying to build social networks and replace us.

The revenue is immaterial to us compared to any risk."21

88.

Similarly, in a January 24, 2013 email, Zuckerberg gave the green light to Justin Osofsky,

Facebook's former Vice President of Global Operations, to "shut down" Vine, a popular video-

sharing app's access to the "friends API"—that app was owned by Facebook's competitor Twitter,

Inc.22

19

*Id.*

20

Email from Mark Zuckerberg to Sam Lessin (Nov. 19, 2012, 10:39 a.m.), available at

https://dataviz.nbcnews.com/projects/20191104-facebook-leaked-documents/assets/facebook-

sealed-exhibits.pdf.

21

Email from Mark Zuckerberg to Javier Olivan, Sheryl Sandberg, Dan Rose, Mike Vernal, Justin

Osofsky, Elliot Schrage, Sam Lessin, et. al. (Jan. 10, 2013, 1:28 a.m.), available at

https://dataviz.nbcnews.com/projects/20191104-facebook-leaked-documents/assets/facebook-

sealed-exhibits.pdf.

22

Email from Dan Rose to Mike Vernal, Justin Osofsky, Mark Zuckerberg, Kevin Systrom, Douglas

Purdy and Dan Rose (Jan. 24, 2013, 12:21 p.m.), available at

https://dataviz.nbcnews.com/projects/20191104-facebook-leaked-documents/assets/facebook-

sealed-exhibits.pdf.


26


B.

Zuckerberg was aware of the risks posed by an "Open" Platform but failed to act 89.

Zuckerberg was personally aware of the risks that sharing consumer data with apps posed, but

actively disregarded those risks because sharing data was otherwise beneficial and lucrative to

Facebook's business model and Platform growth.

90.

Even as early as 2012, Zuckerberg was aware of potential harms that might result from sharing

consumer data. In an October 27, 2012, email concerning apps leaking personal data, Zuckerberg

stated,

I'm getting more on board with locking down some parts of platform, including friends'

data and potentially email addresses for mobile apps. I'm generally skeptical that there is as much

data leak strategic risk as you think. ***I agree there is clear risk on the advertiser side***, but I haven't

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 95 of 102

Pg   95 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

figured out how that connects to the rest of the platform. ***I think we leak info to developers***, but I

just can't think of any instances where that data has leaked from developer to developer and caused

a real issue for us.23


91.

Despite being aware of risks on the Platform, Zuckerberg failed to take the necessary steps to

protect consumer data—including the personal data of hundreds of thousands of District consumers.

92.

Just months before the Cambridge Analytica data harvest became public, Zuckerberg admitted that

his "personal challenge for 2018" was to fix abuse on the platform:

"we currently make too many errors enforcing our policies and preventing misuse of our tools."24

When details about Cambridge Analytica became public in March 2018, Zuckerberg publicly 23

Email from Mark Zuckerberg (Oct. 27, 2012, 6:06 a.m.), available at

https://dataviz.nbcnews.com/projects/20191104-facebook-leaked-documents/assets/facebook-

sealed-exhibits.pdf.

24

Mark Zuckerberg, FACEBOOK (Jan. 4, 2018),

https://www.facebook.com/zuck/posts/10104380170714571 (last visited May 20, 2022).


27

acknowledged the incident as a "breach of trust between Facebook and the people who share their

data with us and expect us to protect it."25

93. Zuckerberg's shift in tone and acknowledgment of Cambridge Analytica shows Facebook knew it could no longer hide behind its lax enforcement actions in the past. At Zuckerberg's direction, Facebook shifted to promising future improvements to the security of the Platform, thereby hoping to obscure the company's past harms and failures to adequately protect users' privacy.

94. For example, despite Facebook's ability to audit apps well before Cambridge Analytica became public in 2018, Zuckerberg vowed only after the breach became public to "conduct a full audit of any app with suspicious activity" and promised to "ban any developer from our platform that does not agree to a thorough audit."26 Zuckerberg also promised additional restrictions on developers' access to user data and additional tools to help users more easily "revoke those apps' permissions to [user] data."

95. Zuckerberg has publicly taken personal responsibility for Facebook's failures leading up the Cambridge Analytica incident as well. In April 2018 at a Congressional hearing relating to data privacy, Zuckerberg himself testified, "I started Facebook, I run it, and I'm responsible for what happens here."28 In another statement in April 2018 concerning data privacy

Mark Zuckerberg, FACEBOOK (Mar. 21, 2018),

https://www.facebook.com/zuck/posts/10104712037900071 (last visited May 20, 2022).

26

*Id.*

27

*Id.*

28

*Facebook CEO Mark Zuckerberg Hearing on Data Privacy and Protection, C-SPAN*

(Apr. 10, 2018), https://www.c-span.org/video/?443543-1/facebook-ceo-mark-zuckerberg-testifies-data-protection (complete opening statement in Senate Hearing).

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 97 of 102

Pg   97 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

28

on the Platform, Zuckerberg stated, "We didn't take a broad enough view of what our responsibility is, and that was a huge mistake. *It was my mistake.*"29

96. In sum, Zuckerberg is broadly responsible for his Platform "vision" which required implementing an open Platform and exposing consumers' personal data, was aware of the trade-off between the security of users' data and Facebook's own profits that these choices posed, and was directly responsible for Facebook's lax enforcement standards and actions.

97. As CEO, Zuckerberg had the authority to control and direct—and had knowledge of—Facebook's deceptive trade practices and misrepresentations to District consumers.

98. As such, Zuckerberg participated in, directed, managed, or otherwise knew of, and had the authority to control, Facebook's inconsistent actions regarding privacy, including deceptive trade practices, misrepresentations, and ambiguities that violate the CPPA—namely: a. Facebook's representations to consumers that Facebook would protect the privacy of consumers' personal information, when, in fact, it did not implement or maintain reasonable privacy safeguards and failed to take reasonable measures in response to the harvesting and use of data by Cambridge Analytica; b. Facebook's representations to consumers that it requires applications and third-party developers to respect the privacy of consumers' personal information, when, in fact, it did not implement or maintain reasonable oversight of third-party applications (such as conduct appropriate audits of applications); c. Facebook's representations to consumers that consumers' agreements with third-party applications will control how those applications use consumer data, when, in fact, applications were able to collect and use consumer data without regard to those agreements; d.

Facebook's failure to inform consumers, or to adequately inform consumers, that their personal

information may be shared with third-party

*Hard Questions: Q&A With Mark Zuckerberg on Protecting People's Information*, FACEBOOK

NEWSROOM (Apr. 4, 2018), https://about.fb.com/news/2018/04/hard-questions-protecting-

peoples-information/ (emphasis added).

applications without their knowledge or affirmative consent; e.

Facebook's failure to tell consumers for over two years that their personal information was

improperly harvested and sold by Kogan to Cambridge Analytica in violation of Facebook's

policies; and

f. Facebook's failure to explain to consumers how to control how information is shared with third-

party applications and how to change privacy settings with respect to applications, and its

representations that consumers can control how their information is shared.

**Count I: Violations of the Consumer Protection Procedures Act**

99. The District incorporates by reference the foregoing allegations.

100. The CPPA is a remedial statute that is to be broadly construed. It establishes an enforceable

right to truthful information from merchants about consumer goods and services that are or would

be purchased, leased, or received in the District of Columbia.

101. The services that Facebook provides consumers are for personal, household, or family

purposes and, therefore, are consumer goods and services.

102. Facebook, in the ordinary course of business, supplies consumer goods and services and,

therefore, is a merchant under the CPPA.

103. Facebook users receive consumer goods and services from Facebook in the form of social

networking services and, therefore, are consumers under the CPPA.

104. The CPPA prohibits unfair and deceptive trade practices in connection with the offer, sale, and

supply of consumer goods and services.

105. Facebook's representations to consumers, both express and implied, that it will protect the

privacy of consumers' personal information, that it requires applications and third-party developers

to respect the privacy of consumers' personal information, and that consumers'

agreement with third-party applications will control how those applications use consumer data, 30

are misrepresentations concerning material facts that have a tendency to mislead consumers and are

unfair and deceptive trade practices that violate the CPPA, D.C. Code § 28-3904(e).

106. Facebook's failure to disclose, or failure to adequately disclose, to consumers that their

personal information may be shared with third-party applications without their knowledge or

affirmative consent, is a material fact, the omission of which tended to mislead consumers and are

unfair and deceptive trade practices that violate the CPPA, D.C. Code § 28-3904(f).

107. Facebook's failure to disclose, or failure to adequately disclose, to consumers that their

personal information was improperly harvested and used by third-party applications and others in

violation of Facebook's policies, such as in the Kogan and Cambridge Analytica example, is a

material fact, the omission of which tended to mislead consumers and are unfair and deceptive trade

practices that violate the CPPA, D.C. Code § 28-3904(f).

108. Facebook's failure to explain to consumers how to control how information is shared with

third-party applications and how to change privacy settings with respect to applications, as well as

its representations to consumers, both express and implied, that it will protect the privacy of

Case 3:22-cv-01107-WHA   Document 36   Filed 06/03/22   Page 100 of 102

Pg   100 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –
NorCal 9th District - CASE NO.: 22-cv-1107-TSH

consumers' personal information, that it requires applications and third-party developers to respect

the privacy of consumers' personal information, and that consumers'

agreement with third-party applications will control how those applications use consumer data,

constitute ambiguities as to material facts that have the tendency to mislead consumers and are

unfair and deceptive trade practices that violate the CPPA, D.C. Code § 28-3904(f-1).

109. At all times relevant to this Complaint, Defendant Mark Zuckerberg (i) was aware or should

have been aware of Facebook's data-sharing policy terms; (ii) possessed and/or exercised the

authority to control the policies and practices of Facebook, Inc.; (iii) was responsible for creating

and implementing the deceptive policies and trade practices of

Facebook, Inc. that are described in this Complaint; (iv) participated in the deceptive trade practices

that are described in this Complaint; (v); directed, managed, or supervised, those employees at

Facebook, Inc. who participated in the deceptive trade practices described in this Complaint; and

(vi) knew or should have known of the deceptive trade practices that are described in this Complaint

and had the power to stop them, but did not.

**The DC District Court asked for:** *"... District of Columbia respectfully requests this Court enter a*

*judgment in its favor and grant relief against Defendant Mark Zuckerberg as follows: (a)*

*Permanently enjoin Defendant, pursuant to D.C. Code § 28-3909(a), from violating the CPPA; (b)*

*Order Defendant to pay restitution or damages pursuant to D.C. Code § 28-3909; (c) Award civil*

*penalties in an amount to be proven at trial and as authorized per violation of the CPPA pursuant*

*to D.C. Code § 28-3909(b); (d) Award the District the costs of this action and reasonable attorneys'*

*fees pursuant to D.C. Code § 28-3909(b); and (e) grant such further relief as the Court deems just*

*and proper.*

Plaintiff has provided vast volumes of evidence, some of which was provided by FBI, NSA, CIA,

DOJ, FTC, SEC, IG and other officials, proving that vast corruption exists in government agencies;

that said corruption is coordinated as a criminal 'enterprise', and that the force of those corrupt

officials had the means, incentive, history, tools and standard operating procedure of attacking and

harming Plaintiff.

Many additional documents prove that Facebook and various government agency work together via

the agencies turning a blind eye to Facebook's crimes and the agencies assisting Facebook with

those crimes and illicit deeds because agency bosses profit from *** FACEBOOK ***.

The USPTO, DOJ, DOE, EPA and other agencies used their resources to harm Plaintiff in order to

avenge and/or stop competition. The executives and judiciary of government agencies own and

party with the very offices which harmed Plaintiff and benefit from those harms and business

blockades against Plaintiff.


DATED this day of the filing of 2022

Respectfully submitted,


(SIGNED ELECTRONICALLY)
**Name: SD Redmond**
**Address: 210 S. Ellsworth Ave, #1275**
**San Mateo, CA 94401**
**Phone Number: 510-868-2862**
**E-mail Address: justice@majestic111.com**
***Pro Se – A federal witness***


EXHIBITS AND PROOFS ARE PROVIDED AS SEPARATE NUMBERED DOCUMENTS

(PAGES PAST THIS SENTENCE ARE INTENTIONALLY BLANK)

Pg   102 of 102,  EXHIBIT - GOVT INSIDERS ATTACKING PLAINTIFF  - 6.2.22  - 6.2.22 –

NorCal 9th District - CASE NO.: 22-cv-1107-TSH

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28